UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

———————————————— x

ROBERT BLUE, Individually and on Behalf      :      Civil Action No. 3:14-cv-01393-GAG
of All Others Similarly Situated,            :
                                             :      CLASS ACTION
                    Plaintiff,               :
                                             :      CONSOLIDATED AMENDED
          vs.                                :      COMPLAINT FOR VIOLATIONS OF THE
                                             :      FEDERAL SECURITIES LAWS
DORAL FINANCIAL CORPORATION,                 :
GLENN R. WAKEMAN, ROBERT E.                  :
WAHLMAN, PENKO IVANOV, DAVID                 :
HOOSTON, ENRIQUE R. UBARRI-                  :
BARAGANO and CHRISTOPHER C.                  :
POULTON,                                     :
                                             :      DEMAND FOR JURY TRIAL
                    Defendants.              :
                                             :
———————————————— x

Lead Plaintiffs Jensine Andresen, Ken M. Nimmons and Mordechai Hakim ("Lead Plaintiffs" or "Plaintiffs"), by their undersigned attorneys, make the allegations set forth herein based upon knowledge as to their own acts and upon the investigation conducted by Lead Plaintiffs' counsel.  The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by Doral Financial Corporation ("Doral" or the "Company"), regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, interviews with former employees of the Company, conversations with industry experts, and public filings in the action captioned *Doral Financial Corp., et. al. v. Estado Libre Asociado de Puerto Rico, et. al*., K AC2014 0533, filed in the Civil Court of First Instance, San Juan Superior Division.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of purchasers of the common stock of Doral between April 2, 2012 and May 1, 2014, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      Defendant Doral is the holding company for Doral Bank ("Doral Bank" or the "Bank"), through which it engages in retail and investment banking activities, primarily in Puerto Rico.

3.      In the years leading up to the Class Period, Doral's operations were in disarray and the Company was struggling to regain profitability following a massive restatement, announced in February 2006, stemming from phony mortgage "sales" between it and, among others, First BanCorp, which settled a securities fraud lawsuit arising out of those transactions

for $74.25 million.   During the Class Period, Defendants represented that Doral had changed its ways and was "well positioned" and "on a solid course."

4.      In fact, Defendants publicly stated that the amount of capital that the Company and the Bank were required to maintain was adequate.  Unbeknownst to investors, however, and as described by several high-level former employees of Doral, Defendants were able to achieve the reported capital ratios, in part, by understating Doral's allowance for loan and lease losses ("ALLL").  ALLL represents a reserve that banks are required to maintain for impaired loans (or leases) – and is a critical accounting metric.  Closely related to ALLL is the associated provision for loan and lease losses ("PLLL"), which takes the form of a charge against earnings, and is assessed on a quarterly basis, in order to maintain the ALLL at an appropriate level.

5.      On August 8, 2012, Doral announced that the Bank had entered into a consent order with its regulators (the "Consent Order"), which required the Bank to implement: (i) a comprehensive ALLL policy and methodology; (ii) an independent loan review program; and (iii) a revised appraisal compliance program.  These directives indicate that the Bank previously lacked adequate policies pertaining to its ALLL, as well as the loan review and appraisal programs from which the ALLL was derived.  The Consent Order also required the Bank to maintain a higher amount of capital than was otherwise necessary under applicable regulations.

6.      The requirements set forth in the Consent Order assured investors that Doral and the Bank thereafter would take measures to strengthen the Company's ALLL policy and methodology.  Indeed, Defendants repeatedly assured investors throughout the Class Period that the Company was in compliance with the terms of the Consent Order and other regulatory requirements.  Far from complying with the Consent Order, however, former Doral employees described how Defendants continued to understate the Company's ALLL, and concealed

- 2 -

numerous problems with loan review, appraisals, and the ALLL model itself, all of which undermined the accuracy of Doral's ALLL. All the while, Defendants repeatedly described Doral's ALLL as the product of "conservative standards" and providing "strong coverage" for probable losses.

7.      In addition to artificially inflating Doral's capital by understating the Company's ALLL, Defendants failed to disclose the known, material risk that the largest single component of the Company's capital, a $229,884,087 purported tax receivable (the "Tax Receivable") from the Puerto Rico Treasury Department (the "Treasury Department"), was at risk of non-payment – a fact which Defendants knew as a result of their regular communications with representatives from the Treasury Department throughout the Class Period. Instead of adequately disclosing this risk, Defendants continuously highlighted that Doral was entitled to a "refund" of "prepaid tax[es]," and that the Treasury Department was "obligat[ed] to return the overpayments to Doral" – even though Defendants knew or recklessly disregarded that the Treasury Department would claim that the Tax Receivable was obtained through misrepresentations by Doral, and that the Company did not actually overpay taxes in the amount claimed.

8.      On March 18, 2014, investors began to discover that the problems with the accuracy of Doral's ALLL were more significant than previously disclosed, and that Doral had not adequately addressed its ALLL-related problems following the Consent Order. On that date, Doral announced that it would not be able to timely file its 2013 financial results due to "a material weakness in [the Company's] internal control over financial reporting . . . related to the review of the underlying data and mathematical model supporting its [ALLL]," and that Doral's "internal control over financial reporting and disclosure controls and procedures were ineffective[.]"

- 3 -

9.      Investors' concerns were confirmed on March 21, 2014, when Defendants revealed in a press release and Form 10-K that the "material weakness in [Doral's] internal control over financial reporting" had "resulted in the Company's understatement of the [ALLL]," and Defendants had been forced to "revise" Doral's previously-reported financial statements for the third quarter of 2013 to increase the provision for loan losses for the quarter by $7.2 million. As a result: (i) Doral's third quarter PLLL was retroactively increased from the previously-reported amount of $16.4 million, to $23.6 million; and (ii) the Company's third quarter net loss was retroactively increased from the previously-reported amount of $7.5 million, to $14.7 million.  Since that time, Doral has not filed *any* financial statements with the SEC, leaving investors in the dark about the magnitude and scope of the problems associated with the ALLL.

10.      In response to the disclosures that Doral had understated its ALLL and needed to make a substantial out-of-period increase to its PLLL, thereby increasing its third quarter 2013 net loss, continued to suffer from widespread internal control deficiencies, and had not addressed the problems with its ALLL policy and methodology as required by the Consent Order, the price of Doral common stock fell a total of 25.6% over the next week, as the market digested these adverse announcements.  However, Defendants' simultaneous assurances about the adequacy of the Company's capital prevented a more substantial decline in Doral's stock price at that time.

11.      On April 15, 2014, the risk that the Treasury Department would seek to void the Tax Receivable finally materialized, when Doral received a letter from the Treasury Department questioning the validity of the purported receivable and requesting that Doral provide information demonstrating that it actually had overpaid taxes and was entitled to the Tax Receivable.

12.     Recognizing that their scheme of inflating Doral's capital levels by understating the Company's ALLL would no longer be enough to comply with the capital requirements of the Consent Order, Defendants disclosed the receipt of the letter on May 1, 2014.  Defendants further disclosed that the Federal Deposit Insurance Corporation (the "FDIC") had informed Doral that it could not include the Tax Receivable in its capital, which meant that Doral Bank was "no longer . . . in compliance with its capital requirements under its Consent Order[.]"  As a result of the Bank's capital shortfall: (i) the FDIC would not grant the Bank waivers to accept brokered deposits – an important source of liquidity; and (ii) the Bank was required to either regain compliance with the Consent Order, or submit to the FDIC a contingency plan for the sale, merger, or liquidation of the Bank.

13.     After investors received this news, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014 – a decline of more than 90% from the stock's Class Period high.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

16.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Doral is headquartered in this District and many of the acts and practices complained of herein, including the preparation and dissemination of materially false and misleading information,  occurred in substantial part in this District.

17.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities market.

## PARTIES

18.    Lead Plaintiffs purchased Doral common stock during the Class Period, as set forth in the certifications previously filed with the Court and incorporated by reference herein, and have been damaged thereby.

19.    Defendant Doral, headquartered in San Juan, Puerto Rico, operates as the bank holding company for Doral Bank, which provides retail banking services to the general public and institutions, primarily in Puerto Rico.  Doral's common stock was listed and traded on the NYSE, an efficient market, throughout the Class Period under the ticker symbol "DRL."  As of April 30, 2014, Doral had more than 6.6 million shares of common stock issued and outstanding.[1]

20.    Defendant Glen R. Wakeman ("Wakeman") is, and was throughout the Class Period, Doral's Chief Executive Officer ("CEO"), President and a Director of the Bank.

21.    Defendant Robert E. Wahlman ("Wahlman") served as Doral's Chief Financial Officer ("CFO"), Chief Investment Officer, Chief Accounting Officer, an Executive Vice President, and a Director of the Bank during the Class Period.  In addition, Wahlman served as Chief Accounting Officer during the Class Period, until September 20, 2012.  On March 13,

---

[1]    On June 28, 2013, after the close of trading, Doral effectuated a 1-for-20 reverse stock split of its common shares.  Unless otherwise indicated, common stock prices are presented in split-adjusted prices, while daily trading volumes are presented as the actual number of shares traded that day.

2013, Doral announced that Wahlman was resigning from his corporate positions, effective May 17, 2014.

22.    Defendant Penko Ivanov ("Ivanov") served as Doral's Interim CFO between May 17, 2013 and October 3, 2013.

23.    Defendant David E. Hooston ("Hooston") joined Doral as Executive Vice President of Finance on July 1, 2013, pending regulatory approval of his appointment as permanent CFO.  Effective October 3, 2013, Defendant Hooston was appointed CFO and an Executive Vice President.  On October 6, 2014, after the end of the Class Period, Doral announced that Hooston had been placed on "paid administrative leave."

24.    Defendant Enrique R. Ubarri-Baragano ("Ubarri") is, and was throughout the Class Period, Doral's Chief Compliance Officer, General Legal Counsel and an Executive Vice President.

25.    Defendant Christopher C. Poulton ("Poulton") is, and was throughout the Class Period, Doral's Chief Business Development Officer and an Executive Vice President.

26.    Defendants Wakeman, Wahlman, Ivanov, Hooston, Ubarri and Poulton are collectively referred to herein as the "Individual Defendants" and, together with Doral, as "Defendants."

## CLASS ACTION ALLEGATIONS

27.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Doral between April 2, 2012 and May 1, 2014, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

- 7 -

28.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Doral common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Doral and/or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, management and/or operations of Doral;

- 8 -

(c)     whether the price of Doral common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FORMER EMPLOYEES**

33.     The allegations made herein are further supported by the first-hand knowledge of four former employees ("FEs").  As detailed below, these former employees have direct knowledge about Doral's business prior to and during the Class Period and served in positions at Doral that provided them with access to the information they are alleged to possess.

34.     FE1 was Doral's Principal Accounting Officer and a Senior Vice President from September 2011 through March 15, 2012.  FE1 reported directly to Defendant Wahlman and regularly attended meetings with other Doral executives, including the Individual Defendants.

35.     FE2 is a former Vice President who worked at Doral from August 2012 through April 2014, and was involved with Doral's financial reporting and regulatory compliance.  FE2's responsibilities included, among other things, assisting in the preparation of SEC filings, regulatory reports, and reports provided to the Company's executive management, including the Individual Defendants.  FE2 reported directly to Doral's Principal Accounting Officer, a position

held by Nancy Reinhard (who is presently Doral's acting CFO) from September 20, 2012 though the end of the Class Period.

36.     FE3 was employed by Doral as a Senior Credit Risk Analyst from September 2012 through July 2013.  FE3 aided in the creation of presentations made on a monthly and quarterly basis to Doral's Board of Directors, as well for Doral's Risk Policy Committee and the ALLL Committee.

37.     FE4 worked at Doral as a Vice President of Commercial Administration from approximately June 2012 until August 2013.  In that position, FE4 was responsible for, among other things, updating policies and procedures related to Doral's commercial real estate business.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

38.      Defendant Doral was founded in 1972 and is based in San Juan, Puerto Rico. Doral describes itself as a diversified financial services company engaged in banking, mortgage banking, investment banking activities, institutional securities and insurance agency operations.

39.     Prior to January 1, 2013, Doral organized its operations into four business segments: Puerto Rico, United States, Liquidating Operations, and Treasury.   Effective January 1, 2013, Doral redefined its operating segments and reorganized its banking operations into two units: (i) Doral Growth, comprised of the Bank's profitable mortgage and commercial banking operations; and (ii) Doral Recovery, comprised of the Bank's non-performing assets. The Company now manages its operations through five business segments: Puerto Rico Growth, United States, Recovery, Treasury, and Corporate.

40.     Through the Bank, Doral provides retail banking services to the general public and institutions.  As of December 31, 2013, the Bank operated a network of 22 branches located in Puerto Rico and 8 branches located in New York and Florida.

41.     The Bank engages in consumer lending, including residential mortgage lending and consumer loans; and commercial lending, including commercial real estate, commercial and industrial, and construction and land.  As of December 31, 2013, the Bank's consumer loan portfolio totaled $2.7 billion, or 44.77%, of its loans receivable portfolio, while its commercial loan portfolio totaled $3.3 billion, or 55.23%, of its loans receivable portfolio.

42.     The Bank's lending activities in Puerto Rico are focused on the origination of residential mortgage loans.  The U.S. operations of the Bank also engage in the mortgage banking business in the New York City metropolitan area and purchase assigned interests in senior credit facilities.  The Bank also offers deposit products and other retail banking services; engages in mortgage loan servicing; and sells or securitizes a portion of the residential mortgage loans it originates.  Through its subsidiary Doral Insurance Agency, Doral also offers property, casualty, life, and title insurance products primarily to its mortgage loan customers.

### The Adequacy of Doral's Regulatory Capital Was and Is Highly Material to Its Business and Operations

43.     As a bank holding company, Doral is subject to supervision and examination by federal and local banking regulators, including the FDIC, the Federal Reserve Bank of New York (the "FRBNY"), and the Office of the Commissioner of Financial Institutions of Puerto Rico (the "PR Commissioner").  These agencies have the authority to assess civil money penalties, issue cease and desist orders, and initiate injunctive actions against banking organizations for violations of laws and regulations and unsafe or unsound banking practices.

44.     Under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), federal banking regulators must take "prompt corrective action" with respect to banks that do not meet minimum capital requirements.

45.     The relevant capital metrics are the "Total Risk-Based Capital Ratio," the "Tier 1 Risk-Based Capital Ratio," and the "Tier 1 Leverage Ratio."[2]

46.     At least half of a bank's Total Risk-Based Capital must be comprised of Tier 1 Capital, which may include common equity, retained earnings, minority interests in unconsolidated subsidiaries, noncumulative perpetual preferred stock and a limited amount of cumulative perpetual preferred stock (in the case of a bank holding company), minus goodwill and certain other intangible assets.  The remainder may consist of Tier 2 Capital, which may include a limited amount of subordinated debt, other preferred stock, certain other instruments and a limited amount of loan and lease loss reserves.

47.     A bank's Total Risk-Based Capital Ratio is derived by taking the sum of its Tier 1 and Tier 2 Capital, and dividing it by all of the bank's assets, weighted by credit risk.  A bank's Tier 1 Risk-Based Capital Ratio is derived by dividing its Tier 1 Capital by all of the bank's assets, weighted by credit risk.  In computing total risk-weighted assets, a bank's assets are given risk-weightings ranging from 0% for the least risky assets (such as obligations backed by the full faith and credit of the U.S. Government), to 200% for the riskiest assets (such as non-investment grade mortgage-backed securities).

48.     Finally, a bank's Tier 1 Leverage Ratio is the ratio of its Tier 1 Capital to total assets, minus goodwill and certain other intangible assets.

---

[2]     The "Total Risk-Based Capital Ratio" and the "Tier 1 Risk-Based Capital Ratio are sometimes referred to herein as the "Total Capital Ratio" and the "Tier 1 Capital Ratio," respectively.  The "Tier 1 Leverage Ratio" is sometimes referred to herein as the "Tier 1 Capital Leverage Ratio."

49.     The FDICIA establishes five capital tiers: "well-capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized."

50.     A bank is considered to be: (1) "well-capitalized" if it maintains a Tier 1 Leverage Ratio of at least 5%, a Tier 1 Risk-Based Capital Ratio of at least 6% and a Total Risk-Based Capital Ratio of at least 10%, and is not subject to any written agreement or regulatory directive to meet a specific capital level; (2) "adequately capitalized" if it is not well-capitalized but maintains a Tier 1 Leverage Ratio of at least 4% (or at least 3% if given the highest regulatory rating and not experiencing or anticipating significant growth), a Tier l Risk-Based Capital Ratio of at least 4% and a Total Risk-Based Capital Ratio of at least 8%; (3) "undercapitalized" if it fails to meet the standards for adequately capitalized institutions (unless it is deemed to be significantly or critically undercapitalized); (4) "significantly undercapitalized" if it has a Tier 1 Leverage Ratio of less than 3%, a Tier 1 Risk-Based Capital Ratio of less than 3% or a Total Risk-Based Capital Ratio of less than 6%; and (5) "critically undercapitalized" if it has tangible equity equal to 2% or less of total assets.

51.     As discussed herein, the Consent Order required that Doral Bank maintain even higher capital ratios than those necessary for an institution to qualify as "well-capitalized," specifically mandating a Tier 1 Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10%, and a Total Risk-Based Capital Ratio of at least 12%.

52.     The FDICIA generally prohibits a bank from making any capital distribution or paying a dividend or management fee to its holding company if the bank would thereafter be undercapitalized.  Undercapitalized banks are also subject to growth limitations and restrictions on borrowing from the Federal Reserve System, and are required to submit capital restoration

plans to federal banking regulators.  If a bank fails to timely submit an acceptable plan, it is treated as if it were significantly undercapitalized.  Significantly undercapitalized banks may be subject to a number of requirements and restrictions, including orders to sell sufficient voting stock to become adequately capitalized, orders to reduce total assets and orders to cease the receipt of deposits.  Critically undercapitalized banks are subject to appointment of a receiver or conservator.

53.     In addition, banks that are not well-capitalized are prohibited from accepting new brokered deposits in the absence of a waiver from the FDIC, and are prohibited from paying attractive interest rates on the brokered deposits they currently hold.

54.     Brokered deposits, which include certificates of deposit and money market deposits, are defined as any deposit with an interest rate of more than 75 basis points above prevailing market rates.  Investors find brokered deposits attractive because they typically offer a higher rate of return.

55.     Under FDIC regulations adopted pursuant to the FDICIA, a bank cannot accept, roll over or renew brokered deposits unless: (i) it is well-capitalized; or (ii) it is adequately capitalized and receives a waiver from the FDIC.  Even with such a waiver, a bank that is merely adequately capitalized may not pay an interest rate on any brokered deposits in excess of 75 basis points above prevailing market rates.  By contrast, there are no such restrictions on a bank that is well-capitalized.

56.     Aside from deriving a significant amount of interest income from brokered deposits, during the relevant time period herein, Doral Bank used brokered deposits as a source of long-term funds.  As such, the Bank's liquidity relied (and continues to rely) in part on

brokered deposits.  At the end of fiscal years 2011, 2012 and 2013, Doral Bank held a total of

approximately $2.2 billion, $2 billion, and $1.4 billion worth of brokered deposits, respectively.

**Doral Was and Is Required to Maintain an Adequate
Allowance for Loan and Lease Losses**

57.     Pursuant to Generally Accepted Accounting Principles ("GAAP"), Doral was, at

all times relevant herein, and is required to maintain an allowance for impaired loans and leases

to reflect the difference, if any, between the principal balance of the loan (or lease) and the

present value of projected cash flows, observable fair value, or collateral value.  An impaired

loan is a loan for which it is probable that the lender will not collect all amounts due under the

contractual terms of the loan.  An allowance for loan and lease losses (sometimes referred to

herein as ALLL) is established and maintained via a provision for loan and lease losses

(sometimes referred to herein as PLLL), in the form of a charge against earnings.

58.     In light of the critical importance of ALLL to a lending institution's financial

statements, on December 13, 2006, the FDIC and the Board of Governors of the Federal Reserve

System, together with other banking regulators, jointly issued an *Interagency Policy Statement

on the Allowance for Loan and Lease Losses*, which stated, in part, that:

> The ***ALLL represents one of the most significant estimates in an institution's
> financial statements*** and regulatory reports.[3]  ***Because of its significance, each
> institution has a responsibility for developing, maintaining, and documenting a
> comprehensive, systematic, and consistently applied process for determining the
> amounts of the ALLL and the provision for loan and lease losses (PLLL)***.  To
> fulfill this responsibility, ***each institution should ensure controls are in place to
> consistently determine the ALLL in accordance with GAAP***, the institution's
> stated policies and procedures, management's best judgment and relevant
> supervisory guidance.
>
> ***As of the end of each quarter, or more frequently if warranted, each institution
> must analyze the collectability of its loans and leases held for investment* . . .
> *and maintain an ALLL at a level that is appropriate and determined in***

---

[3]     All emphasis in quotations is added, unless otherwise noted.

