# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re Doral Financial Corp. Sec. Litig. | Master File No. 3:14-CV-01393 (GAG) |
|  | (Consolidated with Case No. 3:14-CV-01414) |
|  | ORAL ARGUMENT REQUESTED |

## MOTION TO DISMISS
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

THE PARTIES..................................................................................................5

ARGUMENT ...................................................................................................6

I.      PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED ...........................7

      A.      Plaintiffs Have Failed To Plead An Actionable Misrepresentation or Omission ................................................................................................7

            1.      The Complaint Fails To Plead Actionable Misstatements Or Omissions Concerning The Tax Receivable................................8

                  a.      The Company Disclosed The Possibility That The Tax Receivable Would Not Qualify As Tier 1 Capital ........................8

                  b.      The Tax Receivable Claim Is Impermissible Fraud By Hindsight................................................................................9

                  c.      The Court Of First Instance Has Rejected The Treasury Department's Efforts To Avoid The Tax Receivable ..................10

            2.      The Complaint Fails To Plead Actionable Misstatements Or Omissions Concerning ALLL................................................12

      B.      Plaintiffs Have Failed To Allege Particularized Facts Demonstrating A Strong Inference Of Scienter ................................................................15

            1.      Plaintiffs Do Not Allege Particularized Facts Indicating Scienter On An Individual Basis................................................17

            2.      Plaintiffs Have Failed To Adequately Plead Scienter With Respect To Their Tax Receivable Claims ................................18

            3.      Plaintiffs Have Failed To Adequately Plead Scienter With Respect To Their ALLL Claims ................................................22

                   a.      The FE Allegations Do Not Demonstrate Scienter.......................23

                        i.      FE1's Statements Are Not Entitled To Any Weight..........24

                        ii.      The Allegations Attributed To FE2, FE3 and FE4 Are Equally Deficient ................................................28

                   b.      Competing Inferences Defeat A Showing Of Scienter .................30

            4.      Plaintiffs' Additional Scienter Allegations Are Insufficient ....................32

      C.      The Complaint Fails To Plead Loss Causation....................................38

      D.      Plaintiffs' Claims Against Messrs. Poulton and Ubarri Also Should Be Dismissed For the Separate Reason That They Are Not Alleged To Have Made Any Of The Challenged Statements ................................41

-i-

## TABLE OF CONTENTS
(continued)

**Page**

II.     PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED ............................42

CONCLUSION.................................................................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A123 Sys., Inc. Sec. Litig.*,
   930 F. Supp. 2d 278 (D. Mass. 2013) .................................................... 7, 19, 20, 42

*Abrams v. Baker Hughes, Inc.*,
   292 F.3d 424 (5th Cir. 2002) ............................................................ 34

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) .......................................................... 10, 15, 42

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 1999) ............................................................ 35

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) .......................................................... 42, 43

*Aronson v. Advanced Cell Tech., Inc.*,
   902 F. Supp. 2d 106 (D. Mass. 2012) .................................................... 44

*Bartesch v. Cook*,
   941 F. Supp. 2d 501 (D. Del. 2013) .................................................. 9, 37, 38

*Berrios-Romero v. Estado Libre Asociado de Puerto Rico*,
   641 F.3d 24 (1st Cir. 2011) ............................................................. 1

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................... 36

*In re Boston Tech. Sec. Litig.*,
   8 F. Supp. 2d 43 (D. Mass. 1998) .................................................... 20, 34

*In re Buca Inc. Sec. Litig.*,
   2006 WL 3030886 (D. Minn. Oct. 16, 2006) ............................................. 40

*Carney v. Cambridge Tech. Partners, Inc.*,
   135 F. Supp. 2d 235 (D. Mass. 2001) .................................................... 32

*In re Ceridian Corp. Sec. Litig.*,
   542 F.3d 240 (8th Cir. 2008) ............................................................ 33

*City of Edinburgh Council v. Pfizer, Inc.*,
   754 F.3d 159 (3d Cir. 2014) ............................................................ 41

*City of Philadelphia v. Fleming Cos., Inc.*,
   264 F.3d 1245 (10th Cir. 2001) .......................................................... 35

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
　752 F.3d 173 (2d Cir. 2014).................................................................. 41

*City of Roseville Employees Ret. Sys. v. Sterling Fin. Corp.*,
　963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................*passim*

*City of Roseville Employees Ret. Sys. v. Textron, Inc*.,
　810 F. Supp. 2d 434 (D.R.I. 2011), *aff'd sub nom*. *Auto. Indus. Trust Fund v.*
　*Textron, Inc.*, 682 F.3d 34 (1st Cir. 2012) .................................. 8, 15, 23

*Cole v. Health Mgmt. Assocs., Inc.*,
　2009 WL 2713178 (M.D. Fla. July 17, 2009) .......................... 15, 34, 41

*In re Colonial Mortgage Bankers Corp.*,
　324 F.3d 12 (1st Cir. 2003)..................................................................... 1

*Coyne v. Metabolix, Inc.*,
　943 F. Supp. 2d 259 (D. Mass. 2013) .................................... 20, 38, 41

*In re Downey Sec. Litig*.,
　2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)..............................*passim*

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005)............................................................................ 38

*Fait v. Regions Fin. Corp*.,
　655 F.3d 105 (2d Cir. 2011)........................................................... 22, 23

*In re The First Marblehead Corp. Sec. Litig.*,
　639 F. Supp. 2d 145 (D. Mass. 2009) ..........................................*passim*

*Footbridge Ltd. v. Countrywide Home Loans, Inc*.,
　2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)..................................... 31

*In re Franklin Bank Corp. Sec. Litig.*,
　782 F. Supp. 2d 364 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust v.*
　*Nocella*, 464 F. App'x 334 (5th Cir. 2012)........................................... 31

*Garfield v. NDC Health Corp.*,
　466 F.3d 1255 (11th Cir. 2006) .................................................... 32, 33

*In re Gentiva Sec. Litig.*,
　932 F. Supp. 2d 352 (E.D.N.Y. 2013) ................................................ 19

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014) .......................................................................... 7, 18

*Giragosian v. Ryan*,
    547 F.3d 59 (1st Cir. 2008) .................................................................................. 10

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) ............................................................................... 22

*In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*,
    103 F. App'x 465 (3d Cir. 2004) .......................................................................... 36

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999) ............................................................................... 16

*Guerra v. Teradyne Inc.*,
    2004 WL 1467069 (D. Mass. Jan. 16, 2004) ......................................................... 1

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................................... 33

*Hensley v. IEC Elecs. Corp.*,
    2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ..................................................... 19

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010) ....................................................................... 43

*Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009) ................................................................... 21, 30, 38

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    625 F. Supp. 2d 1267 (S.D. Fla. 2008) .......................................................... 26, 29

*In re Impac Mortgage Holdings Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................................... 42

*In re Intelligroup Sec. Litig.*,
    468 F. Supp. 2d 670 (D.N.J. 2006) ...................................................................... 40

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................................. 35

*Kleiman v. Wells Fargo & Co.*,
    576 F. App'x 694 (9th Cir. 2014) ........................................................................... 5

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Lenartz v. Am. Superconductor Corp.*,
  879 F. Supp. 2d 167 (D. Mass. 2012) ................................................................ 19

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ......................................................................... 22

*Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth
  Third Bancorp*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010) ......................................................*passim*

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd,* 430 F. App'x 63 (2d Cir. 2011)..........23, 27, 34

*Lynn v. Helf*,
  2014 WL 5431221 (M.D. Tenn. Oct. 24, 2014) ........................................... 12, 31

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998) ................................................................................ 32

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) ................... 29

*In re Manulife Fin. Corp. Sec. Litig.*,
  276 F.R.D. 87 (S.D.N.Y. 2011) ........................................................................ 33

*In re Medicis Pharm. Corp. Sec. Litig.*,
  689 F. Supp. 2d 1192 (D. Ariz. 2009) ............................................................. 27

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008)............................................................... 40

*Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.*,
  523 F.3d 75 (1st Cir. 2008)............................................................................... 10

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
  537 F.3d 35 (1st Cir. 2008).................................................................... 17, 24, 34

*Okla. Firefighters Pension & Ret. Sys v. Student Loan Corp.*,
  951 F. Supp. 2d 479 (S.D.N.Y. 2013)................................................ 15, 23, 31, 41

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
  2014 WL 7139634 (9th Cir. Dec. 16, 2014) ..................................................... 38

*Pa. Pub. Sch. Employees v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)............................................................... 37

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec,*
    2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) ...................................................... 12

*In re Platinum & Palladium Commodities Litig.,*
    828 F. Supp. 2d 588 (S.D.N.Y. 2011) ................................................................... 31

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v.*
    *Arbitron Inc.,*
    741 F. Supp. 2d 474 (S.D.N.Y. 2010) ................................................................... 43

*Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP,*
    551 F. 3d 305 (4th Cir. 2009) ............................................................................... 38

*In re Rigel Pharm., Inc. Sec. Litig.,*
    697 F.3d 869 (9th Cir. 2012) ................................................................................ 35

*Ronconi v. Larkin,*
    253 F.3d 423 (9th Cir. 2001) ................................................................................ 34

*Seaman v. Cal. Bus. Bank,*
    2013 WL 5890726 (N.D. Cal. Oct. 30, 2013) ...................................................... 22

*Seaman v. Cal. Bus. Bank,*
    2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) ................................................. 23, 30

*Shapiro v. UJB Fin. Corp.,*
    964 F.2d 272 (3d Cir. 1992)................................................................................. 23

*In re Silicon Graphics Inc. Sec. Litig.,*
    183 F.3d 970 (9th Cir. 1999) ................................................................................ 34

*Simon v. Abiomed, Inc.,*
    2014 WL 1413638 (D. Mass. Apr. 10, 2014) .................................................28, 35

*Stevens v. InPhonic, Inc.,*
    662 F. Supp. 2d 105 (D.D.C. 2009) ..................................................................... 32

*Stumpf v. Garvey,*
    2005 WL 2127674 (D.N.H. Sept. 2, 2005) .......................................................... 17

*Swack v. Credit Suisse First Boston,*
    383 F. Supp. 2d 223 (D. Mass. 2004) .................................................................. 42

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................. 32

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................ 16, 17

*In re Textron, Inc.*,
    811 F. Supp. 2d 564 (D.R.I. 2011).......................................... 21, 43

*Urman v. Novelos Therapeutics, Inc.*,
    796 F. Supp. 2d 277 (D. Mass. 2011) ..................................... 32

*In re Verifone Holdings, Inc. Sec. Litig.*,
    2009 WL 1458211 (N.D. Cal. May 26, 2009) ........................ 37

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)..................................... 19, 20

*Washtenaw County Employees Ret. Sys. v. Avid Tech., Inc.*,
    2014 WL 2925435 (D. Mass. June 27, 2014) ......................... 36

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................. 21, 29, 36

**Statutes**

15 U.S.C. § 78u-4(b)(4) ............................................................. 38

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................... 1, 44

Fed. R. Civ. 12(b)(6) .................................................................. 1, 44

**TO THE HONORABLE COURT:**

Defendants Doral Financial Corporation ("DFC" or the "Company") and the Individual Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Complaint For Violations Of The Federal Securities Laws, dated November 6, 2014 (the "Complaint"), filed by Lead Plaintiffs Jensine Andersen, Ken M. Nimmons and Mordechai Hakim ("Plaintiffs"), pursuant to the Private Securities Litigation Reform Act (the "PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6).[1]

## INTRODUCTION[2]

The Company has recently been embroiled in a well-publicized litigation against Puerto Rico's Treasury Department (the "Treasury Department"), stemming from the Treasury Department's attempt to renege on a March 26, 2012 closing agreement (the "2012 Closing Agreement") with DFC. Under the terms of the 2012 Closing Agreement, the Treasury Department agreed to provide DFC and its subsidiaries with a payable of $229,884,087 resulting from past DFC tax payments (the "Tax Receivable"). ¶¶ 115, 122.[3] However, in April 2014, the Treasury Department took the position — for the first time — that the 2012 Closing Agreement was void and that DFC was not entitled to the Tax Receivable. Shortly thereafter, the Federal Deposit Insurance Corporation (the "FDIC") informed the Company that it could no longer treat

---

[1]   The "Individual Defendants" are Glenn R. Wakeman, Robert E. Wahlman, Penko Ivanov, David Hooston, Enrique R. Ubarri-Baragaño, and Christopher C. Poulton.

