# UNITED STATES DISTRICT COURT

# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re Doral Financial Corp. Sec. Litig. | Case No. 3:14-cv-01393-GAG |
| | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | The Hon. Gustavo A. Gelpi |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ...............................................................................................1

II.    STATEMENT OF FACTS .................................................................................3

    A.    Material Financial Metrics at Issue in This Case: Regulatory Capital and ALLL ............................................................................................3

    B.    Doral's Sordid History: Billions of Dollars in Phony Mortgage "Sales" and a Massive Restatement ................................................................4

    C.    The 2012 Closing Agreement and the Creation of the "Tax Receivable" ...............4

    D.    The August 2012 Consent Order and the September 2012 Written Agreement: Increased Capital Ratio Requirements and Ordered ALLL Overhaul ....................................................................................................5

    E.    Defendants Concealed Risks Related to Doral's Capital Levels, the Tax Receivable, and Systemic ALLL-Related Control Deficiencies that Persisted Throughout the Class Period ...........................................6

    F.    Risks Materialize and the Truth Emerges, Causing Doral's Share Price to Plummet ...................................................................................7

    G.    Post-Class Period Events Reinforce Plaintiffs' Allegations of Fraud and/or Reckless Misconduct .................................................................9

    H.    The Individual Defendants' Roles .......................................................10

III.    ARGUMENT ...................................................................................................13

    A.    Applicable Standards on a Motion to Dismiss Disfavor Defendants' Motion ......13

    B.    The Complaint Adequately Pleads Material Misrepresentations and/or Omissions Made During the Class Period ...........................................14

        1.    Standards for Pleading Material Misstatements and Omissions................14

        2.    Doral's SEC Filings Asserting Compliance with GAAP Were Materially False and/or Misleading ...........................................15

        3.    Statements Asserting Compliance with Regulatory Orders, Including as Related to the Company's ALLL and Capital Levels, Were False and/or Misleading ...................................................16

            (a)    Plaintiffs Allege Actionable Misrepresentations and Omissions Relating to ALLL.......................................16

                (i)    Defendants Purposely Understated ALLL to Increase Capital Levels .........................................17

                (ii)    Defendants' Supposed ALLL-Related "Disclosures" were Incomplete, Inadequate, and Misleading .................17

(iii) Defendants' ALLL Manipulation Constituted a Wholesale Abandonment of Accounting Standards and Was a Systematic Part of Defendants' Fraud.............21

(b) Plaintiffs Allege Actionable Misrepresentations and Omissions Regarding Doral's Capital Levels and the Purported Tax Receivable................................................22

(i) The Puerto Rico Court Decision on the Tax Receivable Does Not Exculpate Defendants From Liability Here For Their Concealment of Risks ...............22

(ii) Allegations Relating to the Tax Receivable Do Not Constitute "Fraud by Hindsight" .......................24

(iii) Purported Disclosures Relating to the Tax Receivable Were Incomplete, Inadequate, and Misleading When Viewed in Context with Defendants' Other Statements ..........................................................24

C. Plaintiffs Adequately Plead that Defendants Acted with Scienter........................26

1. Standards for Pleading Scienter .................................................26

2. Former Employees Provided Particularized Facts that Are Strongly Probative of Scienter .............................................................28

(a) The FEs Have Provided Credible Information ..............................28

(b) Pre-Class Period Facts Provided by FE1 Are Probative of Scienter .....................................................................31

3. Accounting Shenanigans, GAAP Violations, Disregard for the Most Current Information, Purposely Lax Internal Controls, and "Revision" of Previously-Reported Financial Statements........................33

4. Large Scale Fraudulent Practices Over Time, Culminating in SEC Investigation and FBI Raid .................................................34

5. The Individual Defendants' Signatures on SEC Filings ...........................35

6. The Critical Importance of the ALLL and Capital Levels, Combined with the Individual Defendants' Access to Information Through Their Committee Membership, Attendance at Meetings, and Receipt of Detailed Reporting ................................................................35

7. Individual Defendants' Self Interest and Insider Sales............................37

8. Defendants' "Competing Inferences" Do Not Defeat Plaintiffs' Allegations of Scienter.........................................................38

D. Plaintiffs Adequately Plead Loss Causation ......................................................40

E. The Complaint States Claims Against Poulton and Ubarri ...................................43

F. Plaintiffs Adequately Plead Claims for §20(a) Control Person Liability .............44

## TABLE OF AUTHORITIES

**Page**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008) ........................................................................ 24, 26

*Akamai Tech., Inc. v. Deutsche Bank AG*,
  764 F. Supp. 2d 263 (D. Mass. 2011) ....................................................... 44, 45

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) ......................................................... 26, 35, 37, 39

*Barrie v. Intervoice-Brite, Inc.*,
  409 F.3d 653 (5th Cir. 2005) ............................................................................ 44

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013) ................................................................ 25

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .................................................................................. 14, 15

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006) ................................................. 20, 37, 38

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) ......................................................... 39

*City of Roseville Emps.' Ret. Sys. v. Energy Solutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................... 43, 44

*City of Roseville Emps.' Ret. Sys. v. Textron, Inc.*,
  810 F. Supp. 2d 434 (D.R.I. 2011) .................................................................. 21

*Cole v. Health Mgmt. Assoc., Inc.*,
  No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178 (M.D. Fla. July 17, 2009) ................... 21

*Collier v. ModusLink Global Solutions, Inc.*,
  9 F. Supp. 3d 61 (D. Mass. 2014) ......................................................... 28, 31, 37

*Coyne v. Metabolix, Inc.*,
  943 F. Supp. 2d 259 (D. Mass. 2013) .............................................................. 43

*Crowell v. Ionics, Inc.*,
  343 F. Supp. 2d 1 (D. Mass. 2004) ...................................................... 32, 33, 36, 38

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................................. 14, 40

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)..................................................................... 42

*Epstein v. Itron, Inc.*,
    993 F. Supp. 1314 (E.D. Wash. 1998) ..................................................... 36

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ................................................................... 20

*Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)...................................................... 21

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................. 43, 44

*Ganino v. Citizens Util. Co.*,
    228 F.3d 154 (2d Cir. 2000).................................................................... 27

*Geffon v. Micrion Corp.*,
    249 F.3d 29 (1st Cir. 2001) ..................................................................... 33

*Greebel v. FTP Software, Inc.*,
    194 F.3d 185 (1st Cir. 1999)......................................................... 27, 32, 33

*Hill v. State St. Corp.*,
    No. 09cv12146-NG, 2011 WL 3420439 (D. Mass. Aug. 3, 2011)................. passim

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010)...................................................... 42, 44, 45

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ................................................................. 35

*Ibis Tech. Sec. Litig.*,
    422 F. Supp. 2d 294 (D. Mass. 2006) ...................................................... 16

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999)................................................................. 37, 38

*In re Allstate Life Ins. Co. Litig.*,
    No. CV-09-8162-PCT-GMS, 2012 WL 176497 (D. Ariz. Jan. 23, 2012)............ 44

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)...................................................... 39

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)................................................................. passim

*In re Credit Suisse-AOL Sec. Litig.*,
    465 F. Supp. 2d 34 (D. Mass. 2006) ........................................................ 40

*In re Cytyc Corp.*,
    No. Civ. A. 02-12399-NMG, 2005 WL 3801468 (D. Mass. Mar. 2, 2005) ............ 45

*In re Dynex Capital, Inc. Sec. Litig.*,
N. 05 Civ. 1897(HB), 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ...................................... 32

*In re eSpeed Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)...................................................................................... 40

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010)...................................................................................... 43

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012)................................................................................. 43, 44

*In re Gentiva Sec. Litig.*,
932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..................................................................................... 39

*In re Ibis Tech. Sec. Litig.*,
422 F. Supp. 2d 294 (D. Mass. 2006) ...................................................................................... 16

*In re Merck & Co., Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005).................................................................................................... 32

*In re Pfizer Inc. Sec. Litig.*,
No. 04 CIV. 9866 LTS HBP, 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ........................... 44

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001) ...................................................................................... 37

*In re REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................................................................... 32

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...................................................................................................... 32

*In re SmarTalk Teleservices, Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) .................................................................................... 44

*In re Sonus Networks, Inc. Sec. Litig.*,
No. Civ. A. 04-10294-DPW, 2006 WL 1308165 (D. Mass. May 10, 2006)............... 16, 28, 33

*In re StockerYale Sec. Litig.*,
453 F. Supp. 2d 345 (D.N.H. 2006)........................................................................ 40, 41, 42, 45

*In re Stone and Webster, Inc. Sec. Litig.*,
253 F. Supp. 2d 102 (D. Mass. 2003) ...................................................................................... 36

*In re The First Marblehead Corp. Sec. Litig.*,
639 F. Supp. 2d 145 (D. Mass 2009) ....................................................................................... 25

*In re Tyco Int'l, Ltd.*,
MDL 02-1335-B, 2007 WL 1703023 (D.N.H. June 11, 2007) ................................................ 45

*In re Tyco Int'l., Ltd.*,
No. MDL 02-1335-B, 2004 WL 2348315 (D.N.H. Oct. 14, 2004) ................................... 27, 37

*In re Williams Sec. Litig.*,
   558 F.3d 1130 (10th Cir. 2009) ............................................................ 40

*Janus Capital Group, Inc. v. First Derivative Traders*,
   131 S.Ct. 2296 (2010) ..................................................................... 43

*Kenney v. State St. Corp.*,
   694 F. Supp. 2d 67 (D. Mass. 2010) ...................................................... 20

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010) ..................................................... 40

*Kinney v. Metro Global Media, Inc.*,
   170 F. Supp. 2d 173 (D.R.I. 2001) ............................................. 15, 16, 33

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..................................................... 20

*Lentell v. Merrill Lynch & Co. Inc.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................... 40

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ......................................................... 23, 27

*Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*,
   843 F. Supp. 2d 191 (D. Mass. 2012) ..................................................... 21

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) ................................................. 13, 14, 40, 42

*Miss. Pub. Emp. Ret. Sys. v. Boston Scientific Corp.*,
   523 F.3d 75 (1st Cir. 2008) ................................................... 14, 24, 26

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) ............................................................. 36

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .............................................................. 28

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
   951 F. Supp. 2d 479 (S.D.N.Y. 2013) ..................................................... 21

*Plotkin v. IP Axess Inc.*,
   407 F.3d 690 (5th Cir. 2005) ............................................................. 26

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
   717 F. Supp. 2d 1170 (E.D. Wash. 2010) ................................................. 44

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
   632 F.3d 762 (1st Cir. 2011) ............................................................. 21

*Quaak v. Dexia, S.A.*,
   445 F. Supp. 2d 130 (D. Mass. 2006) ..................................................... 45

*Rosen v. Textron, Inc.*,
    321 F. Supp. 2d 308 (D.R.I. 2004)........................................................... 15, 21

*S.E.C. v. Patel*,
    Civil No. 07-cv-39-SM, 2009 WL 3151143 (D.N.H. Sept. 30, 2009) ..................................... 39

*Sekuk Global Enter. v. KVH Indus. Inc.*,
    No. Civ. A. 04-306ML, 2005 WL 1924202 (D.R.I. 2005)................................................. 15, 16

*Simon v. Abiomed, Inc.*,
    Civil Action No. 12-12137-FDS, 2014 WL 1413638 (D. Mass. Apr. 10, 2014) ................... 32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................... 26, 27

*Upjohn Co. v. Mova Pharm. Corp.*,
    899 F. Supp. 46 (D.P.R. 1995)............................................................... 13, 14

*Va. Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)............................................................................. 20

*Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) ........................................................... 39

## Statutes

15 U.S.C. §78u-4(b)(1)(A).......................................................................... 14
15 U.S.C. §78u-4(b)(1)(B).......................................................................... 14

## Regulations

12 C.F.R. 167.10 ...................................................................................... 3
17 C.F.R. §210.4-01(a)(1)......................................................................... 15

**TO THE HONORABLE COURT:**

**NOW COME** Lead Plaintiffs Jensine Andresen, Ken M. Nimmons and Mordechai Hakim ("Plaintiffs") and submit this memorandum of law in opposition to Defendants'[1] Motion to Dismiss the Consolidated Amended Complaint (Dkt. No. 56, the "Motion").  As set forth herein, Plaintiffs' operative complaint (Dkt. No. 53, the "Complaint")[2] sufficiently alleges claims against Defendants on behalf of purchasers of Doral common stock during the period of April 2, 2012, through May 1, 2014 (the "Class Period"), for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.  In support of this opposition, Plaintiffs state as follows:

## I.   INTRODUCTION

Plaintiffs' claims arise from Defendants' material misstatements and omissions regarding the financial health and status of Doral and Doral Bank made throughout the Class Period.  Specifically, Plaintiffs allege that Defendants misrepresented the Company's regulatory compliance and artificially inflated its capital levels by means of: (i) systemic and widespread deficiencies in the Company's procedures for determining appropriate loan reserves, referred to as the allowance for loan and lease losses ("ALLL"), which deficiencies were concealed during the Class Period and enabled Defendants to manipulate Doral's ALLL and, by extension, its capital ratios; and (ii) concealed risks underlying a so-called "Tax Receivable," which Doral relied upon heavily to satisfy its capital requirements.[3]  The ALLL malfeasance manifested itself in violations of Generally Accepted Accounting Principles ("GAAP") throughout the Class Period, ultimately resulting in the need for Doral to "revise" previously-reported financial results near the end of the Class Period.  And, the materialization of risks relating to the Tax Receivable has left the Company and the Bank teetering on the brink of failure.  In the end, when the market learned of this news, the price of

---

[1] Defendants are: Doral Financial Corporation ("Doral" or "the Company"), which served as the holding company for Doral Bank ("the Bank"); Glen Wakeman ("Wakeman"), Robert Wahlman ("Wahlman"), Penko Ivanov ("Ivanov"), David Hooston ("Hooston"), Enrique Ubarri-Baragano ("Ubarri"), and Christopher Poulton ("Poulton") (collectively, the "Individual Defendants").

[2] All citations herein refer to "¶__" refer to the Complaint.

[3] During the Class Period, the Tax Receivable accounted for about one-third of Doral's Tier 1 Capital. ¶115.

Doral's stock, which had traded as high as $25 during the Class Period, plummeted to just $3.73 at the close of the Class Period – erasing more than $141 million in market capitalization from the Class Period high.  ¶277.

By their Motion, Defendants now attempt to bury the fact that their malfeasance – which was obscured from investors for years – eventually came to light and resulted in the need for Doral to "revise" (*i.e.*, restate) previously-reported financials.  While arguing that Plaintiffs have not adequately alleged GAAP violations, Defendants completely ignore Doral's own retroactive revision of its financials, which essentially concedes as much.[4]  To be sure, Defendants offer no real response to the fact that, at all times throughout the Class Period, they falsely certified that Doral's financial statements complied with GAAP.