***accordance with GAAP***.  An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio.

[Footnotes omitted.]

59.     As discussed below in ¶71 and ¶77, the Consent Order and the Written Agreement (defined below) both specifically mandated that Doral comply with the above edict.

60.     GAAP provides that collateral dependent loans meeting the criteria for impairment are to be measured based on the fair value of the loan's collateral.  *See, e.g.*, Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topics 310 and 450.

61.     During the Class Period, Defendants falsely represented that Doral's policy of calculating and accounting for its ALLL was consistent with the requirements of GAAP.  For example, Doral's annual report on Form 10-K for the year ended December 31, 2012 (the "2012 10-K") stated, in pertinent part:

> The Company maintains an allowance for loan and lease losses to absorb probable credit-related losses inherent in the portfolio of loans receivable as of each balance sheet date.  The allowance . . . consists of specific and general components based on the Company's assessment of default probabilities, internal risk ratings (based on borrowers' financial stability, external credit ratings, management strength, earnings and operating environment), probable loss and recovery rates, and the degree of risk inherent in the loans receivable portfolio. ***The allowance is maintained at a level that the Company considers appropriate to absorb probable losses***.
>
> ***Loans or portions of loans estimated by management to be uncollectible are charged to the allowance for loan and lease losses***.  Recoveries on loans previously charged-off are credited to the allowance.  ***Provisions for loan and lease losses are charged to expenses and credited to the ALLL in amounts estimated by management based upon its evaluation of the known and inherent risks in the loan portfolio***.

62.     The 2012 10-K further falsely represented the manner in which Defendants monitored Doral's loan portfolio and evaluated the adequacy of the ALLL:

The Company estimates and records its ALLL on a quarterly basis. Management estimates the ALLL separately for each product and geography, and combines the amounts in reaching its estimate for the full portfolio. ALLL includes both unimpaired and impaired loans, but excludes loans that are carried at fair value, or subject to lower of cost or market . . . . ***On an ongoing basis, management monitors the loan portfolio and evaluates the adequacy of the ALLL***. In determining the adequacy of the ALLL, management considers such factors as default probabilities, internal risk ratings, probable loss and recovery rates, cash flow forecasts and the degree of risk inherent in the loan portfolios.

63.     Similarly, the 2012 10-K falsely described the criteria Defendants used to estimate the ALLL:

Management's loss reserve estimate for performing loans is assessed based upon: (i) the probability of the performing loan defaulting at some future period; (ii) the likelihood of the loan curing or resuming payment versus the likelihood of the collateral being foreclosed upon and sold or a short sale; and (iii) Doral's historical experience of recoveries on sale of OREO [*i.e.*, other real estate owned, or lender owned] related to the contractual principal balance at the time the collateral is repossessed.

\*       \*       \*

For non-performing loans, the reserve is estimated either by: (i) considering the loans' current level of delinquency and the probability that the loan will be foreclosed upon from that delinquency stage, and the loss that will be realized assuming foreclosure (mortgage loans); (ii) considering the loans' book value less discounted forecasted cash flows; or (iii) measuring impairment for individual loans considering the specific facts and circumstances of the borrower, guarantors, collateral, legal matters, market matters, and other circumstances that may affect the borrower's ability to repay their loan, Doral's ability to repossess and liquidate the collateral, and Doral's ability to pursue and enforce any deficiency amount to be collected.

\*       \*       \*

In accordance with current accounting guidance, loans determined to be TDRs [*i.e.*, troubled debt restructurings] are considered to be impaired for purposes of estimating the ALLL and when being evaluated for impairment.

64.     The 2012 10-K also falsely represented how and when Doral would charge-off loans:

- 17 -

Doral charges loans off when it is determined that the likelihood of collecting the amount is reduced to a level that the continuation of their recognition as an asset is not warranted.

65.     Moreover, the 2012 10-K misrepresented how Doral established reserves for impaired loans:

An allowance reserve is established for individually impaired loans.  The impairment loss measurement, if any, on each individual loan identified as impaired is generally measured based on the present value of expected cash flows discounted at the loan's effective interest rate. . . . If foreclosure is probable, the Company is required to measure impairment based on the fair value of the collateral.  The fair value of the collateral is generally obtained from appraisals . . . .  In the event that appraisals show a deficiency, the Company includes the deficiency in its loss reserve estimate.

66.     Defendants repeated these statements, and made similar statements concerning Doral's ALLL, in the Company's quarterly and annual financial reports filed with the SEC throughout the Class Period.

### The Consent Order and Written Agreement Required Doral to Maintain Adequate Regulatory Capital and an Adequate Allowance for Loan and Lease Losses

67.     On April 2, 2012, the first day of the Class Period, the FDIC notified Doral that it considered the Bank to be in "troubled condition."  Doral did not publicly disclose this until approximately four months later, when on August 8, 2012, it announced that the Bank had entered into the Consent Order with the FDIC and the PR Commissioner.

68.     Among other things, the Consent Order required Doral to submit a capital plan within 60 days detailing the manner in which the Bank would maintain a *Tier 1 Leverage Ratio of at least 8%; a Tier 1 Risk-Based Capital Ratio of at least 10%; and a Total Risk-Based Capital Ratio of at least 12%* – compared to the 5% Tier 1 Leverage Ratio, 6% Tier 1 Risk-Based Capital Ratio and 10% Total Risk-Based Capital Ratio required for a bank to be considered well-capitalized under the FDICIA.

- 18 -

69.     The Consent Order also provided that Doral Bank was required to obtain a waiver from the FDIC before accepting, renewing or rolling over brokered deposits.

70.     In addition, the Consent Order required Doral Bank to:

- immediately notify the FDIC Regional Director and the PR Commissioner in the event any capital ratio falls below the minimum required by the approved capital plan, and within 60 days thereafter either: (i) increase capital in an amount sufficient to comply with the capital ratios as set forth in the approved Capital Plan; or (ii) submit to the FDIC Regional Director and the PR Commissioner a Contingency Plan for the sale, merger, or liquidation of the Bank in the event the primary sources of capital are not available within 120 days.

- establish plans, policies and procedures acceptable to the FDIC and the PR Commissioner relating to the Bank's capital, profit and budget plan *(including establishing specific goals to maintain appropriate provisions to the ALLL), ALLL,* loan policy, *loan review program,* loan modification program, *appraisal compliance program* and strategic plan that comply with the requirements set forth in the Consent Order;

- eliminate from its books, by charge-off or collection, all assets or portions of assets classified as a "loss" by the FDIC and the PR Commissioner;

- establish and provide to the FDIC and the PR Commissioner a plan to reduce Doral Bank's risk position in each loan in excess of $1 million that is: (i) more than 90 days delinquent, or (ii) classified "Substandard" or "Doubtful" in a report of examination by the FDIC and the PR Commissioner;

- retain qualified management acceptable to the FDIC;

- undertake, through a third party consultant, an assessment of its board and management;

- refrain from extending credit to certain delinquent borrowers;

- refrain from declaring a dividend without the prior written consent of the Regional Director of the FDIC and the PR Commissioner;

- obtain approval prior to the appointment of a new director or senior executive officer of Doral or the Bank, any change in a senior executive officer's responsibilities, or the making of severance or indemnification payments to directors, executive officers or other affiliated persons;

- establish a compliance committee to monitor and ensure the Bank's compliance with the Consent Order;

- 19 -

- provide quarterly updates to the Regional Director of the FDIC and the PR Commissioner on the Bank's compliance with the Consent Order; and

- take all steps necessary, consistent with the Consent Order and safe and sound banking practices, to eliminate, correct and prevent unsafe or unsound banking practices, violations of law or regulation, and all contraventions of regulatory policies or guidelines cited in the current Report of Examination.

71.     In particular, with respect to the ALLL, the Consent Order required the Bank to develop and thereafter implement "*a comprehensive policy and methodology for determining the allowance for loan and lease losses ('ALLL Policy')*."   The Consent Order stated, in pertinent part:

> The ALLL Policy shall provide for a review of the ALLL at least once each calendar quarter.  Said review should be completed at least 7 days prior to the end of each calendar quarter in order that the results of the review conducted by the Board may be properly reported in the quarterly Consolidated Reports of Condition and Income ("Call Report").

> *Such reviews shall, at a minimum, be made in accordance with*: (i) [FASB] ASC 310-40 and FASB ASC 310-10-35-2 through 30; (ii) the FFIEC's Instructions for the Call Report; (iii) *the Interagency Statement of Policy on the Allowance for Loan and Lease Losses* (FIL-105-206, issued December 13, 2006); (iv) other applicable regulatory guidance that addresses the appropriateness of the Bank's ALLL; and (v) any analysis of the Bank's ALLL provided by the FDIC.

> (b) Such reviews shall include, at a minimum: (i) the Bank's loan loss experience; (ii) an estimate of the potential loss exposure in the Bank's loan portfolio; and (iii) trends of delinquent and nonaccrual loans and prevailing and prospective economic conditions.

> (c) The minutes of the Board meetings at which such reviews are undertaken shall include complete details of the reviews and the resulting recommended adjustment in the ALLL.  The Board shall document in the minutes the basis for any determination not to require provisions for loan losses in accordance with subparagraphs (a) and (b).

> *            *            *

> (e) *A deficiency in the ALLL shall be remedied in the calendar quarter in which it is discovered by a charge to current operating earnings prior to any Tier 1 capital determinations* required by [the Consent Order] and prior to the Bank's

submission of its Call Report.  The Bank shall thereafter maintain an appropriate ALLL.

(f) The analysis supporting the determination of the adequacy of the ALLL shall be submitted to the Regional Director and the Commissioner. . . . In the event that the Regional Director or the Commissioner determines that the Bank's ALLL is inadequate, the Bank shall increase its ALLL and amend its Call Reports accordingly.

72.     In addition, the Consent Order required the Bank to: (i) "***establish a program of independent loan review*** that will provide for a periodic review of the Bank's loan portfolio and the identification and categorization of problem credits"; and (ii) among other things, implement "a mechanism for reporting . . . no . . . less than quarterly, the information developed" through the loan review program "to the Board."

73.     The requirement that the Bank establish an adequate, independent loan review program (from which the ALLL is derived) and ensure that loan review information reached the Board assured investors that Defendants would implement measures to make sure that Doral maintained an adequate ALLL.

74.     The Consent Order also required the Bank to "***revise its appraisal compliance program, including enhancing the Bank's appraisal policy*** to capture risk management and internal controls that ensure that appraisals are obtained in a timely manner . . . and that appraisals contain appropriate valuation approaches to support assigned values" – which likewise assured investors that Defendants would implement measures to make sure that Doral maintained an adequate ALLL.

75.     Then, on September 13, 2012, Doral announced that on September 11, 2012, the Company had entered into a written agreement with the FRBNY (the "Written Agreement"). The Written Agreement, which was signed by Defendant Wakeman, replaced and superseded an

existing cease and desist order entered into with the Board of Governors of the Federal Reserve System on March 16, 2006.

76.    The Written Agreement imposed operational restrictions and regulatory requirements on Doral similar to those imposed by the Consent Order applicable to the Bank. Among other things, the Written Agreement also required that Doral:

- *submit to the FRBNY an acceptable written plan to maintain sufficient capital at Doral* on a consolidated basis, including maintaining compliance with the capital adequacy guidelines for the Bank issued by the FDIC, and which takes into account, *inter alia*, *the adequacy of the Bank's ALLL*;

- establish programs, policies and procedures acceptable to the FRBNY relating to credit risk management practices, credit administration (*including developing procedures to ensure that appraisals conform to accepted standards and developing enhanced appraisal review procedures to ensure the quality and timeliness of appraisals*), loan grading (*including developing standards and criteria for assessing the credit quality of loans*), asset improvement, other real estate owned, *allowance for loan and lease losses*, internal audit, and *accounting and internal controls* (including taking necessary actions to ensure that accounting and financial reporting functions are staffed by qualified personnel and that management and the board receive timely and accurate reports necessary to correct weaknesses and deficiencies associated with accounting and financial reporting);

- take appropriate steps to fully utilize its financial and managerial resources to serve as a source of strength to Doral Bank, including steps to ensure that Doral Bank complies with any supervisory action taken by the Bank's federal and state regulators; and

- provide quarterly progress reports to the FRBNY on Doral's compliance with the Written Agreement.

77.    Similar to the Consent Order, the Written Agreement required Doral to "establish an [ALLL] methodology . . . consistent with relevant supervisory guidance, including the Interagency Policy Statements on the Allowance for Loan and Lease Losses, dated . . . December 13, 2006" and "submit to the [FRBNY] an acceptable written program for maintenance of an adequate ALLL[,]" and further stated, in pertinent part:

[10. (c)] . . . ***The program shall include policies and procedures to ensure adherence to the ALLL methodology and provide for periodic reviews and updates to the ALLL methodology***, as appropriate.   The program shall also provide for a review of the ALLL by the board of directors on at least a quarterly calendar basis.  ***Any deficiency found in the ALLL shall be remedied in the quarter it is discovered, prior to the filing of any required regulatory reports, by additional provisions***.   The board of directors shall maintain written documentation of its review, including the factors considered and conclusions reached by Doral in determining the adequacy of the ALLL.  During the term of this Agreement, Doral shall submit to the [FRBNY], within 45 days after the end of each calendar quarter, a written report regarding the board of directors' quarterly review of the ALLL and a description of any changes to the methodology used in determining the amount of ALLL for that quarter.

(d) Within 90 days of this Agreement, ***Doral shall hire an independent third party to validate that Doral's ALLL methodology is consistent with relevant supervisory guidance, including the Interagency Policy Statements on the Allowance for Loan and Lease Losses, dated*** July 2, 2001 (SR 01-17 (Sup)) and ***December 13, 2006*** (SR 06-17).

78.    Despite the significant problems identified by Doral's regulators, the directives set forth in the Consent Order and the Written Agreement assured investors that Doral and the Bank would ensure the development and employment of a sound and comprehensive ALLL policy and methodology, as well as implement a mechanism for independent loan review and reporting, and enhance the appraisal programs – all information from which the ALLL was derived.   Moreover, Defendants at all relevant times represented to the investing public that Doral and the Bank were in compliance with the requirements of the Consent Order and Written Agreement when Defendants, in fact, knew otherwise.

79.    As set forth below, Doral and the Bank violated the Consent Order and the Written Agreement and misled investors by failing to implement a comprehensive ALLL Policy and methodology, including failing to ensure adequate loan review and appraisal programs, and continuing to understate Doral's ALLL.

80.    Defendants' continued failures, even after the Consent Order and the Written Agreement, to: (i) establish a comprehensive ALLL Policy and methodology; (ii) establish

procedures by which to ensure independent and accurate loan review information was gathered and reached the board for purposes of the ALLL calculation; and (iii) establish procedures to ensure timely and accurate appraisals – in direct violation of the Consent Order and the Written Agreement, and contrary to representations made to Doral investors regarding ALLL methodology and Doral's purported compliance with the agreements – constituted highly reckless or intentionally fraudulent conduct.

81.     Moreover, as discussed below, although Defendants claimed they succeeded in maintaining the regulatory capital ratios required by the FDICIA and the Consent Order until the end of the Class Period, they did so, in part, by purposely understating Doral's ALLL.

<b>Defendants Fraudulently Inflated the Regulatory Capital<br>Ratios of Doral and the Bank by Understating Doral's ALLL</b>

82.     Unbeknownst to investors, Defendants deliberately understated Doral's ALLL prior to and during the Class Period in order to inflate the Company's regulatory capital ratios. By understating Doral's ALLL, Defendants correspondingly overstated the Company's net income, which in turn, overstated the Company's capital and artificially inflated its regulatory capital ratios.

83.     According to FE1, Doral's former Principal Accounting Officer, Defendants' scheme to inflate Doral's capital ratios began even before the Class Period.  During a January 11, 2012 meeting held to discuss Doral's fourth quarter and full year 2011 financial results, attended by FE1, Defendant Wahlman and Defendant Ubarri, among others, Defendant Wakeman stated, "I want our leverage ratio over 9% even if that means booking assets in later periods." Defendant Wakeman's statement directing Doral's senior management to "book[] assets in later periods" in order achieve a specific Tier 1 Leverage Ratio gives rise to a strong inference that the Company's Tier 1 Leverage Ratio reported in Doral's annual report on Form 10-K for the year

ended December 31, 2011 (the "2011 10-K") was knowingly manipulated. Defendant Wakeman's statement is also probative of Defendants' scienter and willingness to artificially inflate Doral's regulatory capital ratios during the Class Period.

84.     Moreover, both FE1 and FE2, a former Vice President, reported that Doral was constantly altering its ALLL model – and that the alterations were done not to make sound methodological changes, but to achieve the desired result of maintaining the ALLL at as low a level as possible. FE1 stated that Defendant Wahlman, who had daily involvement with Doral's ALLL model, was constantly pushing through changes to the model.

85.     FE1 further stated that Doral's Chief Risk Officer expressed concern regarding the calculation of the ALLL. FE1 similarly stated that the employee in charge of running the ALLL model also expressed to FE1 that he was very uncomfortable with the model and the constant changes made to the ALLL by Defendant Wahlman, but felt that he had to do what Wahlman directed.

86.     FE1 believed that the ALLL model was continuously altered not because it needed to be updated, or because its inputs were changing, but rather, to keep Doral's ALLL as low as possible. FE2 likewise suggested that Doral' ALLL methodology was constantly revised not based on changing factors, but rather, to come up with the ALLL figure that Doral executives wanted.

87.     FE1 further opined that Defendants kept Doral's ALLL low in order to indirectly bolster the Company's capital ratios. In fact, FE1 reported that management frequently discussed making changes to Doral's ALLL model in connection with discussing the Company's capital levels. FE2 further stated that the ALLL greatly impacted the Company's capital ratios because the ALLL affected Doral's balance sheet assets. FE2 likewise acknowledged that

Defendants understated Doral's ALLL during the Class Period in order to achieve the desired regulatory capital ratios.

88.     FE3, a former Senior Credit Risk Analyst, similarly expressed the belief that Doral found ways to justify reporting numbers in a manner that benefited the Company, although the numbers were not supported by any analytical tools.  According to FE3, Defendants moved assets around to justify Doral's ALLL because if loan losses were higher, Doral would have had to increase its ALLL, which in turn would have impacted the capital ratios.  FE3 commented that if Doral had used proper methodologies, the Company would have become illiquid.

89.     In addition, FE2 was directed throughout the Class Period to provide calculations of Doral's capital ratios to the Company's CFO on a monthly and bi-monthly basis.  FE2 believed that the frequent calculations were an effort to determine whether moving receivables and calculating the capital ratios at different time intervals would generate more favorable ratios.

### Defendants Concealed Numerous Problems that Undermined the Accuracy of Doral's ALLL

90.     Prior to and during the Class Period, numerous undisclosed issues contributed to the ongoing understatement of Doral's ALLL.

91.     According to FE1, even before the Class Period, Doral's ALLL was based on outdated property appraisals, which created a significant issue with the accuracy of the ALLL. FE1 further stated that Defendants intentionally delayed obtaining up-to-date property appraisals.

92.     FE1 explained that since the property values input into Doral's ALLL model were outdated – and should have been lower due to declining property values in Puerto Rico – the resulting ALLL was understated.  For example, FE1 reported that Doral had a large land portfolio with a fair value significantly below the carrying value of the loans, but Defendants did

not adjust its value because they did not want to account for the decline by increasing the ALLL, which would have resulted in lower reported earnings and capital ratios.

93.     Moreover, according to FE1, when appraisals **were** completed, the updated property values were often purposely not recorded.  FE1 reported that loan processors were specifically instructed by the Senior Vice President of Doral's loan processing group (who reported directly to Defendant Wakeman) not to input updated property appraisals if they were below a certain level, and not to input any significant declines in property values.  According to FE1, this practice was brought to Defendant Wahlman's attention in January 2012, shortly before the start of the Class Period, but Wahlman instructed that the data should not be touched. Consequently, Doral's ALLL remained understated during the Class Period.  FE1 further stated that the problems with appraisals were well-known to Doral executives, including Wakeman and Wahlman.

94.     FE2, FE3 and FE4 confirmed that the issues undermining the accuracy of Doral's ALLL persisted throughout the Class Period – notwithstanding Defendants' false representations that Doral adopted "more conservative" ALLL assumptions during the first quarter of 2012, and contrary to the directives of the Consent Order and the Written Agreement to perform independent loan review and enhance the appraisal process.

95.     For example, FE4, a former a Vice President of Commercial Administration, stated that appraisals continued to be delayed during the Class Period.  FE4 also stated that during the second half of 2012, few problematic commercial real estate loans were being addressed, which contributed to the understatement of Doral's ALLL.

96.     FE2 explained that problems existed with both the underlying loan data from which the ALLL was calculated, and with the model itself.  According to FE2, Doral's ALLL

- 27 -

model needed to be completely overhauled.  But instead of doing so, Defendants only made minor adjustments in response to problems caught by the Company's regulators.