[2]   For purposes of this motion only, the factually supported allegations of the Complaint are accepted as true but "bald assertions and unsupportable conclusions" are not. *See, e.g.*, *In re Colonial Mortgage Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003). "These principles require us to consider not only the complaint but also matters fairly incorporated within it and matters susceptible to judicial notice." *Id.* This includes documents referenced in the Complaint, the Company's public filings with the United States Securities Exchange Commission (the "SEC"), and the Puerto Rico Court of First Instance's rulings in *Doral Financial Corp. v. Commonwealth of Puerto Rico*, Civil No. KAC2014-0533, Court of First Instance, San Juan Superior Part. *See, e.g.*, *Guerra v. Teradyne Inc.*, 2004 WL 1467069, at *2 (D. Mass. Jan. 16, 2004) ("It is clear that the court may take judicial notice of these SEC filings"); *Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011) ("A decision of a sister court is a proper matter of judicial notice").

[3]   Citations to "¶" are to the Complaint at Dkt. No. 53. Citations to "Ex." are to the exhibits attached hereto.

the Tax Receivable as part of its Tier 1 capital, due to the Treasury Department's actions.  ¶¶ 275-276.

On May 1, 2014, the Company disclosed both that the Treasury Department was attempting to rescind the Tax Receivable and the FDIC's position relating to the Tax Receivable. ¶ 275.  The initial complaints in this action were filed soon after and focused almost entirely on claims alleging that DFC should have previously disclosed the risk that the Treasury Department would not comply with the 2012 Closing Agreement (Dkt. No. 1; Case No. 3:14-CV-01414, Dkt. No. 1; Case No. 3:14-CV-01391, Dkt. No. 1) — despite the fact that the Company disclosed its entry into the 2012 Closing Agreement, the existence of the Tax Receivable and the possibility that the FDIC may, in the future, reduce the Company's Tier 1 regulatory capital (including the increase caused by the Tax Receivable) days after the 2012 Closing Agreement was signed.  *See* Dkt. No. 1; Case No. 3:14-CV-01414, Dkt. No. 1; Case No. 3:14-CV-01391, Dkt. No. 1; *infra* at 8-9.

On June 5, 2014, the Company commenced litigation against the Treasury Department in Puerto Rico's Court of First Instance, requesting a declaratory judgment that the 2012 Closing Agreement and the Tax Receivable are valid (the "Tax Litigation").[4]  The Court of First Instance issued its decision on October 10, 2014, in which it emphatically rejected the Treasury Department's attempt to void the Tax Receivable and held that the 2012 Closing Agreement is "final and conclusive and cannot be reopened, annulled set aside or disregarded in litigation in terms of the matters agreed upon," that "[DFC] did not make false representations to the Department of the Treasury when executing the 2012 Closing Agreement," and that the

---

[4]    Plaintiffs specifically requested this Court to extend their time to file the Complaint so that they could conform their pleadings to the Court of First Instance's decision in the Tax Litigation.  *See* Dkt. No. 46 at1.

Company is fully entitled to the benefits of the Tax Receivable.  *See* Ex. 1, Court of First Instance Decision at 29, 46.

Nonetheless, Plaintiff continues to assert that the Company should have known that the Treasury Department would attempt to void the Tax Receivable **on grounds that have been found to be meritless** — *i.e.*, that the Company should have simply assumed that the Treasury Department would seek to evade its binding contractual obligations.  That, of course, cannot form the basis of a securities fraud claim.  *See infra* Sec. I.A.1.

Apparently recognizing that fact, Plaintiff's new Complaint switches its focus to an issue that was only peripherally discussed in the initial complaints filed in this action:  the Company's March 18, 2014 disclosure that its internal controls were discovered to be ineffective as of December 31, 2013, and that DFC had restated certain financial information in its November 15, 2013 10-Q for the quarter ending September 30, 2013 related to its allowance for loan and lease losses ("ALLL") (with no adjustments for prior periods).  *See* Dkt. No. 53.[5]  According to Plaintiffs, this means that the Company's ALLL was **deliberately** understated throughout the Class Period (as defined below), and that the Defendants must have concealed problems with its internal controls and ALLL calculations from the public.  That argument ignores the history of the Company's public disclosures during the Class Period.  Specifically, as Plaintiffs concede, DFC repeatedly disclosed that there were deficiencies in its ALLL procedures and calculations, as well as material weaknesses in its internal controls.  *See infra* Sec. I.A.2.  It is therefore

---

[5]    Specifically, the Company announced that it could not timely file its Form 10-K for the year ending December 31, 2013 because it had discovered a material weakness in its internal controls, and that these controls were ineffective as of December 31, 2013.  ¶¶ 269-71; Ex. 2, March 18, 2014 Form NT 10-K.  The Company also restated certain financial information relating to its ALLL for the third quarter of 2013, raised its loan losses for that period from $16.4 million to $23.6 million, and announced that its net loss for the same period was $14.7 million compared to the previously-reported $7.5 million. ¶ 271; Ex. 3, March 21, 2014 10-K ("2013 10-K") at F-95.  Tellingly, **no securities fraud complaints were filed after this disclosure**.  It was only after the Company disclosed the Treasury Department's challenge to the Tax Receivable, that securities claims were filed.

unsurprising that the March 18, 2014 disclosure did not cause an out of the ordinary drop in DFC's stock price.  Although Plaintiffs allege that the price of DFC's stock dropped 25.6% over the next ten days, this price adjustment is consistent with the downward trend in DFC's stock price — including high volatility and identical price shifts at various points throughout the Class Period.[6]  *See infra* Sec. I.C.

In an attempt to avoid the inescapable inference that arises from these facts — *i.e.*, there was no fraud — Plaintiffs cite to allegations attributed to four unidentified former DFC employees, ostensibly to show that the Individual Defendants were acting with the requisite scienter (*i.e.*, a conscious intent to defraud or a high degree of recklessness).  However, those allegations are inadequate for multiple reasons — most importantly, none of these former employees claim to have had **any** contact with the Individual Defendants, or have any basis to know what the Individual Defendants understood about the Company's Tax Receivable and ALLL, during the Class Period.  *See infra* Secs. I.B.2 and I.B.3.  Plaintiffs also assert a number of *pro forma* allegations of scienter, virtually identical to those alleged by every securities fraud plaintiff (*e.g.*, that the Individual Defendants were motivated to increase their compensation or signed allegedly false certifications under the Sarbanes-Oxley Act of 2002 ("SOX")).  As courts have repeatedly found, such generalized allegations are insufficient to support a claim for violations of the federal securities laws.  *See infra* Sec. I.B.4.

Accordingly, and for the additional reasons set forth more fully below, Plaintiffs' claims should be dismissed with prejudice.

---

[6]     There was a 1-20 reverse stock split of the Company's common stock on June 28, 2013.  Prior to that point, the stock traded in the range of $.53 to $1.92.  ¶ 231.

## THE PARTIES

*The Company.*  DFC is a publicly owned bank holding company that owns Doral Bank, a financial institution that offers financial and banking services.  ¶ 19.  Like most financial institutions based in Puerto Rico, the economic recession in Puerto Rico has taken its toll on the Company's operations.  *See, e.g.*, Ex. 3, 2013 10-K at 13-14; Ex. 4, March 30, 2012 10-K ("2011 10-K") at 39-40; Ex. 5, March 12, 2013 10-K ("2012 10-K") at 39-40.  Consequently, the Company has been operating under the terms of (i) a August 12, 2012 consent order (the "Consent Order") with the FDIC; and (ii) a September 11, 2012 written agreement (the "Written Agreement") with the Federal Reserve Bank of New York (the "FRBNY").  ¶¶ 67, 75.  Under the terms of the Consent Order and the Written Agreement, the Company is subject to strict supervision by the FDIC and the FRBNY, as well as stringent reporting requirements, including the provision of regular financial reports to the FDIC and the FRBNY.  ¶¶ 67-77.

*The Individual Defendants.*  The Individual Defendants are present and former executives of the Company:

- **Glen R. Wakeman** served as President and Chief Executive Officer of DFC throughout the Class Period. ¶ 20.  He was also a director of Doral Bank during this period.  *Id.*

- **Robert E. Wahlman** was DFC's Chief Financial Officer, Chief Accounting Officer and Executive Vice President from the beginning of the Class Period until May 17, 2013.  ¶ 21; Ex. 6, March 13, 2013 8-K.[7]  He also served as the Company's Chief Accounting Officer until September 20, 2012, and was a director of Doral Bank during the Class Period.  ¶ 21.

---

[7]    The Complaint erroneously asserts that Mr. Wahlman resigned from DFC as of May 17, 2014.  ¶ 20. Allegations that are contradicted by the public record are not entitled to any weight.  *See, e.g.*, *Kleiman v. Wells Fargo & Co.*, 576 F. App'x 694, 695 (9th Cir. 2014) (A district court "need not accept as true allegations that contradict matters properly subject to judicial notice" and "may take judicial notice of matters of public record…") (internal quotations omitted).

- **Penko Ivanov** briefly acted as the Company's interim Chief Financial Officer after Mr. Wahlman's resignation, from May 17, 2013 to October 3, 2013.  ¶ 22.

- **David Hooston** joined DFC as an Executive Vice President on July 1, 2013, subject to regulatory approval of his appointment as Chief Financial Officer; his position as Chief Financial Officer became effective on October 3, 2013.  ¶ 23.  He continued in that capacity until October 6, 2014.  Ex. 7, October 7, 2014 8-K; ¶ 23.

- **Enrique R. Ubarri-Baragaño** served as the Company's Chief Compliance Officer, General Legal Counsel and an Executive Vice President during the Class Period.  ¶ 24.

- **Christopher C. Poulton** was an Executive Vice President for U.S. Operations of DFC through the Class Period.  ¶ 25.

*Plaintiffs*.  Plaintiffs are individual investors who purport to be acting on behalf of a putative class of purchasers of DFC's common stock from April 2, 2012 to May 1, 2014 (the "Class Period").  ¶ 27.  Plaintiffs have asserted claims for (i) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against Defendants, and (ii) violations of Section 20(a) of the Exchange Act against each of the Individual Defendants.

## ARGUMENT

As noted above, Plaintiffs assert claims based on two categories of alleged misrepresentations:

   i.  **The Tax Receivable Claims**.  Plaintiffs assert that the possibility of the Tax Receivable being challenged by the Treasury Department and the FDIC disallowing the inclusion of the Tax Receivable in Tier 1 capital were previously known to Defendants and should have been disclosed during the Class Period.  ¶ 7.

   ii.  **The ALLL Claims**.  Plaintiffs assert that the Company deliberately understated its ALLL during the Class Period, and that problems with DFC's internal controls and their impact on the Company's ALLL estimates were not properly disclosed prior to March 18, 2014.  ¶¶ 4-6, 8.

According to Plaintiffs, Defendants' alleged failure to disclose these issues rendered misleading virtually every one of the Company's SEC filings (and attendant press releases and

conference calls) during the Class Period.  ¶¶ 133-268.[8]  As detailed below, Plaintiffs fail to state

a claim with respect to either the Tax Receivable Claims or the ALLL Claims.  Specifically,

Plaintiffs fail to plead (i) an actionable misrepresentation or omission (*infra* Secs. I.A and I.D),

(ii) a strong inference of scienter as to any Individual Defendant (*infra* Sec. I.B); (iii) loss

causation (*infra* Sec. I.C); or (iv) control person liability (*infra* Sec. II).  As such, this action

should be dismissed with prejudice.

## I.      PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED

"To sustain a claim for securities fraud under Section 10(b) and Rule 10b-5 a plaintiff

must satisfactorily plead six elements: (1) a material misrepresentation or omission; (2) scienter,

or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance;

(5) economic loss; and (6) loss causation."  *In re A123 Sys., Inc. Sec. Litig*., 930 F. Supp. 2d 278,

283 (D. Mass. 2013) (quoting *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v.*

*Waters Corp*., 632 F.3d 751, 756 (1st Cir. 2011)) (internal quotations omitted).  In order to do so,

Plaintiffs must satisfy the "exacting pleading requirements" of the PSLRA, as well as Rule 9(b)'s

requirement to "plead the circumstances of fraud with heightened specificity."  *In re Genzyme*

*Corp. Sec. Litig.*, 754 F.3d 31, 34, 40 (1st Cir. 2014).  As discussed further below, the Complaint

fails to meet Plaintiffs' pleading burden.