Defendants instead focus their arguments on the enforceability of an agreement entered into with the government of Puerto Rico in 2012 which purportedly created the approximate $230 million Tax Receivable.  Notwithstanding that a local trial court held, in a judgment that is currently on appeal, that the tax agreement was facially valid; that judgment is a red herring.  Throughout the Class Period, Defendants concealed material risks underlying the Tax Receivable from the investing public – risks which materialized at the end of the Class Period when the agreement was voided and the Federal Deposit Insurance Corporation ("FDIC") declared Doral to be in violation of its capital requirements.  That the trial court issued a judgment in Defendants' favor does not inoculate Defendants from liability stemming from the risks that they created and concealed during the Class Period.  Moreover, even after that judgment, the FDIC still has not permitted Doral to include the amount of the Tax Receivable toward its capital requirements.[5]  Thus, Defendants' Class Period statements about Doral's capital position are just as false now as they were during the Class Period –

---

[4] On March 21, 2014, Doral announced the need to "revise" its previously reported financial statements for the period ended September 30, 2013.  While the Company has not yet filed a formal "restatement" of any previously-reported results (and, indeed, has filed *no* financial statements with the SEC since the close of the Class Period), Defendants characterize this "revision" as a "restatement" in their Motion.  Motion at 3, 39.

[5] To date, the FDIC has twice rejected Doral's revised capital plan, as it continues to include the purported Tax Receivable.  *See* Forms 8-K dated December 8, 2014, and January 9, 2015 ("if the Bank is unable to take prompt action that meets the requirements of the…Consent Order, the Bank may be subject to additional regulatory enforcement actions up to and including the appointment of a receiver or conservator…."); *see also* http://www.law360.com/articles/615894/fdic-tells-doral-to-boost-capital-or-find-a-buyer.

Doral simply did not (and still does not) have the capital levels Defendants represented it did during the Class Period.

Defendants also claim that Plaintiffs and the Class have not been damaged because Doral made disclosures relating to some of the ALLL and Tax Receivable related problems alleged in the Complaint. This argument, however, ignores the fundamental fact that the supposed disclosures *themselves* were inadequate and misleading. They were especially misleading when examined in the context of Defendants' contemporaneous and specific Class Period assurances. Furthermore, Doral has not made any of its required periodic SEC filings since the 2013 10-K, which was filed in March of last year. Thus, investors are still in the dark as to the magnitude and scope of the ALLL-related problems disclosed in the 2013 10-K, as well as the very future of the Bank and the Company itself.

In sum, whether or not the Tax Receivable is finally adjudicated as owed, or ultimately paid to Doral (a contingency which is highly in doubt), Class Period investors deserve recompense because Defendants misled them about the status of Doral's regulatory compliance – indeed, its core ability to operate as a bank – with respect to its required capital ratios vis-à-vis the Tax Receivable *and* ALLL. For reasons set forth herein, Defendants' Motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    Material Financial Metrics at Issue in This Case: Regulatory Capital and ALLL

Capital requirements are vital to the operation of any bank and are a central component of banking regulation in the United States. If a bank fails to meet its capital requirements, and fails to come into compliance, bank regulators can severely restrict its essential functions – up to and including the imposition of a receivership. *See* 12 C.F.R. 167.10; ¶12. This is precisely what happened here, as the Bank now teeters on the brink of failure.

Like capital requirements, maintaining appropriate ALLL is of critical importance to the operation of a lending institution such as Doral. ¶58. Appropriate ALLL levels are supposed to be maintained via a related quarterly provision for loan and lease losses ("PLLL"), which takes the form of a charge against earnings. *E.g.*, ¶¶4, 57. ALLL (and any quarterly provision (PLLL) required to maintain appropriate ALLL levels) are critical accounting metrics which represent the

reserve that banks are required to maintain for impaired loans and leases.  ¶4.[6]  Because ALLL/PLLL has a direct effect on a bank's net income, maintaining an artificially *low* ALLL – as Doral did here – has the effect of overstating net income, and correspondingly overstating the bank's capital.  ¶82.

As discussed below, both Doral's capital requirements and its ALLL/PLLL procedures were the subject of regulatory action before, during, and after the Class Period.

### B.     Doral's Sordid History: Billions of Dollars in Phony Mortgage "Sales" and a Massive Restatement

In the years leading up to the Class Period, Doral's operations were in disarray and the Company was struggling to regain profitability following a massive restatement, announced in February 2006, stemming from phony mortgage "sales" between it and other Puerto Rican banks, including First Bancorp, which subsequently paid $74.25 million to settle a securities fraud case resulting from the transactions. ¶3.  After this scheme was uncovered, Doral was forced to restate its financial results and reverse the "income" from the phony sales. ¶¶117-18. As a result of the reversal of income, the Company claimed that it had overpaid more than $152 million in taxes and was thus entitled to a reimbursement of the purported overpayment from the Treasury Department.  *Id*.  On September 26, 2006, Doral and the Treasury Department entered into the 2006 Closing Agreement, whereby in lieu of claiming a reimbursement of the allegedly overpaid taxes, the parties agreed that Doral would have the right to recognize a deferred tax asset ("DTA") in the amount of $889,723,361, and to amortize that sum against its tax liability over a 15-year period. ¶119.

### C.     The 2012 Closing Agreement and the Creation of the "Tax Receivable"

On March 26, 2012, Doral and the Treasury Department entered into a new Closing Agreement, which superseded the 2006 agreement.  ¶¶115-16.  According to Doral, the Company entered into the 2012 Closing Agreement because it was apparent that the Company "would not be able to realize the full value of its tax asset before it expired," and – significantly – Doral "could not use the tax asset to satisfy [its regulatory] capital requirements."  ¶121.  Doral further characterized

---

[6]  As the FDIC and the Board of Governors of the Federal Reserve System have stated, "ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports." ¶58 (quoting "Interagency Policy Statement on the Allowance for Loan and Lease Losses" (or "ALLL Policy Statement")).

the 2012 Closing Agreement as addressing the "pressing public interest[]" of "keep[ing] the banking system capitalized…." ¶124.  In other words, Doral intended to use the agreement to bolster its Tier 1 Capital, and thus to remain in compliance with regulatory capital requirements. *Id.* Following the 2012 Closing Agreement, Doral recognized $229,884,087 as a receivable (the "Tax Receivable") and included it in its Tier 1 Capital. ¶125.  Defendants thereafter touted the importance of the 2012 Closing Agreement and, specifically, the significance and reliability of the Tax Receivable.[7]

### D. The August 2012 Consent Order and the September 2012 Written Agreement: Increased Capital Ratio Requirements and Ordered ALLL Overhaul

Following the 2012 Closing Agreement and the creation of the Tax Receivable, Defendants represented that Doral had changed its ways, had moved beyond the disarray, and was, in fact, "on a solid course" and "well positioned." ¶¶143, 155.  However, just one month before these statements were made, on April 2, 2012 (the first day of the Class Period), the FDIC notified Doral that it considered the Bank to be in "troubled condition." ¶67.  Defendants did not publicly disclose this until approximately four months later, on August 8, 2012, when announcing that the Bank had entered into a Consent Order with the FDIC and the Office of the Commissioner of Financial Institutions of Puerto Rico (the "Consent Order"). *Id.* Significantly, the Consent Order required the Bank to maintain a higher amount of capital than was otherwise necessary under applicable regulations for even "well-capitalized" institutions. ¶¶50-51.[8]  The Consent Order also required Doral to substantially overhaul its ALLL-related policies, including, *inter alia*, by implementing an independent loan review program and a revised appraisal compliance program. ¶5.[9]

---

[7] *See, e.g.*, ¶135 (2011 10-K); ¶¶155-56 (5/16/12 conference call, Wakeman professed "a substantial increase in capital" and that "Doral's capital after…the tax transaction…is truly a **strength of the organization**…." and explained that "[t]he new agreement replaces the old one and **acknowledges the asset as what it, in fact, is – an overpayment of tax**. Therefore, the tax asset is now recognized as a receivable which **is no longer tied to future earnings**.") (emphasis added); *see also* ¶¶169, 187, 208, 223, 237, 257 (SEC filings characterizing Tax Receivable as government's "obligation to return the [past tax] overpayments to Doral.").

[8] The Consent Order required the Bank to maintain a Tier 1 Leverage Ratio of at least 8%; a Tier 1 Risk-Based Capital Ratio of at least 10%; and a Total Risk-Based Capital Ratio of at least 12% – compared to the 5% Tier 1 Leverage Ratio, 6% Tier 1 Risk- Based Capital Ratio and 10% Total Risk-Based Capital Ratio required for a bank to be "well-capitalized" under the Federal Deposit Insurance Corporation Improvement Act of 1991. ¶68.

[9] *See also* ¶¶58-59 (requiring compliance with the FDIC/Federal Reserve ALLL Policy Statement).

---

On September 13, 2012, Doral entered into an agreement with the Federal Reserve Bank of New York ("FRBNY") (the "Written Agreement"), which imposed additional operational restrictions and regulatory requirements similar to those imposed by the Consent Order. ¶¶75-76. Among other things, the Written Agreement required that Doral: (i) submit to the FRBNY an acceptable written plan to maintain sufficient capital (a plan which complied with the Consent Order's increased capital requirements and took into account, *inter alia*, the adequacy of the Bank's ALLL); and (ii) establish new ALLL, audit, and accounting-related practices regarding credit risk management and credit administration (including developing procedures to ensure that appraisals conformed to accepted standards and ensuring the quality and timeliness of appraisals). ¶76.[10]

### E. Defendants Concealed Risks Related to Doral's Capital Levels, the Tax Receivable, and Systemic ALLL-Related Control Deficiencies that Persisted Throughout the Class Period

Despite the significant problems raised by the Consent Order and the Written Agreement, the mandates set forth therein – combined with Defendants' repeated assurances as to Doral's compliance with those mandates – assured investors that Doral and the Bank thereafter would be well capitalized and would follow significantly improved ALLL-related procedures, thereby seemingly increasing the safety and soundness of the Company. ¶6. However, Defendants failed to implement these ALLL-related changes and bore significant (yet concealed) risks with respect to the maintenance of Doral's capital levels. ¶¶6, 78.

Defendants concealed that pervasive control deficiencies relating to Doral's ALLL existed *throughout* the Class Period, which greatly undermined the accuracy of Doral's financial statements. For example, throughout the Class Period: (i) Doral's ALLL was based on outdated property appraisals; (ii) Defendants *intentionally* delayed obtaining up-to-date property appraisals; (iii) updated property appraisals often were *purposely* not recorded; (iv) Doral's ALLL model was fundamentally flawed; (v) underlying data inputs were often incorrect, incomplete, and unreliable; and (vi) Defendant Wahlman and other Doral executives took advantage of control deficiencies to

---

[10] The Written Agreement also required Doral to comply with the FDIC/Federal Reserve ALLL Policy Statement and further stated: "The program shall include policies and procedures to ensure adherence to the ALLL methodology and provide for periodic reviews and updates to the ALLL methodology, as appropriate…. Any deficiency…in the ALLL shall be remedied in the quarter it is discovered…." ¶77.

enable Defendants to *purposely* bypass purported procedures in order to manipulate ALLL, and otherwise ignored concerns relating to ALLL methodologies and inputs that were brought to their attention.  ¶¶90-101, 294.[11]

Moreover, during the Class Period, Defendants repeatedly stated that the Company easily satisfied all regulatory capital requirements and was in full compliance with all other regulatory rules and orders.  However, just prior to the Class Period, Defendant Wakeman instructed Doral's senior management to "book[] assets in later periods" in order to achieve a specific Tier 1 Leverage Ratio. ¶¶83, 134.  This directive gives rise to a strong inference that Doral's capital levels were knowingly manipulated and overstated during the Class Period.  *Id.*

Defendants also failed to disclose material risks associated with the likelihood that the government of Puerto Rico would seek to void the purported $230 million Tax Receivable.  As alleged in the Complaint, there were numerous undisclosed issues surrounding the creation of the Tax Receivable, including that the Closing Agreement was allegedly obtained through misrepresentations by Doral and that Doral did not actually overpay taxes in the amount claimed. ¶¶7, 114, 126-30.  Further, Defendants knew there was a risk that the Tax Receivable would be rendered worthless due to the financial instability of the Puerto Rican government.  ¶132.  Finally, Defendants were aware of these risks throughout the Class Period by virtue of their roles in negotiating the Closing Agreement, given the significance of the Tax Receivable to Doral's regulatory capital ratios (and thus, to the Company's overall operations), and Doral's regular contact with the Treasury Department.  ¶131.

### F.   Risks Materialize and the Truth Emerges, Causing Doral's Share Price to Plummet

Ultimately, the risks underlying the precarious state of Doral's capital ratio requirements materialized and the extent of its ALLL-related troubles was revealed, exposing Defendants' fraudulent conduct, through a series of events spanning approximately six weeks.

---

[11] *Compare, e.g.*, ¶¶102-111, 212, 227, 241, 243, 263, 273 (Class Period assurances of remediation/correction of control problems and/or representations that controls were effective) *and* ¶¶146, 151, 158, 159, 171, 189, 195, 210 (Class Period assurances that Doral had adopted a "more conservative" approach to ALLL) *with* ¶¶6, 90-101 (facts detailing nature and extent of continued, yet concealed, control deficiencies) *and* ¶¶269-71 (end-of-Class Period revelation of continued deficiencies).

On March 18, 2014, Doral announced that it would not be able to timely file its 2013 financial results due to "a material weakness in [the Company's] internal control over financial reporting…related to the review of the underlying data and mathematical model supporting its [ALLL]," and that Doral's "internal control over financial reporting and disclosure controls and procedures were ineffective[.]"  ¶8.  Thus, investors began to discover that Doral's ALLL-related problems were much more significant than any issues previously disclosed, and that Doral had not adequately remedied its ALLL-related problems following the mandates of the Consent Order and the Written Agreement. *Id.*  In response to this news, the price of Doral common stock fell $1.13 per share, or more than 9%, from a closing price of $12.30 per share on March 17, 2014, to close at $11.17 per share on March 18, 2014.  ¶270.

Investors' ALLL-related concerns were confirmed on March 21, 2014, when Defendants revealed (after the close of the market) in a press release and Form 10-K that the "material weakness in [Doral's] internal control over financial reporting" had "resulted in the Company's understatement of the [ALLL]," and that Doral would be forced to "revise" its previously-reported financial statements for the third quarter of 2013 to increase the provision for loan losses for the quarter by $7.2 million (an increase of almost 50%).  ¶¶9, 271.  As a result: (i) Doral's third quarter PLLL was retroactively increased from the previously reported amount of $16.4 million, to $23.6 million; and (ii) the Company's third quarter net loss was retroactively increased by almost 100%, from the previously-reported amount of $7.5 million, to $14.7 million.  On this news, Doral's stock tumbled an additional 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014. The stock continued to decline over the next four trading days, as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014 – a total decline of 25.6%.  ¶274.  However, Defendants' simultaneous assurances about the adequacy of the Company's capital prevented a more substantial decline in Doral's stock price at that time.  ¶¶272-74.