97.     FE2 further stated that the underlying loan data used to calculate Doral's ALLL was unreliable, in part because crucial loan data was systematically missing or was incorrect in the loan files.  FE2 reported, for example, that when borrowers failed to make timely balloon payments on loans (and instead continued to make the regular loan payments), the loans should have been recorded as delinquent, but were not.

98.     FE2 also reported that during the Class Period, Doral conducted a review of a sample of loans that uncovered numerous systematic and widespread errors, including incorrect coding, missing information, such as the collateral type, and properties recorded as owner-occupied that were not.  Although the sample review uncovered widespread errors, FE2 stated that Doral did not take the actions necessary to respond to or remedy the errors discovered because Defendants did not want to spend the necessary resources.

99.     According to FE2, while management was preparing Doral's 2013 Form 10-K, an error was discovered in the ALLL model.  Once the error was corrected, management was unhappy with the resulting impact on the ALLL, and subsequently adjusted the ALLL to achieve a more favorable figure.  FE2 expressed concerns to Doral's Principal Accounting Officer, Nancy Reinhard, that the ALLL calculation was inaccurate and the entire model needed to be overhauled.  According to FE2, Reinhard refused to have the ALLL model reworked.

100.    Like the intentional failure to update property appraisals described by FE1, the issues with Doral's ALLL during the Class Period went well beyond mere errors and problems. For example, FE2 reported that Doral altered its assumptions for non-performing loans during the Class Period to add an extra four days to the 90 day non-payment deadline at which a loan

was classified as non-performing.  FE2 explained that this change was made in order to delay the time when Doral had to reverse the accrued interest on non-performing loans, and to keep the ALLL as low as possible.  FE2 stated that while the change appeared minor, it had a notable impact in furthering those objectives.

101.    Even worse, in March of 2013, FE3 was tasked with developing a forecast for expected mortgage loan charge-offs for 2013, which FE3 explained would in turn be used to establish Doral's ALLL.  FE3 developed a forecast, but was subsequently instructed by the Chief Risk and Credit Officer to modify the projection to a lower figure that FE3 believed was impossible to achieve based upon the actual charge-offs to date.

### Defendants Concealed the Extent to Which Doral's Internal Controls Were in Disarray Throughout the Class Period

102.    Doral's system of internal control over its financial reporting, particularly those controls associated with Doral's reporting of its ALLL and PLLL, was riddled with material deficiencies throughout the Class Period.

103.    At the start of the Class Period, Defendants acknowledged in Doral's 2011 10-K that the Company had "material weaknesses in [its] internal control over financial reporting" concerning the failure to "maintain effective controls over the completeness and valuation of its [ALLL] and the related [PLLL]."  Specifically, the 2011 10-K explained that Doral had not maintained effective controls to reasonably assure: (i) that residential second mortgages and commercial real estate loan valuations were obtained and processed accurately so that the property value updates received were either reflected as charge-offs, or reflected in the ALLL in a timely manner; and (ii) that the ALLL was adequately reviewed and the underlying data was properly reconciled.  As a result of the control deficiency, Doral had reduced the ALLL by

$10.1 million in its 2011 financial statements from the amount previously reported in the Company's January 19, 2012 earnings release.

104.     In the 2011 10-K, Defendants assured investors that Doral was "expeditiously" implementing a series of "remediation efforts" to address both material weaknesses. Notwithstanding these internal control deficiencies, Defendants falsely represented that Doral's financial statements were presented "in accordance with [GAAP]" – and repeated that representation throughout the Class Period.

105.     In its financial reports for the first and second quarters of 2012, however, Doral continued to report that the material weaknesses identified in the 2011 Form 10-K still had not been remediated and "the Company's disclosure controls and procedures were not effective[.]"

106.     Then, in its financial report on Form 10-Q for the third quarter, ended September 30, 2012 (the "3Q12 10-Q"), Doral announced that it had finally "executed the[] remediation efforts" outlined in the 2011 10-K.    Nonetheless, Defendants reported that the Company's "disclosure controls and procedures [still] were not effective as a result of the continuing material weaknesses in [its] internal control over financial reporting . . . described in [the 2011 10-K]."

107.     In Doral's 2012 10-K, filed on March 13, 2013, Defendants finally reported that – one year later – the material weaknesses identified in the 2011 10-K had "been remediated" and "the Company's internal control over financial reporting [was now] effective."    In truth, however, Defendants and members of Doral's senior management continued to override the Company's internal controls in order to understate Doral's ALLL and inflate the Company's regulatory capital ratios.

108.   The following quarter, Defendants represented that there had "been no changes in [Doral's] internal control over financial reporting" and "the Company's disclosure controls and procedures were effective[.]"

109.   One quarter later, in Doral's financial report on Form 10-Q for the second quarter, ended June 30, 2013 (the "2Q13 10-Q"), which the Company filed on August 15, 2013, Doral disclosed another error in the calculation of its ALLL – going back ten quarters.  The 2Q13 10-Q stated, in pertinent part, as follows:

> *[T]he Company determined that it had incorrectly recorded $6.2 million interest income cumulatively from January 1, 2011 through June 30, 2013 (a period of ten fiscal quarters).  In correcting the interest income over accrual there was a corresponding, cumulative adjustment to the ALLL associated with the loan modifications*.  In particular, the Company has reduced the reserves in the ALLL totaling $4.6 million, all of which has been recognized into income as of the three and six months period ended June 30, 2013.   This results in a cumulative adjustment of $1.6 million.
>
> The cumulative effect of all of these adjustments is a pre-tax decrease by $1.6 million to the Company's income in the fiscal quarter ended June 30, 2013.

110.   Although Doral admitted "that these accounting issues constitute a control deficiency[,]" the 2Q13 10-Q represented that the deficiency had already "*been corrected* principally by a change in the loan modification process, as well as other changes in the Company's accounting procedures implemented through the second fiscal quarter of 2013[,]" and falsely stated that "the Company's disclosure controls and procedures were [now] effective[.]"

111.   The following quarter, in Doral's financial report on Form 10-Q for the third quarter, ended September 30, 2013 (the "3Q13 10-Q"), Defendants represented that there had "been no changes in [Doral's] internal control over financial reporting" and "the Company's disclosure controls and procedures were effective[.]"  As investors have since discovered, these representations were false.

112.    On March 18, 2014, Doral announced that it needed to delay the filing of its annual report on Form 10-K for the year ended December 31, 2013 (the "2013 10-K") due to "a material weakness in its internal control over financial reporting as of December 31, 2013, related to the review of the underlying data and mathematical model supporting its [ALLL] and the related [PLLL]," and admitted that the Company's "internal control over financial reporting and disclosure controls and procedures were ineffective[.]"

113.    When Doral belatedly filed the 2013 10-K and issued a press release on March 21, 2014, investors learned that the "material weakness in [Doral's] internal control over financial reporting" had caused Doral to understate its ALLL and PLLL in the 3Q13 10-Q, and it was necessary to "revise" Doral's previously-reported PLLL for the third quarter of 2013 upward by **_$7.2 million_**, from the previously-reported amount of $16.4 million, to **_$23.6 million_**.  As a result, Doral's third quarter net loss was retroactively increased from the previously-reported amount of $7.5 million, to $14.7 million.  Since that time, Doral has not filed any financial statements with the SEC.

**Defendants Failed to Adequately Disclose the Risk
that the Treasury Department Would Seek
to Void the 2012 Closing Agreement**

114.    In addition to artificially inflating Doral's capital ratios by understating the Company's ALLL, Defendants failed to disclose that the largest single component of Doral's Tier 1 Capital – the purported Tax Receivable from the Treasury Department – was at risk of non-payment.

115.    During the Class Period, approximately one-third of Doral's Tier 1 Capital was attributable to a purported $229,884,087 Tax Receivable that Doral recorded following an agreement that the Company entered into with the Treasury Department on March 26, 2012 (the "2012 Closing Agreement").

- 32 -

116.    The 2012 Closing Agreement, which Doral announced at the start of the Class Period, replaced and superseded a 2006 agreement (the "2006 Closing Agreement") that followed in the wake of a massive restatement of Doral's financial results for the five year period ended December 31, 2004.

117.    The February 2006 restatement arose from Doral's phony "sales" of more than $4 billion worth of non-conforming mortgages to other Puerto Rican banks, including First Bancorp, which subsequently paid $74.25 million to settle a securities fraud case resulting from the transactions.  In connection with these "sales," Doral retained a portion of the interest to be paid on the mortgages – known as interest-only strips, or "IOs" – and booked a gain on the sale of the mortgages.  In fact, Doral did not truly "sell" the mortgages, but instead was simply borrowing money which was collateralized by the mortgages.  Through side deals and oral agreements, Doral provided the "purchaser" with full recourse rights, thereby rendering the transactions loans, rather than sales.

118.    After this scheme was uncovered and Doral was forced to restate its financial results and reverse the "income" from the phony sales, the Company claimed that it had overpaid more than $152 million in taxes, and was entitled to a reimbursement from the Treasury Department.

119.    On September 26, 2006, Doral and the Treasury Department entered into the 2006 Closing Agreement.  In lieu of claiming a reimbursement of the allegedly overpaid taxes, the parties agreed that Doral would have the right to recognize a deferred tax asset ("DTA") in the amount of $889,723,361, and to gradually amortize that sum against its tax liability over a 15-year period.

120.   On March 26, 2012, Doral and the Treasury Department entered into the 2012 Closing Agreement.   Doral represented that as of that date, it had amortized $123,443,072 of the $889,723,361 DTA in prior tax returns, leaving a balance of $766,280,289.

121.   According to Doral, the Company entered into the 2012 Closing Agreement because it was apparent that the Company "would not be able to realize the full value of its tax asset before it expired," and – significantly – Doral "*could not use the tax asset to satisfy [its regulatory] capital requirements*."

122.   The 2012 Closing Agreement voided the $766,280,289 balance of amortization, and instead provided, in pertinent part, as follows:

> [Doral and the Treasury Department] hereby agree to recognize the value of the unamortized IO adjusted basis as a tax overpayment not recovered by [Doral] for the period covered by the restatement, amounting to $229,884,087 as of January 1, 2011.  This overpayment of taxes will be treated as a pre-payment of income tax by [Doral] and can be apportioned among and used by any [Doral subsidiary] to offset income taxes due to the Puerto Rican Government . . . in future years, either through reductions of estimated income taxes or through refunds over a period of 5 years, upon proper claim by Doral.

123.   According to Doral, the $229,884,087 amount was arrived at by applying the lowest possible tax contribution payable on the amortizable balance of $766,280,289 (30% rather than 39%, as provided by the Internal Revenue Code of 1994, in effect for the years in question).

124.   According to Doral, the 2012 Closing Agreement addressed the "pressing public interest[]" of "keep[ing] the banking system capitalized . . . ."  In other words, Doral intended to use the agreement to bolster its Tier 1 Capital, and thus to remain in compliance with regulatory capital requirements.  For its part, Doral agreed to aid the Puerto Rico economy by expanding home preservation and commercial development programs by up to $70 million.[4]

---

[4]   According to FE1, this provision was, in essence, a payment that Doral had to make to the Treasury Department in order to obtain the Tax Receivable.

125.    Following the 2012 Closing Agreement, Doral recognized the $229,884,087 as a tax receivable and included the Tax Receivable in its Tier 1 Capital. The Treasury Department later challenged the legitimacy of the 2012 Closing Agreement and the Tax Receivable.

126.    According to the Treasury Department (and as investors learned only after the end of the Class Period), Doral allegedly falsely represented the balance of amortization, and thereby obtained a larger tax receivable than it was entitled to.  The Treasury Department claimed that the true balance of amortization at the time of the 2012 Closing Agreement was $652,463,797 – not $766,280,289 as Doral had represented.

127.    According to the Treasury Department, Doral had improperly added $113,816,492 in net operational losses (consisting of the amount of the DTA that Doral had not been able to amortize) to the actual unamortized balance of $652,463,797.  The Treasury Department asserted that if the actual unamortized amount of $652,463,797 had been used to calculate the Tax Receivable, Doral would have been entitled to $195,793,139, rather than $229,884,087 – a difference of $34,144,948.

128.    The Treasury Department also claimed that Doral was not entitled to the Tax Receivable because the Company did not actually overpay its taxes in the amount of $152 million, and the Company had falsely represented that the $229,884,087 amount of the Tax Receivable corresponded to an overpayment of taxes by Doral – another fact which was not revealed to investors until after the end of the Class Period.  Rather, during the Class Period, Defendants repeatedly represented that the Tax Receivable reflected prior tax overpayments actually made by Doral.

129.    Similarly, the Treasury Department asserted that Doral had falsely represented that the reduction in its income for purposes of book value following the restatement had led to a

"concomitant" reduction in the Company's tax liability of more than $152 million, when in fact, the reduction in Doral's tax liability was not proportional to the reduction in income following the restatement.

130.    During the Class Period, Defendants failed to disclose that there was a significant risk that the Treasury Department would seek to void the 2012 Closing Agreement on the grounds that: (i) the 2012 Closing Agreement was obtained through misrepresentations by Doral; and (ii) Doral did not actually overpay taxes in the amount claimed.

131.    Defendants were aware of these risks throughout the Class Period, given the significance of the Tax Receivable to Doral's regulatory capital ratios (and thus, the Company's overall operations), and Defendants' regular communications with the Treasury Department. According to FE2, Doral's Vice President of Tax, George Scopetta, met with representatives from the Treasury Department at least bi-monthly during the Class Period.

132.    FE2 further stated that Defendants knew there was a risk that the Treasury Department would not pay Doral the Tax Receivable due to the financial instability of the Puerto Rican Government.  FE2 also explained that there were internal discussions at Doral each quarter about whether to continue to include the Tax Receivable in the Company's Tier 1 Capital.  Many of these discussions were held at the executive level at audit committee meetings, which were attended by FE2's direct supervisor, Nancy Reinhard.  FE2 also was involved in quarterly discussions with Reinhard and Doral's CFO regarding whether to continue to include the Tax Receivable in Doral's Tier 1 Capital.  According to FE2, by early 2014, the FDIC was also closely scrutinizing Doral's inclusion of the Tax Receivable in its Tier 1 Capital.  None of this was disclosed to investors.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

**Full Year 2011 Financial Results**

133.    The Class Period begins on Monday, April 2, 2012.  On Friday, March 30, 2012, after the close of the market, Doral filed its annual report for the year ended December 31, 2011 with the SEC on Form 10-K.  The 2011 10-K was signed and certified as to its veracity, as required by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), by Defendants Wakeman and Wahlman.  The 2011 10-K represented that "[a]s of December 31, 2011, Doral Bank was in compliance with all the regulatory capital requirements" and "was considered a well-capitalized bank for purposes of [the FDICIA]."  The 2011 10-K set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as follows:

|  | Doral Financial | Doral Bank [2] | Well Capitalized Minimum |
|---|---|---|---|
| Total capital ratio (total capital to risk weighted assets) | 13.4% | 14.3% | 10.0% |
| Tier 1 capital ratio (Tier 1 capital to risk weighted assets) | 12.2% | 13.0% | 6.0% |
| [Tier 1] Leverage ratio [1] | 9.1% | 8.6% | 5.0% |

[Footnotes omitted.]

134.    The statements referenced above in ¶133 concerning Doral's capital ratios and the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that Defendants had inflated Doral's capital by deliberately understating the Company's ALLL.   In addition, the statement referenced above in ¶133 reporting Doral's Tier 1 Leverage Ratio as 9.1% was materially false and misleading because Doral had likely achieved that ratio by "booking assets in later periods," pursuant to Defendant Wakeman's directive at a January 11, 2012 meeting.

135.    With respect to the 2012 Closing Agreement that Doral had recently entered into with the Treasury Department, the 2011 10-K stated, in pertinent part, as follows:

> *On March 26, 2012 Doral . . . jointly with each of its Puerto Rico operating*
> *subsidiaries . . . entered into a Closing Agreement with the Commonwealth of*
> *Puerto Rico (the "[2012 Closing] Agreement") in which the Commonwealth of*
> *Puerto Rico recognized a prepayment of income taxes of approximately $230*
> *million from the Company related to the past overpayment of taxes.   In*
> *accordance to the [2012 Closing] Agreement, the Company has a present claim*
> *on the overpayment to the Commonwealth of Puerto Rico that is not dependent*
> *on its future earnings*.  The [2012 Closing] Agreement also clarifies that the pre-
> paid tax asset survives in the event of a change in control of the Company or any
> of its Puerto Rico operating subsidiaries and can be apportioned among and used
> by the Company or any of its Puerto Rico subsidiaries.  *The [2012 Closing]*
> *Agreement supersedes and replaces the previous Closing Agreements between*
> *the Company and the Commonwealth of Puerto Rico in which the Company's*
> *recovery of amounts related to the overpayment of taxes was in the form of an*
> *amortizing deferred tax asset which was used as an expense to reduce taxable*
> *income. The Company estimates it will recognize a tax benefit relating to the*
> *execution of the Agreement of approximately $100 million due to release of the*
> *associated deferred tax asset reserves, and will increase its reported Tier 1*
> *regulatory capital by approximately $200 million*.  In the [2012 Closing]
> Agreement the Company committed to expand its Home Preservation Program by
> $50 million to allow Puerto Rico families to restructure or refinance their existing
> loans to remain in their homes, and to participate in a Puerto Rico government
> program to lend to small businesses.  The Federal Reserve and the . . . [FDIC]
> have supervisory oversight authority over the Company and Doral Bank,
> including the quality of our Tier 1 regulatory capital, and as such the . . . [FDIC]
> or Federal Reserve in the future can seek to reduce our Tier 1 regulatory capital.

136.   The statements referenced above in ¶135 concerning the 2012 Closing Agreement

and the Tax Receivable were materially false and misleading because Defendants misrepresented

and failed to disclose that there was a material risk that the Treasury Department would seek to

void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable.

137.   The 2011 10-K also stated that Doral's provisions for loan and lease losses for the

quarter and full year ended December 31, 2011 were $9.914 million and $67.525 million,

respectively, and the Company's ALLL was $102.609 million as of December 31, 2011.  The

2011 10-K further stated, in pertinent part, as follows:

> *The provision for loan and lease losses is charged to earnings to bring the total*
> *allowance for loan and lease losses to a level considered appropriate by*
> *management considering all losses inherent in the portfolio and based on Doral*
> *Financial's historical loss experience, current delinquency rates, known and*

*inherent risks in the loan portfolio, individual assessment of significant impaired loans, the estimated value of the underlying collateral or discounted expected cash flows, and an assessment of current economic conditions and emerging risks*. . . .

\*       \*       \*

. . . ***The $67.5 million provision for loan and lease losses in 2011 resulted from***: (i) $31.6 million for non-guaranteed residential loans as new loans became delinquent, previously delinquent loans reached later delinquency stages, and Doral changed its cash flow estimates for TDR loans; (ii) $23.8 million from construction and land largely due to new valuations on properties collateralizing impaired loans received in the second half of the year and some deterioration of loan performance; (iii) $32.1 million for growth in the U.S. commercial and industrial loan portfolio; and (iv) $9.0 million for commercial real estate and other consumer for adverse loan performance of largely previously performing loans experienced during the year.

\*       \*       \*

. . . ***The [ALLL] is maintained at a level that Doral Financial considers appropriate to absorb probable losses***. . . .

The Company estimates and records its ALLL on a quarterly basis.  For all performing loans and non-performing small balance homogeneous loans (including residential mortgages, consumer, construction, commercial real estate and commercial under $1.0 million; and performing construction, commercial real estate and commercial greater than $1.0 million) the ALLL is estimated based upon estimated probability of default and loss given default by shared product characteristics using the Company's historical experience.     For larger construction, commercial real estate and commercial loans (loan balance greater than $1.0 million) that are 90 or more days past due or are, otherwise considered to be impaired, management estimates the related ALLL based upon an analysis of each individual loans' characteristics.

\*       \*       \*

***As of December 31, 2011, the Company's allowance for loan and lease losses was $102.6 million***, a decrease of $21.1 million from $123.7 million as of December 31, 2010.  ***This decrease was driven by a reduction in the allowance of loan and lease losses of $16.8 million in commercial real estate, $7.3 million in construction and land portfolio, and $1.9 million in residential mortgage loans, related to charge offs of previously reserved loans and foreclosure process upon the receipt of updated valuations on properties securing these loans***.  This decrease was partially offset by an increase in the allowance of loan and lease losses of $2.5 million on the commercial and industrial portfolio

resulting from the increase on non-performing loans due to economic distress in Puerto Rico.

138.    The statements referenced above in ¶137 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; and (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.