### A.      Plaintiffs Have Failed To Plead An Actionable Misrepresentation or Omission

The "PSLRA mandates that a complaint asserting securities fraud pursuant to the

Exchange Act and Rule 10b-5 must (1) specify each statement alleged to have been misleading;

---

[8]      Plaintiffs appear to challenge at least one series of statements (contained in the Company's 2011 10-K, filed on March 30, 2012) made prior to the beginning of the Class Period on April 2, 2012.  ¶¶ 133-140.  Statements made prior to the Class Period cannot form the basis for liability: "[a]s the class period defines the time during which defendants' fraud was allegedly alive in the market, statements made … before or after the purported class period are irrelevant to plaintiff's fraud claims."  *City of Roseville Employees Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1110-11 (E.D. Wash. 2013).  Thus, any claims based on the 2011 10-K or any other statements made before the Class Period must be dismissed.

(2) specify the reason or reasons why the statement is misleading; and (3) if an allegation

regarding the statement or omission is made on information and belief, . . . state with

particularity all facts on which that belief is formed." *City of Roseville Employees Ret. Sys. v.*

*Textron, Inc*., 810 F. Supp. 2d 434, 441 (D.R.I. 2011), *aff'd sub nom*. *Auto. Indus. Trust Fund v.*

*Textron, Inc.*, 682 F.3d 34 (1st Cir. 2012) (quoting 15 U.S.C. § 78u-4(b)(1)).

      1.      The Complaint Fails To Plead Actionable Misstatements
                   Or Omissions Concerning The Tax Receivable

Plaintiffs' Tax Receivable Claims are based on the assertion that DFC failed to disclose

during the Class Period that "there was a significant risk that the Treasury Department would

seek to void the 2012 Closing Agreement on the grounds that: (i) the 2012 Closing Agreement

was obtained through misrepresentations by Doral; and (ii) Doral did not actually overpay taxes

in the amount claimed."  ¶ 130; *see also* ¶ 7.  According to Plaintiffs, Defendants thus concealed

the possibility that the Tax Receivable may not qualify as Tier 1 capital under FDIC guidelines.

¶¶ 131-32.

      a.      *The Company Disclosed The Possibility That The Tax Receivable
                   Would Not Qualify As Tier 1 Capital*

Plaintiffs ignore DFC's explicit disclosure — immediately after the 2012 Closing

Agreement was entered into — of the terms of the 2012 Closing Agreement, that the Company

planned to treat the Tax Receivable as Tier 1 capital, and that the FDIC might refuse to treat it as

such:

> **Governmental agencies that have supervisory authority over the Company and Doral Bank can review the quality of our Tier 1 capital and may determine to reduce all or a portion of the increase to our Tier 1 capital caused by our agreement with the Commonwealth of Puerto Rico regarding our deferred tax asset.**
>
> We recently entered into an agreement with the Commonwealth of Puerto Rico in which the Commonwealth of Puerto Rico

8

recognized a prepayment of income taxes of approximately $230 million from us relating to our past overpayment of taxes. We believe that this agreement will result in an increase in our reported Tier 1 regulatory capital by approximately $200 million. **The Federal Reserve and the Federal Deposit Insurance Corporation have supervisory oversight authority over the Company and Doral Bank, including the quality of our Tier 1 regulatory capital, and as such there can be no assurance that the Federal Deposit Insurance Corporation or Federal Reserve may not seek to reduce in the future our Tier 1 regulatory capital including the increase caused by the agreement with the Commonwealth of Puerto Rico. If either regulatory agency reduces our Tier 1 regulatory capital our operations may be materially adversely effected.**

Ex. 4, 2011 10-K at 49.

These disclosures conclusively rebut any notion that Defendants concealed the possibility that the Tax Receivable might not be treated as Tier 1 capital: "[a] plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if that information was, in fact, disclosed." *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009); *see also Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) ("the alleged omissions are contradicted by the company's public disclosures and, therefore, there can be no Section 10(b) claim").

> b.    *The Tax Receivable Claim Is Impermissible Fraud By Hindsight*

Plaintiffs' assertions are based on the fact that "the Treasury Department **later** challenged the legitimacy of the 2012 Closing Agreement and the Tax Receivable." ¶¶ 126-129.  Plaintiffs attempt to gloss over when this "later" challenge occurred, but the Complaint and the Company's disclosures show that the Treasury Department did not challenge the Tax Receivable until **April 15, 2014**, and that the Company disclosed this issue shortly thereafter, on May 1, 2014.  ¶ 276. Thus, in Plaintiffs' view, because the Treasury Department questioned the Tax Receivable and the 2012 Closing Agreement in April 2014, Defendants must have known — starting on March

30, 2012, just **four days** after the 2012 Closing Agreement was entered into — that the Treasury Department was going to try and renege on a contract it had just signed.  ¶¶ 135-36.  Plaintiffs similarly suggest that because the FDIC informed the Company on May 1, 2014 that the Company could no longer treat the Tax Receivable as Tier 1 capital, Defendants must have known throughout the Class Period that the FDIC **would** make this determination – even though Plaintiffs' assertion is directly contradicted by the fact that the Company "included the Puerto Rico Government tax receivables as Tier 1 capital at Doral Bank without objection by the FDIC and the FRBNY" for over two years.  ¶ 132; Ex. 8, May 1, 2014 8-K.

This is nothing more than impermissible fraud by hindsight, "where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly."  *Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir. 2008); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) ("A plaintiff may not plead 'fraud by hindsight'; *i.e.* a complaint may not simply contrast a defendant's past optimism with less favorable actual results….") (internal quotations omitted).

    c. *The Court Of First Instance Has Rejected The Treasury Department's Efforts To Avoid The Tax Receivable*

Equally fundamental, Plaintiffs completely ignore the substance of the Court of First Instance's recent ruling that the Company "did not make false representations to the Department of Treasury when executing the 2012 Closing Agreement," and that the Treasury Department has no basis to challenge the 2012 Closing Agreement and the Tax Receivable.  *See* Ex. 1, Court of First Instance Decision at 46-47; ¶ 288 (one-sentence acknowledgment that the Court of First Instance has found that the 2012 Closing Agreement is enforceable).[9]

---

[9] As noted, the Puerto Rico Court of First Instance's decision is properly considered on this motion.  *See supra* at 2; *Giragosian v. Ryan*, 547 F.3d 59, 66 (1st Cir. 2008) (documents and facts the court can consider "include matters of public record, such as documents from prior state court adjudications.").

Plaintiffs' assertions that the 2012 Closing Agreement and the Tax Receivable were not valid are based entirely on positions taken by the Treasury Department.  ¶¶ 126-129.  But Plaintiffs neglect to mention that the Court of First Instance has expressly rejected **each** of those contentions:

- The Court of First Instance held that "[t]he evidence presented to us does not show either that the Treasury was not aware of the fact that the item represented in Representation H ($766,280,289) was made up of the amortization balance ($652,463,797) plus the net operating losses of the portion Doral did not benefit from ($113,816,492)."  Ex. 1, Court of First Instance Decision at 44; *compare* ¶¶ 126-27 ("Doral had improperly added $113,816,492 in net operational losses … to the actual unamortized balance of $652,463,797.").

- The Court of First Instance also found that "[DFC] did not represent having made a $152 million overpayment in Representation E of the 2012 Closing Agreement.  In addition, such item was not used to register the $229,884,087 refund."  Ex. 1, Court of First Instance Decision at 34, 38; *compare* ¶ 128 ("the Company did not actually overpay its taxes in the amount of $152 million, and the Company had falsely represented that the $229,884,087 amount of the Tax Receivable corresponded to overpayment of taxes").

- Similarly, the Court of First Instance held that "the word 'concomitant' is perfectly consistent with the sense of Representation E and does not render such clause false."  Ex. 1, Court of First Instance Decision at 37; *compare* ¶ 129 ("Doral had falsely represented that the reduction in its income for purposes of book value following the restatement had a led to a 'concomitant' reduction in the Company's tax liability").

In rejecting the Treasury Department's (and Plaintiffs') allegations, the Court of First Instance emphasized that closing agreements are "final and conclusive and cannot be reopened, annulled set aside or disregarded in litigation in terms of the matters agreed upon;" that the "finality of closing agreements must be zealously guarded by the courts;" and that "the State is a contracting party like any other and must comply with what was agreed."  Ex. 1, Court of First Instance Decision at 29, 30, 31.  In essence, Plaintiffs' argument appears to be that Defendants should

11

have known (and disclosed) that Puerto Rico was not going to abide by its binding, contractual

obligations to the Company.  That is not tenable.[10]

      2.    The Complaint Fails To Plead Actionable Misstatements Or Omissions
           Concerning ALLL

The predicate for Plaintiffs' ALLL claims — that DFC failed to disclose its ongoing

problems with its ALLL estimates and the continuing deficiencies in its internal mechanisms —

is impossible to reconcile with the history of the Company's disclosures immediately prior to and

during the Class Period.  In particular, the Company repeatedly disclosed at regular intervals that

there were deficiencies in its ALLL procedures and calculations, as well as material weaknesses

in its internal controls.

For example, the Company's 2011 10-K (filed on March 30, 2012) disclosed as follows:

> The Company did not maintain effective controls over the
> completeness and valuation of its allowance for loan and lease
> losses and the related provision for loan and lease losses … These
> control deficiencies could have resulted in a misstatement of the
> Company's allowance for loan and lease losses and the related
> provision for loan losses that would result in a material
> misstatement to the annual or interim consolidated financial
> statements that would not be prevented or detected.  Accordingly,
> management has determined that these control deficiencies
> constitute material weaknesses.
>
> As a result of the existence of these material weaknesses,
> management has concluded that as of December 31, 2011 the
> Company did not maintain effective internal control over financial
> reporting based on the criteria established in Internal Control —
> Integrated Framework issued by the COSO.

Ex. 4, 2011 10-K at 138; *see also id.* at 47 ("Doral Financial's management has concluded that

the Company's internal control over financial reporting was not effective as of December 31,

---

[10]    *See, e.g.*, *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *18 (E.D.N.C. Mar. 22, 2013) (no basis to infer that defendants knew that government of India would revise regulations adversely impacting revenue); *Lynn v. Helf*, 2014 WL 5431221, at *18 (M.D. Tenn. Oct. 24, 2014) (fraud could not be inferred based on allegations in another lawsuit; where that lawsuit did not result in any adverse findings against defendant, "there was no reason to believe that … allegations were true").

2011, due to several material weaknesses described in this Annual Report on Form 10-K. …
Each material weakness results in more than a remote likelihood that a material misstatement of
the Company's annual or interim financial statements will not be prevented or detected.").  DFC
made similar disclosures throughout the Class Period.[11]

The Company also disclosed its ongoing efforts to remediate its ALLL and internal
controls defects on a regular basis, but cautioned that its ability to satisfactorily or promptly
comply with the requirements imposed by the Consent Order was uncertain:

- "Doral Financial's management, with the oversight of the Audit
  Committee, will complete the work necessary to remedy the identified
  material weaknesses in the Company's internal control over financial
  reporting as expeditiously as possible."  Ex. 4, 2011 10-K at 47; *see
  also* Ex. 9, November 9, 2012 10-Q at 112 (describing remediation
  efforts as of September 30, 2012); Ex. 3, 2013 10-K at 60-63
  (describing remediation and compliance efforts as of December 31,
  2013).

- "[Disclosing] uncertainty about whether Doral Financial and Doral
  Bank will be able to fully comply with the terms and conditions of the
  [Written Agreement and Consent Order]" and "the operating and other
  conditions imposed by the FDIC and the PR Commissioner under the
  Consent Order and by the FRBNY under the Written Agreement,
  which may lead to, among other things, an increase in our charge-offs,
  loan loss provisions, and compliance costs, and an increased risk of
  being subject to additional regulatory actions, as well as additional
  actions resulting from the future regular annual safety and soundness
  and compliance examinations by these federal regulators."  Ex. 9,
  11/9/12 10-Q at 62.