Then, on April 15, 2014, the risk that the Treasury Department would seek to void the Tax Receivable materialized when Doral received a letter from the Treasury Department questioning the validity of the purported receivable and requesting that Doral provide information demonstrating that

it actually had overpaid taxes and was entitled to the Tax Receivable.  ¶11.  Defendants disclosed the receipt of the letter on May 1, 2014.  ¶12.  Defendants further disclosed that the FDIC had informed Doral that it could not include the Tax Receivable in its capital, which meant that the Bank was "no longer . . . in compliance with its capital requirements under its Consent Order[.]"  *Id.*  As a result of this capital shortfall: (i) the FDIC would not grant the Bank waivers to accept brokered deposits – an important source of liquidity; and (ii) the Bank was required to either regain compliance with the Consent Order, or submit to the FDIC a contingency plan for the sale, merger, or liquidation of the Bank.  *Id.*  Upon this news, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014 – marking a decline of more than 90% from the stock's Class Period high.  ¶13.

### G.    Post-Class Period Events Reinforce Plaintiffs' Allegations of Fraud and/or Reckless Misconduct

Post-Class Period events lend further support to Plaintiffs' allegations of Defendants' fraudulent and/or reckless misconduct, which was engendered by a deeply ingrained culture of corruption and manipulation at Doral.  *E.g.*, ¶¶3, 117-18.  For example, on December 23, 2014 – the very day Defendants filed their Motion – the FBI raided Doral Bank's Puerto Rico headquarters in connection with "several ongoing investigations."[12]

The FBI raid is only the latest in a string of maladies stemming from Defendants' misconduct, however.  For example, in August 2014, the SEC launched an investigation into, *inter alia*, Doral's "determination . . . [to] inclu[de] . . . [the Tax Receivable] as Tier 1 capital, the Company's allowance for loan and lease losses for the quarter ended September 30, 2013, and Doral Bank's compliance with [the] Consent Order[.]"  ¶285.

Moreover, Doral has filed no financial statements with the SEC since the 2013 10-K filed on March 21, 2014.  Nor has Doral regained compliance with the Consent Order or submitted to the FDIC an acceptable capital restoration plan.  *See* n.5, *supra*.  In this regard, the Puerto Rico trial court's ruling on the Tax Receivable (which is currently on appeal) is worth no more than the paper

---

[12] *See* http://www.bloomberg.com/news/2014-12-23/doral-bank-s-san-juan-offices-raided-by-fbi-for-computers-files.html.

it is written on – the financially devastating effects of the materialization of the concealed risks surrounding the Tax Receivable, which occurred as a result of Defendants' purposeful or reckless misconduct, persist to this day.  Taken together with the allegations in the Complaint, these post-Class Period events further underscore Defendants' misconduct.

### H.    The Individual Defendants' Roles

**Wakeman**:  Defendant Wakeman is, and was throughout the Class Period, Doral's Chief Executive Officer ("CEO"), President, and a Director of the Bank.  ¶20.  As CEO, he was responsible for the Company's financial reporting, and signed various significant documents on behalf of Doral, including each of the Company's periodic SEC filings during the Class Period, as well as various agreements.  *See, e.g.*, ¶75 (Written Agreement); ¶¶133, 148, 167, 186, 207, 222, 236, 256, 295 (SEC Forms 10-K and 10-Q, Sarbanes-Oxley certifications).[13]  Wakeman described his own close involvement with the Company's regulatory compliance, when he assured investors that "***we're fully compliant with the orders***.  And ***we are, line-by-line, very actively managing to the orders***. And ***we believe that we have nothing to report in terms of being non-compliant***."  ¶199 (emphasis added).

Information provided by the former Doral Principal Accounting Officer and Senior Vice President, Former Employee ("FE") 1, underscores the extent of Wakeman's involvement in, and influence over, issues relating to Doral's capital ratios, as Wakeman went so far as to instruct senior Doral management during a 2012 meeting: "I want our leverage ratio over 9% even if that means booking assets in later periods."  ¶83.  Concerning ALLL, the Senior Vice President of Doral's loan processing group, who had responsibility for appraisals and updating property values in Doral's loan portfolios – and actually *instructed* loan processors *not* to input updated property appraisals if they were below a certain level and *not* to input any significant declines in property values – reported directly to Defendant Wakeman.  ¶93.

---

[13] Wakeman was also a member of Doral's Disclosure Committee, which met at least twice per quarter and reviewed the Company's SEC filings prior to their finalization and filing.  ¶297. Wakeman also received monthly reports, which included income statements, balance sheets, deposit activity, and loan activity reports for Doral and the Bank. ¶299.

Wakeman also was the central public voice of Doral in the Company's investor conference calls and press releases during the Class Period.  Throughout the Class Period, Wakeman affirmatively and emphatically assured investors that Doral was "solid,"[14] and was in compliance with all regulatory rules and orders (*i.e.* the Consent Order and Written Agreement),[15] including, statements that: (1) the Company's capital ratios were well in excess of regulatory requirements and not in danger of non-compliance;[16] (2) the Company's ALLL models and inputs were not only adequate, but "conservative;"[17] and (3) its credit reserves were more than sufficient.[18]

**Wahlman**:  Defendant Wahlman served as Doral's Chief Financial Officer ("CFO"), Chief Investment Officer, an Executive Vice President, and a Director of the Bank during the Class Period.  ¶21.[19]  On March 13, 2013, Doral announced that Wahlman was resigning from his corporate positions, effective May 17, 2013, yet he continued to be employed by Doral until June 25, 2013.  ¶210; Motion at 36; Def. Ex. 6.  As CFO, Wahlman was responsible for the Company's financial reporting, and signed the Company's public filings on behalf of Doral.  *See, e.g.*, ¶¶133, 148, 167, 186, 207, 222, 295 (SEC Forms 10-K and 10-Q, Sarbanes-Oxley certifications).  He was a member of Doral's Disclosure Committee.  ¶297; *see also* n.13, *supra*.  He also participated in investor conference calls, reviewed periodic reports filed with the FDIC (including Call Reports) and the FRBNY (including FR Y-9C and FR Y-9LP reports), and received monthly reports that included financial information for Doral and the Bank, including income statements, balance sheets, deposit activity, and loan activity reports. ¶298-99.

Wahlman was present at the 2012 meeting when Wakeman instructed Doral executives that the "leverage ratio [be] over 9% even if that means booking assets in later periods."  ¶83.  According

---

[14] *E.g.*, ¶143 (5/15/12 press release, "Doral is on a solid course"); ¶155 (5/16/12 conference call, Doral is "solid and well positioned" and "Doral is a well-capitalized and diversified company").

[15] *E.g.*, ¶¶175, 178, 199, 214, 245, 265.

[16] ¶¶143, 155, 175, 162, 163, 178, 179, 182, 202, 214, 229, 245, 265.

[17] *E.g.*, ¶158; *see also* ¶267 (referring to "very specific policies on asset valuations, appraisals and so forth"). This new "conservative approach" to ALLL also was touted in the Company's press releases and SEC filings. ¶¶146, 151, 171, 189, 210.

[18] *E.g.*, ¶¶143, 155, 158, 175, 202, 214, 247, 267.

[19] Wahlman also served as Chief Accounting Officer until September 20, 2012.  ¶21.

to FE1, Wahlman had daily involvement in the calculation of ALLL, was heavily involved in changes made to the ALLL model, and ultimately controlled the final ALLL figures reported. ¶¶84-85. As FE1 reported (exemplary of Wahlman's substantial involvement), Wahlman was made aware of problems in Doral's ALLL model and inputs, including that updated properly values were purposely not being entered, yet specifically instructed that the data should not be updated. ¶93.

Similar to Wakeman, Wahlman publicly touted the importance of the 2012 Closing Agreement and the creation of the Tax Receivable, particularly as related to the Company's capital levels, as well as the strength of the Company's overall financial condition.[20] He also vouched for the Company's compliance with the Consent Order (¶¶176, 197), highlighted the "more conservative approach" to ALLL the Company supposedly adopted in early 2012 (¶159), and assured investors of the sufficiency of Doral's ALLL (¶194).

**Ivanov**: Defendant Ivanov served as Doral's Interim CFO following Wahlman's departure, from May 17, 2013 until October 3, 2013. ¶¶22, 201. As CFO, Ivanov was responsible for the Company's financial reporting, and also signed the Company's public filings on behalf of Doral. *See, e.g.*, ¶¶236, 295 (SEC Form 10-Q for 2Q 2013, Sarbanes-Oxley certification). Ivanov was a member of Doral's Disclosure Committee (*see* n.13, *supra*), reviewed periodic reports filed with the FDIC (including Call Reports) and the FRBNY (including FR Y-9C and FR Y-9LP reports), and received monthly reports that included information for Doral and the Bank, including income statements, balance sheets, deposit activity, and loan activity reports. ¶¶297-99.

**Hooston**: Defendant Hooston joined Doral as Executive Vice President of Finance on July 1, 2013, and effective October 3, 2013, was appointed CFO, a position which he held until his departure from the Company on October 6, 2014. ¶¶23, 249. During this time, Hooston signed and was responsible for Doral's public financial statements filed with the SEC. ¶¶256, 295 (SEC Form 10-Q for 3Q 2013, Sarbanes-Oxley certification). Hooston served on Doral's Disclosure Committee (*see* n.13, *supra*), reviewed periodic reports filed with the FDIC (including Call Reports) and the FRBNY (including FR Y-9C and FR Y-9LP reports), and received monthly management reports that

---

[20] *See, e.g.*, ¶156 ("Doral's capital after both the tax transaction and the provision for loan losses . . . is truly a strength of the organization."); *see also* ¶¶176, 197.

included income statements, balance sheets, deposit activity, and loan activity reports.  ¶¶297-99.  Moreover, beginning in January 2014, the FDIC required daily reports detailing Doral's liquidity, which Hooston reviewed prior to their being sent to the FDIC and the FRBNY.  ¶301.  Hooston also spoke publicly on behalf of the Company during investor conference calls regarding ALLL and the Company's financial condition, including its required capital levels.  ¶¶247, 267 (addressing ALLL and PLLL and assuring investors of "ongoing adherence to monitoring our credit quality").

**Ubarri**:  Defendant Ubarri is, and was throughout the Class Period, Doral's Chief Compliance Officer, General Legal Counsel and an Executive Vice President. ¶24.  Ubarri was present at the 2012 meeting during which Wakeman instructed Doral executives that the "leverage ratio [be] over 9% even if that means booking assets in later periods."  ¶83.  Ubarri served on Doral's Disclosure Committee (*see* n.13, *supra*), participated in investor conference calls, and received monthly management reports that included Doral's income statements, balance sheets, deposit activity, and loan activity reports.  ¶¶297-99.

**Poulton**:  Defendant Poulton is, and was throughout the Class Period, Doral's Chief Business Development Officer and an Executive Vice President.  ¶25.  Poulton prepared the investor presentation filed with the Company's Form 8-K March 21, 2014, which Plaintiffs allege continued to misrepresent the Company's capital position.  ¶272.  Poulton also served on Doral's Disclosure Committee (*see* n.13, *supra*), participated in investor conference calls, and received monthly management reports that included Doral's income statements, balance sheets, deposit activity, and loan activity reports.  ¶¶297-99.

## III.   ARGUMENT

### A.   Applicable Standards on a Motion to Dismiss Disfavor Defendants' Motion

On a motion to dismiss, "the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true."  *Upjohn Co. v. Mova Pharm. Corp.*, 899 F. Supp. 46, 47 (D.P.R. 1995);[21] *Mass. Ret. Sys. v. CVS Caremark Corp.* ("*Caremark*"), 716 F.3d 229, 237 (1st Cir. 2013) ("we accept as true all well-pleaded facts set forth in the complaint and draw all reasonable

---

[21] Internal citations and quotations are omitted unless otherwise stated.

inferences therefrom in the pleader's favor.").  With the foregoing considerations in mind, courts in this Circuit recognize that "the motion to dismiss for failure to state a claim is viewed with disfavor." *Upjohn*, 899 F. Supp. at 47.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Caremark*, 716 F.3d at 237.  "The plausibility standard is not akin to a probability requirement[;]" rather, a claim is "facially plausible if it is supported by factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

To state a claim under §10(b), a plaintiff must allege: "(1) a material misrepresentation (or omission) [*i.e.*, falsity]; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to…as 'transaction causation,'; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Caremark*, 716 F.3d at 237 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

By their Motion, Defendants contest only Plaintiffs' allegations of falsity, scienter, and loss causation.  As to each of these required elements, the Complaint is sufficient.

### B.    The Complaint Adequately Pleads Material Misrepresentations and/or Omissions Made During the Class Period

#### 1.    Standards for Pleading Material Misstatements and Omissions

Plaintiffs are required to identify "the specific statements rendered materially misleading" by the fraud alleged in the Complaint.  *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33-34 (1st Cir. 2002). Falsity is adequately alleged "when plaintiff claims that defendant made 'an untrue statement of a material fact,' . . . or 'omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading.'" *Miss. Pub. Emp. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008) (quoting 15 U.S.C. §§78u-4(b)(1)(A) & 78u-4(b)(1)(B)).  "A fact is material if it is substantially likely 'that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Cabletron*, 311 F.3d at 34 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)).  Moreover, because "the materiality of a statement or omission is a question of

fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss[,]" courts "review the complaint only to determine that it pleads the existence of such statements and presents a plausible jury question of materiality." *Id.*[22]

As discussed below, the Complaint sufficiently identifies the specific statements and/or omissions alleged to be materially false and/or misleading, as well as the reasons why they were false or misleading, with respect to the Tax Receivable, ALLL, GAAP compliance, and the Company's capital levels and regulatory compliance. *See generally* ¶¶133-268.

## 2. Doral's SEC Filings Asserting Compliance with GAAP Were Materially False and/or Misleading

Generally Accepted Accounting Principles "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." *Sekuk Global Enter. v. KVH Indus. Inc.*, No. Civ. A. 04-306ML, 2005 WL 1924202, at *9 (D.R.I. 2005). "Filings that contain violations of GAAP are presumed to be misleading." *Id.* (citing 17 C.F.R. §210.4-01(a)(1)). Moreover, GAAP violations that result in a need to restate earnings figures are deemed material because as "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a corporation's] stock." *Id.* (quoting *Cabletron*, 311 F.3d at 35); *Rosen*, 321 F. Supp. 2d at 318-19 (same). Thus, this Circuit has recognized that "systemic" or "systematic" GAAP violations are "sufficient to establish liability under Section 10(b)." *Sekuk*, *supra*, *id.*; *Cabletron*, *supra*, *id.*

Here, Plaintiffs contend that statements made in SEC filings attesting to GAAP compliance were materially false and/or misleading because Defendants at all relevant times knew (or recklessly disregarded) that material weaknesses and control deficiencies relating to ALLL and financial reporting were *systemic* and persisted throughout the Class Period. *E.g.*, ¶¶90-101, 140, 154, 174, 192, 242, 248, 262. Moreover, these concealed deficiencies eventually necessitated an out-of-period

---

[22] *See also Rosen v. Textron, Inc.*, 321 F. Supp. 2d 308, 318 (D.R.I. 2004) (same, denying motion to dismiss securities action alleging GAAP and accounting violations); *Kinney v. Metro Global Media, Inc.*, 170 F. Supp. 2d 173, 179 (D.R.I. 2001) (denying motion to dismiss action alleging accounting violations, stating: "[a]t this stage in the case, the fact that the Plaintiffs specified each statement they allege to be misleading and specified the reasons why the statements were allegedly misleading is sufficient to sustain their burden.").

revision of Doral's financial statements and resulted in a retroactive increase to net losses.  ¶¶269-71.  Such allegations are sufficiently particular to state a claim for violation of §10(b).[23]

### 3. Statements Asserting Compliance with Regulatory Orders, Including as Related to the Company's ALLL and Capital Levels, Were False and/or Misleading

Throughout the Class Period, Defendants repeatedly assured investors that the Company was in full compliance with the requirements of the Consent Order and the Written Agreement, including specifically as related to its required capital levels and mandated ALLL-related improvements. Defendants repeatedly assured investors that Doral's capital levels were more than sufficient and not in danger of regulatory violation.  *See, e.g.*, nn.14-18, *supra*.  In truth, however, the Company's capital levels were manipulated (through ALLL-related misconduct, including Wakeman's early 2012 directive (¶¶83, 134)) and/or misrepresented (in light of the undisclosed risks associated with non-payment of the Tax Receivable).  As a result, the Company's capital levels actually were at substantial risk of violating regulatory requirements.  Because Defendants knew of yet failed to disclose the risks related to the Tax Receivable and the ALLL manipulations, their Class Period statements that Doral fully complied with all regulatory orders were materially false and misleading.