139.    Finally, the 2011 10-K represented that although "the Company's disclosure controls and procedures were not effective as of December 31, 2011[,]" and the Company had identified "material weaknesses" in its system of internal control over financial reporting concerning the failure to "maintain effective controls over the completeness and valuation of its [ALLL and PLLL]," Defendants had "performed additional analysis and other post-closing procedures to ensure that the financial statements were prepared in accordance with [GAAP]" and concluded "that the financial statements included in [the 2011 10-K] fairly present[ed], in all material respects, the Company's financial condition . . . for the periods presented."

140.    The statements referenced above in ¶139 concerning Doral's internal controls and the accuracy of the Company's financial results were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) the material weaknesses in Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were far more systematic and widespread than Defendants represented; and (b) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

141.    In response to the news that the 2012 Closing Agreement would increase the Company's Tier 1 Capital by "approximately 200 million," the price of Doral's common stock rose from a split-adjusted closing price of $30.80 per share on Friday, March 30, 2012 to close at a split-adjusted price of $37.20 per share on Monday, April 2, 2012, on unusually heavy trading volume of more than one million shares traded.

142.    As lamented by *American Banker* in its April 2, 2012 article stating that "[s]hares of Doral . . . shot up Monday after the . . . company said in its annual report that the reclassification of a previously reported tax overpayment will result in a significant boost to its capital levels," "Deferred Tax Assets are usually reversed when a company *proves that it can make money on a consistent basis*, but in Doral's case the primary accounting implication is [that] the asset will no longer be dependent on the company's future earnings stream."   A research note published the same day by Sandler O'Neill & Partners LP explained that "the valuation allowance accrued against the DTA . . . will be reversed and reflected in 1Q operating results as a tax benefit," and estimated that the reclassification would bolster Doral's Tier 1 Capital Ratio from 12.2% to 15%.

**First Quarter 2012 Financial Results**

143.    On May 15, 2012, after the close of the market, the Company issued a press release entitled "Doral . . . Reports Financial Results for the Quarter Ended March 31, 2012 [–] Reports Net Income of $2.6 million; *Increases Tier 1 Capital by $101.5 million*."   Defendant Wakeman commented, in pertinent part, as follows:

> *Doral is on a solid course.  Additional capital and reserves strengthened our balance sheet considerably*. . . .

144.    The press release discussed the impact of the 2012 Closing Agreement on Doral's capital levels and financial condition, in pertinent part, as follows:

*[Doral] [r]ealized an income tax benefit of $112.6 million* for the first quarter of 2012 *largely as a result of the new Closing Agreement entered into between Doral . . . and the Commonwealth of Puerto Rico*.

\*      \*      \*

*. . . The income tax benefit resulted from a new Closing Agreement with the Commonwealth of Puerto Rico in which the Commonwealth of Puerto Rico recognized a prepayment of income taxes of approximately $225.7 million from Doral related to the past overpayment of taxes*.

\*      \*      \*

Doral reported total assets as of March 31, 2012 of $8.1 billion compared to $8.0 billion as of December 31, 2011 and $8.5 billion as of March 31, 2011. *The increase of $118.0 million when compared to December 31, 2011 is mainly due to the release of the valuation allowance associated with the deferred tax asset that was derecognized and recorded as a receivable from the Commonwealth of Puerto Rico*.

\*      \*      \*

*[Doral] [i]ncreased Tier 1 capital by $101.5 million from December 31, 2011 to $822.9, largely resulting from the new Closing Agreement. The Tier 1 leverage ratio increased by 106 basis points from December 31, 2011 to 10.19%*.

\*      \*      \*

*The Company's capital ratios continue to exceed the well-capitalized standards established by the federal banking agencies with ratios of Tier 1 Leverage of 10.19%, Tier 1 Risk-based Capital of 13.22% and Total Risk-based Capital of 14.49%. The Leverage, Tier 1 and Total Risk-based Capital Ratios exceeded the well-capitalized standards by $419.3 million, $449.4 million and $279.3 million, respectively. The increase in the capital ratios results in large part from the effects of Doral's new Closing Agreement with the Commonwealth of Puerto Rico which resulted in a realized gain and reduced amount of disqualified deferred tax assets*.

145.    The statements referenced above in ¶¶143-44 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to

void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized.

146.    Taking advantage of the temporary capital cushion created by the 2012 Closing Agreement, Defendants announced that they had increased Doral's provision for loan and lease losses, supposedly as a result of "more conservative" modeling.  The press release stated, in pertinent part, as follows:

> *[Doral] [i]ncurred $115.2 million in provision for loan and lease losses, recognizing the adoption of a more conservative outlook reflective of the uncertain economic and regulatory environments, receipt of new real estate valuations, availability of new market based and performance data and consideration of such new information in forecasting future cash flows on impaired loans*.

> \*          \*          \*

> Provision for loan and lease losses for the first quarter of 2012 was $115.2 million, an increase of $105.3 million over the fourth quarter 2011 provision, and an increase of $112.6 million from the provision recorded in the first quarter of 2011.  The $115.2 million provision for loan and lease losses in the first quarter of 2012 resulted mainly from the residential mortgage ($68.9 million), construction and land ($26.4 million), and commercial real estate ($17.6 million) portfolios as *the Company received many newly-updated valuations of real estate securing its delinquent loans, incorporated the findings of the recently completed third party real estate market analysis into cash flow models and impairment calculations, and adopted a more conservative outlook reflective of the uncertain economic and regulatory environments in which Doral operates*.

147.    The statements referenced above in ¶146 concerning Doral's PLLL and the Company's basis for determining the amount of the provision were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; and (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.

148.    Also on May 15, 2012, Doral filed its quarterly report for the first quarter, ended March 31, 2012, with the SEC on Form 10-Q (the "1Q12 10-Q"), which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Wahlman.   The 1Q12 10-Q represented that "[a]s of March 31, 2012, Doral Bank was in compliance with all the applicable regulatory capital requirements" and the Company "exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA]."   The 1Q12 10-Q set forth Doral's and the Bank's regulatory capital ratios as follows:

|  | As of March 31, 2012 | |
|  | Doral Financial | Doral Bank |
| --- | --- | --- |
| Total Capital Ratio (Total capital to risk-weighted assets) | 14.5% | 13.4% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 13.2% | 12.1% |
| Tier 1 Leverage Ratio[1] | 10.2% | 8.3% |

[Footnote omitted.]

149.    The 1Q12 10-Q also emphasized that Doral's financial "performance for the first quarter of 2012 was *primarily due to the income tax benefit from the Closing Agreement with the Commonwealth of Puerto Rico*[,]" and explained that during the quarter, Doral had effectuated a "[r]eclassification of deferred tax asset to *prepaid income tax*" in the amount of $225.735 million.   The 1Q12 10-Q further stated, in pertinent part, as follows:

> . . . *The prepaid income tax balance as of March 31, [2012] includes $225.7 million related to the Closing Agreement . . . entered into during the first quarter of 2012 with the Commonwealth of Puerto Rico related to past income tax overpayments*.

> \*      \*      \*

> *The deferred income tax benefit of $114.5 million for the quarter ended March 31, 2012 resulted mainly from the $112.0 million benefit recorded when Doral Financial Corporation and its Puerto Rico domiciled subsidiaries entered into a new Closing Agreement with the Commonwealth of Puerto Rico related to past income tax overpayments, which allowed Doral to convert certain DTAs into a prepaid tax*.

Deferred Tax Components

\*       \*       \*

Prior to March 2012, the largest component of the DTA arose from the IO [interest-only] DTA, which represented a stand-alone intangible asset subject to a straight-line amortization based on a useful life of 15 years.  The intangible asset was created by a series of closing agreements that Doral entered into with the Puerto Rico Government, which were entered into in 2004 through 2010. ***However, on March 26, 2012 Doral signed a new closing agreement* . . . *specifying the terms and conditions under which Doral could recover certain amounts paid as taxes to the Commonwealth of Puerto Rico for certain years prior to 2005.  In the agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period*.**  This agreement is the fifth agreement between Doral and the Commonwealth of Puerto Rico related to this matter.  ***This agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to Doral to return the overpayments***.

150.    The statements referenced above in ¶¶148-49 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized.

151.    The 1Q12 10-Q also stated that following the $115.181 million provision for loan and lease losses taken during the first quarter of 2012, the Company's ALLL was $166.79 million as of March 31, 2012.  The 1Q12 10-Q discussed the "more conservative"

- 45 -

assumptions for the calculation of Doral's ALLL purportedly adopted by the Company during

the quarter, in pertinent part, as follows:

> *During the first quarter of 2012, Doral reviewed its ALLL estimate assumptions and calculations, and adopted a more conservative outlook as to future loan performance considering new information developed during the quarter, and the uncertain economic and regulatory environments.*

> \*     \*     \*

> *The resulting changes in estimate are reflected in the first quarter of 2012 allowance for loan and lease losses. Significant changes in assumptions and calculations include reducing the definition of a defaulted loan by 90 days, increasing the expectation that long term delinquent loans are foreclosed, emphasizing the consideration of more recent experience in determining the probability of default and loss given defaults, adjusting factors considered in estimating the expected loss, reducing the estimate prepayment speed on TDR loans. The effect of these changes in underlying assumptions resulted in an addition provision of approximately $42.0 million for the quarter ended March 31, 2012. Also, the Company adopted a more conservative view on the estimated collectability of significantly aged residential mortgage loans, resulting in an additional provision of $25.0 million for the quarter, reflecting estimated declines in value of certain collateral dependent loans.* In addition, in late March 2012 a market analysis on land use was completed and issued. The analysis provides information necessary for appraisers to value undeveloped land in Puerto Rico. *During the first quarter of 2012 Doral increased its reserves by approximately $10.0 million to reflect the estimated effect of the market analysis on the valuations of the collateral dependent loans. Other provisions totaling approximately $38.0 million reflect new loans becoming more delinquent, the receipt of new valuations estimates on collateral dependent loans, and other estimated declines in value on collateral dependent loans.*

> \*     \*     \*

> *During the first quarter of 2012, management undertook an effort to review the assumptions and modeling underlying its allowance for loan and lease losses estimate and align the Company's estimate and calculation more closely with those assumptions and calculation advocated by its regulators. The resulting changes in estimates are reflected in the first quarter of 2012 allowance for loan and lease losses. Doral recorded a provision for loan and lease[] losses of $115.2 million during the first quarter of 2012, and recorded charge-offs totaling $51.5 million, increasing the ALLL to $166.8 million as of March 31, 2012. Significant provisions were made in the first quarter of 2012 for residential mortgage loans, construction and land loans, and commercial real estate, generally for credit exposure in Puerto Rico* . . . .

152.    The statements referenced above in ¶151 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; and (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.

153.    Finally, the 1Q12 10-Q represented that although "the Company's disclosure controls and procedures were [still] not effective as of March 31, 2012[,]" and "the Company ha[d] identified . . . material weaknesses in its system of internal control over financial reporting," Defendants had "*taken reasonable steps to ascertain that the financial information contained in [the 1Q12 10-Q]" was presented "in accordance with [GAAP]*."

154.    The statements referenced above in ¶153 concerning Doral's internal controls and the accuracy of the Company's financial results were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) the material weaknesses in Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were far more systematic and widespread than Defendants represented; and (b) Defendants had not taken reasonable steps to ascertain that Doral's financial results were presented in accordance with GAAP, and Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

155.    The following day, on May 16, 2012, Defendants held a conference call with analysts and investors, during which Defendant Wakeman stated that "Doral is solid and is well positioned in the difficult Puerto Rico market" following "a substantial increase in capital, as

- 47 -

well as a substantial increase in credit reserves."   Defendant Wakeman provided additional

commentary on the 2012 Closing Agreement, in pertinent part, as follows:

> ***We reached an important agreement with the government of Puerto Rico regarding our deferred tax assets.   The agreement covers the portion of the deferred tax assets that was created through a prior overpayment related to Doral's legacy trading business***.  Now we have previously referred to this asset as the I/O VTA and over the past several months we worked with the government of Puerto Rico to simplify the tax agreement that was signed in 2005.
>
> ***The new agreement replaces the old one and acknowledges the asset as what it, in fact, is – an overpayment of tax.   Therefore, the tax asset is now recognized as a receivable which is no longer tied to future earnings***.
>
> ***Now this is an important transaction for us and it produced two clear benefits in the first quarter.   The first benefit relates to earnings.   We eliminated a reserve of $112 million, which we had carried against this asset.   This elimination of reserve flowed through our financial statements as a gain in the first quarter***.
>
> ***The second benefit relates to capital.   Under the previous agreement less than $10 million of the DTA was included in Tier 1 capital.   As the asset is now a receivable and no longer tied to future earnings, the entire amount of the asset, $223 million, is Tier 1 capital***.

156.   Defendant Wahlman similarly highlighted the impact of the 2012 Closing

Agreement on Doral's capital levels and financial condition, stating, in pertinent part, as follows:

> . . . ***Doral's capital after both the tax transaction and the provision for loan losses . . . is truly a strength of the organization***.   The tax transaction with the Commonwealth of Puerto Rico provided . . . over $110 million[] of GAAP capital and nearly $220 million of incremental regulatory capital.   ***While a good portion of these capital increases were invested in the allowance for loan and lease losses*** in the balance sheet, . . . ***the transactions still significantly strengthened Doral's capital ratios and overall balance sheet***.
>
> Each of the key regulatory capital ratios – leverage, Tier 1, risk-based, and total risk-based – increased by over 100 basis points. . . .

157.   The statements referenced above in ¶¶155-56 concerning Doral's capital ratios

and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax

Receivable were materially false and misleading because Defendants misrepresented and failed

to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized.

158.    During the call, Defendant Wakeman commented on Doral's increased provision for loan and lease losses, in pertinent part, as follows:

> ***This quarter we also shored up our credit reserves.  There is substantial uncertainty that remains in the Puerto Rico market; therefore, we have chosen to adopt more conservative standards in how we prepare our estimates.  This has resulted in a charge of $115 million this quarter***.

> \*       \*       \*

> ***After fully absorbing these changes, at the end of the quarter we still strengthened capital significantly as our leverage ratio now exceeds 10%.***

> ***Going forward, Doral is a well-capitalized and diversified company***.

159.    Defendant Wahlman also commented on Doral's ALLL, and the related provision for loan and lease losses, in pertinent part, as follows:

> . . . [I]n light of the difficult economy, ***we have adopted a more conservative approach to estimating the allowance for loan losses and non-performing loans. The changes we made in how we estimate the allowance for loan and lease losses and the non-performing loan result from our decision to be more prudent***.

> \*       \*       \*

> . . . ***In the face of the economic uncertainties that Doral now views as extending into the future[,] Doral has adopted a more conservative view of future borrower performance.  This view led to an increase in the ALLL, which is up 62% from December 31 to $166[.8] million, and it also resulted in the $51 million in charge-offs that Doral recorded during Q1 of 2012***.

> . . . [T]he $115 million provision [for loan and lease losses] and the $51 million charge-off leav[es] the $167 million allowance [for loan and] lease losses.  ***The key assumptions that we changed during the period include our definition of***

*what is a defaulted loan, increasing our estimate of defaulting loans moving to REO [i.e., lender owned] or to a short sale, increasing our probabilities of default on current performing loans, adjusting how certain matters are considered in estimating our expected losses, reducing the prepayment speed on troubled debt restructured loans, estimating values on land loans based on recent market analysis, and changing our accounting for loans more than five years delinquent whereby we charged the balance down to zero as opposed* to . . . estimated *net realizable value*.

160.     The statements referenced above in ¶¶158-59 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves; and the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL.

**Second Quarter 2012 Financial Results**

161.     On August 8, 2012, Doral announced that the Bank had entered into the Consent Order with the FDIC and the PR Commissioner, as discussed above in ¶¶67-74.

162.     Also on August 8, 2012, after the close of the market, the Company issued a press release entitled "Doral . . . Reports Financial Results for the Quarter Ended June 30, 2012 [–] Reports Q2 2012 Net Loss of $1.6 million; Maintained book value per share of $3.82." Defendant Wakeman commented, in pertinent part, as follows:

*Over the past several quarters Doral took prudent actions that increased regulatory capital, strengthened asset coverage ratios* and grew revenue. . . .

163.     With respect to the Consent Order and Doral's capital levels, the press release stated, in pertinent part, as follows:

. . . The consent order includes provisions that require Doral Bank to maintain Tier 1 leverage, Tier 1 risk-based, and Total risk-based capital ratios in the amount of 8.0%, 10.0%, and 12.0%, respectively . . . . *As of the signing of the Consent Order, Doral Bank's capital ratios exceeded the required levels. In addition, Doral Financial maintained capital levels in excess of the noted levels and the holding company serves as a source of capital strength to Doral Bank*.

*        *        *

*The Company's capital ratios continue to exceed the well-capitalized standards established by the federal banking agencies with ratios of Tier 1 Leverage of 9.92%, Tier 1 Risk-based Capital of 12.94% and Total Risk-based Capital of 14.21%. The Leverage, Tier 1 and Total Risk-based Capital Ratios exceeded the well-capitalized standards by $407.5 million, $440.7 million and $267.0 million, respectively. The increase in the capital ratios results in large part from the effects of Doral's new Closing Agreement with the Commonwealth of Puerto Rico which resulted in a realized gain and reduced amount of disqualified deferred tax assets*.

164.    The statements referenced above in ¶¶162-63 concerning Doral's capital ratios and the adequacy of the Company's capital; the 2012 Closing Agreement and the Tax Receivable; and the Consent Order were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

165.    In addition, the press release discussed Doral's provision for loan and lease losses, in pertinent part, as follows:

*Provision for loan and lease losses for the second quarter of 2012 was $5.2 million, a decrease of $110.0 million over the first quarter 2012 provision, and a decrease of $8.1 million from the provision recorded in the second quarter of 2011. The $5.2 million provision for loan and lease losses in the second quarter of 2012 resulted mainly from commercial real estate ($3.8 million) and the residential mortgage portfolios ($2.5 million), particularly related to Puerto Rico loan exposures*.

- 51 -

166.    The statements referenced above in ¶165 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; and (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.

167.    The same day, on August 8, 2012, Doral filed its quarterly report for the second quarter, ended June 30, 2012, with the SEC on Form 10-Q (the "2Q12 10-Q"), which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Wahlman.  The 2Q12 10-Q represented that "[a]s of June 30, 2012, Doral Bank was in compliance with all the applicable regulatory capital requirements" and the Company "exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA]."  The 2Q12 10-Q set forth Doral's and the Bank's regulatory capital ratios as follows:

| | As of June 30, 2012 | |
| | Doral Financial | Doral Bank |
|---|---|---|
| Total Capital Ratio (Total capital to risk-weighted assets) | 14.2% | 12.7% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 12.9% | 11.5% |
| Tier 1 Leverage Ratio[1] | 9.9% | 7.9% |

[Footnote omitted.]

168.    The 2Q12 10-Q also represented that the Bank was now in compliance with the higher capital ratios required under the Consent Order, in pertinent part, as follows:

> On August 8, 2012 Doral Bank signed a consent order with the [FDIC] and the [PR Commissioner].  The consent order includes provisions that require Doral to maintain Tier 1 leverage, Tier 1 risk-based, and Total risk-based capital ratios in the amount of 8.0%, 10.0%, and 12.0%, respectively, and require Doral to obtain a waiver from the FDIC before accepting new brokered deposits.  ***Doral estimates it is currently in compliance with the capital ratio requirements***. . . .

169.    Under the heading "Deferred Tax Components," the 2Q12 10-Q contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above

in ¶149) of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period[,]" and emphasizing that the "agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral." The 2Q12 10-Q further stated, in pertinent part, as follows:

> The deferred income tax benefit of $115.8 million for the six month period ended June 30, 2012 resulted mainly from the $113.2 million benefit recorded when Doral Financial Corporation and its Puerto Rico domiciled subsidiaries entered into a new Closing Agreement with the Commonwealth of Puerto Rico related to past income tax overpayments, which allowed Doral to convert certain DTAs into a prepaid tax.

> *     *     *

> Prepaid taxes increased $224.9 million and the DTA decreased $104.1 million as a result of the de-recognition of a DTA that was recorded as a receivable from the Commonwealth of Puerto Rico and the release of the valuation allowance associated to the derecognized DTA.

170.    The statements referenced above in ¶¶167-69 concerning Doral's capital ratios and the adequacy of the Company's capital; Doral's compliance with the Consent Order; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

171.     The 2Q12 10-Q also stated that following the provisions for loan and lease losses for the quarter and six months ended June 30, 2013 of $5.2 million and $104.5 million, respectively, the Company's ALLL was $152.689 million as of June 30, 2013.  The 2Q12 10-Q further stated, in pertinent part, as follows:

> . . . [I]n the second quarter of 2012 management determined to add $5.2 million to the provision for loan and lease losses whereas in the first quarter of 2012 management determined to add $115.2 million to the provision for loan and lease losses *as it adopted a notably more conservative view of the financial effects of the current and estimated future economic and regulatory environment in which Doral's businesses operates*. . . .