---

[11]  *See, e.g.*, Ex. 10, May 15, 2012 10-Q at 91 ("the Company's disclosure controls and procedures were not
effective as of March 31, 2012"); Ex. 11, August 8, 2012 10-Q at 106 (same as of June 30, 2012); Ex. 9, 11/9/12 10-
Q at 111 (same as September 30, 2012); Ex. 2, March 18, 2014 Form NT 10-K ("The Company has concluded that it
has a material weakness in its internal control over financial reporting as of December 31, 2013, related to the
review of the underlying data and mathematical model supporting its allowance for loan and lease losses and the
related provision for loan and lease losses.  As a result of the material weakness, the Company has concluded that its
internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31,
2013.  While the Company has implemented processes and controls to address this material weakness during the
fourth quarter, management has determined that sufficient time has not passed to conclude that the weakness has
been remediated.").

Finally, DFC made clear that, since the calculation of ALLL is an estimate involving management judgment and discretion, the Company's ALLL estimates might turn out to be inaccurate and have to be modified in the future:

> Although we strive to utilize our best judgment in providing for loan losses, we may fail to accurately estimate the level of inherent loan losses or may have to increase our provision in the future as a result of new information regarding existing loans, future increases in non-performing loans, changes in economic and other conditions affecting borrowers or for other reasons beyond our control. In addition, bank regulatory agencies, such as FDIC and the Office of the Commissioner, periodically review the adequacy of our allowance for loan and lease losses and may require an increase in the provision for loan and lease losses or loan charge-offs, based on judgments different from those of our management.

> The determination of the appropriate level of the allowance for loan and lease losses inherently involves a high degree of subjectivity and requires us to make significant estimates and judgments regarding credit risks and future trends, all of which may undergo substantial changes. If our estimates prove to be incorrect, our allowance for loan and lease losses may not be sufficient to cover losses in our loan portfolio and our expense relating to the additional provision for credit losses could increase substantially. Any such increase in our provision for loan losses would have an adverse effect on our future financial condition and results of operations.

Ex. 4, 2011 10-K at 45; *see also, e.g.*, Ex. 9, 11/9/12 10-Q at 74; Ex. 5, 2012 10-K at 40 ("We believe our allowance for loan and lease losses is currently sufficient given the constant monitoring of the risk inherent in the loan portfolio.  However, there is no precise method of predicting loan losses and therefore we always face the risk that charge-offs in future periods will exceed the allowance for loan and lease losses and that additional provisions to increase the allowance for loan and lease losses will be required.  In addition, the FDIC as well as the Office of the Commissioner may require us to establish additional reserves.  Additions to the allowance for loan and lease losses would adversely affect our results of operations and our financial

condition"); Ex. 5, 2012 10-K at 101 (same); Ex. 12, August 14, 2013 10-Q at 110 (same); Ex. 3, 2013 10-K at 43 (same).

In light of these specific disclosures, Plaintiffs have no legitimate basis to claim that the Company withheld information about its concerns regarding ALLL and internal controls.  Courts faced with similar circumstances have repeatedly come to that conclusion.  *See, e.g.*, *Textron*, 810 F. Supp. 2d at 445 (company's disclosures were not misleading because "the record reveals…that defendants made disclosures on this subject during the Class Period"); *Okla. Firefighters Pension & Ret. Sys v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) ("[defendant] clearly stated that its loss reserves were estimated figures subject to market conditions and were by no means guarantees of the loss amounts likely to be incurred"); *Cole v. Health Mgmt. Assocs., Inc.*, 2009 WL 2713178, at *7 (M.D. Fla. July 17, 2009) ("contrary to plaintiffs' allegation that [the company] concealed its…problem, the company actually made ongoing disclosures regarding the problem, all the while noting that, if the trend continued, it might need to adjust these reserves again."); *supra* at 12-14.

### B.   Plaintiffs Have Failed To Allege Particularized Facts Demonstrating A Strong Inference Of Scienter

As the First Circuit has explained:

> The PSLRA also **separately imposes a rigorous pleading standard on allegations of scienter**. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  **In this circuit, a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or "a high degree of recklessness**."   A complaint alleging securities fraud "**shall, with respect to each [alleged] act or omission ... state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind**."

*ACA Fin. Guar. Corp.*, 512 F.3d at 58-59 (internal citations omitted, emphasis added).  Scienter under the recklessness standard requires "a highly unreasonable omission, involving not merely

simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary

care, and which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious the actor must have been aware of it." *Greebel v. FTP Software, Inc.*,

194 F.3d 185, 198 (1st Cir. 1999).

The Supreme Court has emphasized that:

> [I]n determining whether the pleaded facts give rise to a "strong"
> inference of scienter, the court must take into account plausible
> opposing inferences.... Congress did not merely require plaintiffs
> to provide a factual basis for [their] scienter allegations ... *i.e.*, to
> allege facts from which an inference of scienter rationally could be
> drawn. Instead, **Congress required plaintiffs to plead with
> particularity facts that give rise to a "strong" — *i.e.*, a
> powerful or cogent — inference**.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 323 (2007) (internal quotations

omitted, emphasis added).

Finally, where, as here, Plaintiffs rely on allegations attributed to unnamed sources —

frequently referred to as "confidential witnesses" and referred to in the Complaint as "former

employees" or "FEs" — the First Circuit has developed specific standards to evaluate such

allegations:

> [W]here plaintiffs rely on confidential personal sources but also on
> other facts, they need not name their sources **as long as the latter
> facts provide an adequate basis for believing that the
> defendants' statements were false**. Moreover, even if personal
> sources must be identified, there is no requirement that they be
> named, **provided they are described in the complaint with
> sufficient particularity to support the probability that a person
> in the position occupied by the source would possess the
> information alleged**. In both of these situations, the plaintiffs will
> have pleaded enough facts to support their belief, even though
> some arguably relevant facts have been left out.
>
> Consequently, we look at all of the facts alleged to see if they
> provide an adequate basis for believing that the defendants'
> statements were false. **This involves an evaluation, *inter alia*, of
> the level of detail provided by the confidential sources, the**

16

> **corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.**
>
> *Tellabs* requires that all information in plaintiffs' complaint be evaluated. We think that includes confidential source information, subject to the restrictions stated in our case law. **We have never said a complaint would survive if it were based only on confidential source allegations.  Indeed, we have said there must be a hard look at such allegations to evaluate their worth**.

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) (internal quotations and citations omitted, emphasis added).  "In other words, the confidential witnesses must provide enough information to establish their basis of knowledge of the alleged misconduct ('what, when, where, and how') and they must establish that the defendants were aware of the misconduct."  *Local 295/Local 851 IBT Employer Group Pension Trust & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 721 (S.D. Ohio 2010).

       1.     Plaintiffs Do Not Allege Particularized Facts
                  Indicating Scienter On An Individual Basis

It is axiomatic that "a plaintiff is required to plead particularized facts that support a strong inference of scienter with respect to **each** defendant."  *Stumpf v. Garvey*, 2005 WL 2127674, at *11 (D.N.H. Sept. 2, 2005) (emphasis added).  The Complaint fails to do so. Instead, it relies almost entirely on allegations that either lump the Individual Defendants together as a group (*see, e.g.*, ¶¶ 61, 82, 94, 114, 290-94) or on allegations attributed to FEs who admittedly had no contact with any of the Individual Defendants and, in many instances, do not even mention any of the Individual Defendants.  ¶¶ 86-89, 131-32; *see infra* at 19-21, 27-28.  In the rare instances where an allegation is directed at a specific Individual Defendant, it is patently insufficient to raise a strong inference of scienter: it either relates to pre-Class Period conduct (¶¶

83, 91-93) or merely echoes *pro forma* allegations that courts have repeatedly deemed insufficient.  ¶¶ 290-305; *see infra* at 24-27, 32-37.

        2.       Plaintiffs Have Failed To Adequately Plead Scienter
                        <u>With Respect To Their Tax Receivable Claims</u>

        As discussed above, the Company explicitly disclosed its entry into the 2012 Closing Agreement, the classification of the Tax Receivable as Tier 1 Capital, and the possibility that the FDIC would disallow the Tax Receivable from counting towards Tier 1 Capital.  *See supra* at 8-9.  These disclosures, which go to the core of Plaintiffs' theory regarding the Tax Receivable, simply cannot be reconciled with any inference of fraudulent intent or deliberate recklessness. As the court in *First Marblehead* held in the face of similar facts:

> **<u>Lead Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter because First Marblehead disclosed that which the Complaint alleges it concealed</u>**.  During the Class Period, First Marblehead disclosed that it did not require borrowers to have a FICO score above 700, it had lowered its credit criteria, default rates had risen to 14.77%, it had a close relationship with TERI, various risks accompanied its relationship with TERI, and changes in various factors could undermine its financial projections.  These disclosures went to the heart of Lead Plaintiffs' theory that Defendants instituted a clandestine program to reduce credit guidelines, which led to an undisclosed rise in default rates and TERI's eventual bankruptcy. **<u>First Marblehead's detailed disclosures negate any inference of scienter</u>**.

639 F. Supp. 2d at 163-64 (footnotes omitted); *see also, e.g.*, *In re Genzyme Corp.*, 754 F.3d at 42 ("a full and prompt disclosure…further undercut[s] any inference of fraudulent intent on the part of defendants"); *infra* at 19-21.

        In an attempt to avoid the dispositive impact of these facts, Plaintiffs rely on four perfunctory assertions attributed to one of their anonymous sources (FE2), contained in two

paragraphs of the Complaint.  ¶¶ 131-32.[12]  None of these statements come remotely close to demonstrating that Defendants knew or recklessly disregarded that the Treasury Department would attempt to avoid the 2012 Closing Agreement prior to April 2014 — *i.e.*, that Defendants acted with scienter.

As a threshold matter, FE2 is not alleged to have had **any** contact or communications with any of the Individual Defendants.  ¶¶ 131-32.  As such, FE2's observations cannot raise any inference of scienter against any of the Individual Defendants.  *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 378 (E.D.N.Y. 2013) (rejecting statements of witnesses where no allegation that "any of the CWs had 'any contact with . . . [executives] or would have knowledge of what they knew or should have known'"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (rejecting witnesses' statements where "there is no allegation that any CW met the Individual Defendants, reported any concerns, received any instructions, or made any personal contact with them during the Class Period").

The substance of the FE2 allegations is equally insufficient.  For example, the fact that "Doral's Vice President of Tax, George Scopetta, met with representatives from the Treasury Department at least bi-monthly during the Class Period" (¶ 131) is immaterial.  No information whatsoever is alleged about the substance of those meetings — there is no allegation that the Treasury Department raised any concerns about the 2012 Closing Agreement and Tax

---

[12]    Plaintiffs also appear to suggest that Defendants must have been aware that the Treasury Department would challenge the Tax Receivable because of the significance of the Tax Receivable to the Company.  ¶ 131.  Setting aside the circularity of that assertion, Plaintiff's invocation of such a "core operations" theory of liability — *i.e.*, that certain operations are so important to a company's performance that executives are presumed to know the operational details — is unavailing.  "There is considerable doubt whether the core operations doctrine survived enactment of the PSLRA, and many courts have held that it is no longer valid."  *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).  But even if such a theory survived the passage of the PSLRA, courts in this Circuit have expressly held that it does not apply in the absence of specific factual allegations providing an independent basis to infer that the defendants had notice of wrongdoing.  *See Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012); *In re A123 Sys.*, 930 F. Supp. 2d at 285.

Receivable (or that those topics were discussed at all).  *See id.*[13]  The assertion that "there were internal discussions at Doral each quarter about whether to continue to include the Tax Receivable in the Company's Tier 1 Capital" (¶ 132) suffers from the same deficiency.  FE2 does not claim that the possibility of the Treasury Department challenging the Tax Receivable was even considered during these "internal discussions," let alone known.  *See id.*  And there is, of course, nothing suspicious about the fact that DFC had discussions about the appropriate classification of the Tax Receivable on a quarterly basis — to the contrary, it indicates that the Company was fulfilling its responsibility to actively monitor its Tier 1 capital.