### (a) Plaintiffs Allege Actionable Misrepresentations and Omissions Relating to ALLL

Defendants do not challenge the materiality of their ALLL-related statements.  Rather, they assert that all of the Company's ALLL-related problems purportedly were either disclosed or remedied during the Class Period. *See* Motion at 6, 12-15.  Defendants, however, mischaracterize Plaintiffs' ALLL-related claims, and exaggerate the extent and effect of their purported "disclosures" as well as the status of their supposed remediation efforts.

---

[23] *See, e.g.*, *Sekuk*, 2005 WL 1924202, at *9 (allegations of systemic fraud in form of fictional sales in violation of GAAP alleged sufficiently particularized false and/or misleading statements); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 301 (D. Mass. 2006) (investors stated securities fraud claim based on company's failure to write-off value of obsolete assets in violation of GAAP); *Kinney*, 170 F. Supp. 2d at 179 (investors adequately pled securities fraud claims alleging GAAP violations that resulted in overstatement of net income; plaintiffs were only required to identify the statements alleged to be misleading and why they were misleading); *In re Sonus Networks, Inc. Sec. Litig.*, No. Civ. A. 04-10294-DPW, 2006 WL 1308165, at *13, *16 (D. Mass. May 10, 2006) (plaintiffs stated claim based on failure to disclose "material breakdown in internal controls" that resulted in GAAP violations; holding that defendants' subsequent restatement "essentially amounts to an admission" that they violated GAAP).

### (i)   Defendants Purposely Understated ALLL to Increase Capital Levels

Defendants ignore Plaintiffs' allegations regarding the connection between Doral's capital ratios and Defendants' manipulation of ALLL and PLLL.  As Plaintiffs allege, Doral's understated ALLL resulted in a corresponding overstatement of net income, which, in turn, enabled the Company to artificially inflate its regulatory capital ratios.  ¶82.  Specifically, Plaintiffs allege that: (i) Defendants purposely and artificially maintained Doral's ALLL at precariously low levels (despite Defendants' repeated assurances as to the adequacy of reserves); (ii) ALLL models and inputs were purposely manipulated and/or knowingly incorrect; and (iii) this manipulation was done in order to artificially bolster the Company's capital levels.  *See, e.g.*, ¶¶86-89.  Plaintiffs further allege that Defendants concealed the extent to which Doral's internal controls were in disarray *throughout* the Class Period (¶¶90-113), and that Defendants capitalized upon the lack of controls in order to manipulate ALLL for the purpose of affecting net income and, by extension, capital levels (¶294).  Finally, Defendants ignore that their malfeasance actually did cause the Company to "revise" (*i.e.*, restate) its ALLL via an announcement in March 2014 that the Company would retroactively allocate an additional $7.2 million provision to Doral's 3Q 2013 financial statements, and that this provision directly translated to a retroactive increase to net losses of approximately 100%  for the quarter.  ¶113.

### (ii)   Defendants' Supposed ALLL-Related "Disclosures" were Incomplete, Inadequate, and Misleading

Defendants point to a number of supposed cautionary "disclosures" that they claim fully revealed the Company's ALLL-related problems throughout the Class Period such that Plaintiffs can point to no actionable false statements.  Motion at 12-15.  None of these supposed disclosures in any way revealed the news that was eventually released during March 18-21, 2014: that Doral's internal controls and ALLL procedures were deeply and systematically flawed; that its ALLL calculations were not GAAP compliant; and that Doral had not been in compliance with the Consent Order and the Written Agreement during the Class Period.  To the contrary, Defendants simultaneously falsely represented throughout the Class Period that ALLL was determined in accordance with GAAP, pursuant to a "more conservative" approach, and that loan loss reserves were adequate.

At the start of the Class Period, in the 2011 10-K filed on March 30, 2012, Defendants acknowledged certain control deficiencies relating to ALLL and PLLL.  ¶103; Motion at 12.[24] These early disclosures, however, do not negate the overarching falsity of Defendants' statements made *throughout* the Class Period.  At the same time that these deficiencies were initially acknowledged, Defendants represented that Doral's financial statements, including ALLL, were presented "in accordance with [GAAP]."  ¶¶104, 139.  Moreover, Defendants simultaneously assured investors that Doral was "expeditiously" implementing a series of "remediation efforts" to address the deficiencies.  ¶104.  Defendants went on to assure investors in its first and second quarter 2012 Form 10-Q SEC filings that despite some continuing internal control deficiencies, its financial statements, including ALLL, were fully GAAP compliant.  ¶¶153, 173.[25]

Then, in the Form 10-Q filing for the third quarter of 2012, Doral announced that the Company's so-called ALLL remediation efforts had been "executed" during the quarter.  ¶106. Ultimately, in the 2012 10-K filed on March 13, 2013, Defendants proclaimed that the problems had "been remediated" and "the Company's internal control over financial reporting [was now] effective."  ¶107.  Defendants continued to report the purported effectiveness of Doral's overall internal financial controls and procedures in SEC filings until the end of the Class Period.  *See, e.g.*, ¶227 (1Q13 10-Q, stating that there had "been no changes in [Doral's] internal control over financial reporting" and "the Company's disclosure controls and procedures were effective…."); ¶¶241-43 (2Q13 10-Q, same as of June 30, 2013;[26] ¶¶261-63 (3Q13 10-Q, same as of September 30, 2013).[27]

---

[24] Defendants assert that the false and  misleading statements contained in the 2011 10-K are not actionable because they were made pre-Class Period.  Motion at 7, n.8.  The Class Period begins on April 2, 2012, because Doral filed the 2011 10-K after the market closed on Friday, March 30, 2012, and accordingly, those statements reached the market on Monday, April 2, 2012.  In the event that the Court agrees with Defendants' position, Plaintiffs respectfully request leave to amend to start the Class Period on March 30, 2012.

[25] *Compare with* Motion at 13, n.11  (citing purported disclosures made in 1Q12 and 2Q12 Form 10-Q filings, but ignoring GAAP certifications).

[26] While the 2Q13 10-Q ostensibly recognized an "error" in ALLL that would require adjustment going back ten quarters, the Company continued to insist that its "controls and procedures were effective…." ¶¶241, 243. The 2Q13 10-Q further assured investors that the cause of the "error" already had "been corrected [.]" ¶110. Indeed, Defendants mischaracterized the need to make an out-of-period adjustment in 2Q13 as an isolated issue to correct a mere accounting "error" or "anomaly" rather than what it was – indicative of widespread and systematic internal control deficiencies.  ¶¶247-48 (8/16/13 conference call: Hooston described the

---

Indeed, none of the purported disclosures revealed what lies at the heart of Plaintiffs' Complaint, to wit, allegations of continued and pervasive ALLL-related problems that persisted as part of Defendants' systematic fraud.  None of the purported disclosures revealed that the Company was in violation of the ALLL-related terms and conditions of the Consent Order, which required, *inter alia*: implementation of a comprehensive new ALLL policy; a new independent loan review process; and a revised appraisal compliance program – all of which Plaintiffs allege Defendants failed or refused to implement. *See, e.g.*, ¶¶79, 90-101. None of the purported disclosures revealed the specific ALLL-related problems that were concealed from the public during the Class Period, including, that ALLL had been manipulated and suffered from systemic material deficiencies and weaknesses – some *purposeful* – in terms of both its methodology and inputs throughout the Class Period.[28]  Moreover, the effect of these problems on the Company's GAAP compliance (or lack thereof) is evident from the Company's eventual disclosure on March 21, 2014, that it would have to revise its previously-reported financial statements to increase ALLL via an additional provision, thereby increasing net losses by almost 100%.  ¶271.

In addition to the false representations regarding the general efficacy of Doral's internal controls and GAAP compliance, Defendants made a number of additional false assurances regarding

---

"correction of an **error** relating to [ALLL data inputs]" and Wakeman described the supposed "rigorous analysis" that "detected [the] **anomaly**" and minimized the "going forward" effect on ALLL-related issues).

[27] Defendants also cite to additional disclosures in the 2013 10-K, dated March 20, 2014, which they claim revealed the truth such that Plaintiffs' ALLL-related statements are not actionable.  Motion at 13, n.9.  These end of Class Period disclosures, of course, are precisely when Plaintiffs allege the truth started to emerge, and Defendants were forced to retroactively "revise" Doral's previously-reported financial statements.  ¶9.  To be clear, disclosures made over the March 18-21, 2014, time frame are associated directly with the losses alleged by Plaintiffs.  These disclosures were not, as Defendants would have the Court believe, *exculpatory* statements that informed investors of relevant information in a timely manner *prior* to causing any losses; rather, these end of Class Period disclosures are part of the *cause* of Plaintiffs' losses.

[28] *See, e.g.*, ¶¶91-95 (outdated property values, delayed appraisals, purposeful failure to input appraisal updates); ¶¶96, 99 (systemic problems inherent in ALLL model, itself, which management refused to address); ¶¶97-98 (incomplete and/or incorrect loan data inputs); ¶100 (managerial interference with model and/or circumvention of controls which may have been in place); ¶101 (purposeful ignorance of actual charge-offs in forecasting).

---

ALLL, including repeatedly assuring investors that its loan loss reserves were adequate[29] and that Doral had adopted a "more conservative" approach to ALLL.[30]

Even assuming, *arguendo*, that Defendants *did* make any disclosures of ALLL-related control deficiencies, they were rendered meaningless (and themselves misleading) by Defendants' simultaneous and *specific* reassurances regarding the Company's GAAP compliance, adequacy of ALLL procedures, and sufficiency of loan loss reserves – which were made repeatedly throughout the Class Period.[31] *See, e.g.*, *Hill v. State St. Corp.*, No. 09cv12146-NG, 2011 WL 3420439, at *20-*21 (D. Mass. Aug. 3, 2011) (cautionary disclosures made while defendant simultaneously "assured investors that the portfolio and conduits' assets were high quality" did not defeat securities fraud claim where "some…disclosures simply failed to provide sufficient warning or detail, while others actually obscured as much as they revealed").[32]

---

[29] *See, e.g.*, ¶¶151, 155, 158-59, 267.

[30] *See, e.g.*, ¶¶146, 151, 158-59, 171, 189, 195, 210 (assurances that Doral had adopted a "more conservative" ALLL approach); ¶65 (misrepresentations as to how reserves were set); ¶267 (Wakeman touting "very specific policies on asset valuations, appraisals and so forth" and misrepresenting ALLL/PLLL as "policy and model driven….").

[31] For example, the generic ALLL-related cautionary language Defendants cite from the Company's 2012 10-K, 2Q 2013 10-Q, and 2013 10-K (*see* Motion at 14-15, that "there is no precise method of predicting loan losses") does not insulate them from liability here.  First, the supposedly cautionary section quoted by Defendants actually repeated the same false and misleading statement reassuring investors that ALLL was "**currently sufficient**" and attempted to bolster investor confidence with the assurance that the Company was "**constant[ly] monitoring … risk**" in the loan portfolio. *Id.* (emphasis added).  Moreover, to the extent that Defendants are attempting to invoke the "bespeaks caution" doctrine by arguing that their ALLL-related statements were couched in sufficient cautionary language, the argument fails here because Defendants simultaneously: (i) assured investors as to GAAP and regulatory compliance; (ii) misrepresented the supposed "conservative" approach by which ALLL/reserves were determined; and (iii) failed to disclose substantial problems with ALLL, including that appraisals were delayed and/or purposely not updated, that management interfered with ALLL modeling and calculations, and that ALLL inputs were known to be incorrect, outdated, and unreliable. *See* n.28, *supra*; *Hill*, 2011 WL 3420439, at *18 (the bespeaks caution doctrine does not "universally immunize a party that sprinkles its statements with some cautionary language. Rather, it simply instructs that a statement or omission *be considered in context*." (emphasis added).

[32] *See also Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 252 (D. Mass. 2006) ("cautionary language" found at the end of press release announcing partnership "did not counter sufficiently the strong [misleading] implication that the [] partnership would lead to…a significant revenue stream."); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 236 (S.D.N.Y. 2006) (even if defendants' disclosures did "constitute[] storm warnings, investors were also being fed reassuring statements"); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995) ("Inclusion of *some* cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading."); *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("a misleading statement will not always lose its deceptive edge simply by joinder with others that are true…."); *cf. Kenney v. State St. Corp.*, 694 F. Supp. 2d 67, 79 (D. Mass. 2010) ("lengthy, turgid disclosures in the SEC filings" did not defeat negligent misrepresentation claim where "[a] Plan beneficiary

---

(iii)    **Defendants' ALLL Manipulation Constituted a Wholesale Abandonment of Accounting Standards and Was a Systematic Part of Defendants' Fraud**

Finally, Defendants insist that ALLL is a subjective matter and only an estimation, thus apparently arguing that no action can be brought for misrepresentations concerning ALLL.  *See* Motion at 14 (citing generic 10-K statement that "there is no precise method of predicting loan losses"); *id.* at 15 (citing cases).  The cases Defendants cite in support of their argument that their ALLL-related disclosures were sufficient are inapposite because they did not involve the *purposeful manipulation* and *known deficiencies* that Plaintiffs allege were present (and obfuscated by Defendants) here as part of a systematic fraud.[33]

Indeed, Plaintiffs' ALLL-related allegations go far beyond general, unspecified allegations of errors in judgment, missed projections, or even basic accounting irregularities.  Rather, this case involves systemic problems and a wholesale abandonment by Defendants of ALLL accounting standards.  *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.* ("*Nomura*"), 632 F.3d 762, 773 (1st Cir. 2011) (holding that warnings and disclosures cannot defeat a claim that, like the claims here, is based on "wholesale abandonment of underwriting standards."); *see also Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (citing *Nomura* and concluding that general disclosures in offering documents that loan originators could make exceptions to underwriting guidelines did not defeat securities purchaser's claims under Massachusetts Uniform Securities Act because the plaintiffs alleged a "wholesale" or "widespread" abandonment of standards).  Like the plaintiffs in *Nomura* and *Residential Funding*

---

could reasonably have read [the CEO]'s statement to be a pat-on-the-back assurance that, despite the unrealized losses in the third quarter, no further significant losses were foreseeable….").