*     *     *

> •   Residential Mortgages – The provision for loan and lease losses for the three months ended June 30, 2012 totaled $2.5 million . . . as a result of valuation adjustments for loans 180 days or more delinquent based upon the receipt of new appraisals, and an increase in the amount of long term delinquent loans and loans moving to real estate owned in part by improved realization on disposition of residential real estate owned.

> •    Commercial Real Estate – The provision for loan and lease losses for the quarter ended June 30, 2012 totaled $3.8 million . . . as a result of an increase in the probability of defaulting combined with a decrease in the estimated realization on disposition of commercial real estate owned.

*     *     *

> *During the first half of 2012, management reviewed its ALLL estimate assumptions and calculations and adopted a more conservative outlook as to future loan performance considering the uncertain economic and regulatory environments.  The resulting changes in estimate are reflected in the June 30, 2012 allowance for loan and lease losses*.

*     *     *

> These changes resulted in approximately $81.0 million in provisions in the first quarter of 2012.

*     *     *

> *The remainder of the 2012 provision for residential loans totaling $39.4 million reflects new loans becoming delinquent, delinquent loans aging in delinquency, the continuing receipt of new appraisals, and other declines in value estimates on collateral dependent loans*.

- 54 -

172.    The statements referenced above in ¶171 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; and (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.

173.    Finally, the 2Q12 10-Q represented that although "the Company's disclosure controls and procedures were [still] not effective as of June 30, 2012[,]" and "the Company ha[d] identified . . . material weaknesses in its system of internal control over financial reporting," Defendants had "***taken reasonable steps to ascertain that the financial information contained in [the 2Q12 10-Q]*" was presented "*in accordance with [GAAP]*.*"

174.    The statements referenced above in ¶173 concerning Doral's internal controls and the accuracy of the Company's financial results were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) the material weaknesses in Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were far more systematic and widespread than Defendants represented, and as a result, the Company could not effectively comply with the Consent Order; and (b) Defendants had not taken reasonable steps to ascertain that Doral's financial results were presented in accordance with GAAP, and Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

175.    The following day, on August 9, 2012, Defendants held a conference call with analysts and investors, during which Defendant Wakeman commented on the Consent Order, in pertinent part, as follows:

. . . [Y]esterday Doral Bank executed a consent order with the FDIC.  That order has a number of requirements including capital targets.  **It is very important to note that Doral Bank fully complies with and in fact exceeds these capital targets**.

\*        \*        \*

Turning to the order, . . . **very importantly, we agreed to maintain an 8% leverage ratio, 10% Tier 1, and 12% total risk-based capital levels in the Bank**.

**We comply with those requirements today as a result of the regulatory capital we generated in the first quarter.  Moreover, we maintain in excess to those requirements of over $150 million in our Holding Company.  Put simply, we do not need to raise capital to comply with this order**.

\*        \*        \*

And finally, we have agreed to improve our credit and risk administration functions, which requires investments in staffing and subject matter experts. . . . **[W]e are confident in our ability to fully comply with this order**.

176.    During the call, when an analyst asked whether Defendants "expect[ed] any trouble renewing any brokered [deposits]," as a result of the Consent Order, Defendants provided the following reassurances:

Defendant Wakeman:

**Actually, we don't**. . . . We have a substantial amount of cash on hand. . . .

So, **we foresee no immediate term impacts and, frankly, or medium term as well. This is a customary process, and we expect our ability to receive the appropriate waivers and so forth as part of ordinary course**. . . .

Defendant Wahlman:

. . . **Doral believes that it has significant, adequate funding for its business activities in the short term and the medium term**.  We . . . are sitting on over $500 million of cash at this point in time.

- 56 -

*And we do expect that the [brokered] deposit waiver process will only take a couple of weeks once the application is complete, which will be in short order. So, there is really not going to be any effect in terms of our operations there.*

177.     During the call, Defendant Wakeman emphasized that:

*One of the things to point out about the [consent] order is that the assessments and so forth of the Company – I think this is a very important point – did not consider . . . the capital that we generated . . . in the first quarter.*  And so in some regards, as there always is in examination cycles . . ., there is a little bit of a lag . . . factor.

178.     Also during the call, when an analyst asked about the circumstances under which

Doral might need to raise capital to comply with the Consent Order, Defendant Wakeman

reassured investors in the following exchange:

Orin Kramer – Boston Provident – Analyst:

. . . [Y]ou said we do not need to raise capital to comply with this order and I just want to understand.  Does that mean we do not need to raise capital at this point or does it mean that absent a material deterioration in the Puerto Rican economy, we will not need to raise capital to comply with this order?

Defendant Wakeman:

It means *as of right now, we have not only excess capital, we are not only complying with the order but we have an incremental additional $150 million worth of eligible capital over and above the 8% requirement.*

Orin Kramer – Boston Provident – Analyst:

Just so I understand, that means absent different economic dynamics that we are not currently looking at, we will not need to raise capital to comply with this order?

Defendant Wakeman:

I think *that is correct.*

179.     When the same analyst asked about the circumstances under which the Consent

Order would require the Bank to "enter into a merger or sell or liquidate," the following

exchange occurred:

<u>Defendant Wakeman</u>:

. . . That takes place if and only if the bank falls below the 8% Tier 1 requirement and *that is why the incremental $150 million is such an important factor*.

<u>Orin Kramer - Boston Provident – Analyst</u>:

And *you are confident that again absent a change in economic conditions, that clause is not going to be triggered?*

<u>Defendant Wakeman</u>:

*Yes*.

180.    The statements referenced above in ¶¶175-79 concerning the adequacy of the Company's capital; Doral's ability to comply with the Consent Order; and the expected impact of the Consent Order were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order; and (c) as a result of the numerous undisclosed problems undermining the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived, and the material weaknesses in Doral's internal controls related to the Company's ALLL, the Company could not effectively comply with the Consent Order.

**Third Quarter 2012 Financial Results**

181.    On September 13, 2012, Doral announced that the Company had entered into the Written Agreement with the FRBNY, as discussed above in ¶¶75-77.

182.    On November 9, 2012, the Company issued a press release entitled "Doral . . . Reports Financial Results for the Quarter Ended September 30, 2012 [–] Reports Net Loss of

$32.5 million . . . ; ***Capital Ratios Continue to Exceed Well-Capitalized Standards***.”  Defendant

Wakeman emphasized that, despite the net loss, Doral had “***preserved . . . high levels of***

***capital[.]***”  The press release further discussed Doral’s capital levels, in pertinent part, as

follows:

> *[Doral] [p]reserved excess capital levels well above the standards established by*
> *the federal banking agencies with ratios of Tier 1 Leverage of 9.32%, Tier 1*
> *Risk-based Capital of 11.94% and Total Risk-based Capital of 13.26%.  The*
> *Leverage, Tier 1 and Total Risk-based Capital Ratios exceeded the well-*
> *capitalized standards by $361.3 million, $387.9 million and $213.0 million,*
> *respectively*.

183.    The statements referenced above in ¶182 concerning Doral’s capital ratios and the

adequacy of the Company’s capital were materially false and misleading because Defendants

misrepresented and failed to disclose that: (a) Defendants had inflated Doral’s capital by

deliberately understating the Company’s ALLL; and (b) there was a material risk that the

Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral

the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have

adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

184.    The press release discussed Doral’s provision for loan and lease losses, in

pertinent part, as follows:

> *[Doral] [i]ncreased loan and lease loss provisions by $29.2 million to $34.4*
> *million in the third quarter of 2012, compared to $5.2 million in the second*
> *quarter of 2012 as a result of re-defaults on previously modified loans and new*
> *valuations of defaulted residential loans*.
>
>                    *             *             *
>
> *Provision for loan and lease losses for the third quarter of 2012 was $34.4*
> *million, an increase of $29.2 million over the second quarter 2012 provision,*
> *and a decrease of $7.3 million from the provision recorded in the third quarter*
> *of 2011.  The $34.4 million provision for loan and lease losses in the third*
> *quarter of 2012 resulted mainly from the residential mortgage portfolios ($28.8*
> *million), and resulted from higher re-defaults of previously modified loans and*
> *new valuations of defaulted loans, all related to Puerto Rico loan exposures*.

185.    The statements referenced above in ¶184 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

186.    Also on November 9, 2012, Doral filed its quarterly report for the third quarter, ended September 30, 2012, with the SEC on Form 10-Q, which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Wahlman.    The 3Q12 10-Q represented that "[a]s of September 30, 2012, Doral Bank was in compliance with all the applicable regulatory capital requirements[,]" including the more stringent capital requirements set forth in the Consent Order (*i.e.*, a Tier 1 Capital Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10%, and a Total Risk-Based Capital Ratio of at least 12%), and the Company "exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA].  The 3Q12 10-Q set forth Doral's and the Bank's regulatory capital ratios as follows:

|  | As of September 30, 2012 | |
| --- | --- | --- |
|  | Doral Financial | Doral Bank |
| Total Capital Ratio (Total capital to risk-weighted assets) | 13.3% | 12.8% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 11.9% | 11.5% |
| Tier 1 Leverage Ratio[1] | 9.3% | 8.2% |

[Footnote omitted.]

187.    Under the heading "Deferred Tax Components," the 3Q12 10-Q contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above in ¶149) and 2Q12 10-Q of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the agreement, the Commonwealth of Puerto Rico

states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period[,]" and emphasizing that the "agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral."  The 3Q12 10-Q further stated, in pertinent part, as follows:

> The deferred income tax benefit of $116.5 million for the nine month period ended September 30, 2012 resulted mainly from the $113.7 million benefit recorded when Doral Financial Corporation and its P.R. domiciled subsidiaries entered into a new Closing Agreement with the Commonwealth of Puerto Rico related to past income tax overpayments, which allowed Doral to convert certain DTAs into a prepaid tax.
>
> *       *       *
>
> Prepaid taxes increased $226.4 million and the DTA decreased $102.7 million mostly as a result of the de-recognition of a DTA that was recorded as a receivable from the Commonwealth of Puerto Rico and the release of the valuation allowance associated to the derecognized DTA.

188.    The statements referenced above in ¶¶186-87 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

189.    The 3Q12 10-Q also stated that following the provisions for loan and lease losses for the quarter and nine months ended September 30, 2012 of $34.413 million and

$154.803 million, respectively, the Company's ALLL was $145.773 million as of September 30,

2012.  The 3Q12 10-Q further stated, in pertinent part, as follows:

> The provision for loan and lease losses for the quarter ended September 30, 2012 was $34.4 million, a decrease of $7.3 million compared to the $41.7 million provision for the corresponding 2011 period.  The provision for loan and lease losses in the third quarter of 2012 resulted primarily from commercial real estate, commercial and industrial, and the residential mortgage portfolios, particularly related to Puerto Rico loan exposures. ***The lower provision for the third quarter of 2012 compared to the same period of 2011 resulted from less deterioration in credit quality and collateral values in the residential mortgage and construction and land portfolios***.

> \*       \*       \*

> Provisions were made during the quarter ended September 30, 2012 for residential mortgage and commercial real estate loans as described below:

> •   Residential Mortgage Loans – The provision for loan and lease losses for the three months ended September 30, 2012 totaled $28.8 million . . . . The $28.8 million provision in the quarter is a result of valuation adjustments for loans 180 days or more delinquent based upon the receipt of new appraisals ($12.0 million) as Doral worked through the backlog of stale appraisals, an increase in the amount of previously modified loans that defaulted ($6.0 million), and an increase in Doral's estimate of all TDR loans that will re-default prior to pay off by 4% to 35% ($4.4 million). In addition, during the third quarter of 2012, management recorded a one-time charge of $7.0 million to reflect the estimated future performance of certain loans modified between September 2010 and March 2011. Management believes that certain loans modified during this period have had performance dissimilar from other periods of modified loans.

> •   Commercial Real Estate Loans – The provision for loan and lease losses for the quarter ended September 30, 2012 totaled $3.4 million, . . . as fewer adjustments are needed as loan performance has stabilized and newer appraisals are reflecting more stable market values.

> •   Commercial and Industrial Loans – The provision for loan and lease losses for the quarter ended September 30, 2012 totaled $3.9 million, . . . as a result of the growth in the U.S. commercial loan portfolio during the period.

> \*       \*       \*

> ***During 2012, management reviewed its ALLL estimate assumptions and calculations and adopted a more conservative outlook as to future loan performance considering the uncertain economic and regulatory environments.***

*The resulting changes in estimate are reflected in the September 30, 2012 allowance for loan and lease losses*.

\*     \*     \*

These changes resulted in approximately $81.0 million in provisions in the first quarter of 2012.

\*     \*     \*

*The remainder of the 2012 provision for residential mortgage loans totaling $19.3 million reflects the continuing receipt of new appraisals, previously delinquent and modified loans defaulting on the modified loan terms, new loans becoming delinquent, delinquent loans aging in delinquency, and other changes in factors affecting the TDR cash flow forecasts*.

190.    The statements referenced above in ¶189 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

191.    Finally, the 3Q12 10-Q represented that although "the Company's disclosure controls and procedures were [still] not effective as of September 30, 2012[,]" and "the Company ha[d] identified . . . material weaknesses in its system of internal control over financial reporting," Defendants had "*taken reasonable steps to ascertain that the financial information contained in [the 3Q12 10-Q]*" was presented "*in accordance with [GAAP]*."

192.    The statements referenced above in ¶191 concerning Doral's internal controls and the accuracy of the Company's financial results were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) the material weaknesses in Doral's

internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were far more systematic and widespread than Defendants represented, and as a result, the Company could not effectively comply with the Consent Order and the Written Agreement; and (b) Defendants had not taken reasonable steps to ascertain that Doral's financial results were presented in accordance with GAAP, and Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

193.    In an additional press release issued on November 9, 2012, Doral disclosed that on November 8, 2012, it had received a notice from the NYSE stating that the Company was not "in compliance with the NYSE's continued listing standards because the average per share closing price of [Doral's] common stock for the consecutive 30 trading-day period ending on October 31, 2012 ha[d] fallen below the NYSE's share price requirement[]" of at least $1.00 per share.   The press release stated that Doral had six months to cure the deficiency – or face delisting.

194.    Later in the day on November 9, 2012, Defendants held a conference call with analysts and investors, during which Defendant Wakeman explained that "the biggest impact on the quarter" was Doral's $34.4 million provision for loan and lease losses.   Defendants commented on the provision, in pertinent part, as follows:

<u>Defendant Wakeman</u>:

. . . Well, the third quarter results are disappointing.  There is really no other way to say it.  We are reporting a $32.5 million loss that's driven by the volatility in the TDR [*i.e.*, troubled debt restructuring] portion of our mortgage book. . . . To be clear, we're not satisfied with the quarter.  ***Our loss was largely driven by provisions [for loan and lease losses] of $34 million***. . . . ***[R]esidential mortgages accounted for 85% of the provisions this quarter, primarily driven by our TDR portfolio***.

Defendant Wahlman:

. . . I did want to point out that with the provisions . . . ***Doral's allowance for loan lease losses provide[s] strong coverage for losses*** that reasonably could be expected to rise in the portfolio.

195.     During the call, when an analyst asked about Doral's provision for loan and lease

losses, Defendant Wahlman responded, in pertinent part, as follows:

Dean Keaton – Property Investments – Analyst:

. . . In terms of looking back over the last six quarters, ***the provision [for loan and lease losses] has seen some high peaks and pretty low valleys***. . . . [T]here is . . . an extraordinary $100 million-plus proviso[n] in the first quarter of this year. ***What's driving those inconsistent spikes?***

Defendant Wahlman:

***There will be different factors at different points in time that will affect the allowance loan and lease losses***. . . .

***During the first quarter of [2012]***, . . . ***there were a number of adjustments, changes in the assumptions that underline our calculation for the allowance loan and lease losses that were incorporated into the model and are generally gravitat[]ed towards a more conservative set of assumptions***. . . . ***In this particular quarter***, as we've just disclosed, ***it's kind of a mixed bag of thing. None of the same drivers is what we had last quarter***.

And the drivers this time are . . . the residential mortgage loan portfolio, and ***in particular, the driver this quarter was the TDR loans***, where we had . . . a segment of those TDR loans that did not perform at the level that we had expected and that had previously been built into the model.  And so as we put through the actual performance, we ended up with an increase in reserves. . . . ***So it's really a different story for each quarter***.

196.     The statements referenced above in ¶¶194-95 concerning Doral's ALLL and

PLLL and the Company's basis for determining the amount of those reserves were materially

false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's

ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined

the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan

and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in

compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

197.    Also during the call, an analyst questioned Defendants about Doral's capital adequacy, and Defendants provided the following reassurances:

<u>Dean Keaton – Property Investments – Analyst</u>:

. . . I see that you contributed $65 million in capital from the holding company to the bank to comply with the capital requirements of your cease-and-desist order. What do you have in terms of liquid assets if the holding company is to continue to be able to do that?

<u>Defendant Wahlman</u>:

*. . . [W]e continue to believe that the holding company will serve as a source of strength to the bank. There [is] in excess over $100 million that we have in terms of assets that can be moved down to the bank should it need the additional support*.

\*        \*        \*

*. . . The bank continues to exceed all of the capital ratios that are required by the consent order.  And we continue to expect that they will continue to exceed all the capital ratios of the consent order*. . . .

198.    The statements referenced above in ¶197 concerning the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

199.    Finally, during the call, Defendant Wakeman responded to an analyst's question about Doral's and the Bank's compliance with the Consent Order and the Written Agreement, in pertinent part, as follows:

- 66 -

*Well, we're fully compliant with the orders.  And we are, line-by-line, very actively managing to the orders.  And we believe that we have nothing to report in terms of being non-compliant.*

200.    The statements referenced above in ¶199 concerning Doral's and the Bank's compliance with the Consent Order and the Written Agreement were materially false and misleading because Defendants misrepresented and failed to disclose that Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

**Fourth Quarter and Full Year 2012 Financial Results**

201.    On March 13, 2013, Doral unexpectedly announced that Defendant Wahlman was resigning from his positions as CFO, Chief Investment Officer and an Executive Vice President, effective May 17, 2013 – ostensibly "to pursue other interests."  Doral announced that Defendant Ivanov would serve as the interim CFO while the Company searched for a permanent successor.

202.    Also on March 13, 2013, the Company issued a press release entitled "Doral . . . Reports Financial Results for the Quarter Ended December 31, 2012 [–] Reports Net Income of $28.3 million . . . ; *Capital Ratios Continue to Exceed Well-Capitalized Standards*."  Defendant Wakeman commented, in pertinent part, as follows:

*Over the past year, Doral improved revenue, capital and generated substantial benefits from our tax assets while making significant investments in credit and compliance. . . .*

203.    The press release continued to assure investors that Doral's capital levels were more than sufficient, stating, in pertinent part, as follows:

*[Doral] [p]reserved excess capital levels well above the standards established by the federal banking agencies . . . .*

\*        \*        \*

*The Company's capital ratios continue to exceed the well-capitalized standards established by the federal banking agencies with ratios of Tier 1 Leverage of*

*9.39%, Tier 1 Risk-based Capital of 11.93% and Total Risk-based Capital of 13.19%. The Leverage, Tier 1 and Total Risk-based Capital Ratios exceeded the well-capitalized standards by $363.7 million, $386.8 million and $208.0 million, respectively*.

204.    The statements referenced above in ¶¶202-03 concerning Doral's capital ratios and the adequacy of the Company's capital; and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

205.    The press release discussed Doral's provision for loan and lease losses, in pertinent part, as follows:

> *[Doral] [p]rovided $21.3 million for loan and lease losses as a result of redefaults on previously modified loans and new valuations received on defaulted residential mortgage loans compared to a $34.4 million provision in the third quarter of 2012 and a $9.9 million provision in the fourth quarter of 2011. The $21.3 million provision for loan and lease losses in the fourth quarter of 2012 resulted mainly from provisions of $11.7 million and $8.6 million for residential mortgage and commercial real estate portfolios respectively*.

206.    The statements referenced above in ¶205 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

207.    The same day, on March 13, 2013, Doral filed its annual report for the year ended December 31, 2012 with the SEC on Form 10-K, which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Wahlman.  The 2012 10-K represented that "[a]s of December 31, 2012, Doral Bank exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA]," and "was in compliance with all the regulatory capital requirements that were applicable to it . . . as well as those minimums related to the Consent Order and Written Agreement" (*i.e.*, a Tier 1 Capital Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10% and Total Risk-Based Capital Ratio of at least 12%).  The 2012 10-K set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as follows:

| | Doral Financial | Doral Bank | Well Capitalized Minimum Under FDICIA's Prompt Corrective Action Provisions |
|---|---|---|---|
| Total capital ratio (Total capital to risk weighted assets) | 13.2% | 12.8% | 10.0% |
| Tier 1 capital ratio (Tier 1 capital to risk weighted assets) | 11.9% | 11.5% | 6.0% |
| [Tier 1] Leverage ratio (Tier 1 capital to adjusted average assets) | 9.4% | 8.2% | 5.0% |

208.    Under the heading "Deferred Tax Components," the 2012 10-K contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above in ¶149), 2Q12 10-Q and 3Q12 10-Q of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the Closing Agreement the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto

Rico may pay over a five-year period[,]" and emphasizing that "[t]he Closing Agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral."  The 2012 10-K further stated, in pertinent part, as follows:

> The deferred income tax benefit of $166.7 million for the year ended December 31, 2012 resulted mainly from the $113.7 million benefit recorded when Doral Financial Corporation and its P.R. domiciled subsidiaries entered into a Closing Agreement with the Commonwealth of Puerto Rico related to past income tax overpayments, which allowed Doral to convert certain DTAs into a prepaid tax . . . .
>
> \*        \*        \*
>
> Prepaid taxes increased $227.4 million and the DTA decreased $62.3 mostly as a result of the de-recognition of a DTA that was recorded as a receivable from the Commonwealth of Puerto Rico and the release of the valuation allowance associated with the derecognized DTA.