Furthermore, FE2 does not contend that any of the Individual Defendants were involved in any of the referenced meetings or discussions; or that Mr. Scopetta reported his discussions with the Treasury Department to any of the Individual Defendants.  ¶¶ 131-32.  Therefore, they provide no insight into what the Individual Defendants knew or believed about the Tax Receivable.  *See, e.g.*, *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013) ("Plaintiff in this case makes no allegations regarding any particular meeting that Defendants attended or any specific discussions that occurred at any meeting.  There is no way, from the allegations in the operative complaint, to infer what defendants knew or when"); *In re Boston Tech. Sec. Litig.*, 8 F. Supp. 2d 43, 57 (D. Mass. 1998) (a plaintiff "must allege details of defendants' alleged fraudulent involvement, including specifics as to what defendants had knowledge of and when") (internal quotations and alterations omitted); *In re A123 Sys.,* 930 F. Supp. 2d at 285 ("there is no plausible suggestion that [confidential witnesses] would have known what [another employee] … may have told the defendants").

---

[13]   Indeed, the Court of First Instance credited Mr. Scopetta's testimony that the facts the Treasury Department claimed were withheld from it were disclosed to, and understood by, the Treasury Department.  *See* Ex. 1, Court of First Instance Decision at 42, 45.

Similarly, the unsupported suggestion that "Defendants knew there was a risk that the Treasury Department would not pay Doral the Tax Receivable due to the financial instability of the Puerto Rican Government" (¶ 132) is far too conclusory to support any inference of scienter. It does not explain how (or which) Individual Defendants "knew" this, why they purportedly assumed that the Treasury Department would not live up to its contractual obligations, or how FE2 was aware of Defendants' supposed knowledge. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 (9th Cir. 2009) ("conclusory assertions about the defendants' scienter.… are usually insufficient, standing alone, to adequately allege scienter"); *Horizon Asset Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 762 (8th Cir. 2009) ("a general, conclusory statement provides only weak support, if any, for an inference of … scienter"); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *9 (C.D. Cal. Aug. 21, 2009) ("the statements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation"). Moreover, the potential volatility presented by the adverse economic conditions in Puerto Rico "does not require disclosure to be understood by investors and, in any event, it is a risk that [DFC] acknowledged in its securities filing." *In re Textron, Inc.*, 811 F. Supp. 2d 564, 574 (D.R.I. 2011); *see, e.g.*, Ex. 13, September 30, 2012 10-Q at 59 (warning of risks presented by the ongoing weakness of the Puerto Rico economy, including "uncertainty about the legislative and other measures adopted by the Puerto Rico government in response to its fiscal situation"); Ex. 5, 2012 10-K at 135-37.

Finally, the fact that, "by early 2014, the FDIC was also closely scrutinizing Doral's inclusion of the Tax Receivable in its Tier 1 Capital" (¶ 132) was not concealed; it was expressly disclosed by the Company on May 1, 2014. *See supra* at 9, 20; Ex. 8, May 1, 2014 8-K.[14]

---

[14]   To the extent Plaintiffs contend that Defendants were motivated to conceal the alleged risk associated with the Tax Receivable in order to conceal the possibility that the Tax Receivable may not qualify as Tier 1 capital under

3.      **Plaintiffs Have Failed To Adequately Plead Scienter
        <u>With Respect To Their ALLL Claims</u>**

As numerous courts have recognized, "determining the adequacy of loan loss reserves is not a matter of objective fact," but rather "reflect[s] management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011); *see also Sterling Fin.*, 963 F. Supp. 2d at 1117 ("Determining the proper amount of reserves is an act laden with managerial judgment and discretion."); *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) ("the valuation of assets and the setting of loan loss reserves are based on flexible accounting concepts which, when applied, do not always (or perhaps ever) yield a single correct figure"). That is, an issuer's assessment of probable loan losses is an inherently subjective process.[15]

---

FDIC guidelines (¶¶ 131-32) this is nothing more than a variant of the allegation that defendants wanted to make their company appear successful, an allegation that has uniformly been rejected by the courts as insufficient to show fraud. *See, e.g.*, *Seaman v. Cal. Bus. Bank*, 2013 WL 5890726, at *6 (N.D. Cal. Oct. 30, 2013) ("Plaintiff argues that Defendants had a motive to misrepresent CBB's financial information in the PPM because if CBB failed to increase its capital, it faced the possibility of further FDIC enforcement actions…. It may be true that Defendants were motivated to raise capital to avoid further regulatory action. But the same would be true for any bank or bank managers in Defendants' position. Without more, Plaintiff's allegations of motive do not support a compelling inference of fraudulent intent or recklessness."); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012) (finding that Defendants' motive to refinance the Company's debt was a "general motive for management to further the interests of the corporation [that] fail[ed] to raise an inference of scienter").

[15]    The Complaint itself appears to acknowledge that fact — it cites to no fewer than five sources of accounting guidance governing the calculation of ALLL but is unable to explain **how** the Company's ALLL was in violation of those guidelines. ¶¶ 58, 60, 71; *see Fifth Third Bancorp.*, 731 F. Supp. 2d at 722 ("even the complaint has to admit that estimating and setting aside appropriate loan loss reserves is a complicated accounting function"). The cited sources make clear that the calculation of ALLL involves a great deal of latitude. "Because 'it is usually difficult, **even with hindsight**, to identify any single event that made a particular loan uncollectible,' GAAP requires that 'impairment in receivables shall be recognized when, based on all available information, it is *probable that a loss has been incurred* based on past events and conditions existing at the date of the financial statements.' ASC 310-10-35-4(a) (emphasis added). Thus, lenders are instructed to record loss provisions only when both of the following conditions are met: (1) information available prior to issuance of the financial statement indicates that it is probable that an asset has been impaired; and (2) the amount of loss can be reasonably estimated. FAS No. 5 ¶ 8. **Whether the amount of loss can be reasonably estimated should depend upon a variety of market and institution-specific factors**, such as an institution's historical loss experience, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the economic environment. *See* ASC 310-10-35-41. GAAP further requires that a lender's income be charged off in the period in which **it deems** the loan uncollectible, which is the period in which the estimated loss is probable to have been incurred. ASC 310-10-35-41. Thus, losses 'shall not be recognized before it is probable that they have been incurred, even though it may be probable based on past

Thus, "**accounting for loan loss reserves is not the sort of simple accounting concept the violation of which creates an inference of scienter**." *Fifth Third Bancorp*, 731 F. Supp. 2d at 722.[16] "Offering a projection about the adequacy of a loan loss reserve necessarily involves some degree of judgment about the possibility of future loss, and it is not securities fraud for that judgment to be in error." *Seaman v. Cal. Bus. Bank*, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014). Rather, for Plaintiffs to base liability on the "inherently subjective" process of calculating ALLL, they "**must allege that defendant's opinions were both false and not honestly believed when they were made**." *Fait*, 655 F.3d at 113; *see also, e.g.*, *Textron*, 810 F. Supp.2d at 442 n.5 (a statement of opinion "can only be actionable if the speaker did not actually hold the opinion or if the statement implies a statement of fact that is itself false or misleading.").[17]

### a. The FE Allegations Do Not Demonstrate Scienter

Once again, Plaintiffs rely exclusively on statements attributed to the four FEs in their attempt to plead that the Defendants **knew** that the Company's ALLL was understated through the Class Period. ¶¶ 83-88, 93-97, 99-100. As a threshold matter, the Complaint is devoid of

---

experience that losses will be incurred in the future.' *Id.* 310-10-35-4(b)." *Okla. Firefighters*, 951 F. Supp. 2d at 485-86 (emphasis added).

[16]   In any event, Plaintiffs' assertions that DFC's ALLL calculations violated GAAP (¶ 40) are so conclusory as to be meaningless. The *Textron* court rejected similarly generic allegations, finding that "plaintiffs' conclusory assertion that the company's loan loss reserves were not reported in accordance with [GAAP] does nothing to clarify plaintiffs' position because it is so generally pleaded that it will not support their contention that defendants' alleged omissions made their statements misleading. Instead of providing specific allegations describing [defendant's] past loan loss provisions or what amount of loan loss provisions would have been sufficient to satisfy GAAP in this case, the plaintiffs simply allege that [defendant] inappropriately maintained its provision at historic levels. These general allegations … are insufficient to plausibly establish that [defendant's] accounting practices violated GAAP." 810 F. Supp. 2d at 444 n.7.

[17]   *See also Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 463 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011*)* (Plaintiffs must allege specific facts showing that defendants were aware that "loss reserves were too low"); *In re Downey*, 2009 WL 2767670, at *4-5 ("Merely alleging that bad debt reserves were inadequate is insufficient because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 283 (3d Cir. 1992) ("It is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collateralize or secure a loan portfolio; or provide sufficient internal controls or management practices.").

any "other facts" to bolster the FE allegations, such as internal documents or memoranda —

Plaintiffs' allegations are based solely (and impermissibly) on statements attributed to FE1 to

FE4.  *See Biogen*, 537 F.3d at 51 ("We have never said a complaint would survive if it were

based only on confidential source allegations.").  Even if the Court were inclined to consider the

FE allegations, they are insufficient to demonstrate the requisite strong inference of scienter.

### i.      FE1's Statements Are Not Entitled To Any Weight

Although Plaintiffs primarily rely on allegations attributed to FE1, they acknowledge that

FE1 left the Company on March 15, 2012, prior to the commencement of the Class Period.  ¶ 34.

That fact alone renders the allegations attributed to FE1 incapable of demonstrating scienter.

Contrary to Plaintiffs' assertions (¶ 83), allegations of prior misconduct cannot support an

inference of misconduct during the Class Period:

> [C]onfidential sources who "were not employed by [the defendant]
> during the Class Period … lack personal knowledge about [the
> defendant's] practices during the Class Period.  Any inference that
> pre-Class Period practices continued during the Class Period
> amounts to unsubstantiated speculation."

*Sterling Fin.*, 963 F. Supp. 2d at 1135; *see also, e.g.*, *Fifth Third Bancorp*, 731 F. Supp. 2d at 722

("[A]ll of CW–2's information pre-dates the class period and, thus, is irrelevant."); *In re*

*Downey*, 2009 WL 2767670, at *10 ("CW10 and CW20 have no basis to opine about Downey's

underwriting or lending practices after they left the company, and both CW10 and CW20 left

Downey before the start of the Class Period.").

This is particularly true here, where the allegedly improper pre-Class Period practices

FE1 identifies were explicitly disclosed and were being remediated by the Company shortly after

FE1's departure, prior to the Class Period.  For instance, FE1 states that DFC's "ALLL was

based on outdated property appraisals, which created a significant issue with the accuracy of the

ALLL," that updated property values were not timely recorded, that Mr. Wahlman did not

correct this practice when it "was brought to [his] attention in January 2012," and therefore

DFC's "ALLL remained understated during the Class Period."  ¶¶ 91-93.

Those allegations are conclusively rebutted by the Company's 2011 10-K, filed on March

30, 2012 (two weeks after FE1's departure from the Company), which disclosed that DFC's

ALLL could be based on "dated, or stale, appraisal[s]:"

> **As it takes a period of time for commercial loan appraisals to be completed once they are ordered, Doral must at times estimate its allowance for loan and lease losses for an impaired loan using a dated, or stale, appraisal. Puerto Rico has experienced some decrease in property values during its extended recession; therefore, the reported values of the stale appraisals must be adjusted to recognize the 'fade' in market value**. In order to estimate the value of collateral with stale appraisals, Doral has developed separate collateral price indices for small commercial loans and large commercial loans that are used to measure the market value fade in appraisals completed in one year to the current year. The indices provide a measure of how much the property value has changed from the year in which the most recent appraisal was received to the current year. **In estimating its ALLL on collateral dependent loans using outdated appraisals, Doral uses the original appraisal as adjusted for the estimated fade in property value less selling costs to estimate the current fair value of the collateral**. That current adjusted estimated fair value is then compared to the reported investment, and if the adjusted fair value is less than reported investment, that amount is included in the ALLL estimate.