[33] The court in *Textron* did not, as Defendants suggest, dismiss the complaint because adequate disclosures were made; rather, the court concluded that the plaintiffs failed to sufficiently allege that the disclosures were misleading.  *City of Roseville Emps.' Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 445 (D.R.I. 2011).  Similarly, the court in *Cole* merely found that the plaintiffs failed to "plead with particularity any facts showing how defendants' statements" were false.  *Cole v. Health Mgmt. Assoc., Inc.*, No. 2:07cv00484-FtM-UA-DNF, 2009 WL 2713178, at *5 (M.D. Fla. July 17, 2009).  Finally, the court in *Student Loan Corp.* held that the plaintiffs failed to plead "that defendants did not honestly believe their loan loss reserves were adequate when made."  *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013).  Here, by contrast, the Complaint alleges an abundance of facts to show that Defendants were aware that ALLL-related disclosures made during the Class Period were, themselves, misleading.

alleging "wholesale" and/or "widespread" abandonment of underwriting standards, Plaintiffs here allege a "systematic" abandonment by Defendants of ALLL-related accounting standards. *E.g.*, ¶¶97-101.

> **(b)** **Plaintiffs Allege Actionable Misrepresentations and Omissions Regarding Doral's Capital Levels and the Purported Tax Receivable**
>
> **(i)** **The Puerto Rico Court Decision on the Tax Receivable Does Not Exculpate Defendants From Liability Here For Their Concealment of Risks**

With respect to required capital levels, Plaintiffs further allege that Defendants knew of, yet failed to disclose, the risk that the Tax Receivable – which Doral and the Bank heavily relied upon to satisfy required capital – was in danger of non-payment.[34] Defendants rely heavily on the fact that a trial court in Puerto Rico recently ruled that the government is responsible for the Tax Receivable. Motion at 1-3, 10-12. This decision is not a final judgment, however, and the Puerto Rican government recently filed an appeal of that order. Moreover, the decision does not inoculate Defendants from liability stemming from the risks that they created and concealed during the Class Period – which ultimately materialized when the Puerto Rican government challenged the validity of the Tax Receivable and the FDIC declared Doral to be in violation of its capital requirements.

The undisclosed issues surrounding the creation of the Tax Receivable, which created a substantial risk of non-payment by the government, or that, upon discovery, the government would seek to void the Tax Receivable, included the following facts: (i) the 2012 Closing Agreement was obtained through misrepresentations by Doral (¶¶126, 127, 129); and (ii) Doral did not actually overpay taxes in the amount claimed (¶128).[35] Moreover, Defendants knew there was a risk that the

---

[34] *E.g.*, ¶¶136, 150, 157, 164, 170, 180, 183, 188, 198, 204, 209, 215, 217, 219, 224, 230, 233, 238, 246, 253, 258, 266 (allegations that statements regarding Tax Receivable were materially false and misleading).

[35] Defendants continue to characterize the Tax Receivable as resulting from "past DFC tax payments." Motion at 1. This is not in the record and is, in fact, directly contradictory to allegations in the Complaint that Doral did not, in fact, "overpay" taxes in the amount claimed (¶7) – which allegation must be taken as true at this stage. This is further contrary to Defendants' own position during the trial, wherein Wakeman testified that "***the 2012 Closing Agreement was based <u>not on the payments made</u> to the Treasury, but rather on the formula used to value the DTA***...." Def. Ex. 1, at 38-39 (emphasis added). This *ex post facto* evidence created by Wakeman directly contradicts  representations made to investors during the Class Period, wherein Defendants repeatedly cited Doral's supposed "overpayment" of taxes. *See, e.g.*, ¶¶7, 128, 135 (2011 10-K, stating that "Puerto Rico recognized a prepayment of income taxes of approximately $230 million from the Company related to the past overpayment of taxes."); ¶¶169, 187, 208, 223, 237, 257 (SEC filings

Treasury Department would not pay Doral the Tax Receivable due to the financial instability of the Puerto Rican government.  ¶132.  Defendants were aware of these risks throughout the Class Period, given the significance of the Tax Receivable to Doral's regulatory capital ratios (and thus, to the Company's overall operations), and Doral's regular contact with the Treasury Department.  ¶131. Yet, all the while, Defendants touted the importance of the Tax Receivable, but never disclosed the substantial underlying risks of non-payment.  The legal action and pending appeal show that not only was the undisclosed risk of non-payment present and real during the Class Period, the risk of non-payment persists to this day (a fact which the FDIC has recognized).

Defendants' failure to disclose known risks relating to such an important aspect of Doral's business is actionable under the securities laws.  *See, e.g.*, *Cabletron*, 311 F.3d at 23 (investors stated claim where company officials saw disaster looming on the horizon, yet engaged in a series of fraudulent practices such as falsifying sales records and delaying reports of liabilities to disguise impending collapse); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 242 (5th Cir. 2009) (omission of a company's decision to extend services to customers with subprime credit without requiring safeguards was misleading where the company was touting the benefits of the program even while defendants fully understood the risk of "financial disaster").

Like the defendants in *Lormand*, Defendants here continued to tout the benefits of the Tax Receivable, even when they knew or should have known of the substantial risk of non-payment by the government.  Moreover, as in *Cabletron*, Defendants knew or should have known, by virtue of their conduct in creating the Tax Receivable and their knowledge regarding the precarious state of the Puerto Rican government, that potential disaster was looming with regard to the Tax Receivable. Instead of disclosing this, however, Defendants  took affirmative steps to attempt to make it appear as though Doral was not in danger of violating its capital requirements.[36]

---

highlighting "Puerto Rico's obligation to Doral to **return the overpayments**.") (emphasis added); ¶155 (5/16/12 conference call, Wakeman stated: "***The new agreement*** replaces the old one and ***acknowledges the asset as what it, in fact, is – an overpayment of tax.*** Therefore, the tax asset is ***now recognized as a receivable which is no longer tied to future earnings***.") (emphasis added).

[36] *See, e.g.*, ¶¶86-89, 202 (ALLL manipulation to artificially inflate capital); ¶¶155, 162-63, 175, 178-79, 182, 203, 232, 245 (stating that capital was well in excess of required levels); ¶¶178-79, 229, 245, 265 (assuring market of availability of sufficient capital to "pull down" to the Bank from the Company if needed).

### (ii) Allegations Relating to the Tax Receivable Do Not Constitute "Fraud by Hindsight"

Nor do Plaintiffs' allegations constitute fraud by hindsight, as Defendants maintain.  Motion at 9-10.  Defendants *knew of the undisclosed risks at the time* of the creation of the Tax Receivable, while the investing public, of course, did not.  These risks did not merely arise when the Treasury Department challenged the Tax Receivable; to be sure, they were created with the execution of the Closing Agreement and perpetuated by Defendants throughout the Class Period.  That these undisclosed risks *later materialized* when the Treasury Department eventually challenged the validity of the Tax Receivable based on Defendants' alleged misrepresentations made at the time of the creations of the Tax Receivable does not render Plaintiffs' allegations fraud by *hindsight.*

This is not merely a case of "something turn[ing] out badly" through no fault of Defendants, as Defendants now would have the Court believe.  Motion at 10 (citing *Boston Scientific*, 523 F.3d at 91 (*rejecting* fraud by hindsight argument where plaintiffs alleged facts suggesting that defendants had contemporaneous knowledge of a manufacturing problem, and where defendants reassured investors any potential problems had been remediated).[37]  Like the court found in *Boston Scientific*, this is *not* "a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later."  *Id.*  Rather, this case involves undisclosed risks that were *created and concealed by Defendants* early in and throughout the Class Period, and which eventually materialized at the end of the Class Period.

### (iii) Purported Disclosures Relating to the Tax Receivable Were Incomplete, Inadequate, and Misleading When Viewed in Context with Defendants' Other Statements

Defendants alternatively argue that the Company *did* disclose the risks that the government could seek to void the Tax Receivable, and that the Company could otherwise fail to meet its Tier 1 regulatory capital requirements.  *E.g.*, Motion at 2, 8-9.  As with the ALLL-related disclosures addressed above, these incomplete disclosures were themselves false and misleading because *they*

---

[37] Defendants also cite *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) (impermissible fraud by hindsight where plaintiffs failed to plead facts supporting the allegation that the defendants had reason to know that figures were incorrect when reported).  *Advest* is inapposite here, as Plaintiffs have pleaded facts supporting their allegations that Defendants were aware of yet failed to disclose risks relating to the Tax Receivable.  *See, e.g.*, ¶¶7, 130-32.

*did not disclose the underlying facts that created the real risk of non-payment*.[38]  The general cautionary language buried in the 2011 10-K (cited in Motion at 8-9) did *not* disclose the specific risks Plaintiffs allege constitute the material Tax Receivable-related omissions at issue.  Moreover, this purported early disclosure conflicts directly with Defendants' various *affirmative* statements made during the Class Period about the significant benefits of the Tax Receivable, the certainty of the Tax Receivable, and the Company's ability to comply with regulatory capital requirements as a result of the Tax Receivable.[39]

For example, each of Doral's subsequent periodic SEC filings made during the Class Period characterized the Tax Receivable essentially as a return of previous overpayments.  *See, e.g.,* ¶¶169, 187, 208, 223, 237, 257 (citing 2Q12 10-Q, 3Q12 10-Q, 2012 10-K, 1Q13 10-Q, 2Q13 10-Q, and 3Q13 10-Q, respectively, characterizing agreement as government's "obligation to return the [past tax] overpayments to Doral.").  Defendants further assured investors of the certainty of the Tax Receivable, emphasizing that the amount would "no longer [be] tied to future earnings."  ¶¶155-56 (5/16/12 conference call, Wakeman professed "a substantial increase in capital" and that "Doral's capital after…the tax transaction…is truly a strength of the organization…." and explained that "[t]he new agreement replaces the old one and acknowledges the asset as what it, in fact, is – an overpayment of tax. Therefore, the tax asset is now recognized as a receivable….").  Notably, *none* of these SEC filings during the Class Period contains the supposed cautionary disclosure included in

---

[38] Thus, this case is markedly different from *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145 (D. Mass 2009) and *Bartesch v. Cook*, 941 F. Supp. 2d 501 (D. Del. 2013), cited in Motion at 9.  Both of those cases involved a finding that the very problem alleged by the plaintiffs had been *specifically* disclosed by the defendants.  *First Marblehead*, 639 F. Supp. 2d at 158-59 (defendant's relationship with a third party loan services company and attendant risks were specifically disclosed, and the court found that plaintiffs' allegations relating to lacking controls were too vague and sounded in mere mismanagement); *Bartesch*, 941 F. Supp. 2d at 508-09 (omissions alleged by plaintiffs regarding development of nuclear power plant were specifically disclosed).  Here, by contrast, Plaintiffs allege numerous specific *undisclosed* risks underlying the Tax Receivable that were, in fact, concealed by Defendants notwithstanding the generic early Class Period disclosure that the FDIC may later revisit Doral's Tier 1 Capital.  Motion at 9.  ¶¶7, 114, 126-32. Further unlike the plaintiffs in *First Marblehead*, Plaintiffs here also allege very detailed systematic ALLL-related control problems that are neither vague nor sounding in mere mismanagement.  *E.g.*, ¶¶82-101.

[39] *See, e.g.*, *Hill*, 2011 WL 3420439, at *21 (incomplete or misleading disclosures are not exculpatory); *see also* nn.31-32 *supra* (regarding "bespeaks caution" doctrine, any supposed cautionary language must be considered in context of other statements and omissions).

---

the 2011 10-K. *E.g.*, ¶¶155, 175, 214 (conference calls during which Defendants touted importance of the Tax Receivable and their confidence in Doral's compliance with Consent Order).

In sum, Defendants did not adequately disclose the risk that the government would seek to void the Tax Receivable (due to factors that Defendants knew and investors did not), and the corresponding risk that FDIC would not allow Doral to include the Tax Receivable as Tier 1 Capital. Rather, Defendants repeatedly emphasized the importance and reliability of the Tax Receivable and the Company's continued ability to comply with regulatory capital requirements.

### C.     Plaintiffs Adequately Plead that Defendants Acted with Scienter

#### 1.     Standards for Pleading Scienter

Scienter may be alleged by showing that defendants either "consciously intended to defraud, or that they acted with a high degree of recklessness." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002); *Boston Scientific*, 523 F.3d at 85 ("[k]nowingly omitting material information is probative…of scienter.").[40] Supreme Court precedent instructs that scienter is adequately alleged if the facts, taken as true, give rise to an inference that the defendants intentionally or recklessly misled the public which is *at least as* compelling as an inference that defendants acted non-culpably. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 324 (2007) ("A complaint will survive…if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").[41]

In *Tellabs,* the Supreme Court clarified the previously amorphous "strong inference standard," explaining that on a motion to dismiss, a court should read scienter allegations "holistically[,]" and determine whether all of the factual allegations "taken collectively" give rise to a "strong inference of scienter," not whether any individual allegation, scrutinized in isolation, meets that standard. *Tellabs,* 551 U.S. at 322-23, 326; *see also Boston Scientific*, 523 F.3d at 86 ("The inquiry...is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of

---

[40] *See also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) ("[a]n egregious refusal to see the obvious" demonstrates severe recklessness).

[41] *See also Advest*, 512 F.3d at 59 ("[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff."); *Boston Scientific*, 523 F.3d at 86 (complaint survives "when there are equally compelling inferences for and against scienter").

scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")
(quoting *Tellabs*, 551 U.S. at 322-23); *Cabletron*, 311 F.3d at 40.

Moreover, under the PSLRA, scienter allegations "need not be irrefutable, *i.e.*, of the
'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at
324; *see also Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir. 2000) (a plaintiff is not
required to plead scienter with "great specificity.").  Indeed, scienter can be inferred from "indirect
and circumstantial evidence."  *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 195 (1st Cir. 1999);
*accord Lormand*, 565 F.3d at 251 (allegations of circumstantial evidence are all that is required to
plead scienter).  Some of the types of circumstantial evidence that can satisfy the scienter pleading
requirement in the First Circuit include:

> (1) GAAP violations; (2) accounting shenanigans; (3) large-scale fraudulent practices
> over time; (4) stock sales by insiders; (5) the quick settlement of an ancillary fraud
> suit; (6) disregard for the most current financial information when making
> statements; (7) the self-interest of defendants in saving their own salaries or jobs; and
> (8) financial restatements. While no single factor will generally be sufficient to
> support a strong inference of scienter, a combination of several factors may satisfy
> the requirement.