209.    The statements referenced above in ¶¶207-08 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

210.    The 2012 10-K also stated that following the provisions for loan and lease losses for the quarter and full year ended December 31, 2012 of $21.295 million and $176.098 million, respectively, the Company's ALLL was $135.343 million as of December 31, 2012.  The 2012 10-K further stated, in pertinent part, as follows:

. . . The provision for loan and lease losses in 2012 resulted from: (i) $112.0 million for non-guaranteed residential loans as new loans became delinquent, previously delinquent loans reached later delinquency stages and valuations were received on properties securing loans more than 180 days past due; (ii) $23.8 million from construction and land largely due to valuations on properties collateralizing impaired loans and continued deterioration of loan performance; (iii) $4.3 million for growth in the U.S. commercial and industrial loan portfolio; and (iv) $35.3 million for commercial real estate related to valuations received on properties securing delinquent loans and adverse loan performance experienced during the year.  Also affecting the 2012 provision was Doral's revision of its future Puerto Rico portfolio performance expectations due to the continuing underperformance of Puerto Rico's economy and the current regulatory environment.

*       *       *

. . . *During 2012, management undertook an effort to review the assumptions and modeling underlying its allowance for loan and lease loss valuation and align the Company's estimate with a more conservative view of future loan performance reflective of the uncertain economic and regulatory environments within which Doral operates.  The resulting changes in estimates are captured in the 2012 allowance for loan and lease losses and the corresponding provision*.

*       *       *

. . . *The 2012 PLLL in general reflects the more conservative estimates adopted by Doral in the provision for loan and lease loss estimates, the receipt of new valuations on properties previously defaulted on their loans or defaulting on their loans during the year, and the increase in nonperforming loans, particularly in the residential mortgage loan portfolio*.  Substantially all the 2012 provision for loan and lease losses relates to loans extended to borrowers domiciled in Puerto Rico.

*       *       *

*As of December 31, 2012, the Company's allowance for loan and lease losses was $135.3 million*, an increase of $32.7 million from $102.6 million as of December 31, 2011.  This growth was driven by an increase in the allowance of loan and lease losses of $35.5 million in residential mortgage loans, $9.5 million in commercial real estate, and $1.1 million in the commercial and industrial portfolio, related to charge offs of previously reserved loans and foreclosure process upon the receipt of updated valuations on properties securing these loans. This increase was partially offset by decreases in the allowance of loan and lease losses of $11.0 million on the construction and land and $2.3 million on the other consumer portfolio resulting from the decrease in non-performing loans.

- 71 -

The provision for loan and lease losses for the year ended December 31, 2012 increased by $108.6 million to $176.1 million compared to $67.5 million for the same period in 2011.  This upswing is related to increases of $80.6 million in non-FHA/VA residential mortgage provision, and $29.5 million in commercial real estate provision.

211.    The statements referenced above in ¶210 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

212.    Finally, the 2012 10-K represented that the material weaknesses identified in the 2011 10-K had "*been remediated*" and "the Company's internal control over financial reporting" and "disclosure controls and procedures" were "*effective*" as of December 31, 2012.

213.    The statements referenced above in ¶212 concerning Doral's internal controls were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were ineffective, and as a result, the Company could not comply with the Consent Order and the Written Agreement; and (b) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

214.    The following day, on March 14, 2013, Defendants held a conference call with analysts and investors, during which they discussed the Company's capital levels and provision for loan and lease losses, in pertinent part, as follows:

- 72 -

Defendant Wakeman:

*We substantially repositioned and improved Doral in 2012*.  Our earnings were up year-over-year by over $8 million, as we approached break-even on an after-tax basis.  *We generated $225 million of new capital.  We fortified our credit provisions*, maintained our book value per share, and continued to grow our revenues. . . .

\*        \*        \*

*For the year, tax management was a key part of our 2012 improvements.  In the first quarter, we reached an agreement with the Puerto Rico government to convert a portion of our DTA, deferred tax asset, to a receivable.  This agreement contributed $114 million to earnings and generated $225 million of capital*.

\*        \*        \*

*During the year, we also incurred significant credit expenses, while adding $176 million in . . . provisions [for loan and lease losses]*.

\*        \*        \*

. . . [P]rovisions [for loan and lease losses] for the quarter were heavily influenced by updated valuations of our real estate backed assets in Puerto Rico.  *These valuation adjustments represented approximately $17 million of the $21 million provision recorded in Q4*.

\*        \*        \*

. . . Now *despite our asset quality challenges, and these significant provisions, we continue to exceed our consent order capital requirements.   It's important to note that*. . . .

Defendant Wahlman:

. . . [Here] is some additional information related to, and intended to provide insight into, *the $21.3 million Q4 provision for loan and lease losses and our overall level of allowance for loan and lease losses*.  *The Q4 provision arose from the Puerto Rico residential mortgage loan portfolio and the Puerto Rico largely small commercial real estate loan portfolio*.  In those portfolios, $16.9 million, or 75% of our Q4 provision, resulted from adjustments to our reserves due to new estimates of property values, $11.8 million of these valuation adjustments arose from the Puerto Rico residential mortgage loan portfolio, and $5.1 million arose from the Puerto Rico commercial real estate portfolio.  Only $3.4 million of the $21.3 million Q4 provision arose from new or worsening delinquencies in our Puerto Rico or US loan portfolios.

- 73 -

215.    The statements referenced above in ¶214 concerning the adequacy of the Company's capital; the 2012 Closing Agreement and the Tax Receivable; and Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order; (c) Doral's ALLL and PLLL were deliberately understated; (d) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (e) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

216.    During the call, an investor asked about the Tax Receivable that was the subject of the 2012 Closing Agreement, and Defendants responded, in pertinent part, as follows:

Greg Greenberg – Private Investor:

. . . First question has to do with the pre-paid income tax line.  I noticed that you have the right to claim a refund, and then you would be paid over a 5-year period.  And especially the $103.8 million that seems to be at the hold[ing] co[mpany] level, have you asked for that refund?  And if not, why not?

Defendant Wahlman:

We haven't asked for that.  *We frankly haven't been compelled to ask for it*.

Defendant Wakeman:

I would just add, *there are some other strategies that we could follow that may be to our advantage to retain this as a prepaid asset as opposed to receiv[ing] cash*.

217.    The statements referenced above in ¶216 concerning the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

**First Quarter 2013 Financial Results**

218.    On May 8, 2013, after the close of the market, the Company issued a press release entitled "Doral . . . Reports Financial Results for the Quarter Ended March 31, 2013 [–] Reports Net Loss of $12.4 Million . . . ."  The press release discussed Doral's capital levels, in pertinent part, as follows:

> ***The Company's capital ratios continue to exceed the standards established by the federal banking agencies with ratios of Tier 1 Leverage of 9.26%, Tier 1 Risk-based Capital of 11.66% and Total Risk-based Capital of 12.92%.***

219.    The statements referenced above in ¶218 concerning Doral's capital ratios and the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

220.    The press release also discussed Doral's provision for loan and lease losses, in pertinent part, as follows:

> ***[Doral] [p]rovided $18.7 million for loan and lease losses as a result of revised cumulative default estimates on modified loans, probability of default and loss given default estimates, new delinquencies and new valuations received on***

*defaulted commercial and residential mortgage loans, compared to a $21.3 million provision in the fourth quarter of 2012 and a $115.2 million provision in the first quarter of 2012.*

221.   The statements referenced above in ¶220 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

222.   The following day, on May 9, 2013, Doral filed its quarterly report for the first quarter, ended March 31, 2013, with the SEC on Form 10-Q (the "1Q13 10-Q"), which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Wahlman.  The 1Q13 10-Q represented that "[a]s of March 31, 2013, Doral . . . exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA]," and "Doral Bank was in compliance with all the regulatory capital requirements that were applicable to it . . . as well as those minimums related to the Consent Order and the Written Agreement" (*i.e.*, a Tier 1 Capital Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10% and Total Risk-Based Capital Ratio of at least 12%).  The 1Q13 10-Q set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as follows:

| | As of March 31, 2013 | | Well Capitalized Minimum (Under FDICIA's Prompt Corrective Action Provisions) |
|---|---|---|---|
| | Doral Financial | Doral Bank | |
| Total Capital Ratio (Total capital to risk-weighted assets) | 12.9% | 12.8% | 10.0% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 11.7% | 11.5% | 6.0% |
| Tier 1 Leverage Ratio [(1)] | 9.3% | 8.4% | 5.0% |

[Footnote and 12/31/12 capital ratios omitted.]

223.    Under the heading "Deferred Tax Components," the 1Q13 10-Q contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above in ¶149), 2Q12 10-Q, 3Q12 10-Q and 2012 10-K of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the Closing Agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period[,]" and emphasizing that "[t]he Closing Agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral."

224.    The statements referenced above in ¶¶222-23 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable

and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

225.    The 1Q13 10-Q also stated that following the $18.723 million provision for loan and lease losses taken during the first quarter of 2013, the Company's ALLL was $125.29 million as of March 31, 2013.   The 1Q13 10-Q further stated, in pertinent part, as follows:

> ***During the first three months of 2013, the Company recorded a provision for loan and lease losses of $18.7 million***, and recorded charge-offs, net of recoveries, of $28.8 million. . . .
>
> \*        \*        \*
>
> The PLLL for the three months ended March 31, 2013 resulted from: (i) $9.3 million in residential mortgage loans resulting mainly from increased estimate of future defaults on modified loans, deterioration in the probability of default and loss given ratios and updated property valuations; (ii) $3.8 million in commercial real estate loans resulting mainly from the receipt of new valuations on loans measured for impairment and deteriorating delinquency and; (iii) $3.8 million in commercial and industrial loans and $1.7 million in construction and land loans mainly attributed to the receipt of new valuations on loans measured for impairment. . . .
>
> \*        \*        \*
>
> As of March 31, 2013, the Company's allowance for loan and lease losses was $125.3 million, a decrease of $10.1 million from $135.3 million as of December 31, 2012.  This decrease resulted mainly from charge-offs totaling $30.9 million, partially offset by recoveries of $2.1 million and a provision of $18.7 million.
>
> \*        \*        \*
>
> Doral Financial's allowance for loan and lease loss coverage ratios for the portfolio (2.02%) and for non-performing loans (19.14%) are low relative to industry levels considering the number of problem assets, ***however management believes the allowance for loan and lease losses appropriately recognizes credit risks and inherent losses***.

226.    The statements referenced above in ¶225 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and

misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

227.    Finally, the 1Q13 10-Q represented that there had "been no changes in [Doral's] internal control over financial reporting" and "***the Company's disclosure controls and procedures were effective as of March 31, 2013***."

228.    The statements referenced above in ¶227 concerning Doral's internal controls were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were ineffective, and as a result, the Company could not comply with the Consent Order and the Written Agreement; and (b) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

229.    Also on May 9, 2013, Defendants held a conference call with analysts and investors, during which an analyst asked about the $25 million "in new capital" that Doral had contributed to the Bank during the first quarter, and Defendant Wakeman stated that Doral still had "pretty close to the same $100 million" available to contribute to the Bank's capital going forward.

230.    The statement referenced above in ¶229 concerning the adequacy of the Company's capital was materially false and misleading because Defendants misrepresented and

failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

231.    On June 28, 2013, Doral effectuated a 20-for-1 reverse stock split of the Company's issued and outstanding common stock in order to regain compliance with the NYSE's requirement that the stock have an average closing price of at least $1.00 per share, thereby reducing the number of issued and outstanding shares of common stock from approximately 134 million to approximately 6.7 million.

**Second Quarter 2013 Financial Results**

232.    On August 14, 2013, after the close of the market, Doral issued a press release announcing its financial results for the second quarter, ended June 30, 2013, and reporting a net loss of $10.4 million for the quarter.  The press release emphasized that Doral had "[p]reserved capital levels" and the Company's "capital ratios [were] in excess of regulatory requirements," and stated, in pertinent part, as follows:

> *The Company's capital ratios exceed the standards established by the federal banking agencies, with ratios of Tier 1 Leverage of 8.98%, Tier 1 Risk-based Capital of 11.21%, and Total Risk-based Capital of 12.51%.*

233.    The statements referenced above in ¶232 concerning Doral's capital ratios and the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral

the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

234.    With respect to Doral's provision for loan and lease losses, the press release stated, in pertinent part, as follows:

> *[Doral] [p]rovided $5.5 million for loan and lease losses, largely as a result of new valuations received on delinquent and defaulted residential and commercial loans*.

*        *        *

> *Loan and lease loss provision for June 30, 2013 quarter was $5.5 million as a result of the $4.6 million reduction related to a cumulative correction of $6.2 million in overstated forbearance balances on modified loans as well as revised cumulative default estimates on modified loans, probability of default and loss given default estimates, new delinquencies, and new valuations received on defaulted commercial and residential mortgage loans*, compared to a $18.7 million provision in the three months ended March 31, 2013 and a $5.2 million provision in the three months ended June 30, 2012.

235.    The statements referenced above in ¶234 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

236.    The following day, on August 15, 2013, Doral filed its quarterly report for the second quarter, ended June 30, 2013, with the SEC on Form 10-Q, which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Ivanov.  The 2Q13 10-Q represented that  "[a]s of June 30, 2013, Doral . . . exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA]," and "Doral Bank was in compliance with all the

regulatory capital requirements that were applicable to it . . . as well as those minimums related to the Consent Order and the Written Agreement" (*i.e.*, a Tier 1 Capital Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10% and Total Risk-Based Capital Ratio of at least 12%).  The 2Q13 10-Q set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as follows:

| | As of June 30, 2013 | | Well Capitalized Minimum (Under FDICIA's Prompt Corrective Action Provisions) |
|---|---|---|---|
| | Doral Financial | Doral Bank | |
| Total Capital Ratio (Total capital to risk-weighted assets) | 12.5% | 12.7% | 10.0% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 11.2% | 11.4% | 6.0% |
| Tier 1 Leverage Ratio [(1)] | 9.0% | 8.5% | 5.0% |

[Footnote and 12/31/12 capital ratios omitted.]

237.    Under the heading "Deferred Tax Components," the 2Q13 10-Q contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above in ¶149), 2Q12 10-Q, 3Q12 10-Q, 2012 10-K and 1Q13 10-Q of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the Closing Agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period[,] and emphasizing that "[t]he Closing Agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral."

238.    The statements referenced above in ¶¶236-37 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

239.    The 2Q13 10-Q also stated that following the provisions for loan and lease losses for the quarter and six months ended June 30, 2013 of $5.536 million and $24.259 million, respectively, and the Company's ALLL was $112.467 million as of June 30, 2013.  The 2Q13 10-Q further stated, in pertinent part, as follows:

> **The provision for loan and lease losses for the three months ended June 30, 2013 was $5.5 million**, . . . *notwithstanding the $4.6 million reduction related to a cumulative correction of $6.2 million in overstated forbearance balances on modified loans*.

*      *      *

. . . The provision for loan and lease losses by loan category was:

•   Residential mortgage – provision for loan and lease losses of $4.4 million compared to $2.5 million recorded for the same 2012 period.  The increase in the 2013 provision resulted principally from additional loans reaching 180 days past due.

•   Commercial real estate – reversal of provision for loan and lease losses of $0.4 million compared to a provision of $3.9 million recorded for the same 2012 period.  The 2013 reversal of provision resulted largely from a decrease in charge-offs of $7.0 million, or 65.9% when compared to the same period in 2012, reducing the allowance required.

•   Commercial and industrial – reversal of provision for loan and lease losses of $28,000 for the three months ended June 30, 2013 mostly the result of an

- 83 -

enhanced risk-rating provision approach for the leveraged lending business in the US, partially offset by downgrades in the Shared National Credit risk rating.

• Construction and land – provision for loan and lease losses of $1.2 million compared to a reversal of provision of $0.7 million recorded for the same 2012 period.  The 2013 provision is largely the result of new valuations received on loans measured individually for impairment.

\*       \*       \*

*As of June 30, 2013, the Company's allowance for loan and lease losses was $112.5 million*, a decrease of $22.9 million, or 16.9%, from $135.3 million as of December 31, 2012.   This decrease resulted from charge-offs totaling $51.2 million, partially offset by recoveries of $4.0 million and a provision of $24.3 million.

240.    The statements referenced above in ¶239 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

241.    The 2Q13 10-Q further explained that Doral had needed to make "out-of-period adjustments" impacting its ALLL to correct errors going back *ten quarters*, stating, in pertinent part, as follows:

*[T]he Company determined that it had incorrectly recorded $6.2 million interest income cumulatively from January 1, 2011 through June 30, 2013 (a period of ten fiscal quarters).  In correcting the interest income over accrual there was a corresponding, cumulative adjustment to the ALLL associated with the loan modifications*.  In particular, the Company has reduced the reserves in the ALLL totaling $4.6 million, all of which has been recognized into income as of the three and six months period ended June 30, 2013.   This results in a cumulative adjustment of $1.6 million.

The cumulative effect of all of these adjustments is a pre-tax decrease by $1.6 million to the Company's income in the fiscal quarter ended June 30, 2013. Further, *the Company determined that these accounting issues constitute a control deficiency that has been corrected principally by a change in the loan modification process, as well as other changes in the Company's accounting procedures implemented through the second fiscal quarter of 2013.*

\*     \*     \*

*During the quarter ended June 30, 2013, the Company recorded several out-of-period adjustments that affected the consolidated results of operations for the three and six months ended June 30, 2013.  The out-of-period adjustments relate primarily to the incorrect recording of past due interest associated with a number of loan modifications and the resulting effect of this adjustment on the calculation of the allowance for loan losses, segmentation of certain modified loans within the ALLL model, and recourse liability.*  The impact on loss before taxes for the three-month and six-month periods ended June 30, 2013 resulted in an increase in the losses recognized of $4.4 million and $3.1 million, respectively. The impact of correcting these errors in the prior periods would have increased (decreased) loss before income taxes by approximately $1.3 million, $3.5 million, and $(0.2) million for the three-month period ended March 31, 2013, year ended December 31, 2012, and six-month period ended June 30, 2012, respectively. *The Company assessed the impact of the adjustments needed to correct these errors in the appropriate periods and concluded that recording the adjustments in the quarter ended June 30, 2013, rather than restating the prior periods impacted, was quantitatively and qualitatively not material to the results of operations, financial position, and cash flows corresponding to the prior periods impacted.*

242.   The statements referenced above in ¶241 concerning the out-of-period adjustments impacting Doral's ALLL were materially false and misleading because Defendants misrepresented and failed to disclose that the internal control deficiency that had resulted in the out-of-period adjustments was not an isolated issue, but instead, was indicative of systematic and widespread internal control deficiencies and numerous undisclosed problems that undermined the accuracy of Doral's ALLL and PLLL.

243.   Finally, the 2Q13 10-Q represented that – notwithstanding the "control deficiency" identified during the quarter that had caused Doral to delay the filing of the 2Q13

10-Q – there had "been no changes in [Doral's] internal control over financial reporting" and "the Company's disclosure controls and procedures were effective as of June 30, 2013."

244.  The statements referenced above in ¶243 concerning Doral's internal controls were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were ineffective, and as a result, the Company could not comply with the Consent Order and the Written Agreement; and (b) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

245.  On August 16, 2013, Defendants held a conference call with analysts and investors, during which Defendant Wakeman continued to assure investors that Doral's capital levels were more than adequate, and responded to an analyst's question on that topic, in pertinent part, as follows:

> Regarding capital, ***our Tier I leverage ratio remains 1% or approximately 100 basis points above our regulatory requirements.  We have excess capital [i]n the holding company that can be pushed down if need be in order to comply.  We can also delever[age] our balance sheet by selling lower margin assets like securities***.  So this gives us some runway to execute our strategy of building a good bank that offsets the costs of a bad bank[.]

> *       *       *

> <u>Greg Greenberg – Wells Fargo Advisors – Analyst</u>:

> . . . ***[Y]ou mentioned in your prepared comments that there were additional funds at the holding company that could be pushed down into the bank*** and I did notice reading the call reports to the last two quarters I believe you've pushed down $25 million [or so] in each of the quarters.