Ex. 4, 2011 10-K at 68.  Similarly, DFC made the following disclosure regarding its failure to

timely record updated property values (the practice that FE1 incorrectly claims Mr. Wahlman did

not address):

> The Company did not maintain effective controls over the completeness and valuation of its allowance for loan and lease losses and the related provision for loan and lease losses. **Specifically, the Company did not maintain effective controls to reasonably assure that (i) all residential second mortgages and all commercial real estate loans valuations were obtained and processed accurately so that all the property value updates received were reflected as charge-offs or in the estimate of the allowance for loan and lease losses in a timely manner**, and (ii)

the allowance for loan and lease losses estimate is adequately reviewed and that underlying data is properly reconciled. The control deficiency related to the accurate and timely processing of new residential and commercial real estate valuations resulted in the Company's reducing the amount of loans by $10.1 million and reducing the allowance for loan and lease losses by $10.1 million in the December 31, 2011 consolidated financial statements from the amounts reported in Doral's January 19, 2012 earnings release. These control deficiencies could have resulted in a misstatement of the Company's allowance for loan and lease losses and the related provision for loan losses that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected. Accordingly, **management has determined that these control deficiencies constitute material weaknesses**

…

**To remediate the material weakness for residential second mortgages and commercial real estate loan valuations receipt and processing, management will clearly define the charge-off calculation, revise the charge-off documentation to clearly define the amount of the charge-off and the responsibility of completing the charge-off forms, retrain those responsible for calculating the charge-off, and design the process and establish written procedures to ensure that all new valuations are obtained timely and are considered in identifying loan charge-offs and in estimating the allowance for loan and lease losses and such charge-offs and loan loss provisions are timely recorded in the accounting records**.

*Id.* at 138-39.

This is precisely why courts have repeatedly held that statements by confidential witnesses who were not employed by the defendant during the relevant class period cannot be credited — they do not have a reliable basis to make any judgments about conduct during the relevant time frame because they have no basis to know what happened in their absence. Similarly, FE1's assertions regarding January 2012 meetings and conversations (¶ 83, ¶ 304), have no bearing on what Defendants knew or did months and years later during the Class Period. *See, e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F. Supp. 2d 1267, 1287 (S.D. Fla. 2008)

26

("the fact that any of the Individual Defendants may have received an Exception Report before the Class Period . . . does not create a strong inference that those Defendants were severely reckless or acting with the intent to deceive, manipulate, or defraud Plaintiff during the Class Period."). Compounding this fundamental temporal deficiency is the vague and second-hand nature of the FE1 allegations, which closely mirror allegations that have been repeatedly rejected as insufficient to draw a strong inference of scienter.

For example, according to the Complaint, FE1 believed that DFC was "constantly altering its ALLL model" in order to reduce ALLL levels. ¶¶ 84, 86, 87. However, absent from the Complaint is any explanation by FE1 as to how the ALLL model was altered, what impact these supposed alterations had on ALLL levels or what ALLL levels should have been. *See Local No. 38*, 724 F. Supp. 2d at 460 ("the CWs offer 'observ[ations]' that AMEX issued credit to high risk individuals, 'belie[fs]' that some customers had trouble paying their bills, or conclusory statements that AMEX had 'lowered its lending criteria.' These anecdotes and conclusory statements of belief cannot form the basis for a finding of reckless disregard."). Nor do Plaintiffs explain why FE1's beliefs about the accuracy of the ALLL model is of any relevance — FE1 does not claim to have been involved in the calculation of ALLL or to have any relevant expertise. *See, e.g.*, *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1211 (D. Ariz. 2009) ("[I]t is unclear what qualifies [a former accounts receivable senior accountant] to provide authoritative guidance with respect to an interpretation of a lengthy and relatively technical accounting provision.").

FE1's statements that **other**, also unnamed, DFC employees were "concerned" about or "uncomfortable" with the Company's ALLL model (¶ 85) are even more attenuated, given that there is no suggestion that these concerns were ever relayed to, or shared by, any of the

Individual Defendants.  *See, e.g.*, *Fifth Third Bancorp*, 731 F. Supp. 2d at 722 ("Although CW-1 reports facts showing that … there was concern in some departments about Fifth Third's lending practices, he does not connect any of this information to any of the Individual Defendants.").

ii.     The Allegations Attributed To FE2, FE3 and FE4
Are Equally Deficient

The allegations attributed to the remaining FEs are similarly lacking.  As a threshold matter, FE2, FE3 or FE4 — none of whom were employed by the Company through the entire Class Period — are not alleged to have had any contact with any of the Individual Defendants. ¶¶ 84, 86-89, 94-101.  Indeed, "not one [FE] represents that he or she ever interacted with [the Individual Defendants] either before, during, or after the Class Period.  Thus, they cannot offer any insight into the knowledge or culpability of the Individual Defendants."  *Sterling Fin.*, 963 F. Supp. 2d at 1136; *see also, e.g.*, *Fifth Third Bancorp*, 731 F. Supp. 2d at 721-22 (discounting confidential witness allegations where "there are no facts alleged from which it can be inferred that the confidential witness had sufficient contact with any of the Defendants to impute their knowledge of misconduct to the Defendants"); *Simon v. Abiomed, Inc.*, 2014 WL 1413638, at *21 (D. Mass. Apr. 10, 2014) ("[a]lthough the complaint identifies seven confidential witnesses, none allege that they were present at any meetings at which critical statements or admissions were made by senior management").

In any event, the statements attributed to these sources are not indicative of wrongdoing. For example:

- The Complaint alleges that "FE2, FE3 and FE4 confirmed that the issues undermining the accuracy of [DFC's] ALLL persisted throughout the Class Period." ¶ 94.  That is neither surprising nor suspicious since the Company explicitly disclosed that fact on various occasions during the Class Period.  *See supra* Sec. I.A.2; *Sterling Fin.*, 963 F. Supp. 2d at 1136 (disregarding confidential witness allegations where they "largely consist of information publicly and contemporaneously disclosed").

28

- FE2 and FE3, like FE1, simply conclude that ALLL was, in their view, understated. Such conclusions have no probative value. *See supra* at 23-28; *In re Downey*, 2009 WL 2767670, at *11 ("With respect to loan loss reserves, the confidential witness statements do not demonstrate that any Individual Defendant knew or was deliberately reckless in not determining that Downey's reserves were allegedly understated. Instead, Plaintiff only offers the belief of CW1 and CW8 that Downey did not maintain adequate reserves.").

- FE2 is also alleged to have expressed concerns to Doral's Principal Accounting Officer, Nancy Reinhard, about the accuracy of the ALLL calculations.  ¶¶ 96-100.  However, there is no allegation that FE2 or Reinhard brought FE2's concern to the attention of the Individual Defendants.  *See, e.g.*, *Hubbard*, 625 F. Supp. 2d at 1289-90 (confidential witness statements attributing knowledge to non-defendant employee irrelevant to knowledge of defendants); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 141 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (no scienter where confidential witnesses did not report accounting deficiencies to defendants).

- FE3 complains that he was directed to develop a forecast for mortgage charge-offs in March 2013, but was told to modify his initial forecast by his superiors in a manner he disagreed with.  ¶ 94.  Setting aside the fact that a subordinate's disagreement with his supervisors is not a basis to infer scienter, FE3 provides no details about whether the forecast was ever used; whether it proved accurate if it was used; what the appropriate forecast should have been; what it was modified to; and whether he ever made his concerns known.   In the absence of any such detail, it is impossible to evaluate FE3's allegations.  *See Zucco Partners,* 552 F.3d at 999 ("CW1's account establish[ing] disagreement and questioning within [defendant company] about the [accounting numbers]… is far from the deliberate, conscious recklessness required for a strong inference of scienter under the PSLRA").

- FE4, who is not alleged to have had any involvement in the calculation of ALLL, claims that appraisals were delayed during the Class Period; but the Company disclosed that fact. *See supra* at 25.  He also states that "during the second half of 2012, few problematic commercial real estate loans were being addressed, which contributed to the understatement of [DFC's] ALLL." ¶ 94.  Again, Plaintiff provides no context for this statement.  In what way were these loans problematic? Were they addressed after the second half of 2012?  How did they contribute to the understatement of ALLL?  In the absence of any such details, nothing can be drawn from these allegations.  "The second-guessing of management decisions by confidential witnesses does not

29

provide a basis for securities fraud." *In re Downey*, 2009 WL 2767670, at *11.

In sum, the FE allegations simply do not convey **_facts_** — as opposed to innuendo and speculation — sufficient to support the strong inference of scienter required by the PSLRA.

b.  <em>Competing Inferences Defeat A Showing Of Scienter</em>

The totality of the facts further undermines Plaintiffs' attempts at pleading scienter with respect to the ALLL claims. *See, e.g.*, *First Marblehead*, 639 F. Supp. 2d at 163 ("court should evaluate scienter 'with reference to the complaint as a whole,' and 'competing inferences should be weighed against plaintiffs' preferred interpretation of the facts'").

As detailed above, DFC expressly disclosed its ongoing issues with ALLL and its internal control failures, as well its attempts to resolve those issues. "Plaintiffs have failed to plead sufficient facts giving rise to a strong inference of scienter because [the Company] disclosed that which the Complaint alleges it concealed." *First Marblehead*, 639 F. Supp. 2d at 163 *see also*, *e.g.*, *Horizon Asset Mgmt. Inc.*, 580 F.3d at 764-65 ("continued disclosures of its control problems in all three of the filings that contained false financial results during this period also weaken the inference that [defendants] acted with scienter" where "it is apparent that [the company] disclosed an ongoing process to remediate complex accounting problems").

That is particularly true here where, as Plaintiffs acknowledge, the Company was subject to extensive supervision by the FDIC during the Class Period. ¶¶ 43, 69-71. In particular, pursuant to the Consent Order (and the written agreement with FRBNY), the Company provided regular reports to the FDIC and FRBNY regarding its ALLL, which was also regularly reviewed by an independent third-party consultant. *See, e.g.*, ¶¶ 70, 76; 2013 10-K at 62. Yet no allegations of fraud or conscious misconduct were raised. *See Seaman*, 2014 WL 1339649, at *6 ("the fact that CBB was subject to a consent order, and was being closely monitored by the

30

FDIC, does not give Defendants a greater motive to lie or be reckless in its statements about the adequacy of its loan loss reserves.  **If anything, it would tend to suggest the opposite**.") (emphasis added); *Sterling Fin.*, 963 F. Supp. 2d at 1113 (dismissing Section 10(b) claims where "the FDIC has never required Sterling to restate any of its financials, despite FDIC's issuance of the CDO and its unilateral power to force companies to restate inaccurate financials"); *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 391-92 (S.D. Tex. 2011), *aff'd sub nom. Harold Roucher Trust v. Nocella*, 464 F. App'x 334 (5th Cir. 2012) (dismissing Section 10(b) claims where FDIC reviewed alleged misstated ALLL).[18]

Nor do plaintiffs allege that DFC's auditor (PricewaterhouseCoopers LLP), which approved the Company's financial statements, raised any red flags suggesting fraud.  *See, e.g.*, *Sterling Fin.*, 963 F. Supp. 2d at 1092; Ex. 3, 2013 10-K at F-2 – F-3; Ex. 4, 2011 10-K at F-2 – F-3; Ex. 5, 2012 10-K at F-2.  As the *Oklahoma Firefighters* court noted in dismissing similar claims asserting that ALLL was understated, "[t]ypically, plaintiffs alleging a company's failure to comply with GAAP bring claims against the accounting firms who prepare, review, or audit the defendant company's financial disclosures.…  We find it curious that plaintiffs have failed to do so here."  951 F. Supp. 2d at 495 n.8.

---

[18]    To the extent Plaintiffs suggest that the Consent Order demonstrates wrongdoing by Defendants (¶ 5), that argument has been conclusively rejected by several recent decisions.  As a threshold matter, such consent orders are the "product of settlement" between regulatory agencies and corporations, "not an adjudication of the underlying issues," and therefore are not evidence of misconduct.  *See, e.g.*, *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011).  That is especially true here, where the Consent Order is entirely forward-looking.  It placed requirements on the Company's calculation of ALLL — similar to those imposed on other Puerto Rican banks by consent order — on a going-forward basis, but did **not** require the Company to restate its ALLL for prior periods.  *See* ¶ 71; Ex. 14, Consent Order at 12-14; *Lynn*, 2014 WL 5431221, at *18 (consent order between FDIC and defendant did not constitute a 'red flag' of previous financial fraud when consent order was forward-looking and did not require any adjustments to previous ALLL estimates).  Thus, courts have not only found that the existence of a consent order does not show fraud, they have stricken all references to consent orders as irrelevant and improperly prejudicial.  *See, e.g.*, *Footbridge Ltd. v. Countrywide Home Loans, Inc*., 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010).