*In re Tyco Int'l., Ltd.*, No. MDL 02-1335-B, 2004 WL 2348315, at *11 (D.N.H. Oct. 14, 2004)
(internal citations omitted); *see also Greebel*, 194 F.3d at 196 (listing factors).[42]

Finally, "scienter alleged against the company's agents is enough to plead scienter for the
company." *Cabletron,* 311 F.3d at 40.  As set forth below, Plaintiffs' allegations, taken together and
read holistically, are adequate to allege a strong inference of scienter.

---

[42] Defendants' attempts to dissect each statement, each Individual Defendant, and each piece of information
offered by Plaintiffs' confidential sources conflicts with the directive of *Tellabs* and the intention of the
PSLRA and must be rejected. As the court observed in *Hill*:

> In effect, **Defendants are asking this Court to consider each of the Plaintiffs' allegations
> individually, scrutinizing each assertion's evidentiary sources in isolation. Such tunnel
> vision blocks the full picture.**  Plaintiffs' evidentiary sources strengthen one another and
> collectively paint a plausible picture of a company defrauding its clients. Multiple types of
> evidence from multiple sources reinforce the same narrative. Without discovery, it is next to
> impossible for Plaintiffs to produce any more.

> Finally**, placing the source of each individual allegation under a microscope distorts
> Plaintiffs' obligations under Rule 9 and the PSLRA**.

2011 WL 3420439, at *13-14 (emphasis added).

---

### 2.   Former Employees Provided Particularized Facts that Are Strongly Probative of Scienter

#### (a)   The FEs Have Provided Credible Information

Defendants attack the information offered by former Doral employees in arguing that Plaintiffs have failed to allege scienter.  Motion at 23-30.  Defendants first assert that the FE information should not be credited because Plaintiffs offer no "internal documents or memoranda" to support the allegations.  Motion at 23-24.  Of course, given the automatic stay of discovery imposed by the PSLRA, it is axiomatic that Plaintiffs would not have access to such internal documents or memoranda at this time.  *See Cabletron*, 311 F.3d at 33 (observing with regard to particularity of pleadings in PSLRA cases that "the procedural posture of the case matters") (citing cases).[43]  Rather than requiring confirmatory internal documents on a motion to dismiss, the First Circuit credits information from confidential sources so long as they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged...."  *Cabletron*, 311 F.3d at 29-30 (adopting rule of *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).  The court in *Cabletron* further instructed:

> [T]he approach we take...is to look at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.' ...This involves an evaluation, *inter alia*, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.

311 F.3d at 29-30.

Plaintiffs allege all of the required information with respect to each FE, including sufficient facts to show the reliability of each confidential source and the corroboration of allegations both by other FEs and by the facts alleged as a whole.  *See Hill*, 2011 WL 3420439, at *13 ("The CWs' statements are more than just water cooler hearsay; they offer important reinforcement for inferences reasonably drawn from other allegations.").

---

[43] *See also Collier v. ModusLink Global Solutions, Inc.*, 9 F. Supp. 3d 61, 69 (D. Mass. 2014) (observing that the PSLRA does not "require the plaintiff to 'plead evidence.'"); *Sonus*, 2006 WL 1308165, at *9 (pre-discovery motions to dismiss are scrutinized "less stringently than...a post-discovery dispositive motion.").

**FE1**:   FE1 was Doral's Principal Accounting Officer and a Senior Vice President from September 2011 through March 15, 2012. FE1 reported directly to Defendant Wahlman and regularly attended meetings with other Doral executives, including the Individual Defendants.  ¶ 34. FE1 was present at the January 11, 2012, meeting and heard Wakeman make the statement regarding manipulation of Doral's leverage ratio and booking assets in later periods.  ¶83.  By virtue of FE1's position as Principal Accounting Officer, FE1 was privy to detailed ALLL/PLLL-related information, as well as information related to Doral's capital levels.  Moreover, FE1 had direct interaction with Individual Defendants regarding those metrics.  *E.g.*, ¶¶83, 87.

**FE2**:   FE2 is a former Vice President involved with Doral's financial reporting and regulatory compliance who worked at Doral from August 2012 through April 2014.  ¶35.  FE2's responsibilities included, among other things, assisting in the preparation of SEC filings, regulatory reports, and reports provided to the Company's executive management, including the Individual Defendants.  *Id.*  FE2 reported directly to Doral's Principal Accounting Officer, a position held by Nancy Reinhard[44] from September 20, 2012 though the end of the Class Period.  *Id.*  By virtue of FE2's position and reporting responsibilities, FE2 was privy to detailed ALLL/PLLL-related information, as well as information relating to Doral's capital levels.  *E.g.*, ¶¶84, 86-87 (describing FE2's experience with ALLL and ALLL relative to capital levels); ¶¶94, 96-100 (describing FE2's ALLL experience); ¶89 (FE2 provided regular reporting on capital levels directly to the CFO on a monthly and bi-monthly basis); ¶132 (FE2 attended quarterly discussions with Reinhard and Doral's CFO regarding the continued inclusion of the Tax Receivable in Tier 1 Capital).[45]

**FE3**:   FE3 was employed by Doral as a Senior Credit Risk Analyst from September 2012 through July 2013.  ¶36.  FE3 aided in the creation of presentations made on a monthly and quarterly basis to Doral's Board of Directors, as well for Doral's Risk Policy Committee and the ALLL Committee.  *Id.*  By virtue of FE3's position, responsibilities, and regular reporting to both the Board

---

[44] Reinhard acted as Doral's CFO after the Class Period until her resignation effective on January 19, 2015, as reported on Doral's Form 8-K dated January 12, 2015.

[45] Defendants incorrectly assert that Plaintiffs failed to allege "any contact or communications" between FE2 and "any of the Individual Defendants."  *Compare* Motion at 19 *with* ¶¶89, 132.

of Directors and the ALLL Committee, FE3 was privy to detailed ALLL/PLLL-related information provided to the Individual Defendants.  ¶¶88, 94, 101.

**FE4**:    FE4 worked at Doral as a Vice President of Commercial Administration from June 2012 until August 2013.  ¶37.  FE4 was responsible for, among other things, updating policies and procedures related to Doral's commercial real estate business.  *Id.*  By virtue of FE4's position and responsibilities, FE4 had specific knowledge of problematic loans and the impact on Doral's ALLL during the Class Period, as well as the purposeful delay of appraisals.  ¶¶94-95.

Accordingly, each of these FEs was in a position to provide – and did provide – credible, corroborating firsthand information about Defendants' personal involvement with the fraud.  For example, the FEs described numerous concealed problems that undermined the accuracy of Doral's reported ALLL, including the following:

- FE1 explained that since the property values input into Doral's ALLL model were outdated – and should have been lower due to declining property values in Puerto Rico – the resulting ALLL was understated.  ¶92.

- Worse, FE1 stated that when appraisals were completed, the updated property values were often purposely not recorded at the instruction of the Senior Vice President of Doral's loan processing group (who reported directly to Wakeman).  ¶93.  Although this practice was brought to Wahlman's attention in January 2012, shortly before the start of the Class Period, Wahlman instructed that the data should not be touched.  *Id.*

- FE1 further stated that the problems with appraisals were well-known to Doral executives, including Wakeman and Wahlman.  ¶93.

- FE2 reported that Doral altered its assumptions for non-performing loans during the Class Period in order to delay the time when Doral had to reverse the accrued interest on non-performing loans, and to keep the ALLL as low as possible.  ¶100.

- FE4 stated that during the second half of 2012, few problematic commercial real estate loans were being addressed, which contributed to the understatement of Doral's ALLL.  ¶95.

- In March of 2013, FE3 was instructed by the Chief Risk and Credit Officer to modify a forecast for expected mortgage loan charge-offs for 2013 to a lower figure that FE3 believed was impossible to achieve based upon the actual charge-offs to date.  ¶101.

- According to FE2, Doral's ALLL model needed to be completely overhauled, but instead of doing so, Defendants only made minor adjustments in response to problems caught by the Company's regulators.  ¶96.  FE2 further stated that the underlying loan data used to calculate Doral's ALLL was unreliable, in part because crucial loan data was systematically missing or was incorrect in the loan files.  ¶97.

- FE2 reported that during the Class Period, Doral conducted a review of a sample of loans that uncovered numerous systematic and widespread errors, including incorrect coding, missing information, such as the collateral type, and properties recorded as owner-occupied that were

not. ¶98. However, Doral did not take the actions necessary to respond to or remedy the errors discovered because Defendants did not want to spend the necessary resources. *Id.*

- Although FE2 expressed concerns to Doral's Principal Accounting Officer, Nancy Reinhard, that the ALLL calculation was inaccurate and the entire model needed to be overhauled, Reinhard refused to have the ALLL model reworked. ¶99.

The FEs further provided information showing that Defendants deliberately understated Doral's ALLL in order to inflate the Company's regulatory capital ratios. Both FE1 and FE2 reported that Doral was constantly altering its ALLL model – and that the alterations were done not to make sound methodological changes, but to achieve the desired result of maintaining the ALLL at as low a level as possible. ¶¶84, 86. FE1 reported that management frequently discussed making changes to Doral's ALLL model in connection with discussing the Company's capital levels, and opined that Defendants kept Doral's ALLL low in order to indirectly bolster the Company's capital ratios. ¶87. FE2 likewise acknowledged that Defendants understated Doral's ALLL during the Class Period in order to achieve the desired regulatory capital ratios. *Id.*

Where, as here, information is provided by credible confidential witnesses with a sufficient basis of knowledge, whose independent statements corroborate each other and other alleged facts, and where the information provided describes "the precise means through which [the alleged fraud] occurred[,]" confidential witness information will support a strong inference of scienter. *Collier*, 9 F. Supp. 3d at 70-71 (confidential witnesses allegations "collectively" showed scienter).

### (b) Pre-Class Period Facts Provided by FE1 Are Probative of Scienter

In attacking the FEs, Defendants focus heavily on FE1, a former high level executive of Doral who provided information relevant to ALLL, Doral's capital levels, and, significantly, Defendants' state of mind regarding those metrics. Motion at 24-28. Defendants all but ignore the additional information and corroborating detail provided by FE2, FE3, and FE4. *Id.* at 28-29.

Defendants' primary criticism of FE1 is that his employment ended on March 15, 2012. Motion at 24. As a preliminary matter, Defendant Wakeman's directive at the January 11, 2012 meeting, recounted by FE1, that "I want our leverage ratio over 9% even if that means booking assets in later periods" (¶83) concerned the leverage ratio in the 2011 10-K, and thus provides direct evidence that this metric – reported during the Class Period – was knowingly manipulated.

Moreover, the fact that FE1's employment ended just prior to the start of the Class Period does not, as Defendants insist, render FE1's information "incapable" of supporting scienter. Motion at 24. Allegations of pre-Class Period conduct are probative of scienter, especially where, as here, the pre-Class Period conduct alleged is *precisely* the type of misconduct that Plaintiffs allege persisted throughout the Class Period and where, as here, the pre-Class Period conduct relates to the *very issues* challenged by Plaintiffs during the Class Period. *See, e.g.*, *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 20 (D. Mass. 2004) (allegations of conduct that preceded the class period by 25 days were probative of scienter).[46]

*Crowell* is on all fours. Just like the allegation in this case that Wakeman directed that Doral's "leverage ratio [be] over 9%" in the 2011 10-K "even if that means booking assets in later periods" (¶83), the plaintiffs in *Crowell* alleged that one of the defendants "ordered contract cost estimates falsified" during a meeting just prior to the class period. 343 F. Supp. 2d at 5. The court found this evidence "probative of the approach Ionics was taking to its accounting practices" during the class period, and noted that the allegations of pre-class period misconduct "bolster[ed]" other allegations of scienter during the class period. *Id*. at 20.[47]

Thus, the pre-Class Period information offered by FE1 is probative of Wakeman's scienter, and also of the scienter of Wahlman and Ubarri, two executives to whom the instruction to maintain a certain leverage ratio "even if that means booking assets in later periods" was directed – because it is indicative of Defendants' scienter and willingness to artificially inflate Doral's regulatory capital

---

[46] Defendants' related criticism that FE2, FE3 and FE4 were not employed "through the entire Class Period" (Motion at 28) is likewise is inconsequential. *See Simon v. Abiomed, Inc.*, Civil Action No. 12-12137-FDS, 2014 WL 1413638, at *14 (D. Mass. Apr. 10, 2014) (observing that "[a] witness need not have been at the company for [the] entire, or indeed any, of an asserted class period to have probative information").

[47] *See also Greebel*, 194 F.3d at 202 (noting that pre-class period allegations "are not irrelevant – evidence of past practice may indeed be probative of present practice"). Courts in other circuits are in accord. *See In re Dynex Capital, Inc. Sec. Litig.*, N. 05 Civ. 1897(HB), 2009 WL 3380621, at *7 n.6 (S.D.N.Y. Oct. 19, 2009) (rejecting defendants' attempt "to discredit Plaintiffs' anonymous sources by noting that many of them were employed by a Dynex affiliate prior to the Class Period"); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1222 (S.D. Cal. 2010) ("Statements made *before* the class period . . . 'may provide insight into what the defendant knew during the class period.'"); *In re Merck & Co., Sec. Litig.*, 432 F.3d 261, 271-72 (3d Cir. 2005) (information from outside the class period may be relevant for purpose of drawing an inference about defendant's knowledge); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class period data relevant to confirm what a defendant should have known at start of class period).

ratios during the Class Period.  ¶¶83, 134.  Wahlman's statement to FE1 in mid-January 2012 that he had "done things that" made him "very uncomfortable," but that he intended to remain at Doral at least until he received his year-end bonus and his shares of Doral stock vested provides additional circumstantial evidence that Wahlman was motivated to continue to engage in, and conceal, the fraudulent conduct alleged in the Complaint throughout the Class Period.  ¶304(b).

### 3.  Accounting Shenanigans, GAAP Violations, Disregard for the Most Current Information, Purposely Lax Internal Controls, and "Revision" of Previously-Reported Financial Statements

"The First Circuit has allowed that GAAP violations alone 'could provide evidence of scienter.'"  *Kinney*, 170 F. Supp. 2d at 180 (quoting *Greebel*, 194 F.3d at 203); *Cabletron*, 311 F.3d at 39.  Similarly, "'accounting shenanigans' are among the characteristic types of circumstances which may demonstrate scienter for securities fraud."  *Id.* (citing *Geffon v. Micrion Corp.*, 249 F.3d 29, 36 (1st Cir. 2001)).  That Defendants' accounting shenanigans here eventually resulted in the need for a "revision" to previously reported financial figures further supports a strong inference of scienter.  *See Sonus*, 2006 WL 1308165, at *16 ("the Restatement essentially amounts to an admission by Sonus that it overstated and understated its revenues and earnings by quantified amounts in contravention of GAAP").