> ***How much did you estimate now would be still available*** before you reduce the balance sheet just as far as from the holding company to push down to the bank?

<u>Defendant Wakeman</u>:

Well, it's pretty close to 1%.  So *a rough estimate would [be] over $80 million* and it's a collection of different types of assets.

246.   The statements referenced above in ¶245 concerning the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

247.   During the call, Defendants discussed the "correction[s]" impacting Doral's ALLL, and responded to an analyst's question on that topic, in pertinent part, as follows:

<u>Defendant Hooston</u>:

. . . As discussed in our earnings release *included in results of operations for the three months ended June 30, 2013, is the correction of an error related to an over accrual of interest income during the period of January 1, 2011 through June 30, 2013.  The error resulted from an incomplete process of recording forbearance balances when modifying troubled single family residential loans. The correction of this over accrual had a net pretax impact of $1.6 million as the impact on interest income was offset by a related credit to the provision for loan and lease losses*.

\*       \*       \*

*The provision for loan and lease losses for the second quarter* . . . *reflects a $4.6 million credit to the provision associated with that excess accrual of interest income discussed above*.

\*       \*       \*

<u>John Markus – Broadville Partners – Analyst</u>:

. . . *I wondered if you could give a little more clarification on the accrual adjustments that caused the delay in the filing of the [10-]Q*.  Was that simply related to non-performing loans that were classified as accruing whereas they

- 87 -

should have been classified as non-accrual *and sort of why did this come up so late kind of in the quarter-end process?*

Defendant Wakeman:

. . . First it's not the difference between non-performing and performing. *It was basically the result of our quarter-end review process. We undergo pretty rigorous analysis*. We detected an anomaly and we chose to thoroughly research the anomaly and variance until we got to the bottom of it and then determine whether or not it was material, and we took the few extra days to do that and that's the result that you see.

*Specifically it was a product of an incomplete process of reporting the forbearance balances on the certain modified loans. So it's on the modified loan portfolio, it's residential. This is over a 30-month period and essentially the balances were booked as a receivable and a provision appropriately set, and we determined that that receivable should be reversed through the interest income because we did record it in the past*.

In terms of the effect and if you are wondering about *the going forward effect, quarterly basis we expect this to be about $0.5 million as we implement this more complete procedure*. So we don't expect a massive shock on a going forward basis but essentially this is a consequence of a thorough analysis and what we determine to be an incomplete process.

248.    The statements referenced above in ¶247 concerning the out-of-period adjustments impacting Doral's ALLL were materially false and misleading because Defendants misrepresented and failed to disclose that the internal control deficiency that had resulted in the out-of-period adjustments was not an isolated issue, but instead, was indicative of systematic and widespread internal control deficiencies and numerous undisclosed problems that undermined the accuracy of Doral's ALLL and PLLL.

249.    On October 3, 2013, the Company announced that, following regulatory approval, Defendant Hooston had been appointed as CFO and an Executive Vice President.

**Third Quarter 2013 Financial Results**

250.    On November 5, 2013, Doral issued a press release announcing its financial results for the third quarter 2013, ended September 30, 2013. The release reported that Doral

had "*reduced its net loss for the third quarter . . . to $7.5 million*" and emphasized the Company's "*continued improvement in its financial performance over . . . this year's preceding quarter*."

251.     The statements referenced above in ¶250 that Doral had "reduced its net loss for the third quarter . . . to $7.5 million" and had exhibited "continued improvement in its financial performance over . . . this year's preceding quarter" were materially false and misleading because Doral's net loss for the third quarter of 2013 should have been $14.7 million – as Defendants have now admitted – which did not represent an "improvement" over the second quarter net loss of $10.4 million.

252.     With respect to Doral's capital levels, the press release stated, in pertinent part, as follows:

> *The Company's capital ratios exceed the standards established by the federal banking agencies, with ratios of Tier 1 Leverage of 8.67%, Tier 1 Risk-based Capital of 10.72%, and Total Risk-based Capital of 12.07%.*

253.     The statements referenced above in ¶252 concerning Doral's capital ratios and the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

254.     With respect to Doral's provision for loan and lease losses, the press release stated, in pertinent part, as follows:

> *Loan and lease loss provision for the quarter ended September 30, 2013 was $16.4 million compared to a $5.5 million provision in the three months ended*

*June 30, 2013 and a $34.4 million provision in the three months ended September 30, 2012*.

255.    The statements referenced above in ¶254 concerning Doral's PLLL were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

256.    Also on November 5, 2013, Doral filed its quarterly report for the third quarter, ended September 30, 2013, with the SEC on Form 10-Q, which was signed and certified pursuant to Sarbanes-Oxley by Defendants Wakeman and Hooston.  The 3Q13 10-Q represented that "[a]s of September 30, 2013, Doral . . . exceeded the thresholds for well-capitalized banks as set forth in the . . . [FDICIA,]" and "Doral Bank was in compliance with all the regulatory capital requirements that were applicable to it . . . as well as those minimums related to the Consent Order and the Written Agreement" (*i.e.*, a Tier 1 Capital Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10% and Total Risk-Based Capital Ratio of at least 12%). The 3Q13 10-Q set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as follows:

| | As of September 30, 2013 | | Well Capitalized Minimum (Under FDICIA's Prompt Corrective Action Provisions) |
| | Doral Financial | Doral Bank | |
|---|---|---|---|
| Total Capital Ratio (Total capital to risk-weighted assets) | 12.1% | 12.3% | 10.0% |
| Tier 1 Capital Ratio (Tier 1 capital to risk-weighted assets) | 10.7% | 11.0% | 6.0% |
| Tier 1 Leverage Ratio [(1)] | 8.7% | 8.3% | 5.0% |

[Footnote and 12/31/12 capital ratios omitted.]

257.    Under the heading "Deferred Tax Components," the 3Q13 10-Q contained a substantially similar discussion to that contained in the Company's 1Q12 10-Q (referenced above in ¶149), 2Q12 10-Q, 3Q12 10-Q, 2012 10-K, 1Q13 10-Q and 2Q13 10-Q of the 2012 Closing Agreement and Doral's purported entitlement to a tax receivable, including reiterating that "[i]n the Closing Agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico can pay over a five-year period[,]" and emphasizing that "[t]he Closing Agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral."

258.    The statements referenced above in ¶¶256-57 concerning Doral's capital ratios and the adequacy of the Company's capital; and the 2012 Closing Agreement and the Tax Receivable were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

259.    The 3Q13 10-Q also stated that following the provisions for loan and lease losses for the quarter and nine months ended September 30, 2013 of $16.395 million and $40.654 million, respectively, the Company's ALLL was $133.3 million as of September 30, 2013.  The 3Q13 10-Q further stated, in pertinent part, as follows:

- 91 -

***The provision for loan and lease losses for the three months ended September 30, 2013 was $16.4 million***, reflecting a decrease of $18.0 million when compared to the $34.4 million provision for the corresponding 2012 period.  ***The decrease in the PLLL is mostly related to: (i) enhancements in the assumptions of the model***; and (ii) a decrease of $24.3 million in charge-offs recorded for the three months ended September 30, 2013 when compared to the same period in 2012.

*        *        *

. . . The provision for loan and lease losses by loan category was:

•   Residential mortgage – provision for loan and lease losses of $11.1 million compared to $28.8 million recorded for the same 2012 period.  The decrease in the 2013 provision resulted principally from model assumption enhancements to better reflect loan performance and lower outstanding balances.

•   Commercial real estate – provision for loan and lease losses of $3.3 million compared to $3.4 million for the same 2012 period.  The PLLL for the three months ended September 30, 2013 principally reflects reserve requirements for new non-performing loans.

•   Commercial and industrial – reversal of provision for loan and lease losses of $0.3 million for the three months ended September 30, 2013 mostly the result of an enhanced risk-rating provision approach for the leveraged lending business in the US, partially offset by downgrades in the Shared National Credit risk rating.

•   Construction and land – provision for loan and lease losses of $2.1 million compared to a reversal of provision of $2.1 million recorded for the same 2012 period.  The PLLL for the three months ended September 30, 2013 reflects declines in the value of collateral supporting loans in the Puerto Rico portfolio.

*        *        *

***As of September 30, 2013, the Company's allowance for loan and lease losses was $113.3 million***, a decrease of $22.0 million, or 16.3%, from $135.3 million as of December 31, 2012.  This decrease resulted from charge-offs totaling $68.9 million, partially offset by recoveries of $6.3 million and a provision of $40.7 million.

260.    The statements referenced above in ¶259 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the

accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

261.   The 3Q13 10-Q further explained that Doral had – once again – needed to make "out-of-period adjustments" impacting its ALLL, stating, in pertinent part, as follows:

> ***During the quarters ended*** June 30, 2013 ***and September 30, 2013, the Company recorded several out-of-period adjustments that affected the consolidated results of operations for the three and nine months ended September 30, 2013.  The out-of-period adjustments relate primarily to the incorrect recording of past due interest associated with a number of loan modifications and the resulting effect of this adjustment on the calculation of the allowance for loan losses, segmentation of certain modified loans within the ALLL model***, recourse liability, recognition of housing tax credits, and dividend deduction recognized in the tax provision.  The impact on loss before taxes for the three-month and nine-month periods ended September 30, 2013 resulted in a decrease in the losses recognized of $3.5 million and $3.7 million, respectively.  The impact of correcting these errors in the prior periods would have increased (decreased) loss before income taxes by approximately $1.3 million, $(0.1) million, and $(2.9) million for the three-month period ended March 31, 2013, year ended December 31, 2012, and nine-month period ended September 30, 2012, respectively.  ***The Company assessed the impact of the adjustments needed to correct these errors in the appropriate periods and concluded that recording the adjustments in the quarters ended June 30, 2013 and September 30, 2013, rather than restating the prior periods impacted, was quantitatively and qualitatively not material to the results of operations, financial position, and cash flows corresponding to the prior periods impacted***.

262.   The statements referenced above in ¶261 concerning the out-of-period adjustments impacting Doral's ALLL were materially false and misleading because Defendants misrepresented and failed to disclose that the out-of-period adjustments were not an isolated issue, but instead, were indicative of systematic and widespread internal control deficiencies and numerous undisclosed problems that undermined the accuracy of Doral's ALLL and PLLL.

263.    Finally, the 3Q13 10-Q represented that there had "been no changes in [Doral's] internal control over financial reporting" and "the Company's disclosure controls and procedures *were effective as of September 30, 2013*."

264.    The statements referenced above in ¶263 concerning Doral's internal controls were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's internal controls over financial reporting and disclosure controls, including the controls related to the Company's ALLL, were ineffective, and as a result, the Company could not comply with the Consent Order and the Written Agreement; and (b) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP and were materially false and misleading.

265.    Later in day on November 5, 2013, Defendants held a conference call with analysts and investors, during which Defendant Wakeman commented on Doral's capital levels, and responded to an analyst's question on that topic, in pertinent part, as follows:

> *Regarding capital, our Tier 1 leverage ratio remains above our regulatory requirements, we continue to hold excess capital in the holding company that can be pushed down if need be*. We can also de-lever our balance sheet by selling lower margin assets li[k]e securities, some $150 million or so. . . . And this gives us some runway to execute our strategy of building a good bank that offsets the cost of a bad bank.

> \*        \*        \*

> Todd L. Hagerman – Analyst:

> . . . And then finally, *I just wanted to ask you a question on capital. You mentioned some of the optionality that you have in the balance sheet*. Again, given the backdrop of your view of the economy and the different options, how should we think about kind of the balance sheet at least near term in terms of, is there further deleveraging, is it kind of status quo?

> \*        \*        \*

<u>Defendant Wakeman</u>:

. . . ***We do carry excess capital in the holding company that we would utilize if we needed to***.

We would de-lever if in fact we needed to de-lever and a lot of that depends on what we see happening in terms of the credit quality and the continued challenges that we have in credit quality on the island.  So I would say step one would be we take a look at assets that we wanted to expire.  Step two is liquidating assets in ordinary course on the island.  And step three would be some other choices. . . .

          *      *      *

To the degree there would be sales that made sense, we look at those, but right now we seem to be much more capital efficient, if you will, by working the loans one at a time, and until and unless something in our market changes that would be our approach.

266.    The statements referenced above in ¶265 concerning the adequacy of the Company's capital were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Defendants had inflated Doral's capital by deliberately understating the Company's ALLL; and (b) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and would not pay Doral the amount of the Tax Receivable and, if that occurred, Doral and the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

267.    During the call, Defendants assured investors that Doral's provision for loan and lease losses was adequate, and responded to an analyst's questions on that topic, in pertinent part, as follows:

<u>Defendant Hooston</u>:

. . . ***For the quarter, our provision for credit losses totaled $16.4 million mostly driven by asset valuation adjustments***.

          *      *      *

Also, we'd like to point out our non-performing loan adjusted coverage ratio. . . . ***With the benefit of charge-offs previously taken plus the ALLL at September***

- 95 -

*30, we have a coverage ratio on our performing loans of nearly 35%.  We think that helps to explain our ongoing adherence to monitoring our credit quality*.

\*        \*        \*

<u>Allan Young – Analyst:</u>

. . . Could you just refocus on the coverage ratio of 35% of NPLs.  **Could you just give me some color as to why you feel that's an adequate amount?**

\*        \*        \*

<u>Defendant Hooston:</u>

. . . Of course, those are always estimates and we are in a challenging economy here in Puerto Rico.  ***The point of the coverage ratio, however, is to show on the face of an ALLL relative to the allowance, you'd look at that ratio, and it's approximately 1.8%, but if you add the previously charged off amounts to that ALLL, which have already been charged down on the unpaid principal balance to reflect the recorded investment that you see on the balance sheet, that shows a nearly 35% coverage ratio***.  So it's an enhancement view to the amount of reserves and valuation scrutiny that we've given to the assets that are on the books.

<u>Defendant Wakeman:</u>

***So the way we approach our provisions is they are policy and model driven*** and we have, as you can see in our Q disclosed by asset class, how we develop those methodologies, and as you know we are a principally a collateral based lender here in Puerto Rico and ***we have very specific policies on asset valuations, appraisals and so forth***.

***We revalue appraisals at noted points in time, mostly on or about four months for resi[dential], on or about 18 months for commercial, and we've revalued north of $1 billion of assets just this year alone***.  So for all of the indications that we have both from model point of view, policy point of view, and evaluations point of view, ***we think we've incorporated everything into these numbers***.

268.    The statements referenced above in ¶267 concerning Doral's ALLL and PLLL and the Company's basis for determining the amount of those reserves were materially false and misleading because Defendants misrepresented and failed to disclose that: (a) Doral's ALLL and PLLL were deliberately understated; (b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and

appraisal data from which the ALLL was derived; and (c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs.

### The Truth Begins to Emerge

269.    On March 18, 2014, Doral disclosed that it would be unable to file its annual report on Form 10-K for the year ended December 31, 2013 within the proscribed time due to a material weakness in the Company's system of  internal control over financial reporting related to the calculation of its ALLL, explaining, as follows:

> ***These delays were primarily a result of performing additional analyses and reviews of the Company's process for estimating its allowance for loan losses*** and evaluating the effectiveness of the Company's disclosure controls and procedures and changes in internal control over financial reporting.  ***The Company has concluded that it has a material weakness in its internal control over financial reporting as of December 31, 2013, related to the review of the underlying data and mathematical model supporting its allowance for loan and lease losses and the related provision for loan and lease losses.  As a result of the material weakness, the Company has concluded that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013***.  While the Company has implemented processes and controls to address this material weakness during the fourth quarter, ***management has determined that sufficient time has not passed to conclude that the weakness has been remediated***.

270.    This announcement began to apprise investors that the problems with the accuracy of Doral's ALLL and the deficiencies in the Company's internal controls were more significant than previously disclosed, and that Doral had not adequately addressed its problems following the Consent Order and the Written Agreement.  In response to this news, the price of Doral common stock fell $1.13 per share, or more than 9%, from a closing price of $12.30 per share on March 17, 2014, to close at $11.17 per share on March 18, 2014.

271.    Investors' concerns were confirmed when, on Friday March 21, 2014, after the close of the market, Doral issued a press release and filed the 2013 10-K with the SEC. The press release and the 2013 10-K disclosed, in pertinent part, as follows:

- The "material weakness in [Doral's] internal control over financial reporting" had "resulted in the Company's understatement of the allowance for loan and lease losses and the related provision for loan and lease losses[,]" *and it was necessary to "revise" Doral's previously-reported financial statements for the third quarter, ended September 30, 2013, to increase the provision for loan losses for the quarter by $7.2 million*, thereby increasing the total provision taken from the previously-reported amount of $16.4 million, to *$23.6 million*.

- As a result of the "revision," Doral's third quarter *net loss was retroactively increased from the previously-reported amount of $7.5 million, to $14.7 million*, and the Company's third quarter net loss attributable to common shareholders was retroactively increased from the previously-reported amount of $16.4 million, or $1.49 per share, to $17.1 million, or $2.57 per share.

272.    In an investor presentation prepared by Defendant Poulton, filed on Form 8-K on March 21, 2014 and discussed during a conference call held on March 24, 2014, Defendants explained that in order for the Bank to remain in compliance with the Consent Order, Doral had been forced to shore up the Bank's regulatory capital ratios by contributing *$81.4 million* in capital to the Bank during the fourth quarter – for a total capital contribution of $131 million during 2013 – and the capital contribution had increased Doral's fourth quarter net loss by *$9 million*. Yet, investors still did not know how precarious the Company's capital situation was.

273.    Defendants expressly emphasized in the press release, 2013 Form 10-K, investor presentation and conference call that, following the capital contribution, Doral and the Bank were in compliance with all of the regulatory capital requirements of the FDICIA and the Consent Order. For example, the 2013 10-K reported the capital ratios of Doral and the Bank as follows:

| | Doral Financial | Doral Bank | Well Capitalized Minimum (Under FDICIA's Prompt Corrective Action Provisions) | Consent Order Minimum (Bank Subsidiary) |
|---|---|---|---|---|
| Total capital ratio (Total capital to risk weighted assets) | 11.3% | 12.6% | 10.0% | 12.0% |
| Tier 1 capital ratio (Tier 1 capital to risk weighted assets) | 9.7% | 11.4% | 6.0% | 10.0% |
| [Tier 1] Leverage ratio (Tier 1 capital to adjusted average assets) | 7.6% | 8.5% | 5.0% | 8.0% |

274.     In response to the news that Doral had understated its ALLL and needed to make a substantial out-of-period increase to its PLLL, thereby increasing its third quarter 2013 net loss, suffered from widespread internal control deficiencies, and had not addressed the problems with its ALLL policy and methodology as required by the Consent Order and the Written Agreement, the price of Doral common stock tumbled 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014.  The stock continued to decline over the next four trading days, as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014 – a total decline of 25.6%.  However, Defendants' assurances about the adequacy of the Company's capital prevented a more dramatic decline in Doral's stock price.

275.     On May 1, 2014, after the close of the market, Doral filed a Form 8-K with the SEC, disclosing, in pertinent part, as follows:

> Doral . . . currently carries on its balance sheet tax receivables from the Puerto Rico Government . . . in the amount of $226 million reflecting certain prior year tax over-payments as agreed to by the Department of Treasury under . . . [the 2012 Closing Agreement].
>
> *. . . **Doral Bank[] has been advised by the [FDIC] that it may no longer include in its calculation of its Tier 1 Capital some or all of the tax receivables from the Government of Puerto Rico.  Puerto Rico tax receivables accounted for $289 million of the bank's approximately $679 million of Tier 1 Capital at December 31, 2013.  The FDIC's determination will cause Doral Bank to no longer be in compliance with its capital requirements under its Consent Order with the FDIC**.*  Pursuant to the Consent Order Doral Bank is not permitted to accept, renew, or roll over any brokered deposits unless it has been granted a brokered

- 99 -

deposit waiver by the FDIC. . . . *[T]he FDIC indicated that* until such time as Doral Bank provides revised capital calculations that incorporate this . . . [determination,] *the FDIC would not consider granting Doral Bank waivers to accept brokered deposits*.  At April 21, 2014, brokered deposits accounted for approximately 18% of the total funding of Doral's operations.  Doral has been working to reduce its reliance on brokered deposits and one of the goals of its current business plan is to eliminate its reliance on brokered deposits.  *Doral Bank believes that as part of its capital plan it must seek immediate financial support from equity and debt holders and/or external sources*.

Under the terms of its Consent Order dated August 8, 2012 issued by the FDIC, in the event any capital ratio falls below the minimum required by the Consent Order, *Doral Bank is required to either (i) increase capital in an amount sufficient to comply with the capital ratios as set forth in Doral Bank's approved capital plan, or (ii) submit to the FDIC a contingency plan for the sale, merger, or liquidation of Doral Bank in the event the primary sources of capital are not available within 120 days*.  Doral also expects that it may have to submit a new capital plan to the [FRBNY], Doral's primary regulatory authority, for approval.