4.     Plaintiffs' Additional Scienter Allegations Are Insufficient

The Complaint also contains a series of so-called "additional scienter allegations," none of which are tied to any specific statement or omission, or to any particular Individual Defendant.  ¶¶ 290-305.  These are nothing more than boilerplate assertions that have been routinely rejected as insufficient to raise the requisite strong inference of scienter.

*First*, courts have repeatedly rejected the generic assertion that the Individual Defendants must have known of the alleged fraud by virtue of "their positions and access to material non-public information" (¶¶ 291-2) because "attributing knowledge to a defendant merely because of the defendant's status in a corporation, generally fails as a method of meeting the rigorous requirements for pleading scienter." *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 255 (D. Mass. 2001); *see also, e.g.*, *Maldonado v. Dominguez*, 137 F.3d 1, 9-10 (1st Cir. 1998) ("the pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts") (internal quotations omitted); *Urman v. Novelos Therapeutics, Inc.*, 796 F. Supp. 2d 277, 284 (D. Mass. 2011) ("A general inference that [a defendant], by virtue of his position within the company ... must have known about the [alleged fraud] is insufficient").

*Second*, the fact that certain of the Individual Defendants (Wakeman, Wahlman, Ivanov, and Hooston) signed certain allegedly inaccurate SOX certifications (¶ 295) cannot give rise to any inference of scienter, absent specific "factual allegations that the defendants had reason to know that the financial statements they certified were false or misleading when released." *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 120 (D.D.C. 2009); *see also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) (SOX "certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements"); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05

(S.D.N.Y. 2008) (same).[19]  As discussed above (*supra* Secs. I. B.1, I.B.2, and I.B.3), the

Complaint is devoid of any such allegations.

*Third*, the existence of a SEC investigation (¶ 296) is in no way indicative of scienter:

"the mere existence of [an] investigation cannot support any inferences of wrongdoing or

fraudulent scienter on the part of [a] company or its senior management."  *In re Hansen Natural*

*Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007); *see also In re Ceridian Corp.*

*Sec. Litig.*, 542 F.3d 240, 248 (8th Cir. 2008) (affirming district court's decision to "giv[e] no

weight to the on-going SEC investigation because no hearing or adverse findings ensued").

"Securities regulators are obligated to examine the behavior of public corporations, and the fact

that a regulator is fulfilling this role cannot be sufficient to allege scienter."  *In re Manulife Fin.*

*Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011).

*Fourth*, the fact that the Company's management, including the Individual Defendants,

received and reviewed various financial reports (¶¶ 296-99) is not surprising.  That is part of

management's job.  The Complaint does not provide any details regarding the contents of those

reports, nor does it allege that those reports contained any information indicating that the

Company's ALLL was understated, that the Tax Receivable was not valid, or that any of the

Company's disclosures were inaccurate.  In the absence of any such concrete facts, all the

Complaint alleges is that the Individual Defendants received financial reports. That is clearly

insufficient to infer any wrongdoing: "merely alleging the existence of a highly efficient

reporting system — even one that would logically lead to internal reports on the relevant subject

matter — is not enough … such allegations may speak to the question of how defendants might

---

[19]    If the simple fact that SOX certifications were subsequently found to be inaccurate was sufficient to show
scienter, "scienter would be established in every case where there was an accounting error or auditing mistake made
by a publicly traded company, thereby eviscerating the pleading requirements for scienter."  *Garfield*, 466 F.3d at
1266.

have known what they allegedly knew, but they are insufficient absent some indication of the specific factual content of any single report generated by the alleged reporting system." *In re Boston Tech.,* 8 F. Supp. 2d at 57-58 (internal quotations and alterations omitted).[20]

*Fifth*, the limited stock sales by Messrs. Ivanov, Ubarri and Poulton (¶ 302) do not give rise to a strong inference of scienter against those individuals (and clearly have no bearing on the other Individual Defendants):

- Messrs. Ubarri and Poulton are not alleged to have made any of the challenged statements or to have had any particular knowledge regarding the alleged fraud, and Plaintiffs do not allege that either Mr. Ubarri or Mr. Poulton even managed any matters related to the ALLL, reserves, charge-offs, or administration of loans. They appear to have been named as defendants solely so Plaintiffs could point to their stock sales. *See Biogen*, 537 F.3d at 56 (no inference of scienter where selling defendant "made none of the statements alleged to be misleading, and there is no specific allegation that [he] was any more knowledgeable than any of the other individual defendants"); *In re Silicon Graphics*, 183 F.3d at 988 (no inference of scienter where selling defendant "did not make any of the alleged misleading statements"); *infra* at Sec. I.D.

- The fact that **one** of the Individual Defendants (Mr. Ivanov, who signed a single 10-Q) traded DFC stock, while **none** of the other similarly situated Individual Defendants sold any stock, is immaterial. *See, e.g.*, *Biogen*, 537 F.3d at 56-57. "One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001); *see also Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 435 (5th Cir. 2002) ("even unusual sales

---

[20]   *See also, e.g.*, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) ("We would expect that a proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability."); *Local No. 38*, 724 F. Supp. 2d at 462 ("Plaintiff's reliance on Risk Management's reporting system is also insufficient to establish scienter. Although Risk Management compiled credit and performance data and reported its conclusions through the corporate hierarchy, the existence of channels of information is not enough.") (internal quotations and alterations omitted); *Cole*, 2009 WL 271378, at *10 (no scienter where plaintiffs "alleged that defendants received regular reports showing HMA's bad debt situation, but they do not allege what the reports actually stated or how, if at all, the data in those reports differed from the data reported in connection with the reserves actually taken."). Likewise, as discussed above, the fact that DFC's governmental regulators received regular reports about the Company's finances (¶¶ 298, 300-01) does not suggest fraud. To the contrary, it negates any inference of fraud. *See supra* at 9-10.

by one insider do not give rise to a strong inference of scienter" when other insiders had not engaged in suspicious trading during the class period). Moreover, Mr. Ivanov's sales were pursuant to a pre-announced trading plan. *See* Ex. 15, June 17, 2013 Prospectus Supplement No. 1 at 21-22. This too negates any inference of scienter. *See, e.g.*, *Simon v. Abiomed, Inc.*, 2014 WL 1413638, at *22. That is particularly true here since Mr. Ivanov was no longer in his position as interim CFO at the time the November 5, 2013 10-Q (the subject of the March 18, 2014 disclosure) was issued.

- The stock sales took place between August 28, 2013 and September 11, 2013. ¶ 302. That is seven months before the March 18, 2014 disclosure Plaintiffs claim revealed the supposed "truth" about the Company's ALLL, and two months prior to the next statement challenged by Plaintiffs. *See* ¶¶ 245-250 (no statements challenged between August 16, 2013 and November 5, 2013). A "broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter." *First Marblehead*, 639 F. Supp. 2d at 164.

Indeed, the fact that several of the Individual Defendants (Messrs. Wakeman, Wahlman and Hooston) did not sell any of their stock in the Company affirmatively **negates** any inference of scienter. *See, e.g.*, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (finding no inference of scienter where three of the five individual defendants sold no stock during the Class Period).

*Sixth*, it is black-letter law that "[a]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (same); *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1269 (10th Cir. 2001) ("alleged motives (4) and (5), that Defendants desired to protect their own positions with the company and the value of their own Fleming stock, are also insufficient, as again they are motives shared by all company executives."). Therefore, Plaintiffs' rote allegation that certain of the Individual Defendants

35

"were further motivated to engage in the fraudulent course of conduct … in order to maximize their compensation" (¶ 304(a)) carries no weight.

    *Seventh*, Mr. Wahlman's resignation (¶ 305) is not probative of scienter.  Courts have uniformly held that "there are any number of reasons that an executive might resign" and have found that executive resignations fail to bolster any inference of scienter "absent any alleged facts linking the . . . resignations and the alleged fraud."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005); *see also, e.g.*, *Washtenaw County Employees Ret. Sys. v. Avid Tech., Inc.*, 2014 WL 2925435, at \*15-16 (D. Mass. June 27, 2014) ("absent any alleged facts linking the two resignations and the alleged fraud, the resignation of [the executives] do not support an inference of conscious misbehavior or recklessness.").[21]

    The Complaint is entirely lacking any such facts — there is nothing linking Mr. Wahlman's resignation to the alleged fraud.  As a threshold matter, Mr. Wahlman's resignation occurred **more than one year before** the March 18, 2014 and May 1, 2014 disclosures, and the period for which DFC's loan reserves were understated (July 1st, 2013 to September 31st, 2013) was **after** Mr. Wahlman left the Company on June 25, 2013**.**  ¶¶ 201, 269, 271, 275.  Obviously, Mr. Wahlman's resignation cannot be indicative of misconduct post-dating his resignation, when he had no participation in the Company's affairs.  Moreover, while Mr. Wahlman's resignation was announced on March 13, 2013, it was not effective until May 13, 2013, and he remained an employee of the Company in order to assist with the transition to a replacement until June 25, 2013.  *See* Ex. 6, March 13, 2013 8-K.   That is not consistent with an "unexpected" resignation

---

[21]   *Accord Zucco Partners*, 552 F.3d at 1002 ("Mere conclusory allegations that a financial manager resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter"); *In re Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 470 (3d Cir. 2004) (resignation fails to raise an inference of scienter when alleged "without factual basis" connecting resignation to alleged accounting problems).

or termination for improper conduct.  *See, e.g.*, *In re Verifone Holdings, Inc. Sec. Litig.*, 2009 WL 1458211, at *9 (N.D. Cal. May 26, 2009) (no inference of scienter raised by executive's resignation post-restatement as company would not have "allowed him to sign the restatement forms, if the auditors, directors or other officers had suspected him of securities fraud").

These facts independently mandate dismissal of all claims against Mr. Wahlman for any statements or conduct occurring after June 25, 2013.  *See Bartesch*, 941 F. Supp. 2d at 511 (dismissing claims against individual defendants for alleged misstatements made before or after their employment with the defendant company because "no fraud liability can exist against any defendant who was not a director or officer of [the company] at the time of the challenged statement because they would not have had the required 'ultimate authority over the statement, including its content and whether and how to communicate it.'") (quoting *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011)).

*Eighth*, the Complaint also asserts that Mr. Hooston was placed on administrative leave on October 6, 2014, after the end of the class period.  ¶ 23.  Once again, Plaintiffs do not provide any link between Mr. Hooston's leave and any alleged fraud.  Nor could they.  As the Company has disclosed, Mr. Hooston took leave "to attend to personal family issues unrelated to his functions as chief financial officer."  Ex. 7, 10/7/14 8-K.  This is precisely why courts have found that a high turnover amongst executives (¶ 305) does **not** support scienter but, rather, "underscores the implausibility" of Plaintiffs' apparent theory (that there was a revolving door admitting various individuals into the purported fraud).  *Pa. Pub. Sch. Employees v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 358 (S.D.N.Y. 2012).  "There are many possible reasons other than fraud for high personnel turnover — personality conflicts, lack of opportunities for advancement,

37

salary and compensation disputes, to name a few." *Pub. Employees' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F. 3d 305, 316 (4th Cir. 2009).

Furthermore, any claims against Mr. Hooston based on statements pre-dating his employment at the Company (on July 1, 2013) must also be dismissed. *See Bartesch*, 941 F. Supp. at 511; *Horizon Asset Mgmt.*, 580 F.3d at 762.

### C.    The Complaint Fails To Plead Loss Causation

Plaintiffs are also required to plead loss causation — *i.e.*, that the alleged fraud caused Plaintiffs' damages. *See* 15 U.S.C. § 78u-4(b)(4). Causation may not be inferred from a drop in stock price because a change in "price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Therefore:

> It is not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other. **The announcement must have been a 'corrective disclosure,' meaning that the announcement must connect the current, present, negative information to the earlier false or misleading statement**. If Plaintiff's loss resulted from the disclosure of negative information other than a prior false or misleading statement by the Defendants, then she cannot show that Defendants' conduct caused her injury and she has not pled an adequate claim for securities fraud.

*Coyne*, 943 F. Supp. 2d at 259.