Moreover, that Defendants knowingly maintained lax internal controls (*see* ¶¶102-13), and admitted on March 18, 2014 to "material weakness in [the Company's] internal control over financial reporting" related to ALLL (¶¶112, 269), further reinforces the inference of scienter.  *Hill*, 2011 WL 3420439, at *13 (citing *Crowell*, 343 F. Supp. 2d at 19-20 (noting that choosing "not to implement adequate internal controls reinforces the inference that [a company] was intentionally engaged in [a] fraudulent course of conduct").

Plaintiffs allege the existence of significant GAAP violations with respect to Doral's ALLL in this case.  ¶¶60-65, 104, 228.  Plaintiffs also allege "accounting shenanigans" with respect to both ALLL and the creation of the Tax Receivable, both of which Plaintiffs alleged were used to

artificially inflate capital levels.[48]  With respect to ALLL, Plaintiffs allege that Defendants knew loan information was inaccurate, purposely delayed appraisals, and failed to utilize the most up-to-date information on appraisal values when appraisals came in too low, because doing so would require an increase in the ALLL.  *See* ¶¶91-95 (purposeful delay and ignoring of appraisals and instruction by Wahlman not to remedy the problem); ¶101 (purposeful ignoring of actual charge-offs).[49]  Plaintiffs allege that this deliberate manipulation of ALLL was done not based on current loan performance, as Defendants represented to the investing public, but rather was done to achieve a desired result and to inflate capital levels.  ¶¶86-88.  Further, Defendants maintained lax internal controls with respect to ALLL precisely to enable such misconduct.  ¶294.  Finally, this malfeasance caused Doral in March 2014 to have to retroactively revise its 3Q 2013 financial statements, to increase the provision for loan losses for the quarter by $7.2 million, resulting in a retroactive increase of the Company's 3Q 2013 net losses from the previously-reported amount of $7.5 million, to $14.7 million.  ¶¶9, 271.

In these respects, this case differs markedly from the "managerial judgment and discretion" cases relied upon by Defendants.  Motion at 22-23.  The malfeasance alleged here reaches far beyond a mere missed projection or innocent error in judgment – it was systemic, knowing, and carried out with a reckless disregard for the truth.

### 4.   Large Scale Fraudulent Practices Over Time, Culminating in SEC Investigation and FBI Raid

Plaintiffs' allegations of large-scale fraudulent practices over time are further indicative of scienter.  *Cabletron*, 311 F.3d at 39 ("allegations of large-scale fraudulent practices over time" made it "difficult to escape a strong inference of the type of recklessness…that amounts to scienter.").  The fraudulent practices in this case date back to Doral's phony mortgage sales (from which its supposed

---

[48] *E.g.*, ¶¶7, 81, 87, 88 (connection between ALLL manipulation and regulatory capital ratios); ¶¶84-88, 91-101 (ALLL-related accounting shenanigans);  ¶¶115, 124 (use of Tax Receivable to satisfy Tier 1 Capital); ¶¶126-130, 132 (alleged undisclosed shenanigans in securing Tax Receivable, and undisclosed risks of non-payment of Tax Receivable); ¶83 (shenanigans with respect to calculation of capital levels).

[49] *See Cabletron*, 311 F.3d at 39 ("Other allegations also add to a strong inference of scienter. The complaint alleges that Benson specifically directed some of the fraudulent…activities at the heart of the complaint. . . . It also alleges that…[other defendants]…received regular information about the SmartSwitch problems which they should have realized contradicted the company's public statements about the rollout of the product.").

tax overpayments arose), continued during the Class Period with the misrepresentations made in connection with the creation of the Tax Receivable, as well as the manipulation of ALLL and capital ratios, and continues post-Class Period with the SEC investigation and the recent FBI raid. Taken together, these facts showing Doral's long-standing malfeasance further support a strong inference of scienter.

### 5. The Individual Defendants' Signatures on SEC Filings

Allegations that the Individual Defendants signed SEC filings containing the allegedly false information further support Plaintiffs' scienter allegations. *See, e.g.*, *Cabletron*, 311 F.3d at 41 (outside directors' signatures on Form 10-K "accept[ing] responsibility for its contents" was indicative of scienter) (citing *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000) (holding outside directors responsible for SEC filings they signed)). Plaintiffs here allege that all of the SEC filings made during the Class Period contained materially false and misleading information. The Individual Defendants' attestations as to the correctness of those filings on Sarbanes-Oxley certifications are further indicative of scienter. *See* ¶¶133, 148, 167, 186, 207, 222 (Wakeman and Wahlman); ¶236 (Wakeman and Ivanov); ¶256 (Wakeman and Hooston).

### 6. The Critical Importance of the ALLL and Capital Levels, Combined with the Individual Defendants' Access to Information Through Their Committee Membership, Attendance at Meetings, and Receipt of Detailed Reporting

The Individual Defendants had access to detailed non-public information pertaining to the Company's capital levels, risks relating to the Tax Receivable, and systemic and persistent ALLL-related problems, which "they should have realized contradicted the company's public statements" on those topics. *Cabletron*, 311 F.3d at 39. First, each of these items was of critical importance to the Company's continued operation.[50] Knowledge of matters of such critical importance to the operation of the Company can be imputed to Defendants and "add to a strong inference of scienter." *Cabletron*, 311 F.3d at 39 (finding "concealment of the serious and worsening deterioration of Cabletron's financial health [was] a significant motive…."); *Aldridge*, 284 F.3d at 83 (scienter

---

[50] *E.g.*, ¶¶4, 58 (ALLL is a critical metric for a lending institution such as Doral); ¶¶7, 155 (importance of Tax Receivable); ¶¶12, 44, 52-56, 175 (importance of meeting regulatory capital requirements).

supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company").[51]

Moreover, the Individual Defendants were personally involved in, or regularly received detailed internal reporting on, each of these topics.[52] *See In re Stone and Webster, Inc. Sec. Litig.*, 253 F. Supp. 2d 102, 131 (D. Mass. 2003) (scienter adequately pled where plaintiffs alleged that the defendants received internal reports reflecting information on high receivables delinquencies that conflicted with their optimistic public statements concerning the company's financial condition).

Finally, each of the Individual Defendants, because of their positions with Doral, controlled the contents of the Company's public statements during the Class Period. ¶¶290-92. Each had access to material non-public information, and each knew or recklessly disregarded that the adverse facts alleged in the Complaint were being concealed from the public and that the positive representations that were being made were false and misleading. ¶292. Each of the Individual Defendants were members of the Disclosure Committee, which typically met twice per quarter and reviewed and had the opportunity to comment on *all* SEC filings and financial statements prior to filing. ¶297. Thus, as executive officers, the Individual Defendants can be held liable for false and misleading statements made in the Company's SEC filings and press releases, and for other similar

---

[51] *See also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001) (scienter relating to misstatements about patent was supported by fact that company's future depended on patent); *Hill*, 2011 WL 3420439, at *23 (scienter adequately pled where plaintiffs alleged that defendants had "'extensive knowledge' about . . . 'two of the most significant components of State Street's business.'"); *Crowell*, 343 F. Supp. 2d at 19 ("it can be inferred that top executives at Ionics were aware of a scheme involving systemically fraudulent sales practices, given the importance of the Aqua Cool sale to Ionics' business that year."); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998) ("facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers").

[52] For example, Wahlman had daily involvement with ALLL and was constantly making changes to ALLL figures – changes which raised concerns on the part of Doral's Chief Risk Officer. ¶¶84-85. Wahlman was further informed that appraisals were not being updated or recorded, but he instructed employees that the values should not be corrected. ¶93. According to FE1, ALLL-related problems were well-known to both Wakeman and Wahlman. *Id.* Moreover, ALLL was a key metric in Doral's financial statements, which were reviewed by all of the Individual Defendants prior to filing with the SEC. ¶¶103-113, 297.

Regarding capital levels, FE2 provided monthly and bi-monthly capital ratio calculations to, and participated in at least quarterly discussions with, Doral's CFO (be it Wahlman, Ivanov, or Hooston). ¶¶89, 132. According to FE2, the Tax Receivable, and its continued inclusion in Tier 1 capital, was often a topic of discourse at executive level meetings, and FE2 discussed the propriety of its continued inclusion in regulatory capital directly with Doral's various CFOs. ¶132. To be sure, all of the Company's executives – including the Individual Defendants – were keenly aware of issues regarding Doral's capital levels at all times.

---

public statements made by Doral.  *See Tyco*, 2004 WL 2348315, at *2 ("Insofar as the group pleading doctrine merely permits a plaintiff to rely on a presumption that statements contained in corporate press releases, SEC filings, and other similar company documents are the collective work of the company's executive officers, the doctrine does not appear to be inconsistent with either the PSLRA or Rule 9(b)."); *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 152-53 (D. Mass. 2001) (holding that group pleading doctrine survives PSLRA)).

### 7.  Individual Defendants' Self Interest and Insider Sales

It is well-settled in the First Circuit that allegations of "motive and opportunity" may, when viewed together with additional factual support, "establish a strong inference of scienter." *Collier*, 9 F. Supp. 3d at 73 (allegations that the individual defendants "personally benefited from the fraud" by "inflating the Company's revenues [to make] themselves appear as effective managers" contributed to the finding of a strong inference of scienter); *see also Aldridge*, 284 F.3d at 82.

Here, given the critical importance of maintaining the Company's required capital levels – which Defendants accomplished through the Tax Receivable and ALLL manipulations – the Individual Defendants' careers and very survival of the Bank were on the line.  This is highly probative of scienter. *See Brumbaugh*, 416 F. Supp. 2d at 253 (noting that "[d]efendants had 'more than the usual concern by executives' to increase the value of Wave's stock; 'the executives' careers and the very survival of the company were on the line.'") (citing *Cabletron*, 311 F.3d at 39).  Indeed, the stakes alleged in this case transcend cases attempting to allege scienter by merely pointing to executive compensation.  Motion at 35-36.

Moreover, allegations of insider trading "provide additional ballast to [Plaintiffs'] argument for scienter." *Cabletron*, 311 F.3d at 40.  Defendants' argument that the insider sales are not probative of scienter because only three of the Individual Defendants made sales (Motion at 34-35) is unpersuasive because Plaintiffs do not allege that these sales, alone, demonstrate scienter;[53] rather,

---

[53] *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) does not stand for the proposition, as Defendants suggest, that the failure of some Individual Defendants to sell their stock "**negates** any inference of scienter."  Motion at 35 (emphasis in original).  Rather, the court in *Advanta* recognized that the fact that some individual defendants failed to sell stock during the class period may "rais[e] doubt" as to whether the

these sales buttress Plaintiffs' other allegations.  *See Brumbaugh*, 416 F. Supp. 2d at 254 ("Plaintiffs' allegations of insider trading…. buttress allegations concerning Defendants' motive and opportunity, and Plaintiffs' case becomes...stronger...when the allegations are considered together."); *Crowell,* 343 F. Supp. 2d at 16 ("The way in which the allegedly fraudulent acts fit together and reinforce one another strongly suggests a conscious course of conduct.").

Plaintiffs allege that the sales by Ivanov, Poulton, and Ubarri were unusual and suspicious because no Company insider had previously made any stock sales for nearly seven years, and that the sales were made while Defendants were in possession of material, non-public information about the understatement of Doral's ALLL and the inflation of its capital ratios.  ¶303.  Thus, these insider sales further "buttress" Plaintiffs' scienter allegations.  *Brumbaugh*, 416 F. Supp. 2d at 254.

### 8.     Defendants' "Competing Inferences" Do Not Defeat Plaintiffs' Allegations of Scienter

As set forth above, when read holistically, Plaintiffs' allegations support a strong inference of scienter.  Defendants insist that their purported disclosures concerning ALLL, the lack of action by the FDIC or the FRBNY, and Plaintiffs' failure to name Doral's auditor, PriceWaterhouseCoopers ("PWC"), as a defendant defeat that strong showing.  Motion at 30-31.  Defendants are mistaken.

First, as they did with respect to the falsity of the ALLL-related statements, Defendants again rely on their partial disclosures of ALLL-related control deficiencies to argue that they supposedly made a full disclosure of the problems, and thus did not act with scienter.  Motion at 30.  As discussed in § III.B.3(a)(ii) above, Defendants' partial disclosures of problems were inadequate, and, moreover, were negated by Defendants' representations during the Class Period that ALLL remediation efforts had been "executed" as of the quarter ended September 30, 2012 (¶106) and "the Company's internal control over financial reporting [was] effective" as of December 31, 2012. ¶107.  Defendants went on to represent that the Company's internal controls were effective up until the March 18, 2014 disclosure.  ¶¶108-11.  Defendants further represented throughout the Class Period that all of Doral's financial statements were presented in accordance with GAAP.  ¶¶104,

---

other sales were indicative of scienter.  180 F.3d at 540.  The court further held that where insider sales were unusual compared to past practice – as is the case here – such sales may be probative of scienter.  *Id.*

139, 153, 173, 191.  These representations were *untrue* and, in fact, the ALLL-related problems and malfeasance continued (and were concealed) until the very end of the Class Period.

Nor does Doral's supervision by, or regular reporting to, the FDIC and the FRBNY regarding ALLL vitiate Plaintiffs' strong showing of scienter.  *See* Motion at 30-31.  While a lack of regulatory action does not undermine scienter, unlike the cases relied upon by Defendants (Motion at 31), Defendants here have been the subject of an SEC investigation and an FBI probe into their alleged wrongdoing, further adding to the strong inference of scienter in this case.  *See, e.g.*, *Washtenaw Cnty. Emp. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114-15 (D. Mass. 2014); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter").[54]

Finally, Plaintiffs' decision not to name PWC as a defendant (Motion at 31) in no way undermines the plethora of other scienter-related allegations in this case.  An outside auditor's approval of financial statements is in no way *determinative* of a lack of scienter, *especially* where, as here, Plaintiffs have alleged a totality of facts otherwise supporting a strong inference of scienter. *See Aldridge*, 284 F.3d at 83 (fact that company's "financial statements were audited by an independent accounting firm" did not defeat scienter because "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts").  Moreover, Plaintiffs' allegations presume that Defendants intentionally concealed material information – such as, for example, the purposeful failure to update appraisals – when presenting their financial statements to PWC.  Thus, neither PWC's failure to raise a red flag, nor Plaintiffs' failure to name PWC as a defendant in this case, is indicative of a *lack* of scienter on Defendants' part.  *See, e.g.*, *S.E.C. v. Patel*, Civil No. 07-cv-39-SM, 2009 WL 3151143, at *41 (D.N.H. Sept. 30, 2009) (defendants "knowingly or recklessly provid[ed] false assurances to…outside auditor").

---

[54] *See also Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 713 n.8 (E.D. Mich. 2010) (existence of government investigations are relevant to support a strong inference of scienter); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008) (investigation by the Department of Justice considered as one of the elements in the scienter analysis).

In sum, none of Defendants' arguments raise a "competing inference" compelling enough to defeat Plaintiffs' strong showing of scienter.