\*      \*      \*

*Doral is developing a revised capital plan for regulatory approval*.  Doral currently projects it can continue to finance its operations at least through the remainder of 2014 without the use of additional brokered deposits as Doral currently has other sources of liquidity.  Nonetheless, *unless Doral can effectuate a capital plan (which would include a recapitalization and restructuring of Doral) that complies with regulatory requirements (1) Doral's financial condition and results of operations will be materially and adversely affected*, (2) Doral may not be able to effectuate the recapitalization and restructuring plans that Doral believes are necessary to comply with regulatory requirements or . . . [do so] on terms that will preserve the value of its outstanding debt and equity, (3) Doral may not be able to obtain on an ongoing basis an unqualified opinion of Doral's independent auditors, and (4) Doral's regulators may take additional regulatory action against Doral.

276.    The Form 8-K explained the catalyst for the FDIC's determination that Doral could not include the Tax Receivable created by the 2012 Closing Agreement in its Tier 1 Capital, in pertinent part, as follows:

*On April 15, 2014 Doral received a letter from the Puerto Rico Department of Treasury . . . requesting Doral to provide information to prove that Doral made actual tax payments to [the Treasury Department] that are the subject of the 2012 Closing Agreement pursuant to which the Government of Puerto Rico agreed to pay back to Doral its tax over-payments.  In addition to the request for*

*information [the Treasury Department] asserted that it did not understand the basis upon which Doral would be due a tax refund of $229,884,087 because the refund was due to "accounting" losses versus actual tax payments*. On April 23, 2014 Doral responded to the letter from [the Treasury Department] and provided copies of tax payments made of approximately $155,634,626 which together with interest entitled Doral under Puerto Rico tax law as of the 2012 Closing Agreement to a refund of $232,089,728.

277.    In response to this news, the price of Doral common stock, which had traded as high as $25 per share in intraday trading during the Class Period (on July 24, 2013, following the twenty-for-one reverse stock split in June 2013), plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014, on unusually heavy trading volume of more than 2.37 million shares traded – erasing more than $141 million in market capitalization from the stock's Class Period high.

### Post-Class Period Events

278.    According to a Form 8-K filed by Doral on May 12, 2014, on May 9, 2014, Doral sent a letter to the Treasury Department demanding immediate payment of "all amounts due to Doral under the 2012 Closing Agreement."

279.    On May 13, 2014, Doral disclosed that it would be not be able to timely file its Form 10-Q for the first quarter, ended March 31, 2014 due to "the receipt by the Company on May 1, 2014, of a joint Report of Examination of Doral Bank issued by the [FDIC] and the [PR Commissioner] for the review period ending March 31, 2013 (the "Report") in which Doral Bank was notified that it may no longer include [the Tax Receivable] in its calculation of Tier 1 Capital . . . ."  Doral revealed that "*[t]he Report also instructs the Company to recognize certain charges related to loans and non-performing assets, and to evaluate certain assumptions in the Allowance for Loan Losses* and for modified loans."  As a result, Doral was unable to finalize its first quarter financial statements "until the Company has fully assessed the impact of the Report on its business, engaged in additional discussions with the regulators, . . . and has

reviewed certain valuation methodologies and estimates as requested by Doral Bank's regulators."

280.    On May 15, 2014, Doral filed a Form 8-K disclosing that the previous day, the Treasury Department had informed Doral of its position that the 2012 Closing Agreement was "null" and Doral was not entitled to a refund of the Tax Receivable.

281.    On June 2, 2014, Doral filed a Form 8-K disclosing that on May 30, 2014, it had received a letter from the FRBNY demanding that Doral classify the Tax Receivable "as a loss" and write off the $229.9 million sum from Doral's balance sheet.  The Form 8-K further disclosed that Doral was attempting to determine whether to recognize an impairment charge for the Tax Receivable in the second quarter of 2014.

282.    On June 5, 2014, Doral issued a press release announcing that it had filed a lawsuit in the Court of First Instance of Puerto Rico seeking a declaratory judgment that the 2012 Closing Agreement was valid and that Doral was entitled to the Tax Receivable.

283.    On June 19, 2014, Doral filed a Form 8-K disclosing that on June 12, 2014, the FDIC had notified the Bank that it was "***undercapitalized***" within the meaning of the FDICIA. According to the Form 8-K, Doral Bank had reported to the FDIC that as of March 31, 2014, its Tier 1 Leverage Ratio was 4.80%, its Tier 1 Risk-Based Capital Ratio was 6.35% and its Total Risk-Based Capital Ratio was 7.61%."  As a result, Doral Bank was "required to file a written capital restoration plan acceptable to the FDIC within 45 days," *i.e.*, by July 27, 2014. Separately, pursuant to the Consent Order, by July 7, 2014, the Bank was required to either: (i) increase capital in an amount sufficient to regain compliance with the Consent Order; or (ii) "submit a contingency plan for the sale, merger or liquidation of Doral Bank."  As a result of

being "undercapitalized," among other restrictions, Doral was "not permitted to accept, renew or roll over any brokered deposits."

284.    On August 12, 2014, Doral disclosed that it was once again unable to timely file its quarterly financial report on Form 10-Q – this time for the second quarter, ended June 30, 2014, citing the same reasons the Company had pointed to for its ongoing failure to file its Form 10-Q for the first quarter.  In addition, Doral disclosed that it needed to "determine whether it will be able to obtain . . . an unqualified opinion of its independent auditors[.]"

285.    In a Form 8-K filed on August 15, 2014, Doral revealed that on August 1, 2014, the SEC had launched an investigation into, among other things, Doral's "determination . . . [to] inclu[de] . . . [the Tax Receivable] as Tier 1 capital, the Company's allowance for loan and lease losses for the quarter ended September 30, 2013, and Doral Bank's compliance with [the] Consent Order[.]"

286.    On October 1, 2014, Doral filed a Form 8-K disclosing that on September 26, 2014, the FDIC had notified the Bank that it was now "***significantly undercapitalized***" within the meaning of the FDICIA.  According to the Form 8-K, Doral Bank had failed to submit a capital restoration plan to the FDIC by July 27, 2014, as required by the FDIC's June 12, 2014 notification, and had also failed to either "increase capital in an amount sufficient to comply with the minimums required by the Consent Order or submit a contingency plan for the sale, merger or liquidation of Doral Bank by July 7, 2014."  The FDIC's notification informed the Bank that both the capital restoration plan and the contingency plan "must be submitted immediately."

287.    In addition, Doral has been forced to sell off assets in a series of transactions in order to preserve the Bank's liquidity:

- On June 2, 2014, Doral announced the sale of mortgage assets to FirstBank Puerto Rico, for approximately $234 million in proceeds, and stated that the Company

intended to engage in a series of transactions "in order to restructure its business operations and capital structure."

- On July 14, 2014, Doral announced the sale of $369 million worth of non-performing assets to Abbey Finance Holdings PR, LLC.

- On September 9, 2014, Doral announced the sale of approximately $429 million worth of mortgage assets to Barclays, Inc.

- On October 1, 2014, Doral announced the sale of additional assets to Abbey Finance Holdings PR, LLC for $16.7 million in proceeds.

- On October 3, 2014, Doral announced the sale of $192.7 million worth of mortgage assets to FirstBank Puerto Rico.

288.   Following a 3-day bench trial in the Court of First Instance of Puerto Rico, on October 10, 2014, the court issued a decision finding that the 2012 Closing Agreement was enforceable.   The Treasury Department has announced that it intends to appeal the decision. According to an October 14, 2014 article appearing in *American Banker*, the court's ruling was "unlikely to immediately improve Doral's distinction as being significantly undercapitalized." The article explained that, "[s]ince the Puerto Rican government is expected to appeal the decision, it is unlikely that the FDIC will immediately reverse course and allow Doral to count the funds towards its capital[.]"

289.   Although the S&P 500 index is presently near record highs, the price of Doral common stock has not rebounded.

## ADDITIONAL SCIENTER ALLEGATIONS

290.   As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company (or in their own name) during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Doral, their control over, and/or receipt and/or modification of Doral's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Doral, were active and culpable participants in the fraudulent scheme alleged herein.

291. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

292. The Individual Defendants, because of their positions with Doral, controlled the contents of the Company's public statements during the Class Period. The Individual Defendants were provided with or had access to copies of the documents alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Doral's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

293. In addition to the accounts by former employees, all of whom had first-hand knowledge about Doral's business, the following facts further contribute to a strong inference that Defendants acted with scienter:

294. Doral's undisputed failure to main effective internal controls over its financial reporting and the recurring lapses in internal controls related to Doral's ALLL and PLLL, described above in ¶¶102-13, support an inference of scienter. These control deficiencies enabled certain Defendants and members of senior management to override controls in order to manipulate Doral's ALLL, PLLL and capital ratios.

295. Defendants' scienter is underscored by the Sarbanes-Oxley mandated certifications of Defendants Wakeman, Wahlman, Ivanov and Hooston, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Doral was made known to them and that the Company's disclosure related controls were operating effectively. In particular, in each of Doral's financial statements filed with the SEC during the Class Period, Defendant Wakeman and Doral's CFO (Defendants Wahlman, Ivanov or Hooston) certified, in pertinent part:

I, [Wakeman, Wahlman, Ivanov or Hooston] certify that:

1. I have reviewed this [Form 10-K or Form 10-Q] of Doral Financial Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

296. In addition, on August 1, 2014, the SEC began investigating Doral's inclusion of the Tax Receivable in its Tier 1 Capital, the Company's ALLL for the third quarter of 2013, and the Bank's compliance with the Consent Order, which further supports an inference of scienter.

297.    Doral's internal reporting structure and procedures for the review and distribution of periodic reports gives rise to a strong inference that Defendants knew, or recklessly disregarded, the fraudulent conduct alleged herein.   According to FE2, the former Vice President, Doral's Principal Accounting Officer during the Class Period, Nancy Reinhard, reported directly to Individual Defendants Wahlman, Ivanov, and Hoosten.   Regarding the Company's financial reporting, FE2 stated that SEC filings were reviewed and commented on prior to being filed by Doral's Disclosure Committee, which typically met twice per quarter. During the Class Period, the Disclosure Committee included: Doral's CEO (Defendant Wakeman); CFO (Wahlman, Ivanov or Hoosten); Chief Business Development Officer / Executive Vice President (Poulton); General Legal Counsel (Ubarri); the CFO of Doral Recovery (Dan Pallone); the CFO of Doral Growth (David Lugo); Reinhard; and external counsel for Doral.

298.    According to FE2, periodic reports filed with the FDIC (including Call Reports) and the FRBNY (including FR Y-9C and FR Y-9LP reports) were reviewed by Doral's CFO prior to being filed with the Company's regulators, and highlights were provided to the Board of Directors after their filing.

299.    In addition, according to FE2, monthly management reports were distributed to, among others, Defendant Wakeman, Doral's CFO (Wahlman, Ivanov, or Hoosten), Defendant Poulton and Defendant Ubarri.  Among other information, the monthly management reports included income statements, balance sheets, deposit activity, and loan activity reports.

300.    According to FE2, beginning in January 2013, in addition to regular quarterly reports required by the FDIC and the FRBNY, the FDIC required Doral to submit weekly and monthly reports, which were also submitted to the FRBNY.  The weekly reports detailed Doral's

liquidity, loans (including loans due to be funded and loans due to be paid off), receivables, deposits and any exposure to the government of Puerto Rico.

301.    Then, beginning in January 2014, FE2 explained that the FDIC required daily reports detailing Doral's liquidity.  These reports were reviewed by Defendant Hoosten prior to being sent to the FDIC and the FRBNY.  Doral's Principal Accounting Officer, Reinhard, also reviewed these reports prior to their filing.  FE2 believed that all of this additional reporting was required by the FDIC because of the tenuous financial condition of the Company, as well as the Puerto Rico government, which was a concern in light of the Company's substantial reliance on the Tax Receivable to satisfy its capital requirements.

302.    Defendants were motivated to engage in this fraudulent course of conduct in order to allow Defendants Ivanov, Poulton and Ubarri to collectively sell 16,305 shares of their personally-held Doral common stock for proceeds of $387,168 during the Class Period.  The following chart sets forth the insider sales:

| Insider | Date | Shares | Price | Proceeds | % Sold |
|---|---|---|---|---|---|
| Defendant Ivanov | 8/30/13 | 2,705 | $23.50 | $63,568 | 100% |
| Defendant Poulton | 8/28/13 | 10,000 | $23.99 | $239,900 | 20.33% |
| Defendant Ubarri | 9/11/13 | 3,600 | $23.25 | $83,700 | 11.60% |
|  |  |  |  |  |  |
|  | Total: | 16,305 |  | $387,168 |  |

303.    These sales are suspicious because they were made while Defendants were in possession of material, non-public information about the understatement of Doral's ALLL and the inflation of its capital ratios.  The sales are unusual because previously, no Company insiders had made any sales of Doral common stock since November 1, 2006 – nearly **seven years** earlier.

304.    Defendants were further motivated to engage in the fraudulent course of conduct alleged herein in order to maximize their compensation, as follows:

(a)     The 2012 Closing Agreement, and corresponding improvement to Doral's capital ratios, provided a justification for increasing the Individual Defendants' salaries.  On April 16, 2012, shortly after Doral entered into the 2012 Closing Agreement, the Company's Board of Directors approved salary increases for four of the Individual Defendants: increasing Defendant Wakeman's annual salary by $250,000, to $1.25 million; increasing Defendant Wahlman's annual salary by $50,000, to $500,000; increasing Defendant Ubarri's annual salary by $50,000, to $450,000; and increasing Defendant Poulton's annual salary by $100,000, to $500,000.

(b)     In addition, according to FE1, Defendant Wahlman acknowledged in a conversation with FE1 in mid-January 2012 (shortly before the Class Period), that although he (Wahlman) had "done things that" made him "very uncomfortable," he intended to remain at Doral until he received his year-end bonus and his shares of Doral stock vested.  The foregoing provides circumstantial evidence that Wahlman was motivated to continue to engage in, and conceal, the fraudulent conduct alleged herein during the Class Period in order to maximize his compensation.

305.    The unexpected resignation of Defendant Wahlman, announced on March 13, 2013, coupled with the fact that Doral has now had *four* different CFOs since the start of the Class Period, provides additional circumstantial evidence of scienter.

## LOSS CAUSATION/ECONOMIC LOSS

306.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Doral common stock and operated as a fraud or deceit on Class Period purchasers of Doral common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market,

the price of Doral common stock fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Doral common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

307.    By failing to disclose to investors that Defendants had understated Doral's ALLL and overstated the Company's capital, among other adverse facts detailed herein, Defendants presented a misleading picture of Doral's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Doral common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as a split-adjusted closing price of $38.40 per share on April 24, 2012, before plummeting to $3.73 per share on May 2, 2014 – a decline of more than 90%.

308.    On March 18, 2014, Doral announced that it would not be able to timely file its 2013 10-K due to "a material weakness in [the Company's] internal control over financial reporting . . . related to the review of the underlying data and mathematical model supporting its [ALLL] and the related [PLLL]," and that Doral's "internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013."   This announcement began to reveal to investors that the problems with the accuracy of Doral's ALLL and the deficiencies in the Company's internal controls were more significant than previously disclosed, and that Doral had not adequately addressed its problems following the Consent Order and the Written Agreement.  In response to this news, the price of Doral common stock fell $1.13 per share, or more than 9%, from a closing price of $12.30 per share on March 17, 2014, to close at $11.17 per share on March 18, 2014.

309.    Investors' concerns were confirmed when, on Friday March 21, 2014, after the close of the market, Defendants revealed in a press release and in the 2013 10-K that the

"material weakness in [Doral's] internal control over financial reporting" had "resulted in the Company's understatement of the [ALLL] and the related [PLLL]," and Defendants had been forced to "revise" Doral's previously-reported financial statements for the third quarter of 2013 to increase the provision for loan losses for the quarter by $7.2 million.  As a result: (i) Doral's third quarter PLLL was retroactively increased from the previously-reported amount of $16.4 million, to $23.6 million; and (ii) the Company's third quarter net loss was retroactively increased from the previously-reported amount of $7.5 million, to $14.7 million.

310.    Although Defendants disclosed in an investor presentation the same day that Doral needed to contribute $81.4 million in capital to the Bank during the fourth quarter in order for the Bank to remain in compliance with the Consent Order, which had increased Doral's fourth quarter net loss by $9 million, they continued to conceal the precarious nature of the Company's capital situation by emphasizing that, following the capital contribution, Doral and the Bank were in compliance with the capital requirements of the FDICIA and the Consent Order.

311.    In response to the disclosures that Doral had understated its ALLL and needed to make a substantial out-of-period increase to its PLLL, thereby increasing its third quarter 2013 net loss, suffered from widespread internal control deficiencies, and had not addressed the problems with its ALLL policy and methodology as required by the Consent Order and the Written Agreement, the price of Doral common stock tumbled 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014.  The stock continued to decline over the next four trading days, as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014 – a total decline of

25.6%. However, Defendants' assurances about the adequacy of the Company's capital prevented a more substantial decline in Doral's stock price.

312.    On April 15, 2014, the risk that the Treasury Department would seek to void the 2012 Closing Agreement finally materialized, when Doral received a letter from the Treasury Department questioning the validity of the agreement and requesting that Doral provide information demonstrating that it had overpaid taxes and was entitled to the Tax Receivable.

313.    Recognizing that their scheme of inflating Doral's capital levels by understating the Company's ALLL would no longer be enough to comply with the capital requirements of the Consent Order, on May 1, 2014, after the close of the market, Defendants disclosed the receipt of the letter. Defendants further disclosed that the FDIC had informed Doral that it could not include the Tax Receivable in its Tier 1 Capital, which meant that Doral Bank was "no longer . . . in compliance with its capital requirements under its Consent Order[.]" As a result of the Bank's capital shortfall: (i) the FDIC would not grant the Bank waivers to accept brokered deposits – an important source of liquidity; and (ii) the Bank was required to either regain compliance with the capital ratios in the Consent Order, or submit to the FDIC a contingency plan for the sale, merger, or liquidation of the Bank.

314.    In response to this news, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014, on unusually heavy trading volume of more than 2.37 million shares traded – erasing more than $141 million in market capitalization from the stock's Class Period high.

315.    The precipitous decline in the price of Doral common stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the declines in the price of Doral common stock negate any

inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Doral common stock and the subsequent significant decline in the value of Doral common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

316. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, Defendants are liable for those any forward-looking statements because they knew that the statement was false or misleading when made. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

317. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's common stock traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)      Plaintiffs and the other members of the Class purchased Doral common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

318.    At all relevant times, the market for Doral common stock was efficient for the following reasons, among others:

(a)      Doral common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)      as a regulated issuer, Doral filed periodic public reports with the SEC and the NYSE;

(c)      Doral regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

(d)      Doral was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

319.    As a result of the foregoing, the market for Doral common stock promptly digested current information regarding Doral from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Doral common stock during the Class Period suffered similar injury through their purchase of Doral common stock at artificially inflated prices and a presumption of reliance applies.

320.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Doral's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

### COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against all Defendants**

321.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

322.    During the Class Period, Defendants disseminated and/or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

323.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and other investors similarly situated in connection with their purchases of Doral common stock during the Class Period.

324.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Doral common stock.  Plaintiffs and the Class would not have purchased Doral common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

325.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Doral common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

326.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

327.    The Individual Defendants acted as controlling persons of Doral within the meaning of §20(a) of the Exchange Act, as alleged herein.  By reason of their high-level positions with the Company, and their ownership of Doral common stock, their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and

materially misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control (and did influence and control), directly or indirectly, the decision-making of the Company, and caused Doral to engage in the wrongful conduct complained of herein, including the dissemination of the various statements which Lead Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had access to: Company reports, press releases, public filings and other information and statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

328.     As set forth above, Doral and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Moreover, by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for Doral's §10(b) and Rule 10b-5 violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.  By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 6th day of November, 2014.

I hereby certify that on this date I presented a Consolidated Amended Complaint for Violations of the Federal Securities Laws to the Clerk of the Court for filing and uploading to the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

THE LAW OFFICES OF ANDRÉS W.
  LÓPEZ, P.S.C.
ANDRÉS W. LÓPEZ (USDC NO. 215311)


                        *s/ Andrés W. López*
                    ANDRÉS W. LÓPEZ

P.O. Box 13909
San Juan, PR  00908
Telephone:  787/294-9508
787/294-9519 (fax)

*Liaison Counsel*

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
rrothman@rgrdlaw.com
eboardman@rgrdlaw.com

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
PETER A. BINKOW
KARA M. WOLKE
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310/201-9150
310/201-9160 (fax)
info@glancylaw.com
pbinkow@glancylaw.com
kwolke@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonandweaver.com

*Additional Counsel for Plaintiffs*