The Complaint does not adequately plead loss causation with respect to the ALLL claims.[22] Plaintiffs assert that DFC's disclosure on March 18, 2014 of material weaknesses in its

---

[22]    Although the First Circuit has not yet ruled on whether the pleading of loss causation is governed by Rule 9(b) or Rule 8(a), recent authority suggests that the pleading of loss causation is subject to Rule 9(b). *See Coyne*, 943 F. Supp. 2d at 259; *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 2014 WL 7139634, at *4 (9th Cir. Dec. 16, 2014) (joining Fourth and Seventh Circuits in holding that Rule 9(b) heightened pleading standards apply to the loss causation element of a securities fraud action). Regardless, the Complaint does not adequately plead loss causation under either Rule 9(b) or Rule 8(a).

internal controls and the restatement of its ALLL for the period from July 1st, 2013 to September 31st, 2013 caused DFC's stock to fall by $1.13 per share (approximately 9%). ¶ 308. The Complaint also claims that, following a March 21, 2014 press conference where the Company further discussed these issues, "the price of Doral common stock tumbled 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014," and continued to decline over the next four trading days, "as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014 – a total decline of 25.6%." ¶ 311.

However, Plaintiffs' loss causation allegations ignore the history of DFC's split-adjusted stock price during the Class Period.[23] Specifically, the Company's stock price declined throughout the Class Period, **before the March 18, 2014 disclosure that Plaintiffs claim revealed the alleged fraud**, resulting in a 60% decline from a price of $30.80 at the start of the Class Period to a price of $12.30 on March 17, 2014, the day **prior** to the revelation of the alleged fraud.  See Ex. 16, Stock Price Chart.  This general downward trend was accompanied by several periods of steep price declines: (i) the Company's stock price fell 31.8% from $38.40 on April 24, 2012 to $26.20 on May 21, 2012; (ii) the stock price again dropped from $18.40 on November 6, 2012 to $11.80 on November 16, 2012, a 35.9% drop; and (iii) from January 22, 2014 to February 5, 2014, DFC's stock dropped 27.4% from $15.14 to $10.99.[24] See Ex. 16, Stock Price Chart.

---

[23]   The Court may take notice of the Company's stock price during the Class Period.  *See, e.g.*, *First Marblehead*, 639 F. Supp. 2d at 165 n. 167 ("A court may take judicial notice of stock prices at the motion to dismiss stage to assess a plaintiff's loss causation allegations").

[24]   For purposes of this motion, consistent with Plaintiffs' allegations, Defendants are using the adjusted stock price, which accounts for a 1-for-20 reverse stock split of the Company's common stock on June 28, 2013.  The non-adjusted closing prices for the dates prior to the stock split were: $1.54 (March 30, 2012); $1.92 (April 24, 2012); $1.31 (May 21, 2012); $0.92 (November 6, 2012); $0.59 (November 16, 2012).  The stock traded between

Thus, the drop in stock price following the March 2014 disclosures was not unique in any way — it was consistent with similar movements throughout the stock period.  *See* Ex. 16, Stock Price Chart.  Courts faced with similar circumstances have uniformly found that loss causation has not been pled.  *See, e.g.*, *First Marblehead*, 639 F. Supp. 2d at 165 ("Defendants' detailed disclosures, the deterioration in the credit markets, and First Marblehead's preexisting pattern of stock declines negate Lead Plaintiffs' theory of loss causation."); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) ("[T]he present Complaint does not address the ten-month decline of CMGI's stock price and does not attempt to explain how the decline of the stock price following the issuance of the October 4, 2000 report was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted CMGI during the Internet sector's collapse."); *In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006) ("the Court does not find that this decline establishes loss causation where the share price was trending downward throughout the Class Period and was already down to $6.38 per share three days before Micatrotto's resignation was announced and the alleged fraud was allegedly gradually revealed."); *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 695 (D.N.J. 2006) (overall stock price decline, accompanied by see-saw movements, invalidated plaintiffs' "bare temporal proximity" claim that the stock price plummeted after the issuance of a press release disclosing errors in defendants' statements).

The same holds true here, especially because the periods of sharp decline in the Company's stock price were not random.  They were centered around the Company's quarterly SEC filings (on May 15, 2012 and November 9, 2012), which disclosed the Company's ongoing problems with internal controls and ALLL — *i.e.*, the very issues that Plaintiffs claim were not

---

$1.92 (April 24, 2012) and $0.53 (March 5, 7, 2013) prior to the stock split and was subject to regular fluctuations of 5% throughout this period.

disclosed.  *See supra* at 13-15.  In other words, the prior price drops reflect the market's absorption of the facts that Plaintiffs claim were not timely disclosed.  *See, e.g.*, *Okla. Firefighters*, 951 F. Supp. 2d at 503, 504 (no loss causation where steady stock price decline was "likely [a] a result of the overwhelmingly negative thrust of defendants' disclosures throughout the class period" and showed "the market had long absorbed the economic difficulties faced by the company"); *First Marblehead*, 639 F. Supp. 2d at 164-65 (same).[25]

Moreover, as noted, the March 18, 2014 disclosure was limited to the period after July 1, 2013.  It cannot serve as the necessary "corrective disclosure" for any statements made prior to July 1, 2013 — thus, Plaintiffs have failed to allege loss causation for any statements made in the first half of the Class Period (April 2, 2012 to June 30, 2013).  *See, e.g.*, *Coyne*, 943 F. Supp. 2d at 259 ("The announcement must have been a 'corrective disclosure,' meaning that the announcement must connect the current, present, negative information to the earlier false or misleading statement.").

> **D.    Plaintiffs' Claims Against Messrs. Poulton and Ubarri Also Should Be Dismissed For the Separate Reason That They Are Not Alleged To Have Made Any Of The Challenged Statements**

The claims against Mr. Poulton and Mr. Ubarri should be dismissed for an additional reason — neither is alleged to have made any of the statements challenged by Plaintiffs, nor are they alleged to have signed any SOX certifications.  *See, e.g.*, ¶ 295; *City of Edinburgh Council v. Pfizer, Inc*., 754 F.3d 159, 172 (3d Cir. 2014) ("Defendants cannot be held responsible for statements they did not make."); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) ("the individual defendants . . . must have actually made the

---

[25]    Similarly, the Company's disclosure of the potential impact of a change in position by the FDIC regarding the Tax Receivable (*supra* at 9) defeats Plaintiffs' attempts to plead loss causation with respect to the Tax Receivable claims.  *See Cole*, 2009 WL 2713178, at *10; *First Marblehead*, 639 F. Supp. 2d at 164 ("Lead Plaintiffs' loss causation allegations fail because First Marblehead provided adequate disclosures.").

statements . . . to be held liable under Section 10(b).”); *In re Impac Mortgage Holdings Sec. Litig.*, 554 F. Supp. 2d 1083, 1093 (C.D. Cal. 2008) (dismissing defendants where complaint “contains no specific factual allegations to link [them] to any of the allegedly false statements”).

Mr. Ubarri is not alleged to have a made a **single** statement, and neither Mr. Ubarri nor Mr. Poulton is alleged to be responsible for any issues relating to the ALLL or accounting. The **sole** individualized allegation against Mr. Poulton is that he allegedly prepared an investor presentation attached to DFC’s March 21, 2014 8-K. ¶ 272. However, Plaintiffs do not identify any false statement contained in that presentation. *See id.* Furthermore, Plaintiffs do not plead any facts to support the naked assertion that Mr. Poulton prepared the underlying presentation; nor does the presentation itself indicate that it was prepared by Mr. Poulton (it simply identifies Mr. Poulton as the point of contact for inquiries in his capacity as the head of investor relations). *See* Ex. 17, Investor Presentation Attached to March 21, 2014 8-K. Under these circumstances, there is no basis for Plaintiffs’ attempt to assert claims against either Mr. Ubarri or Mr. Poulton.

## II.   PLAINTIFFS’ SECTION 20(a) CLAIM SHOULD BE DISMISSED

“To establish a Section 20(a) claim, a plaintiff must plead: (1) an underlying violation by a controlled person or entity; and (2) that a defendant controlled the violator.” *In re A123 Sys.*, 930 F. Supp. 2d at 286. Plaintiffs’ Section 20(a) claim should be dismissed for several independent reasons:

- Since Plaintiffs have failed to adequately allege a Section 10(b) claim, their Section 20(a) claim fails. *See, e.g., ACA Fin.*, 512 F.3d at 68.

- Control cannot be presumed: “even a CEO is not automatically a controlling person under Section 20(a).” *In re Downey*, 2009 WL 2767670, at *15. Rather, Plaintiffs must plead that “the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company.” *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002); *see also Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 246 (D. Mass. 2004) (dismissing Section 20(a) claims against an individual

defendant, while plaintiff had pled that the defendant had the power to control the entity, she had not plead that the defendant exercised such control over the disclosures at issue; "[w]hile it might be reasonable to so assume, the PSLRA and Rule 9(b) require more: she must plead it").

- The Complaint does not plead that any of the Individual Defendants actually exercised control over DFC. For example, Plaintiffs do not plead any facts showing that Mr. Ubarri or Mr. Poulton occupied positions of sufficient seniority to assume their participation in DFC's overall decision-making. Likewise, there is nothing to suggest that Mr. Ivanov's brief stint as an interim CFO allowed him to exercise control over DFC, particularly when his service concluded prior to the issuance of the November 5, 2013 10-Q that was the subject of the later restatement. Similarly, neither Mr. Wahlman nor Mr. Hooston can be deemed to have controlled the Company before or after their tenures at DFC. *See In re Textron*, 811 F. Supp. 2d at 574 ("the complaint … fails to plead viable Section 20(a) claims against the majority of the directors who were not charged with either making or tacitly approving the statements … [because plaintiff] has failed to plead with particularity that the directors who neither made nor authorized the statements qualify as control persons"); *supra* at 34-35, 36-38, 41-42.

- Finally, although the First Circuit has not decided whether "culpable participation" — which has been defined as conduct "at least approximating recklessness in the section 10(b) context" (*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.*, 741 F. Supp. 2d 474, 492 (S.D.N.Y. 2010)) — is a necessary element of a Section 20(a) claim, courts outside the First Circuit have repeatedly imposed such a requirement and courts within this Circuit have also considered whether culpable participation has been pled. *See, e.g.*, *id.*; *Aldridge*, 284 F.3d at 85; *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 100 n.14 (D.P.R. 2010). Plaintiffs have not pled culpable participation against any of the Individual Defendants, for the same reasons that they have failed to adequately plead scienter. *See supra* Sec. I.B; *Arbitron Inc.*, 741 F. Supp. 2d at 492.

Therefore, Plaintiffs' Section 20(a) claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action in its entirety for failure to state a cause of action under the PSLRA and Rules 9(b) and 12(b)(6).  Plaintiffs have now had more than six months to formulate a viable cause of action against Defendants but have been unable to do so, presumably because there is no factual basis here for a securities fraud claim. Thus, dismissal should be with prejudice.  *See, e.g.*, *Aronson v. Advanced Cell Tech.*, *Inc.*, 902 F. Supp. 2d 106, 111 (D. Mass. 2012).[26]

**WHEREFORE**, defendants respectfully request that the Court grant this motion and dismiss plaintiffs' action, with prejudice.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 23rd day of December, 2014.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to all counsel of record.

*s/ José A. Acosta-Grubb*
José A. Acosta-Grubb
USDC-PR No. 119509
Email: jacosta@fgrlaw.com

*s/ José Luis Ramírez-Coll*
José Luis Ramírez-Coll
USDC-PR No. 221702
Email: jramirez@fgrlaw.com

FIDDLER GONZÁLEZ &
RODRÍGUEZ, P.S.C.
P.O. Box 363507

---

[26]    Given the number of parties and issues, the length of the Complaint and the extensive briefing, an oral presentation may be helpful to the Court.  Therefore, Defendants respectfully request oral argument pursuant to Local Rule 7(f).

San Juan, Puerto Rico 00936-3507
Telephone:  (787) 759-3229
Facsimile:   (787) 250-7545

*s/ Kevin C. Logue*
Kevin C. Logue
*s/ Shahzeb Lari*
Shahzeb Lari
*s/ Kevin P. Broughel*
Kevin P. Broughel

PAUL HASTINGS LLP
75 East 55th Street
New York, NY 10022
Tel: (212) 318-6000
Fax: (212) 230-7807
E-mail:  kevinlogue@paulhastings.com

*Attorneys for Defendants*

LEGAL_US_W # 80419304

45