### D.   Plaintiffs Adequately Plead Loss Causation

To adequately plead loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Thus, a complaint need only provide a "'short and plain statement' [in accordance with Rule 8 that] provide[s] the defendant with 'fair notice'" of plaintiff's theory of loss causation. *Id.* at 346.[55] The First Circuit has observed that "[l]oss causation is easiest to show when a corrective disclosure is associated with a drop in share price." *Caremark*, 716 F.3d at 238 (citing *In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009)). Moreover, because "[l]oss causation is a fact-based inquiry," all reasonable inferences should be drawn in plaintiff's favor on a motion to dismiss. *Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 174 (2d Cir. 2005). Thus, the *possibility* of other price depressive factors will not defeat Plaintiffs' allegations of loss causation on a motion to dismiss. *See In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 359 (D.N.H. 2006) ("Defendants' reference to a wide range of economic and other factors that may have caused or contributed to the decline in price…raises issues that will be addressed at later stages of this litigation, but those possibilities do not warrant dismissal….").[56]

Defendants challenge the adequacy of Plaintiffs' loss causation allegations with respect to the ALLL-related claims only. *See* Motion at 38.[57] A review of the Complaint, however, shows that Plaintiffs adequately allege loss causation by tying the revelation of the falsity of Defendants' prior

---

[55] Defendants concede that the First Circuit has not applied the heightened pleading requirements of Rule 9(b) to the element of loss causation. Motion at 38, n.22; *see also In re Credit Suisse-AOL Sec. Litig.*, 465 F. Supp. 2d 34, 45-46 (D. Mass. 2006) (*Dura* "reaffirmed the notion that the loss causation pleading requirements should be interpreted so as not to impose a significant burden on plaintiffs.").

[56] *See also In re eSpeed Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) (plaintiff "is not required to plead that [his] economic loss was caused *solely* by the alleged fraudulent scheme"); *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 342 (S.D.N.Y. 2010) ("[n]either *Dura* nor *Lentell*…imposes on plaintiffs the heavy burden of pleading 'facts sufficient to *exclude* other non-fraud explanations.'").

[57] Defendants do not challenge loss causation with respect to the May 2, 2012, price drop of 62% following the FDIC's announcement that Doral was no longer in compliance with its regulatory capital requirements. Accordingly, Plaintiffs only address loss causation as it relates to their ALLL-related allegations.

ALLL-related misrepresentations to drops in Doral's share price.  First, the Complaint alleges that the ALLL-related corrective disclosures made on March 18, 2014 and March 21, 2014 (*i.e.*, the news that ALLL-related material weaknesses, in fact persisted, and as a result, the Company would need to revise ALLL and retroactively increase its previously-reported net loss) revealed a pertinent truth that had previously been obscured by Defendants' fraud, enabling an inflated share price that Doral's ALLL was not calculated in compliance with GAAP and was dangerously understated, thereby overstating the Company's capital reserves and understating net losses.  *E.g.*, ¶¶112-13, 269-71, 306-09.  Second, the Complaint alleges that Doral's stock price dropped in response to these corrective disclosures.  ¶¶270, 308 (9% drop on March 18); ¶¶274, 311 (25.6% drop in days following March 21 disclosure).

Defendants insist that these drops were merely part of a "general downward trend" in Doral's stock price over the Class Period, and that previous declines in share price meant that the market already had absorbed the impact of the supposed earlier disclosures of ALLL-related problems.  Motion at 39-41.  These arguments, however, ignore the *new* material facts that were revealed on March 18, 2014 and March 21, 2014, and how those facts conflicted with Defendants' prior *assurances* regarding ALLL.  As discussed above, any so-called "disclosures" relating to ALLL deficiencies made during the Class Period were woefully incomplete and misleading, such that the market did not know of the continued existence of the problems and, thus, the existence of such problems was not reflected in Doral's share price.  *See* § III.B.3(a)(ii), *supra*.  Indeed, prior to March 18, 2014, Defendants repeatedly assured investors that any previously-identified ALLL deficiencies had been remediated, that the Company's financial reporting was (at all times until the very end of the Class Period) GAAP compliant, and that reserves were adequate.  *Id.*

Starting on March 18, 2014, however, investors learned *for the first time* that the same ALLL problems that existed at the beginning of the Class Period *had not* been remediated – as Defendants had publicly claimed – and that these problems, in fact, persisted *throughout* the Class Period.  On March 21, 2014, moreover, investors learned *for the first time* that these ALLL problems were so pervasive that Doral would have to revise its previously-reported ALLL and retroactively increase its PLLL, thereby increasing its previously-reported third quarter net loss.  The new information

contained in these corrective disclosures, combined with the stock price drops following the disclosures, adequately plead loss causation.  *See Caremark*, 716 F.3d at 242 (previous disclosure of some problems did not negate loss causation when the market learned of new information and alleged "real reason" for problems; holding that "[d]espite the earlier disclosure of CVS Caremark's lost contracts, this new information could plausibly have caused the [plaintiffs'] losses.").

Moreover, where, as here, Plaintiffs allege the revelation of specific facts that caused the loss, the occurrence of other price declines earlier in the Class Period does not negate Plaintiffs' allegations of loss causation.  *See Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 94 n.12 (D.P.R. 2010) (rejecting defendants' argument that the general decline in stock price throughout the class period negated loss causation); *see also StockerYale*, 453 F. Supp. 2d at 359.  Defendants also misrepresent the performance of Doral's stock price as having experienced a "general downward trend" throughout the Class Period.  In fact, there was general price fluctuation (up and down) throughout the Class Period.  *See generally* Def. Ex. 16.  Furthermore, Defendants' suggestion that declines in Doral's stock price during the Class Period were merely consistent with general market deterioration (Motion at 40) is not supported by historical market data.  *See* Plaintiffs' Ex. A (comparing performance of Doral stock during Class Period to Dow Jones Industrial Index (DJI) and Russell 3000 Index (RUA)).

Accordingly, Defendants' arguments that supposed previous disclosures already incorporated ALLL problems into the stock price and that Doral's share price declines were normal or consistent with general market deterioration are wholly unsupported and at most, create factual disputes that are inappropriate for resolution on a motion to dismiss.  *See Emergent Capital Inv. Mgmt, LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003) (loss causation is generally "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss").

Finally, Defendants argue that the March 18, 2014 stock drop is "limited to" correcting misstatements and omissions made "after July 1, 2013" and cannot be connected to any ALLL-related misstatements or omissions made during the first half of the Class Period (from April 2, 2012

to June 30, 2013).  Motion at 41.[58]  This argument ignores the cumulative, quarter-over-quarter nature of ALLL, as well as Plaintiffs' allegation that ALLL was understated as a result of Defendants' systemic undisclosed practices *throughout* the Class Period, which culminated in the eventual need to restate ALLL and, by extension, net losses for the third quarter of 2013.  *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) ("neither the Supreme Court in Dura, nor any other court addressing the loss causation pleading standard require a corrective disclosure to be a 'mirror image' tantamount to a confession of fraud").

Plaintiffs have alleged that the declines in share price following the March 18 and March 21 announcements, as the market digested the ALLL-related news, were plausibly caused by Defendants' fraud, which is all that is required at the pleading stage.  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) (court need only find it "plausible" that defendants' concealment caused loss "in part").

### E.    The Complaint States Claims Against Poulton and Ubarri

In arguing that Poulton and Ubarri made no actionable statements for purposes of Section 10(b) and Rule 10b-5 liability, Defendants urge the Court to take an unreasonably narrow view of who constitutes a statement's "maker."  Motion at 41-42.  The Supreme Court has held that a statement's "maker" is anyone with "ultimate authority over the statement, including its content and whether and how to communicate it," and further instructed that "attribution within a statement or implicit from surrounding circumstances is strong evidence" of who "makes" a statement.  *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S.Ct. 2296, 2302 (2010).  Section 10(b) liability may attach where a statement is not *explicitly* attributed to an individual defendant, but where "attribution [is] 'implicit from surrounding circumstances.'" *City of Roseville Emps.' Ret. Sys. v. Energy Solutions, Inc.*, 814 F. Supp. 2d 395, 418 (S.D.N.Y. 2011); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012) ("[i]n the post-*Janus* world, an executive may be

---

[58] In support of this argument, Defendants cite only to out of context dicta taken from *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013).  Motion at 41.  Nothing in *Coyne* supports Defendants' novel proposition that a corrective disclosure announcing a restatement may *only* be linked to statements made during the restatement period for loss causation purposes.

held accountable [if he]…ratified and approved the company's statement.…").  Moreover, *Janus* "does not imply that there can be only one 'maker' of a statement in the case of express or implicit attribution." *Energy Solutions*, 814 F. Supp. 2d at 417 n.9.

As members of Doral's Disclosure Committee, both Poulton and Ubarri were responsible for reviewing, commenting on, and approving the Company's public statements in its filings with the SEC. ¶297.  Thus, the Complaint adequately pleads that both Poulton and Ubarri had ultimate authority over, ratified and approved, and were "makers" of, these statements.  *See Fannie Mae 2008*, 891 F. Supp. 2d at 473 (denying motion to dismiss where defendant sat on disclosure committee and reviewed and discussed draft SEC filings prior to filing); *In re Pfizer Inc. Sec. Litig.*, No. 04 CIV. 9866 LTS HBP, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012).  Both Poulton and Ubarri also participated in conference calls during the Class Period, and can be held liable for statements made by their fellow defendants during those conference calls which they failed to correct.  *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 543 (S.D. Ohio 2000) ("a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements. If nothing else, the former official is at fault for a material omission in failing to correct such statements.…"); *see also Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653, 656 (5th Cir. 2005); *Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010); *Freudenberg*, 712 F. Supp. 2d at 195.[59]

### F.    Plaintiffs Adequately Plead Claims for §20(a) Control Person Liability

To plead a control person liability claim under §20(a), Plaintiffs need only allege: (1) a primary violation by a controlled person; and (2) control of the primary violator by the defendant. *See Akamai Tech., Inc. v. Deutsche Bank AG*, 764 F. Supp. 2d 263, 266 (D. Mass. 2011).[60]

---

[59]  The Complaint also expressly attributes to Poulton the March 21, 2014, false statement that "Doral and the Bank were in compliance with all of the regulatory capital requirements" at time.  ¶¶ 272-73.  As Defendants concede, Poulton's name appeared on the presentation. *See In re Allstate Life Ins. Co. Litig.*, No. CV-09-8162-PCT-GMS, 2012 WL 176497, at *5 (D. Ariz. Jan. 23, 2012) (underwriters' names in a "prominent position" on the statements sufficiently alleged attribution, at least in part, to the underwriters).

[60]  As demonstrated above, Plaintiffs have adequately pled a primary violation of §10(b). *See Hoff*, 727 F. Supp. 2d at 96 (denying motion to dismiss §20(a) claim where §10(b) violations were sufficiently alleged).

Defendants argue that Plaintiffs' §20(a) claims fail because each Individual Defendant did not exercise actual control over the Company.  Motion at 42-43.[61]  Lack of control, however, is an affirmative defense that it is premature to assess prior to discovery.[62]  Plaintiffs have sufficiently pled Individual Defendants' control over the Company:

- Each of the Individual Defendants were high level officers of the Company during the Class Period.  *See StockerYale,* 453 F. Supp. 2d at 361 (allegations that defendants were officers of the company supported §20(a) claim).

- Defendants Wakeman, Wahlman, Ivanov, and Hooston each signed one or more of Doral's public filings, thereby "accept[ing] responsibility for its contents" and holding themselves out as having control of the Company.  *Id.* (defendants' direct involvement in drafting or issuing press releases and public statements supported §20(a) claim).

- Each of the Individual Defendants, as members of Doral's Disclosure Committee, reviewed, commented on, and approved the Company's statements in its public filings, and each participated in investor conference calls wherein the allegedly false and misleading statements were made.  *Id.* (allegations that defendants had seen and had control over content of allegedly misleading press releases before they were issued supported §20(a) claim).

In sum, "Plaintiffs have clearly pled Defendant's control over [Doral], [and] it is premature for Defendant[s] to challenge th[is] element."  *Akamai*, 764 F. Supp. 2d at 269.[63]

**FOR THE FOREGOING REASONS**, Lead Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss the Complaint.[64]

---

[61] Defendants incorrectly assert that Plaintiffs' §20(a) claims are subject to the PSLRA's heightened pleading standard.  *See Akamai*, 764 F. Supp. 2d at 267-68 ("the PSLRA's heightened pleading standard…is inapplicable [to §20(a)].  Plaintiffs are not required, therefore, to meet the 'strong inference' scienter requirement of the PSLRA.").  Plaintiffs need only "allege[d] sufficient facts such that it is reasonable [to] believe" the Individual Defendants are controlling persons under §20(a).  *Id.* at 268.

[62] *See, e.g., Cabletron*, 311 F.3d at 41 ("[c]ontrol is a question of fact that 'will not ordinarily be resolved summarily at the pleading stage'"); *Quaak v. Dexia, S.A.*, 445 F. Supp. 2d 130, 148 (D. Mass. 2006) ("only 'a reasonable inference in the complaint' of control is necessary to survive a motion to dismiss"); *In re Tyco Int'l, Ltd.*, MDL 02-1335-B, 2007 WL 1703023, at *11 (D.N.H. June 11, 2007) ("Whether sufficient control has been exercised to support a control person claim ordinarily 'raises a number of complexities that should not be resolved on [ ] an undeveloped record.'").

[63] Although Defendants acknowledge that the First Circuit has not imposed a requirement of "culpable participation," they contend that Plaintiffs have not satisfied such a requirement because scienter has not been adequately pled.  Motion at 43.  As this Court held in *Hoff v. Popular*, the Individual Defendants' conduct in making false and misleading statements, "support[s] an inference that [they] were culpable participants in the alleged fraud." 727 F. Supp. 2d at 96 n.14.  Moreover, because scienter has been adequately pled, Plaintiffs have also alleged culpable participation by the Individual Defendants.

[64] In the event that the motion to dismiss is granted in whole or in part, Plaintiffs respectfully request leave to amend.  *See, e.g., In re Cytyc Corp.*, No. Civ. A. 02-12399-NMG, 2005 WL 3801468, at *29 (D. Mass. Mar. 2, 2005) (granting leave to amend and "allowing plaintiffs an opportunity to replead consistent with the rulings made in this opinion").

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 6th day of February 2015.

I hereby certify that on this date I presented this *Opposition to Defendants' Motion to Dismiss* to the Clerk of the Court for filing and uploading to the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

THE LAW OFFICES OF ANDRÉS W.
LÓPEZ, P.S.C.

*s/ Andrés W. López*
ANDRÉS W. LÓPEZ (USDC NO. 215311)
P.O. Box 13909
San Juan, PR 00908
Telephone: 787/294-9508
787/294-9519 (fax)

*Liaison Counsel*

ROBBINS GELLER RUDMAN & DOWD LLP
ROBERT M. ROTHMAN
ERIN W. BOARDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
rrothman@rgrdlaw.com
eboardman@rgrdlaw.com

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
KARA M. WOLKE
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: 310/201-9150
310/201-9160 (fax)
info@glancylaw.com
kwolke@glancylaw.com

*Co-Lead Counsel for Plaintiffs*

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: 619/230-0063

619/255-1856 (fax)
frankj@johnsonandweaver.com

*Additional Counsel for Plaintiffs*