**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

**ROBERT BLUE, Individually and on
Behalf of All Others Similarly Situated,**

**Plaintiffs,**

**v.**

**CIVIL NO. 14-1393 (GAG)**

**DORAL FINANCIAL
CORPORATION, GLEN R.
WAKEMAN, ROBERT E.
WAHLMAN, PENKO IVANOV,
DAVID HOOSTON, ENRIQUE R.
UBARRI-BARAGANO and
CHRISTOPHER C. POULTON,**

**Defendants.**

## OPINION AND ORDER

Lead Plaintiffs ("Plaintiffs"), Jensine Andresen, Ken M. Nimmons, and Mordechai Hakim,

bring this putative class action lawsuit on behalf of a class of investors against the holding

company of Doral Bank ("Doral Bank" or the "Bank"), Doral Financial Corporation ("Doral"),

and several current and prior company executives, Glen R. Wakeman ("Wakeman"), Robert E.

Wahlman ("Wahlman"), Penko Ivanov ("Ivanov"), David Hooston ("Hooston"), Enrique R.

Ubarri-Baragano ("Ubarri"), and Christopher C. Poulton ("Poulton") (all defendants collectively

referred to as "Defendants" and the latter company executives collectively referred to as the

"Individual Defendants").   The Consolidated Class Action Amended Complaint ("complaint")

alleges that Plaintiffs purchased common stock of Doral between April 2, 2012 and May 1, 2014

(the "class period") at prices that were artificially inflated by Defendants' false and misleading

statements made in violation of sections 10(b) and 20(a) of the of 1934 Securities Exchange Act,

Civil No. 14-1393 (GAG)

15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.  (Docket No. 53.)

Despite the extensiveness of the complaint, rounding out at 122 pages and comprising of 328 paragraphs, the substantive allegations can be boiled down to the contention that, during the class period, Defendants violated securities laws when they engaged in a scheme to misrepresent Doral's regulatory compliance, thus artificially inflating the company's actual worth in two ways. First, Plaintiffs claim that Doral misrepresented the quality of its loan portfolio by failing to publically disclose that it had been deliberately understating its appropriate loan reserves, known as the Allowance for Loan and Lease Losses (the "ALLL"), and by failing to disclose the systematic and widespread deficiencies in its procedures for determining its ALLL.  (Id. ¶¶ 4-6, 8.) The ALLL provides an accurate representation of a lender's present financial status by approximating the portion of the lender's loan portfolio that is impaired or is otherwise not likely to be collected in the future.  This in turn significantly affects the lender's value.  Second, Plaintiffs claim that Defendants failed to disclose the known, material risk that the Puerto Rico Treasury Department ("Treasury Department") and the Federal Deposit Insurance Corporation ("FDIC") would disallow the inclusion of the largest single component of Doral's capital, a $229,884,087 tax receivable, into its Tier 1 capital.  (Id. ¶ 7.)  This fraudulent scheme, Plaintiffs claim, led to inflated stock prices, which ultimately plummeted when Doral announced on March 18, 2014 that it would not be able to timely file its 2013 financial results due to a material weakness in its internal control over its financial reporting and then subsequently announced on May 1, 2014 that the FDIC would not allow Doral to include the tax receivable as part of its capital.  (Id. ¶¶ 9-13.)

Presently before the court is Defendants' motion to dismiss Plaintiffs' complaint pursuant

**Civil No. 14-1393 (GAG)**

to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rules of Civil Procedure 9(b) and 12(b)(6), in which they argue that Plaintiffs fail to state a single claim under the applicable federal securities laws upon which relief can be granted.  (Docket No. 56.) Plaintiffs opposed said motion to dismiss.  (Docket No. 58.)  Defendants, in turn, replied to Plaintiffs' opposition.  (Docket No. 62.)  Plaintiffs then surreplied to Defendants' opposition. (Docket No. 64.)  Thereafter, Doral filed a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*, and, as such, the case against Doral was automatically stayed.  (<u>See</u> Docket No. 65.)  Plaintiffs' case against the Individual Defendants continues, however, and the court will consider whether the complaint sufficiently states a claim upon which relief can be granted against those defendants.

After reviewing the pleadings and pertinent law, and taking into consideration the procedural posture of this case, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss at Docket No. 56 as to the Individual Defendants.

## I.    The Parties

Plaintiffs are stock holders who purchased Doral common stock during the class period. (Docket No. 53 ¶ 18.)  Doral is a diversified financial services company incorporated in San Juan, Puerto Rico that engaged in retail banking, mortgage banking, investment banking activities, institutional securities, and insurance agency operations.  (<u>Id.</u> ¶¶ 19, 38.)

Defendant Wakeman is, and was throughout the class period, Doral's Chief Executive Officer ("CEO"), President, and a Director of the Bank.  (<u>Id.</u> ¶ 20.)  Defendant Wahlman also served as Doral's Chief Financial Officer ("CFO"), Chief Investment Officer, Chief Accounting Officer, an Executive Vice President, and a Director of the Bank during the class period.  (<u>Id.</u> ¶ 21.)  Defendant Ivanov served as Doral's Interim CFO between May 17, 2013 and October 3,

Civil No. 14-1393 (GAG)

2013.  (Id. ¶ 22.)  Defendant Hooston joined Doral as Executive Vice President of Finance on July 1, 2013, pending regulatory approval of his appointment as permanent CFO, and, on October 3, 2013, Hooston was appointed CFO and an Executive Vice President.  (Id. ¶ 23.)  On October 6, 2014, after the end of the class period, Doral announced that Hooston had been placed on "paid administrative leave."  (Id.)  Defendant Ubarri is, and was throughout the class period, Doral's Chief Compliance Officer, General Legal Counsel, and an Executive Vice President.  (Id. ¶ 24.)  Defendant Poulton is, and was throughout the class period, Doral's Chief Business Development Officer and an Executive Vice President.  (Id. ¶ 25.)

**II.   Background**

In articulating the following facts of this case, the court recites such facts as alleged in the complaint, resolving any ambiguities in Plaintiffs' favor.  See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 5 (1st Cir. 2011).

A.   Doral Financial Corporation

Doral is the holding company for Doral Bank, which provided retail banking services to the general public and institutions, primarily in Puerto Rico.  (Docket No. 53 ¶¶ 19, 40.)  The Individual Defendants were the chief officers of Doral and the Bank.  (Id. ¶¶ 20-25.)  As of December 31, 2013, Doral Bank operated a network of twenty-two branches located in Puerto Rico and eight branches in New York and Florida.  (Id. ¶ 40.)  Through these branches, the Bank engaged in consumer and commercial lending, including residential mortgage lending, consumer loans, and commercial real estate and construction loans.  (Id. ¶ 41.)  Doral's stock was publically traded on the New York Stock Exchange ("NYSE") and as of April 30, 2014, it had more than 6.6

Civil No. 14-1393 (GAG)

million shares of common stock outstanding.[1]  (Id. ¶ 19.)

Doral Bank's lending activities in Puerto Rico were focused on the origination of residential mortgage loans.  (Id. ¶ 42.)  The operations of the Bank in the rest of the United States focused on the mortgage banking business and the purchase of assigned interests in senior credit facilities.  (Id.)  The Bank also offered deposit products and other retail banking services and sold or securitized a portion of the residential mortgage loans it originates.  (Id.)

In the years leading up to the class period, Doral's operations were in disarray and the Bank was struggling to regain profitability following a massive restatement that was announced in February, 2006, which stemmed from spurious mortgage sales between it and, among others, FirstBank, which settled a securities fraud lawsuit arising out of those transactions for $74.25 million.  (Id. ¶ 3.)  As a result of its financial struggles, on April 2, 2012, the first day of the class period, the FDIC notified Doral that it considered the Bank to be in "troubled condition."  (Id. ¶ 67.)  As a bank holding company, Doral was subject to supervision and examination by federal and local banking regulators, including the FDIC, the Federal Reserve Bank of New York (the "FRBNY"), and the Office of the Commissioner of Financial Institutions of Puerto Rico (the "PR Commissioner").  (Id. ¶ 43.)  Approximately four months later, August 8, 2012, Doral disclosed this information and announced that the Bank had entered into the "Consent Order" with the FDIC and the PR Commissioner that imposed operational restrictions and regulatory requirements on Doral to get it back on track to becoming successful again.  (Id.)  Thereafter, on September, 13, 2012, Doral announced that it had entered into a similar written agreement with the FRBNY (the "Written Agreement") that replaced and superseded an existing cease and desist order entered into

---

[1] On February 27, 2015, the FDIC was appointed as receiver of Doral, and, as such, trading of Doral stock was halted that same day and subsequently delisted from the New York Stock Exchange on March 2, 2015.  (Docket No. 64 at 1.)

Civil No. 14-1393 (GAG)

with the Board of Governors of the Federal Reserve System on March 16, 2006. (Id. ¶ 75.)

To best understand the specific requirements of the Consent Order, the Written Agreement, and the specific allegations in this case, it is helpful to first explain the basic accounting rules and principles underlying those agreements.

B.     Relevant Principles Regarding the Federal Regulation of Banks

Under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), federal banking regulators must take "prompt corrective action" with respect to banks that do not meet minimum capital requirements. (Id. ¶ 44.) The relevant capital metrics for these requirements are the "Total Risk-Based Capital Ratio," the "Tier 1 Risk-Based Capital Ratio," and the "Tier 1 Leverage Ratio." (Id. ¶ 45.) At least half of a bank's Total Risk-Based Capital must be comprised of Tier 1 Capital, which may include common equity, retained earnings, minority interests in unconsolidated subsidiaries, noncumulative perpetual preferred stock and a limited amount of cumulative perpetual preferred stock (in the case of a bank holding company), minus goodwill, and certain other intangible assets. (Id. ¶ 46.) The remainder may consist of Tier 2 Capital, which may include a limited amount of subordinated debt, other preferred stock, certain other instruments, and a limited amount of loan and lease loss reserves. (Id.) The FDIC assesses the above metrics for banks by dividing certain assets by the bank's credit risks, thereby arriving at ratios that it uses to determine if a bank is "well-capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," or "critically undercapitalized." (Id. ¶ 49.)

The FDICIA generally prohibits a bank from making any capital distribution or paying a dividend or management fee to its holding company if the bank would thereafter be undercapitalized. (Id. ¶ 52.) Undercapitalized banks are also subject to growth limitations and restrictions on borrowing from the Federal Reserve System and are required to submit capital

**Civil No. 14-1393 (GAG)**

1  restoration plans to federal banking regulators.  (Id.)  If a bank fails to timely submit an acceptable

2  plan, it is treated as if it were significantly undercapitalized.  (Id.)  Significantly undercapitalized

3  banks may be subject to a number of requirements and restrictions, including orders to sell

4  sufficient voting stock to become adequately capitalized, orders to reduce total assets and orders to

5  cease the receipt of deposits.  (Id.)  Critically undercapitalized banks are subject to appointment of

6  a receiver or conservator.  (Id.)

7      Furthermore, under FDIC regulations adopted pursuant to the FDICIA, banks that are not

8  well-capitalized are prohibited from accepting new, rolling over, or renewing brokered deposits in

9  the absence of a waiver from the FDIC, and are prohibited from paying attractive interest rates on

10  the brokered deposits they currently hold.  (Id. ¶¶ 53, 55.)  Brokered deposits constitute any

11  deposit with an interest rate of more than seventy-five basis points above prevailing market rate,

12  which includes certificates of deposit and money market deposits.  (Id. ¶ 54.)  Even with such a

13  waiver, a bank that is merely adequately capitalized may not pay an interest rate on any brokered

14  deposits in excess of seventy-five basis points above prevailing market rates.  (Id. ¶ 55.)

15      With respect to lending activities, pursuant to Generally Accepted Accounting Principles[2]

16  ("GAAP"), banks are required to maintain an ALLL to reflect the difference, if any, between the

17  principal balance of a loan and the present value of its projected cash flows, observable fair value,

18  or collateral value.  (Id. ¶ 57.)  In other words, banks are required to maintain an allowance that it

19  could use in the event that any of its impaired loans are not collected upon.  An impaired loan is

20  one for which it is probable that the lender will not collect all amounts due under the contractual

21  terms of the loan.  (Id.)  The ALLL is established and maintained via a provision for loan and lease

22  losses ("PLLL"), to account for any impaired loans and constitutes a charge against the bank's

23

24  [2] "The GAAP rules embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time."  Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir. 2002).

Civil No. 14-1393 (GAG)

earnings.  (Id.)  In light of the critical importance of ALLL to a lending institution's financial statements, on December 13, 2006, the FDIC and the Board of Governors of the Federal Reserve System, together with other banking regulators, jointly issued a policy statement that stated, in part, that:

> The ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports.  Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL and the provision for loan and lease losses (PLLL).  To fulfill this responsibility, each institution should ensure controls are in place to consistently determine the ALLL in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.

> As of the end of each quarter, or more frequently if warranted, each institution must analyze the collectability of its loans and leases held for investment . . . and maintain an ALLL at a level that is appropriate and determined in accordance with GAAP.  An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio.

(Id. ¶ 58); Board of Governors of the Federal Reserve System, Interagency Policy Statement on the Allowance for Loan and Lease Losses (Dec. 13, 2006), available at http://www.federalreserve.gov/boarddocs/srletters/2006/SR0617a1.pdf.

C.  Doral's Consent Order With the FDIC

In sum, the Consent Order required the Bank to: (1) implement a comprehensive ALLL policy and methodology; (2) obtain a waiver from the FDIC before accepting, renewing or rolling over brokered deposits; (3) implement an independent loan review program; (4) implement a revised appraisal compliance program; and (5) maintain a higher amount of capital than was otherwise necessary to be considered well-capitalized under the applicable regulations.  (Id. ¶ 5.) The requirements set forth in the Consent Order assured investors that Doral and the Bank would

Civil No. 14-1393 (GAG)

1   thereafter take measures to strengthen the Bank's ALLL policy and methodology.  (Id. ¶ 6.)

2   Specifically, the Consent Order required, inter alia, that Doral submit a capital plan within

3   sixty days detailing the manner in which the Bank would maintain a Tier 1 Leverage Ratio of at

4   least eight percent, a Tier 1 Risk-Based Capital Ratio of at least ten percent, and a Total Risk-

5   Based Capital Ratio of at least twelve percent—compared to the five percent Tier 1 Leverage

6   Ratio, six percent Tier 1 Risk-Based Capital Ratio, and ten percent Total Risk-Based Capital Ratio

7   that are generally required for a bank to be considered well-capitalized under the FDICIA.  (Id. ¶

8   69.)  Furthermore, Doral Bank was required to immediately notify the FDIC Regional Director and

9   the PR Commissioner in the event any capital ratio falls below the minimum required by the

10  approved capital plan, and within sixty days thereafter either: (1) increase capital in an amount

11  sufficient to comply with the capital ratios as set forth in the approved Capital Plan; or (2) submit

12  to the FDIC Regional Director and the PR Commissioner a Contingency Plan for the sale, merger,

13  or liquidation of the Bank in the event the primary sources of capital are not available within 120

14  days.  (Id. ¶ 70.)

15  The agreement required the Bank to: (1) "establish a program of independent loan review

16  that will provide for a periodic review of the Bank's loan portfolio and the identification and

17  categorization of problem credits"; and (2) among other things, implement "a mechanism for

18  reporting . . . no . . . less than quarterly, the information developed" through the loan review

19  program "to the Board."  (Id. ¶ 72.)  The requirement that the Bank establish an independent loan

20  review program (from which the ALLL is derived) and ensure that loan review information

21  reached the Board assured investors that Defendants would implement measures to make sure that

22  Doral maintained an adequate ALLL.  (Id. ¶ 73.)  The Consent Order also required the Bank to

23  "revise its appraisal compliance program, including enhancing the Bank's appraisal policy to

24

9

**Civil No. 14-1393 (GAG)**

capture risk management and internal controls that ensure that appraisals are obtained in a timely manner . . . and that appraisals contain appropriate valuation approaches to support assigned values," which likewise assured investors that Defendants would implement measures to make sure that Doral maintained an adequate ALLL.  (Id. ¶ 74.)

       D.    Doral's Written Agreement With the FRBNY

The Written Agreement with the FRBNY imposed operational restrictions and regulatory requirements on Doral similar to those imposed by the Consent Order.  (Id. ¶ 76.)  Pertinently, the Written Agreement required that Doral submit to the FRBNY an acceptable written plan to maintain sufficient capital at Doral on a consolidated basis, including maintaining compliance with the capital adequacy guidelines for the Bank issued by the FDIC, which took into account, inter alia, the adequacy of the Bank's ALLL.  (Id.)  The agreement further required Doral to establish programs, policies and procedures acceptable to the FRBNY relating to credit risk management practices, credit administration (including developing procedures to ensure that appraisals conform to accepted standards and developing enhanced appraisal review procedures to ensure the quality and timeliness of appraisals), loan grading (including developing standards and criteria for assessing the credit quality of loans), asset improvement, other real estate owned, allowance for loan and lease losses, internal audit, and accounting and internal controls (including taking necessary actions to ensure that accounting and financial reporting functions are staffed by qualified personnel and that management and the board receive timely and accurate reports necessary to correct weaknesses and deficiencies associated with accounting and financial reporting).  (Id.)  Doral was also to provide quarterly progress reports to the FRBNY on its compliance with the Written Agreement.  (Id.)

Similar to the Consent Order, the Written Agreement also required Doral to "establish an

Civil No. 14-1393 (GAG)

[ALLL] methodology . . . consistent with relevant supervisory guidance, including the Interagency Policy Statements on the Allowance for Loan and Lease Losses, dated . . . December 13, 2006" and "submit to the [FRBNY] an acceptable written program for maintenance of an adequate ALLL." (Id.)   The agreement required Doral's program to include policies and procedures to ensure adherence to the ALLL methodology, provide for periodic reviews of the ALLL by the board of directors on at least a quarterly calendar basis, and to provide updates to the ALLL methodology as appropriate.  (Id. ¶ 77.)  It required the board of directors to maintain written documentation of its review, including the factors considered and conclusions reached by Doral in determining the adequacy of the ALLL and to remedy an deficiency found in the ALLL during the quarter that it is discovered, prior to the filing of any required regulatory reports.  (Id.)  Lastly, the agreement required Doral to submit to the FRBNY, within sixty days after the end of each calendar quarter, a written report regarding the board of directors' quarterly review of the ALLL and a description of any changes to the methodology used in determining the amount of ALLL for that quarter. (Id.)

       E.     Doral's 2012 Closing Agreement with the Treasury Department

In addition to the two aforementioned agreements, Doral had also entered into an agreement with the Treasury Department on March 26, 2012 (the "2012 Closing Agreement"). (Id. ¶ 115.)  The 2012 Closing Agreement, which Doral announced at the start of the class period, replaced and superseded a 2006 agreement (the "2006 Closing Agreement") that followed in the wake of the massive restatement of Doral's financial results for the five year period ending December 31, 2004.  (Id. ¶ 116.)  In connection with the spurious mortgage sales mentioned above, Doral retained a portion of the interest to be paid on the mortgages, known as interest-only strips, or "IOs," and booked a gain on the sale of the mortgages.  (Id. ¶ 117.)  In fact, Doral did not truly

Civil No. 14-1393 (GAG)

sell the mortgages, but instead was simply borrowing money which was collateralized by the mortgages.  (Id.)  Through side deals and oral agreements, Doral provided the purchaser with full recourse rights, thereby rendering the transactions loans, rather than sales.  (Id.)  After this scheme was uncovered and Doral was forced to restate its financial results and reverse the income from the spurious sales, Doral claimed that it had overpaid more than $152 million in taxes, and was entitled to a reimbursement from the Treasury Department.  (Id. ¶ 118.)

Thereafter, on September 26, 2006, Doral and the Treasury Department entered into the 2006 Closing Agreement.  (Id. ¶ 119.)  In lieu of claiming a reimbursement of the allegedly overpaid taxes, the parties agreed that Doral would have the right to recognize a deferred tax asset in the amount of $889,723,361, and to gradually amortize that sum against its tax liability over a fifteen year period.  (Id.)  Six years later, on March 26, 2012, Doral and the Treasury Department entered into the 2012 Closing Agreement, in which Doral represented that as of that date, it had amortized $123,443,072 of the $889,723,361 deferred tax asset in prior tax returns, leaving a balance of $766,280,289.  (Id. ¶ 120.)  According to Doral, it entered into the 2012 Closing Agreement because it was apparent that Doral "would not be able to realize the full value of its tax asset before it expired," and, notably, Doral "could not use the tax asset to satisfy [its regulatory] capital requirements."  (Id. ¶ 121.)

The 2012 Closing Agreement voided the $766,280,289 balance of amortization, and instead provided, in pertinent part, as follows:

> [Doral and the Treasury Department] hereby agree to recognize the value of the unamortized IO adjusted basis as a tax overpayment not recovered by [Doral] for the period covered by the restatement, amounting to $229,884,087 as of January 1, 2011.  This overpayment of taxes will be treated as a pre-payment of income tax by [Doral] and can be apportioned among and used by any [Doral subsidiary] to offset income taxes due to the Puerto Rican Government . . . in future years, either through reductions of estimated income taxes or through refunds over a period of 5 years, upon proper claim by Doral.

**Civil No. 14-1393 (GAG)**

1  (Id. ¶ 122.)  According to Doral, the $229,884,087 amount was arrived at by applying the lowest

2  possible tax contribution payable on the amortizable balance of $766,280,289—30% rather than

3  39%, as provided by the Internal Revenue Code of 1994, which was in effect for the years in

4  question.  (Id. ¶ 123.)  This agreement addressed the "pressing public interest[]" of "keeping the

5  banking system capitalized," according to Doral.  (Id. ¶ 124.)  For its part, Doral agreed to aid the

6  Puerto Rico economy by expanding its home preservation and commercial development program

7  by up to $70 million.  (Id.)  Following the 2012 Closing Agreement, Doral recognized the

8  $229,884,087 as a tax receivable and included the tax receivable in its Tier 1 Capital.  (Id. ¶ 125.)

9         F.      The Alleged Fraudulent Scheme

10        Despite the significant problems identified by Doral's regulators, the directives set forth in

11  the aforementioned Consent Order and Written Agreement assured Doral's investors that Doral

12  and the Bank would develop and implement a sound and comprehensive ALLL policy and

13  methodology, implement a mechanism for independent loan review and reporting, and enhance the

14  appraisal programs—all information from which the ALLL was derived.  (Id. ¶ 78.)  Furthermore,

15  the 2012 Closing Agreement assured investors that Doral maintained an adequate amount of

16  capital throughout the class period.  (Id. ¶¶ 121-124.)  However, Plaintiffs allege that during the

17  class period, when Doral represented to the investing public that it and the Bank were in full

18  compliance with the terms set forth in those agreements, it was in fact engaging in a concerted

19  effort to intentionally disobey the terms of the agreements to disguise the Bank's actual worth and

20  its increasingly dire financial prospects.  (Id. ¶¶ 78, 126-130.)

21        Plaintiffs allege, almost exclusively through accounts of confidential former employees of

22  Doral, that unbeknownst to investors, Defendants deliberately understated Doral's ALLL prior to

23  and during the class period by, inter alia, booking assets in later periods and not fixing or updating

24

Civil No. 14-1393 (GAG)

material deficiencies in Doral's internal control of its financial reporting, in order to inflate the Bank's regulatory capital ratios.  (Id. ¶ 82.)  By understating Doral's ALLL and ignoring the deficiencies in its internal control of its financial reporting, Defendants correspondingly overstated Doral's net income, which in turn, overstated its capital and artificially inflated its regulatory capital ratios.  (Id.)  In addition, Plaintiffs allege that Doral falsely represented to the Treasury Department the balance of amortization of its deferred tax asset at the time of the 2012 Closing Agreement and that it did not actually overpay its taxes in the amount of $152 million. (Id. ¶¶ 126-30.)  As a result, Doral fraudulently obtained a larger tax receivable than it was entitled and there was a significant risk that the Treasury Department would discover Doral's scheme and back out of the agreement.  (Id. ¶¶ 126, 128.)  This resulted in the Treasury Department later claiming that the Agreement is null and void, which then caused the FDIC to disallow Doral to include the almost $230 million tax receivable in its Tier 1 capital.  (Id.)

    G.    The Securities Fraud Claims

    Plaintiffs claim that in light of Defendants' fraudulent scheme to disguise the Bank's actual worth, Defendants repeatedly issued false and misleading statements to the investing public regarding the accuracy of the Bank's ALLL and PLLL and the material risk that the Treasury Department would seek to void the 2012 Closing Agreement.  (Id. ¶ 102.)  Specifically, while making some disclosures about the material deficiencies of Doral's system of internal control over its financial reporting, particularly those controls associated with its reporting of its ALLL and PLLL, Plaintiffs claim that Defendants were unremittingly optimistic about Doral's financial state, failed to disclose the systemic and widespread nature of those problems, that they had been deliberately understating Doral's ALLL and PLLL, and falsely represented that Doral's policy of calculating and accounting for its ALLL was consistent with the requirements of GAAP.  (See,

Civil No. 14-1393 (GAG)

e.g., id. ¶¶ 61, 233, 235, 238, 240, 242, 244, 246, 248.)    Furthermore, Plaintiffs claim that Defendants had numerous opportunities to disclose to the investing public that there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and thus not recognize the almost $230 million tax receivable, leaving the institution without the adequate Tier 1 capital to remain well-capitalized.  (See, e.g., id. ¶ 135-36, 144-45.)

Taken from annual and quarterly SEC filings, accompanying press releases, and conference calls with investors and analysts, Plaintiffs present the allegedly false and misleading statements in more than fifty-seven pages of the complaint with extensive block quotes.  (See Docket No. 53 ¶¶ 133-268.)  These statements purport to describe the current financial state of Doral and the Bank, including its ALLL model and the loan and appraisal data, and its compliance with the Consent Order and Written Agreement.  (Id.)

Plaintiffs allege that the Individual Defendants knew that the statements made were false and misleading by citing observations and beliefs of confidential former employees of Doral regarding the Individual Defendants' involvement in the alleged fraudulent scheme, "by virtue of [the Individual Defendants'] receipt of information reflecting the true facts regarding Doral, their control over, and/or receipt and/or modification of Doral's allegedly materially misleading statements and/or their associations with [Doral] which made them privy to confidential proprietary information concerning Doral," and because of the internal reporting structure of Doral and the high ranking positions that the Individual Defendants held.  (Id. ¶¶ 83-101, 290-94.) Plaintiffs also point to insider stock trades by three of the Individual Defendants and salary increases for four of the Individual Defendants as evidence of Defendants' motivation to engage in the scheme and issue false and misleading statements.  (Id. ¶¶ 302-04.)

The complaint then alleges that when Defendants' misrepresentations and fraudulent

Civil No. 14-1393 (GAG)

conduct were disclosed to investors and the market, Doral's common stock plummeted as a direct result.  (Id. ¶¶ 269-73, 306-15.)  Specifically, Plaintiffs aver that when Doral announced on March 18, 2014 that it needed to delay the filing of its annual 10-K report for the year ending December 31, 2013 due to "a material weakness in its internal control over financial reporting as of December 31, 2013, related to the review of the underlying data and mathematical model supporting its [ALLL] and the related [PLLL]," and admitted that its "internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013," the price of Doral common stock fell $1.13 per share, or more than 9%, from a closing price of $12.30 per share on March 17, 2014, to close at $11.17 per share on March 18, 2014.  (Id. ¶¶ 112, 269-70, 308.)  Thereafter, in response to the release of Doral's 2013 10-K that indicated it had understated its ALLL and needed to make a substantial out-of-period increase to its PLLL, suffered from widespread internal control deficiencies, and had not addressed the problems with its ALLL policy and methodology as required by the Consent Order and the Written Agreement, the price of Doral common stock tumbled 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014.  (Id. ¶¶ 274; 309-11.)

The stock continued to decline over the next four trading days, as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014—a total decline of 25.6%. (Id.)  Finally, Plaintiffs aver that when Doral disclosed on May 1, 2014 that the FDIC was no longer allowing the Bank to include the almost $230 million tax receivable in its Tier 1 capital, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014, on unusually heavy trading volume of more than 2.37 million shares traded—erasing more than $141 million in market capitalization from the stock's class period high.  (Id. ¶¶ 275-77, 315.)

Civil No. 14-1393 (GAG)

**III.    Procedural History**

On May 14, 2014, Robert Blue filed a complaint against Doral and the Individual Defendants on behalf of all purchasers of Doral common stock between April 2, 2012 and May 1, 2014.  (Docket No. 1)  On August 1, 2014, the court approved the plaintiffs' stipulation of the appointment of Jensine Andresen, Ken M. Nimmons, and Mordechai Hakim as the lead plaintiffs. (Docket Nos. 19 and 21.)  Thereafter, on November 6, 2014, Plaintiffs filed the Consolidated Class Action Amended Complaint, alleging that Doral and the Individual Defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder by the SEC.  (Docket No. 53.)

Defendants then timely moved to dismiss the complaint for failure to state a claim upon which relief can be granted, contending that Plaintiffs have failed to adequately allege actionable material misrepresentations or omissions, a strong inference of scienter, loss causation, and control-person liability.  (Docket No. 56.)  Plaintiffs opposed said motion to dismiss.  (Docket No. 58.)  Defendants, in return, replied to Plaintiffs' opposition.  (Docket No. 62.)  Plaintiffs then surreplied to Defendants' opposition.  (Docket No. 64.)  Thereafter, Doral filed a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq*, and, as such, the case against Doral was automatically stayed.  (See Docket No. 65.) Plaintiffs' case against the Individual Defendants continues, however, and the court will consider whether the complaint sufficiently states a claim upon which relief can be granted against those defendants.

**IV.    Standard of Review**

First, as with any inquiry under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "isolate and ignore statements in the complaint that simply offer legal labels and

Civil No. 14-1393 (GAG)

conclusions or merely rehash cause-of-action elements." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012).  Second, the court must then "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor." Id. (citing Ocasio-Hernández, 640 F.3d at 12 which discusses Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).  To survive a motion to dismiss, a complaint must allege facts sufficient to demonstrate "a plausible entitlement to relief." Twombly, 550 U.S. at 559; see also ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).  In asserting a securities fraud claim, the plaintiff has the burden of proving six elements: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228, 240 (1st Cir. 2015) (quoting In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 40 (1st Cir. 2014)).

However, "[a]s with all allegations of fraud, a plaintiff must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)" of the Federal Rules of Civil Procedure.  Hill v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011) (citing ACA Fin. Guar., 512 F.3d at 58).  The federal courts have long acknowledged that "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." Hill, 638 F.3d at 54.  As such, consistent with the requirements of Rule 9(b), the court must apply the heightened pleading standard required by the PSLRA.  See 15 U.S.C. § 78u-4(b)(1); In re Cabletron Sys., Inc., 311 F.3d 11, 27-28 (1st Cir. 2002).  Under the PSLRA, a securities fraud complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading,' and . . . . the statements alleged to be misleading must be misleading to a material degree." Id. (quoting 15 U.S.C. § 78u–4(b)(1)).  To plead scienter, the

Civil No. 14-1393 (GAG)

complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind" as opposed to a mere plausible or reasonable inference. 15 U.S.C. § 78u–4(b)(2); In re Cabletron Sys., Inc., 311 F.3d at 27-28. "This last requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." In re Cabletron Sys., Inc., 311 F.3d at 28 (citing 15 U.S.C. § 78u–4(b)(2) and Greebel v. FTP Software, Inc., 194 F.3d 185, 196-97, 201 (1st Cir. 1999)).

In evaluating the adequacy of a securities fraud complaint, "'the PSLRA does not require plaintiffs to plead evidence.' Nevertheless, a significant amount of 'meat' is needed on the 'bones' of the complaint." Hill, 638 F.3d at 56 (quoting ACA Fin. Guar., 512 F.3d at 63). "Courts should look at the complaint as a whole and weigh competing inferences in a comparative evaluation of plaintiff's allegations and alternative inferences from those allegations. . . . If there are equally strong inferences for and against scienter, then the tie goes to the plaintiff." Simon v. Abiomed, Inc., 37 F. Supp. 3d 499, 512-13 (D. Mass. 2014) aff'd sub nom. Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc., 778 F.3d 228 (1st Cir. 2015) (citing Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007) and New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 45 (1st Cir. 2008)).

**V.    Discussion**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b); see also Tellabs, 551 U.S. at 318. Pursuant to this law, SEC Rule 10b-5 implements Section 10(b) by

Civil No. 14-1393 (GAG)

making it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  As noted above, the six elements of a 10b-5 claim are: "(1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Abiomed, 778 F.3d at 240.

Claims brought under Section 20(a) of the Act, 15 U.S.C. § 78t(a), are derivative of 10b-5 claims.  Hill, 638 F.3d at 53.  Specifically, once any "person" is found liable for violating the Securities Exchange Act's substantive provisions,

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Id. (quoting 15 U.S.C. § 78t(a)).

In moving to dismiss Plaintiffs' complaint, Defendants argue that the complaint fails to adequately allege actionable material misrepresentations or omissions, a strong inference of scienter, loss causation, and control-person liability.  (Docket No. 56.)  Defendants challenge the adequacy of the complaint by systematically going through each of those arguments in order,

**Civil No. 14-1393 (GAG)**

1    starting with the issue of whether Plaintiffs sufficiently allege any material misrepresentations or

2    omissions on part of the Defendants.  (Id. at 17-42.)

3         A.    Whether the Complaint Alleges Actionable Material Misrepresentations or
               Omissions
4

5         The first question for the court is whether the complaint sufficiently alleges misleading

6    statements or omissions by the Individual Defendants in the SEC filings, accompanying press

7    releases, and conference calls, and the reasons why they are misleading.  As described above,

8    Plaintiffs' primary allegation is that Defendants repeatedly issued false and misleading statements

9    to the investing public regarding the accuracy of the Bank's ALLL and PLLL and Doral's capital

10   levels, particularly concerning the tax receivable from the Treasury Department, and its internal

11   financial controls because they were engaging in a scheme to inflate Doral's capital and disguise

12   its dire financial status.  The statements can be generally summarized as stating: (1) that Doral

13   Bank was in compliance with all regulatory requirements and was considered well-capitalized

14   under the two agreements with its regulators; (2) the amounts of its ALLL and PLLL and how the

15   Bank arrived at these figures; (3) that Doral was taking a more conservative approach with respect

16   to its ALLL model; (4) that there was a material weakness in its internal controls over financial

17   reporting relating to the completeness and valuation of its ALLL and PLLL, but the Bank was

18   remedying the problem; (5) that all financial statements were in compliance with GAAP; and (6)

19   that the tax receivable of almost $230 million from the 2012 Closing Agreement was greatly

20   benefiting the bank and boosting its capital**.**  (See, e.g., Docket No. 53 ¶¶ 137-39, 143-49, 155-59.)

21        Examples of these statements are as follows:

22        1.   At the start of the class period, Defendants represented in Doral's 2011 annual
               SEC 10-K form, filed on March 30, 2012, that "[a]s of December 31, 2011,
23             Doral Bank was in compliance with all regulatory requirements" and "was
               considered a well-capitalized bank for purposes of [the FDICIA]."  (Id. ¶ 133.)
24

21

The 2011 10-K set forth Doral's and the Bank's regulatory capital ratios, in comparison to the requirements of the FDICIA, as significantly higher than the well capitalized minimum requirements. (Id.)

2.   The 2011 10-K also stated that Doral's provisions for loan and lease losses for the quarter and full year ended December 31, 2011 were $9.914 million and $67.525 million respectively, and Doral's ALLL was $102.609 million as of December 31, 2011. (Id. ¶ 137.)

3.   Defendants further disclosed in the 2011 10-K that Doral had "material weaknesses in [its] internal control over financial reporting" concerning the failure to "maintain effective controls over the completeness and valuation of its [ALLL] and the related [PLLL]." (Id. ¶ 103.) Specifically, the 2011 10-K explained that Doral had not maintained effective controls to reasonably assure: (1) that residential second mortgages and commercial real estate loan valuations were obtained and processed accurately so that the property value updates received were either reflected as charge-offs, or reflected in the ALLL in a timely manner; and (2) that the ALLL was adequately reviewed and the underlying data was properly reconciled. (Id.) As a result of the control deficiency, Doral had reduced the ALLL by $10.1 million in its 2011 financial statements from the amount previously reported in the Company's January 19, 2012 earnings release. (Id.)

4.   Defendants disclosed that they had "performed additional analysis and other post-closing procedures to ensure that the financial statements were prepared in accordance with [GAAP]" and concluded "that the financial statements included in [the 2011 10-K] fairly present[ed], in all material respects, the Company's financial condition . . . for the periods presented." (Id. ¶ 139.) Defendants also assured investors that Doral was "expeditiously" implementing a series of "remediation efforts" to address both material weaknesses. (Id. ¶ 104.)

5.   In its financial report on Form 10-Q for the first quarter of 2012, which was signed and certified by Defendants Wakeman and Walhman, Doral reported that it was in compliance with all applicable regulatory capital requirements, that it exceeded the thresholds for well-capitalized banks, that its performance for that quarter was primarily due to the income tax benefit from the 2012 Closing Agreement, and then explained the implications of the tax receivable. (Id. ¶¶ 148-49, 151.)

6.   On May 16, 2012, the day following the filing of the first quarter 10-Q, Defendants held a conference call with analysts and investors, during which Defendant Wakeman stated that "Doral is solid and is well positioned in the difficult Puerto Rico market" following "a substantial increase in capital, as well as a substantial increase in credit reserves." (Id. ¶ 155.) Wakeman provided additional commentary on the 2012 Closing Agreement, in pertinent part, as follows:

We reached an important agreement with the government of Puerto Rico regarding our deferred tax assets. The agreement covers the portion of the deferred tax assets that was created through a prior overpayment related to

Civil No. 14-1393 (GAG)

Doral's legacy trading business.  Now we have previously referred to this asset as the I/O VTA and over the past several months we worked with the government of Puerto Rico to simplify the tax agreement that was signed in 2005.

The new agreement replaces the old one and acknowledges the asset as what it, in fact, is – an overpayment of tax.  Therefore, the tax asset is now recognized as a receivable which is no longer tied to future earnings.

Now this is an important transaction for us and it produced two clear benefits in the first quarter.  The first benefit relates to earnings.  We eliminated a reserve of $112 million, which we had carried against this asset. This elimination of reserve flowed through our financial statements as a gain in the first quarter.

The second benefit relates to capital.  Under the previous agreement less than $10 million of the DTA was included in Tier 1 capital.  As the asset is now a receivable and no longer tied to future earnings, the entire amount of the asset, $223 million, is Tier 1 capital. (<u>Id.</u>)

7. Furthermore, in its first quarter 10-Q, Doral reported that the material weaknesses identified in the 2011 Form 10-K still had not been remediated and that although "the Company's disclosure controls and procedures were not effective as of March 31, 2013," and "[Doral] ha[d] identified . . . material weaknesses in its system of internal control over financial reporting," Defendants had "taken reasonable steps to ascertain that the financial information contained the in [the first quarterly report] was presented "in accordance with [GAAP]."  (<u>Id.</u> ¶¶ 105, 153.)

8. The second quarterly Form 10-Q contained a discussion substantially similar to one contained in its first quarterly form 10-Q, that stated that "[i]n the agreement, the Commonwealth of Puerto Rico states that as of March 26, 2012 it has a payable to Doral of approximately $230.0 million resulting from past Doral tax payments (prepaid tax), and that Doral has the right to use the amount due from the Commonwealth of Puerto Rico to offset future Doral tax obligations, or that Doral may claim a refund that the Commonwealth of Puerto Rico may pay over a five-year period[,]" and emphasizing that the "agreement clearly states and recognizes the source of the amount of past taxes paid by Doral, and the Commonwealth of Puerto Rico's obligation to return the overpayments to Doral." (<u>Id.</u> ¶ 169.)

9. The report also noted that Doral had adopted a "notably more conservative view of the financial effects of the current and estimated future economic and regulatory environment in which Doral's businesses operates" and that "during the first half of 2012, management reviewed its ALLL estimate assumptions and calculations and adopted a more conservative outlook as to future loan performance considering the uncertain economic and regulatory environments. The resulting changes in estimate are reflected in the June 30, 2012 allowance for loan and lease losses." (<u>Id.</u> ¶ 171.)

Civil No. 14-1393 (GAG)

Plaintiffs claim that all of the alleged statements were materially false and misleading because Defendants misrepresented and failed to disclose that:

(a) Defendants had inflated Doral's capital by deliberately understating Doral's ALLL and PLLL;

(b) numerous undisclosed problems undermined the accuracy of Doral's ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived;

(c) Doral and the Bank were not in compliance with the Consent Order and the Written Agreement, including those provisions related to the ALLL and loan review and appraisal programs;

(d) Doral's financial results, including its ALLL and PLLL, were not fairly presented in conformity with GAAP;

(e) the internal control deficiency that had resulted in the out-of-period adjustments was not an isolated issue, but instead, was indicative of systematic and widespread internal control deficiencies and numerous undisclosed problems that undermined the accuracy of Doral's ALLL and PLLL; and

(f) there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement and thus the Bank would not have adequate Tier 1 Capital to remain well-capitalized and comply with the Consent Order.

(See, e.g., id. ¶¶ 233, 235, 238, 240, 242, 244, 246, 248.)

Upon reviewing these allegations, due to Plaintiffs' thorough articulation of the time, place, and content of each statement, it becomes clear that this case in large part turns on the reasons why the statements are misleading. "A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it." New Jersey Carpenters, 537 F.3d at 45. For example, failing to disclose that Defendants had inflated Doral's capital by deliberately understating its ALLL and PLLL cannot constitute a material omission if the complaint does not sufficiently allege that Defendants did in fact intentionally understate the

Civil No. 14-1393 (GAG)

1   ALLL and PLLL.

2       The First Circuit has long required "a securities fraud plaintiff to explain why the

3   challenged statement or omission is misleading by requiring that the complaint . . . provide some

4   factual support for the allegations of the fraud." Greebel, 194 F.3d at 193 (internal quotation

5   marks omitted).  Indeed, in the present case, Plaintiffs argue that at the heart of their ALLL claim

6   is the "continued and pervasive ALLL-related problems that persisted [were] part of Defendants'

7   systematic fraud."  (Docket No. 58 at 27.)  As such, this requires Plaintiffs to "not only allege the

8   time, place, and content of the alleged misrepresentations with specificity, but also the factual

9   allegations that would support a reasonable inference that adverse circumstances existed at the

10  time of the offering, and were known and deliberately or recklessly disregarded by defendants."

11  Greebel, 194 F.3d at 193-94.

12      Therefore, because Plaintiffs rely upon Defendants' fraudulent scheme for the reasons why

13  the statements are alleged to be misleading, the court will assume, arguendo, that Defendants

14  engaged in the alleged scheme and then move onto the question of whether a jury reasonably could

15  find that said statements were false or misleading given the particular context alleged.  See Geffon

16  v. Micrion Corp., 249 F.3d 29, 36 n.6 (1st Cir. 2001) ("It is ultimately a question for the trier of

17  fact, here the jury, whether statements are false or misleading so as to be actionable under 10b–

18  5.").  The court will follow this structure because Plaintiffs use mostly the same alleged facts to

19  show that Defendants engaged in the fraudulent scheme as they do to support their claim of

20  scienter, i.e., that Defendants "made the challenged statements with a conscious intent to defraud

21  or with a high degree of recklessness." Abiomed, 778 F.3d at 241.  As such, to analyze the

22  purported fraudulent scheme and then later Defendants' state of mind in making those statements

23  would require a significant amount of overlap in the court's analysis.  The court will examine in

24

**Civil No. 14-1393 (GAG)**

more detail those statements that are alleged to be misleading based upon other statements made by Defendants.

In to moving to dismiss, Defendants do not challenge the particularity of Plaintiffs' articulation of the statements, nor do they challenge the materiality of them.  They do, however, argue that many the many disclosures Defendants made throughout the class period negates a jury's ability to find material misrepresentations of material facts or omissions.  (See Docket No. 56 at 8-38.)  With these thoughts in mind, the court will analyze the disclosures made to the public by Defendants during the class period.  The court notes, however, that for the sake brevity and because this case rests on scienter, it will not articulate the alleged statements in full.

    1. *Analysis of the Statements*

A fact is material if it there is a substantial likelihood "that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." In re Cabletron Sys., Inc., 311 F.3d at 34 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)).  "A statement can be 'false or incomplete' but not actionable 'if the misrepresented fact is otherwise insignificant.'" City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 756-57 (1st Cir. 2011).  In the present case, the Individual Defendants do not challenge the materiality of the aforementioned statements; rather, they challenge whether the statements indeed contained any misrepresentations and omissions.  Further, it is well-established that Section 10(b) does not create an affirmative duty to disclose any and all material information.  In re Genzyme Corp. Sec. Litig., 754 F.3d at 41 (citing In re Bos. Scientific Corp. Sec. Lit., 686 F.3d 21, 27 (1st Cir. 2012)).  Rather, a duty to disclose information earlier omitted arises only where affirmative statements were made and the speaker "fail[ed] to reveal those facts that are needed so that what was revealed

Civil No. 14-1393 (GAG)

would not be so incomplete as to mislead." In re Genzyme Corp. Sec. Litig., 754 F.3d at 41. As such, "[e]ven a voluntary disclosure of information that a reasonable investor would consider material must be complete and accurate." Hill, 638 F.3d at 57 (internal quotation marks omitted). This obligation, however, "does not mean that by revealing one fact . . . , one must reveal all others that, too, would be interesting, market-wise; a company must reveal only those facts that are needed so that what was revealed would not be *so incomplete as to mislead.*" Id. (internal quotation marks omitted and emphasis in original).

<blockquote>
a.   **Failing to Disclose That Defendants Inflated Doral's Capital by Understating its ALLL.**
</blockquote>

Plaintiffs claim that each time Defendants commented on Doral's capital levels, specifically concerning its PLLL and ALLL, in the numerous annual and quarterly SEC filings, press releases, and conference calls, the description of its basis for determining the amount of those reserves and the amount themselves were materially false and misleading because Defendants misrepresented and failed to disclose that the ALLL and PLLL were deliberately understated. (E.g., Docket No. 53 ¶¶ 138, 147, 152, 160, 166, 172, 185, 190.) As discussed above in part V.A. of this opinion, whether the Defendants' failure to disclose that they inflated Doral's capital by deliberately understating its ALLL and PLLL constitutes a material omission requires an analysis of Plaintiffs' confidential source information and other scienter allegations. Therefore, for purposes of this section, the court will assume, arguendo, that the Individual Defendants did purposefully understate Doral's ALLL and PLLL levels.

Assuming that all of the Individual Defendants did indeed purposefully understate Doral's ALLL and PLLL and then submitted SEC filings followed by press releases and conference calls that discussed Doral's capital levels and leverage ratios as significantly higher than the well-capitalized minimum requirements without disclosing that those amounts and the descriptions of

Civil No. 14-1393 (GAG)

how they were obtained were flawed due to the Individual Defendants' fraud, the court finds that a jury reasonably could find that said disclosures were so incomplete as to mislead the public.  By representing to the public that Doral's capital levels, ALLL, and PLLL were all in good shape and describing how they achieved the amounts when in fact the Individual Defendants were fraudulently inflating these numbers, Plaintiffs allege actionable materially misleading statements. See Hill, 638 F.3d at 57 (noting "Rule 10b–5 requires that, when a company speaks, it cannot omit any facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" and that "[e]ven a voluntary disclosure of information that a reasonable investor would consider material must be complete and accurate").

The dispositive question concerns the Individual Defendants' state of mind at the time of making the disclosures, which the court will address, infra.

> **b.** **Misrepresenting and failing to Disclose Numerous Problems That Undermined the Accuracy of Doral's ALLL and PLLL**

The complaint also claims that Doral failed to disclose in its SEC filings, press releases, and conference calls throughout the class period the numerous problems that undermined its internal controls related to the accuracy of its ALLL and PLLL, including issues with the ALLL model and the loan and appraisal data from which the ALLL was derived.  (E.g., Docket No. 53 ¶¶ 138, 154, 166, 180, 190.)  Also at the heart of Plaintiffs' reasons as to why the statements were misleading are their allegations relating to the alleged fraudulent scheme to manipulate Doral's capital levels.  (Docket Nos. 58 at 25-26; 64 at 12-15.)  In moving to dismiss, not only do Defendants challenge the sufficiency of the fraud allegations, but they also posit that said claim is impossible to reconcile with the history of Doral's disclosures during the first half of the class period until March 13, 2013.  (Docket Nos. 56 at 12; 62 at 11-12.)  Specifically, Defendants highlight that Doral repeatedly disclosed at regular intervals up until it filed its 2012 Form 10-K

**Civil No. 14-1393 (GAG)**

report on March 13, 2013 that there were deficiencies in its ALLL procedures and calculations, as well as material weaknesses in its internal controls.  (Id.)  Plaintiffs respond by arguing that none of Defendants' disclosures revealed that the internal control deficiencies were far more systematic and widespread than portrayed because these problems resulted from Defendants' systematic fraudulent scheme.  (Docket Nos. 58 at 18-19; 64 at 12-13.)

> i.     Statements Made From April 2, 2012 to March 13, 2013

An examination of the disclosures reveals that until under March 13, 2013, the Individual Defendants did indeed disclose that there were material weaknesses in their internal controls over the completeness and valuation of its ALLL and PLLL.  For example, in the 2011 Form 10-K, Defendants disclosed:

> The Company did not maintain effective controls over the completeness and valuation of its allowance for loan and lease losses and the related provision for loan and lease losses . . . .  These control deficiencies could have resulted in a misstatement of the Company's allowance for loan and lease losses and the related provision for loan losses that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.  Accordingly, management has determined that these control deficiencies constitute material weaknesses.
>
> As a result of the existence of these material weaknesses, management has concluded that as of December 31, 2011 the Company did not maintain effective internal control over financial reporting based on the criteria established in Internal Control—Integrated Framework issued by the COSO.

(See Docket No. 56-4 at 26.)  Further, in its first, second, and third quarter financial results for the 2012 year, Defendants disclosed that there remained material weaknesses in its system of internal control over its financial reporting.  (Docket No. 53 ¶¶ 105-106, 153, 171, 173, 191.)

Plaintiffs point to their confidential source information to argue that the internal control deficiencies were far more systematic and widespread than disclosed.  (See Docket Nos. 58 at 27; 64 at 13.)  They further argue that said disclosures were rendered meaningless in light of

Civil No. 14-1393 (GAG)

Defendants' assurances to investors that they were "expeditiously" implementing a series of "remedial efforts" to address the deficiencies (see, e.g., id. ¶¶104), that the loan loss reserves were still adequate (see, e.g., id. ¶¶ 151, 155, 158-59, 267), and that the financial statements were presented in accordance with GAAP (see, e.g., id. ¶¶ 105, 153, 173, 191), when Defendants were in fact engaging in systematic fraud to deceive the investing public.  (Docket Nos. 58 at 25-27; 64 at 13-15.)

Accordingly, like the issue in part V.A.1.a. of this opinion, to address Plaintiffs' argument that these disclosures do not defeat its claims that Doral's statements were materially misleading, the court must analyze Plaintiff's scienter allegations.  See In re The First Marblehead Corp. Sec. Litig., 639 F. Supp. 2d 145, 155 (D. Mass. 2009) ("[a] plaintiff fails to plead an actionable § 10(b) claim predicated on the concealment of information if information was, in fact, disclosed"). Assuming, arguendo, that the Individual Defendants were engaging in the alleged fraudulent scheme, specifically concealing the extent of Doral's internal errors and capital levels, then a jury reasonably could find that Defendants' argument regarding its disclosures for this time period was merely "cautionary language" that would not counter the strong misleading language or that the extent of the underlying problems were not described in the those disclosures.[3]  If, however, Plaintiffs fail to sufficiently allege the existence of the fraudulent scheme and it appears that Defendants were just simply negligent in maintaining their internal financial controls, these disclosures could very well have covered their errors.  See Abiomed, 778 F.3d at 244 ("a company may behave 'irresponsibly' if it issues an ominous warning about an uncertain risk that 'had not

---

[3] To the extent that Plaintiffs analyze the "bespeaks caution" doctrine in their reply, the court notes that said doctrine is inapplicable to these statements because they are representations of present fact, as opposed to forward-looking statements.  See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 213 (1st Cir. 2005) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1213 (1st Cir. 1996) (distinguishing applicability of said doctrine to a statement that "has both a forward-looking aspect and an aspect that encompasses a representation of present fact" and concluding that the doctrine was inapplicable to the extent the statement "encompasses the latter representation of present fact").

**Civil No. 14-1393 (GAG)**

yet been adequately investigated'" (citing In re Boston Scientific Corp. Sec. Litig., 686 F.3d 21 (1st Cir. 2012) and New Jersey Carpenters, 537 F.3d at 58)).

ii.      Statements Made From March 13, 2013 to March 18, 2014

With respect to the statements made in the 2012 Form 10-K until the end of the class period, Defendants readily concede that the effectiveness of ALLL-related internal controls ultimately proved incorrect and thus admit that those statements during the second half of the class period were in large part false and misleading.  (Docket No. 62 at 12.)  In the 2012 Form 10-K filed on March 13, 2013, Defendants proclaimed that the problems with its internal financial control and procedures had "been remediated" and "[Doral's] internal control over financial reporting [was now] effective." (Docket No. 53 ¶¶ 107, 212.)  Defendants continued to report the purported effectiveness of Doral's overall internal financial controls and procedures in SEC filings until the end of the Class Period.  (See, e.g., id. ¶¶ 227, 241-43, 261-63.)  Then, on November 5, 2013, Doral announced that it had to make out-of-period adjustments impacting its ALLL going back to the 2012 Form 10-K dates.  (Docket No. 53 ¶ 261.)  Thereafter, on March 18 and 21, 2014, disclosed again there was a material weakness in its internal control relating to the underlying data and mathematical model supporting its ALLL and PLLL going back to the third quarter ending on September 30, 2012 Form 10-Q.  (Id. ¶ 112-13, 269-274.)  Therefore, there is no doubt that a jury reasonably could find that these statements were indeed materially false and misleading.

Defendants argue, however, that Plaintiffs have not sufficiently pleaded that the Individual Defendants knew that these statements were false when they were made.  (Id. at 13.)  This issue will be addressed when the court examines Plaintiffs' scienter allegations, infra.

Civil No. 14-1393 (GAG)

          **c.**     **Misrepresenting and Failing to Disclose That Doral Was Not in Compliance With the Consent Order and the Written Agreement and That Doral's Financial Results Were Not Fairly Presented in Conformity With the GAAP**

Plaintiffs also claim Defendants' statements misrepresented that Doral was in compliance with the Consent Order and Written Agreement because Defendants were manipulating and/or misrepresenting the capital levels by understating the ALLL and PLLL and failing to disclose the risk of non-payment of the tax receivable. (Docket Nos. 53 ¶¶ 185, 190, 196; 58 at 24.) As such, the court must analyze Plaintiffs' fraud allegations first, but assuming that the allegations are sufficient, then the court holds that a jury reasonably could find that when Defendants were representing that they were "line-by-line" in compliance with the agreements, this information was indeed false and misleading.

With respect to Plaintiffs' claims that Defendants misrepresented that Doral's financial results were presented in conformity with GAAP, Defendants argue that these claims fail due to the general nature of the allegations. (Docket No. 62 at 20.) Defendants cite to the established principle that "the complaint must describe the [GAAP] violations with sufficient particularity; 'a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation.'" Greebel, 194 F.3d at 203. In response, Plaintiffs argue that they are not alleging that Doral's loan loss reserves were false because of alleged GAAP violations, but, rather, that Doral's statements about its compliance with GAAP were false and misleading because Defendants' reported ALLL metrics were false due to Defendants' deliberate understatement and rendered inaccurate by numerous undisclosed problems with both ALLL methodology and inputs, as confirmed by their confidential witnesses. (Docket Nos. 58 at 23-24; 64 at 14.)

Civil No. 14-1393 (GAG)

1    To the extent that Plaintiffs claim that Defendants' statements regarding their GAAP

2   compliance were false and misleading, once again, the court must analyze Plaintiffs' fraud

3   allegations to decide whether a jury reasonable could find in favor of the Plaintiffs.  If the court

4   were to assume, arguendo, that Plaintiffs sufficiently allege the purported fraudulent scheme, then

5   the court has no doubt that a jury reasonably could find that said statements concerning Doral's

6   GAAP compliance were materially false and misleading.

7           **d.    Misrepresenting and Failing to Disclose That There Was a
                    Material Risk That the Treasury Department Would Seek to Void**
8           **      the 2012 Closing Agreement**

9           The discussion of whether Defendants failed to disclose the material risk that the Treasury

10  Department would seek to void the 2012 Closing agreement when repeatedly discussing the impact

11  of the almost $230 million tax receivable requires a greater detailed examination.  Plaintiffs allege

12  that the Individual Defendants knew of the risk throughout the class period and that by including

13  the tax receivable into its Tier 1 capital and then discussing the positive impact of the 2012 Closing

14  Agreement in almost all of its SEC filings, press releases, and conference calls, the Individual

15  Defendants were materially misleading the investing public when they failed to disclose the risk.

16  (E.g., Docket No. 53 ¶¶ 130-132.)   Defendants, in moving to dismiss, argue two points: (1)

17  Plaintiffs fail to allege that there was such a real material risk to disclose because the Puerto Rico

18  courts have already held that Defendants did not intentionally misrepresent information to void the

19  2012 Closing Agreement; and (2) they actually disclosed the risk that Doral's regulators might

20  challenge the use of the tax receivable in its Tier 1 capital, thereby rendering all of their statements

21  not misleading or false.  (Docket Nos. 56 at 16-21; 62 at 11-16.)

22

23

24

Civil No. 14-1393 (GAG)

1

> i.   Whether Plaintiffs Fail to Allege That There Was a Real Material
>       Risk to Disclose

2

3      The court will first address the facts alleged by Plaintiffs and the Commonwealth of Puerto

4  Rico court decisions affecting this issue.   Plaintiffs allege that in May, 2014, the Treasury

5  Department challenged the legitimacy of that Agreement by informing Doral that it believed that

6  Defendants had falsely represented the balance of amortization of the original $889,723,361

7  deferred tax asset and thereby obtained a larger tax receivable than it was entitled.  (Docket No. 53

8  ¶ 126.)   The Department claimed that the true balance of amortization at the time of the 2012

9  Closing Agreement was $652,463,797, as opposed to the $766,280,289 that Doral had represented

10  when executing the agreement.   (Id.)   It further claimed that Doral had improperly added

11  $113,816,492 in net operational losses (consisting of the amount of the deferred tax asset that

12  Doral had not been able to amortize) to the actual unamortized balance of $652,463,797.  (Id. ¶

13  127.)   As such, the Treasury Department asserted that if the actual unamortized amount of

14  $652,463,797 had been used to calculate the tax receivable, Doral would have been entitled to

15  $195,793,139, rather than $229,884,087, amounting to a difference of $34,144,948.  (Id.)  Further,

16  the Treasury Department claimed that Doral was not entitled to the tax receivable because it did

17  not actually overpay its taxes in the amount of $152 million and that it had falsely represented that

18  the $229,884,087 amount of the tax receivable corresponded to an overpayment of taxes by Doral.

19  (Id. ¶ 128.)   As such, the Treasury department decided to declare the 2012 Closing Agreement

20  null due to its determination that the Agreement was "the result of an illicit pretense or artifice."

21  (Docket No. 62-1 at 8.)

22      Thereafter, on June 5, 2014, Doral filed suit against the Treasury Department in Puerto

23  Rico's Court of First Instance, requesting a declaratory judgment that the 2012 Closing Agreement

24

Civil No. 14-1393 (GAG)

and the tax receivable resulting from it were both valid.[4]  (Docket No. 56-1 at 3.)  After a three-day

hearing, the trial court held, inter alia, that "[t]he evidence presented demonstrates that Doral did

not make false representations to the Department of the Treasury at the time of executing the 2012

Closing Agreement" and that it was entitled to the almost $230 million tax receivable.  (Id. at 48.)

The Treasury Department then appealed to the Puerto Rico Court of Appeals and on

February 25, 2015, the Court of Appeals reversed the trial court.  (Docket No. 62-1 at 44.)  The

Court of Appeals held that the evidence presented to the trial court revealed "that there was

misrepresentation of the nature of the taxes paid by Doral before 2012," namely, the claimed

overpayment of $152 million, and that "[t]he documentary evidence supports that there was no

such overpayment, [the] reason for which the falsity of such a relevant fact is ground[s] for

invalidating the 2012 Agreement."  (Id. at 31.)  Further, the court held that "Doral knew that the

unamortized base [number of $766,280,289] given to the Department of Finance included [net

operational losses]" but that the evidence "does not permit the conclusion that Doral falsified an

essential fact about this item" because "the [net operational losses], as a potential benefit derived

from the right to amortize conferred on Doral the possibility of obtaining additional tax benefits

that could [have been] the subject of negotiations between the parties."  (Id. at 37.)  Despite

holding that the evidence revealed that Doral misrepresented that it had overpaid $152 million in

---

[4] When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "[t]he court is not limited to the four corners of the complaint."  Wright & Miller, Federal Practice and Procedure: Civil 3d § 1357 (2013).  A court may take judicial notice of matters of public record in resolving such a motion, which may include a decision of a sister court, without converting the motion into one for summary judgment.  Berrios-Romero v. Estado Libre Asociado de Puerto Rico, 641 F.3d 24, 27 (1st Cir. 2011); Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008); see also Lamar v. Micou, 114 U.S. 218, 223, 5 S. Ct. 857, 29 L. Ed. 94 (1885) ("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.").  Accordingly, in light of the recent decisions by the Commonwealth courts regarding the facts of this case, the court incorporates the holdings of these cases into Plaintiffs' complaint in considering Defendants' motion to dismiss.  The court may properly take judicial notice of this decision because the same is not an unfair surprise to any of the parties, as they all discussed the decision in their briefs to this court.  See Giragosian, 547 F.3d at 66 (noting consideration of state-court judgment in resolving a Rule 12(b)(6) motion to dismiss is entirely proper when the parties were given an opportunity to address the decision).

Civil No. 14-1393 (GAG)

taxes, the Court of Appeals did not overrule the trial court's finding that Doral did not *intentionally* misrepresent this information.  (See id. at 14.)  The Court of Appeals rested its holding on the provision of the Puerto Rico Internal Revenue Code that entitles a contracting party to contest the validity of a taxation agreement "upon a showing of . . . a misrepresentation of a material fact."  (Id. at 12-14.)  The finding of a misrepresentation of a material fact in this context, the court emphasized, does not require a finding of intent to provide false information; it merely requires an analysis of "whether the fact in question is important enough to drive a reasonable person to state their consent, independently of the other party's intention."  (Id. at 14.)

In light of the Puerto Rico Court of Appeals holding that "that there was misrepresentation of the nature of the taxes paid by Doral before 2012," and that "[t]he documentary evidence supports that there was no such overpayment, [the] reason for which the falsity of such a relevant fact is ground[s] for invalidating the 2012 Agreement," it is apparent that a jury reasonably could not only find there was such a material risk present during the class period but that by not informing the investing public about this risk, the aforementioned statements were misleading. (Docket No. 62-1 at 31.)  Although Defendants were not required to accuse themselves of wrong doing, once they chose to speak on numerous occasions about the benefits of the tax receivable, including numerous assurances that Doral was in good shape financially because of this tax receivable, the duty arose to disclose such information so to not render those statements misleading.   See Hill, 638 F.3d at 57 ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action."); In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993) ("[a] duty to disclose arises whenever secret information renders prior public statements materially misleading").  However, because the Court of Appeals did not opine on the

Civil No. 14-1393 (GAG)

Individual Defendants' knowledge or reckless disregard of this misrepresentation, the court will

address Plaintiffs' additional allegations in the complaint in the scienter discussion, infra.

ii.    Whether Defendants Actually Disclosed The Risk

With respect to Defendants' disclosure argument, they posit that they did indeed disclose

the risk that Doral's government regulators might reduce all or a portion of the increase to Doral's

Tier 1 capital caused by the 2012 Closing Agreement.  (Docket Nos. 56 at 17-18; 62 at 11-16.)

Specifically, Defendants point to the following disclosures made in the 2011 Form 10-K filed at

the beginning of the class period:

> Governmental agencies that have supervisory authority over the Company and
> Doral Bank can review the quality of our Tier 1 capital and may determine to
> reduce all or a portion of the increase to our Tier 1 capital caused by our agreement
> with the Commonwealth of Puerto Rico regarding our deferred tax asset.  We
> recently entered into an agreement with the Commonwealth of Puerto Rico in
> which the Commonwealth of Puerto Rico recognized a prepayment of income taxes
> of approximately $230 million from us relating to our past overpayment of taxes.
> We believe that this agreement will result in an increase in our reported Tier 1
> regulatory capital by approximately $200 million.  The Federal Reserve and the
> Federal Deposit Insurance Corporation have supervisory oversight authority over
> the Company and Doral Bank, including the quality of our Tier 1 regulatory capital,
> and as such there can be no assurance that the Federal Deposit Insurance
> Corporation or Federal Reserve may not seek to reduce in the future our Tier 1
> regulatory capital including the increase caused by the agreement with the
> Commonwealth of Puerto Rico.  If either regulatory agency reduces our Tier 1
> regulatory capital our operations may be materially adversely effected.

(Docket No. 56 at 18 (citing 56-4 at 16.))  Plaintiffs respond by arguing that this generic disclosure

was incomplete and inadequate to address the material risk that due to Defendants' inaccurate

information given to the Treasury Department when executing the 2012 Closing Agreement, there

was a risk that the Department would nullify that Agreement.  (Docket Nos. 58 at 32-34; 64 at 16-

17.)  Specifically, they argue that unlike in other cases in which the courts found that Defendants

"explicitly" disclosed the specific alleged omission at issue, see Abiomed, 778 F.3d at 243; First

Marblehead, 639 F. Supp. 2d at 154-60, here, while Doral initially disclosed the fact that the FDIC

37

Civil No. 14-1393 (GAG)

might not allow it to include the Tax Receivable in its Tier 1 Capital, Defendants did not disclose the real risk that the Closing Agreement might be voided or rescinded by the Treasury Department due to Doral's misrepresentations made *at the time the agreement was executed*.  (Docket No. 64 at 11, 16-17.)  Plaintiffs further point to the numerous times that Defendants stated that Doral's capital was well in excess of the required levels and made assurances regarding the availability to "pull down" capital the holding company to the Bank if needed.  (Docket No. 58 at 31.)

      With respect to this disclosure argument, the court agrees with Plaintiffs that although Doral made a disclosure in its 2011 Form 10-K concerning the fact that its regulators might reduce its Tier 1 capital based upon its use of the tax receivable, it did not explicitly disclose the material risk that the Treasury Department would challenge the validity of the Closing Agreement.  See Geffon v. Micrion Corp., 249 F.3d 29, 33 (1st Cir. 2001) ("When a corporation does make a disclosure . . . there is a duty to make it complete and accurate.").  More so, Defendants relied upon the almost $230 million tax receivable to assure investors that the bank was financially sound on numerous occasions, thus hammering away at the reliability of the tax receivable.  These facts, taken as a whole, could lead a jury to reasonably find that Doral's disclosures were materially misleading despite the cautionary language articulated above.  See Hill v. State St. Corp., No. 09-12146, 2011 WL 3420439, at *18 (D. Mass. Aug. 3, 2011) (noting "bespeaks caution" doctrine that holds "if a statement is . . . accompanied by prominent cautionary language that clearly disclaims or discounts the drawing of a particular inference, any claim that the statement was materially misleading because it gave rise to that very inference may fail as a matter of law," does not, "universally immunize a party that sprinkles its statements with some cautionary language. Rather, it simply instructs that a statement or omission be considered in context.").  The issue of

Civil No. 14-1393 (GAG)

whether Defendants had the requisite state of mind when making these statements will be discussed next.

B.    Whether the Complaint Sufficiently Alleges Actionable Scienter

As exhaustively noted above, this case boils down to whether the complaint sufficiently alleges with particularity that the Individual Defendants intended to defraud the investing public. In support of this claim, Plaintiffs point to their allegations that Defendants engaged in the purported fraudulent scheme to inflate Doral's capital.

Rule 9(b) requires that, in alleging fraud, the plaintiff must state with particularity the circumstances constituting the fraud. U.S. ex rel. Gagne v. City of Worcester, 565 F.3d 40, 45 (1st Cir. 2009). This standard means that a complaint must specify 'the time, place, and content of an alleged false representation." Id. (internal quotation marks omitted); see also Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004) (noting that Rule 9(b) requires the plaintiff "to specify the who, what, where, and when of the allegedly false or fraudulent representation"). As such, "[c]onclusory allegations . . . are not sufficient to satisfy Rule 9(b)." Gagne, 565 F.3d 40, 45 (1st Cir. 2009). The PSLRA imposes a separate rigorous pleading standard on allegations of scienter. See Greebel, 194 F.3d at 195. "Scienter is a mental state embracing intent to deceive, manipulate, or defraud." City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 757 (1st Cir. 2011) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)). "A complaint will survive a motion to dismiss only if it states with particularity facts giving rise to a 'strong inference' that defendants acted with a conscious intent 'to deceive or defraud investors by controlling or artificially affecting the price of securities' or 'acted with a high degree of recklessness.'" Abiomed, 778 F.3d at 240 (quoting Water Corp., 632 F.3d at 757). "Recklessness,

Civil No. 14-1393 (GAG)

as used in this context, 'does not include ordinary negligence, but is closer to being a lesser form of intent.'" Abiomed, 778 F.3d at 240 (quoting Greebel, 194 F.3d at 188).

A plaintiff must allege facts that allow for a strong inference of scienter that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). "When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." Abiomed, 778 F.3d at 240 (quoting Water Corp., 632 F.3d at 757). Furthermore, scienter must be evaluated with reference to the complaint as a whole as opposed to in piecemeal allegations. Tellabs, 551 U.S. at 322-23 (holding that courts should determine whether all of the factual allegations "taken collectively" give rise to a "strong inference of scienter," not whether any individual allegation, scrutinized in isolation, meets that standard). "There is no set pattern of facts that will establish scienter; it is a case-by-case inquiry." Abiomed, 778 F.3d at 241. Despite this strict pleading requirement, a complaint may pass muster under the PSLRA "when some questions remain unanswered, provided the complaint as a whole is sufficiently particular." In re Cabletron Sys., Inc., 311 F.3d at 32.

Furthermore, the First Circuit has held that with respect to allegations deriving from confidential witnesses, the courts must "look at all of the facts alleged to see if they 'provide an adequate basis for believing that the defendants' statements were false.'" New Jersey Carpenters, 537 F.3d at 51 (quoting Cabletron, 311 F.3d at 29, which in turn quoted Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)). "[T]here is no requirement that [the confidential witnesses] be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." New Jersey Carpenters, 537 F.3d at 51. "This involves an evaluation, inter alia, of the

Civil No. 14-1393 (GAG)

level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Id.

Finally, under the PSLRA, Plaintiffs are required to plead particularized facts that support a strong inference of scienter with respect to each Individual Defendant. See 15 U.S.C. § 78u-4(b)(2); Stumpf v. Garvey, No. 02-1335, 2005 WL 2127674, at *11 (D.N.H. Sept. 2, 2005); In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 263 (S.D.N.Y. 2004).

    1.    *Deliberately Understating the ALLL*

Plaintiffs support their claim that Defendants fraudulently inflated the Bank's capital ratios by understating its ALLL primarily through the accounts of four former employees of Doral, referred to as the formal employees ("FEs"). FE1 was Doral's Principal Accounting Officer and a Senior Vice President from September, 2011 through March 15, 2012. (Docket No. 53 ¶ 34.) FE1 reported directly to Defendant Wahlman and regularly attended meetings with other Doral executives, including the Individual Defendants. (Id.) FE2 was a Vice President who worked at Doral from August, 2012 through April, 2014, and was involved with Doral's financial reporting and regulatory compliance. (Id. ¶ 35.) FE2's responsibilities included, inter alia, assisting in the preparation of SEC filings, regulatory reports, and reports provided to Doral's executive management, including the Individual Defendants. (Id.) FE2 reported directly to Doral's Principal Accounting Officer, a position held by Nancy Reinhard, who is presently Doral's acting CFO, from September 20, 2012 though the end of the class period. (Id.) FE3 was employed by Doral as a Senior Credit Risk Analyst from September, 2012 through July, 2013. (Id. ¶ 36.) FE3 aided in the creation of presentations made on a monthly and quarterly basis to Doral's Board of Directors, as well for Doral's Risk Policy Committee and the ALLL Committee. (Id.) FE4 worked at Doral as a Vice President of Commercial Administration from approximately June, 2012 until August,

Civil No. 14-1393 (GAG)

2013.  (Id. ¶ 37.)  In that position, FE4 was responsible for, among other things, updating policies and procedures related to Doral's commercial real estate business.  (Id.)

According to FE1, Defendants' scheme to inflate Doral's capital ratios began even before the class period.  (Id. ¶ 83.)  During a January 11, 2012 meeting held to discuss Doral's fourth quarter and full-year 2011 financial results that was attended by FE1, Defendants Wahlman and Ubarri, among others, Wakeman stated, "I want our leverage ratio over nine percent even if that means booking assets in later periods."  (Id.)  Plaintiffs claim that Wakeman's statement directing Doral's senior management to "book[] assets in later periods" to achieve a specific Tier 1 Leverage Ratio gives rise to a strong inference that Doral's Tier 1 Leverage Ratio reported in Doral's 2011 Form 10-K for the year ending December 31, 2011 was knowingly manipulated.  (Id.)

Moreover, both FE1 and FE2, believed and suggested that Doral was constantly altering its ALLL model not to make sound methodological changes because it needed to be updated, or because its inputs were changing, but rather to achieve the desired result of maintaining the ALLL at as low a level as possible.  (Id. ¶¶ 84, 86.)  In FE1's opinion, Defendants kept Doral's ALLL low in order to indirectly bolster Doral's capital ratios.  (Id. ¶ 87.)  FE1 stated that Defendant Wahlman, who had daily involvement with Doral's ALLL model, was constantly pushing through changes to the model.  (Id.)  FE1 further stated that Doral's Chief Risk Officer expressed concern regarding the calculation of the ALLL and that the employee in charge of running the ALLL model also expressed to FE1 that he was very uncomfortable with the model and the constant changes made to the ALLL by Defendant Wahlman, but felt that he had to do what Wahlman directed.  (Id. ¶ 85.)

Furthermore, FE1 reported that management frequently discussed making changes to Doral's ALLL model in connection with discussing Doral's capital levels.  (Id. ¶ 87.)  FE2 stated

**Civil No. 14-1393 (GAG)**

that the ALLL greatly impacted Doral's capital ratios because the ALLL affected Doral's balance sheet assets and likewise acknowledged that Defendants understated Doral's ALLL during the class period in order to achieve the desired regulatory capital ratios. (Id.) FE3 similarly expressed the belief that Doral found ways to justify reporting numbers in a manner that benefited the company, although the numbers were not supported by any analytical tools. (Id. ¶ 88.) According to FE3, Defendants moved assets around to justify Doral's ALLL because if loan losses were higher, Doral would have had to increase its ALLL, which in turn would have impacted the capital ratios. (Id.) FE3 commented that if Doral had used proper methodologies, it would have become illiquid. (Id.) FE2 was also directed throughout the class period to provide calculations of Doral's capital ratios to its CFO on a monthly and bi-monthly basis. (Id. ¶ 89.) FE2 believed that the frequent calculations were an effort to determine whether moving receivables and calculating the capital ratios at different time intervals would generate more favorable ratios. (Id.)

### 2. *Concealing Internal Control Flaws*

According to FE1, even before the class period began, Doral's ALLL was based on outdated property appraisals and that Defendants intentionally delayed obtaining up-to-date property appraisals, creating a significant issue with the accuracy of the ALLL. (Id. ¶¶ 91-92.) FE1 explained that because the property values input into Doral's ALLL model were outdated, thus higher than they should be due to declining property values in Puerto Rico, the resulting ALLL was understated. (Id. ¶ 92.) For example, FE1 reported that Doral had a large land portfolio with a fair value significantly below the carrying value of the loans, but Defendants did not adjust its value because they did not want to account for the decline by increasing the ALLL, which would have resulted in lower reported earnings and capital ratios. (Id.)

Moreover, according to FE1, when appraisals were completed, the updated property values

Civil No. 14-1393 (GAG)

were often purposely not recorded.  (Id. ¶ 93.)  FE1 reported that loan processors were specifically instructed by the Senior Vice President of Doral's loan processing group (who reported directly to Defendant Wakeman) not to input updated property appraisals if they were below a certain level, and not to input any significant declines in property values.  (Id.)  According to FE1, this practice was brought to Defendant Wahlman's attention in January 2012, shortly before the start of the Class Period, but Wahlman instructed that the data should not be touched.  (Id.)  Consequently, Doral's ALLL remained understated during the Class Period.  (Id.)  FE1 further stated that the problems with appraisals were well-known to Doral executives, including Wakeman and Wahlman.  (Id.)

FE4 stated that appraisals continued to be delayed during the class period and that during the second half of 2012, few problematic commercial real estate loans were being addressed, which contributed to the understatement of Doral's ALLL.  (Id. ¶ 95.)  FE2 explained that problems existed with both the underlying loan data from which the ALLL was calculated, and with the model itself.  (Id. ¶ 96.)  According to FE2, Doral's ALLL model needed to be completely overhauled.  (Id.)  But instead of doing so, Defendants only made minor adjustments in response to problems caught by Doral's regulators.  (Id.)

FE2 further stated that the underlying loan data used to calculate Doral's ALLL was unreliable, in part because crucial loan data was systematically missing or was incorrect in the loan files.  (Id. ¶ 97.)  FE2 reported, for example, that when borrowers failed to make timely balloon payments on loans (and instead continued to make the regular loan payments), the loans should have been recorded as delinquent, but were not.  (Id.)  FE2 also reported that during the class period, Doral conducted a review of a sample of loans that uncovered numerous systematic and widespread errors, including incorrect coding, missing information, such as the collateral type, and

Civil No. 14-1393 (GAG)

properties recorded as owner-occupied that were not.  (Id. ¶ 98.)  Although the sample review uncovered widespread errors, FE2 stated that Doral did not take the actions necessary to respond to or remedy the errors discovered because Defendants did not want to spend the necessary resources.  (Id.)  Furthermore, according to FE2, while management was preparing Doral's 2013 Form 10-K, an error was discovered in the ALLL model.  (Id. ¶ 99.)  Once the error was corrected, management was unhappy with the resulting impact on the ALLL, and subsequently adjusted the ALLL to achieve a more favorable figure.  (Id.)  FE2 expressed concerns to Doral's Principal Accounting Officer, Nancy Reinhard, that the ALLL calculation was inaccurate and the entire model needed to be overhauled, but Reinhard refused to have the ALLL model reworked.  (Id.)

Like the intentional failure to update property appraisals described by FE1, the issues with Doral's ALLL during the Class Period went well beyond mere errors and problems.  (Id. ¶ 100.) For example, FE2 reported that Doral altered its assumptions for non-performing loans during the Class Period to add an extra four days to the ninety-day non-payment deadline at which a loan was classified as non-performing.  (Id.)  FE2 explained that this change was made to delay the time when Doral had to reverse the accrued interest on non-performing loans, and to keep the ALLL as low as possible.  (Id.)  FE2 stated that while the change appeared minor, it had a notable impact in furthering those objectives.  (Id.)  Even worse, in March, 2013, FE3 was tasked with developing a forecast for expected mortgage loan charge-offs for 2013, which FE3 explained would in turn be used to establish Doral's ALLL.  (Id. ¶ 101.)  FE3 developed a forecast, but was subsequently instructed by the Chief Risk and Credit Officer to modify the projection to a lower figure that FE3 believed was impossible to achieve based upon the actual charge-offs to date.  (Id.)

> 3.   *Scienter Allegations Concerning the Tax Receivable*

Plaintiffs claim that Defendants were aware of these risks throughout the class period,

Civil No. 14-1393 (GAG)

given the significance of the tax receivable to Doral's regulatory capital ratios (and thus, its overall operations), and Defendants' regular communications with the Treasury Department.  (Docket No. 53 ¶ 131.)   According to FE2, Doral's Vice President of Tax, George Scopetta, met with representatives from the Treasury Department at least bi-monthly during the class period.  (Id.) FE2 further stated that Defendants knew there was a risk that the Treasury Department would not pay Doral the tax receivable due to the financial instability of the Puerto Rican Government.  (Id. ¶ 132.) FE2 also explained that there were internal discussions at Doral each quarter about whether to continue to include the tax receivable in the Company's Tier 1 Capital.  (Id.)  Many of these discussions were held at the executive level at audit committee meetings, which were attended by FE2's direct supervisor, Nancy Reinhard.  (Id.)  FE2 also was involved in quarterly discussions with Reinhard and Doral's CFO regarding whether to continue to include the tax receivable in Doral's Tier 1 Capital.  (Id.)  According to FE2, by early 2014, the FDIC was also closely scrutinizing Doral's inclusion of the tax receivable in its Tier 1 Capital.  (Id.)  None of this was disclosed to investors.  (Id.)

### 4.   *Additional Scienter Allegations*

Plaintiffs argue that "Defendants, by virtue of their receipt of information reflecting the true facts regarding Doral, their control over, and/or receipt and/or modification of Doral's allegedly materially misleading statements and/or their associations with [Doral] which made them privy to confidential proprietary information concerning Doral, were active and culpable participants in the fraudulent scheme alleged herein."  (Id. ¶ 290.)  Plaintiffs also claim that because of the Individual Defendants' positions within Doral, they controlled and were provided access to the documents alleged to be false or misleading, and also had access to non-public information.  (Id. ¶ 292.)  As such, Plaintiffs claim that each Individual Defendant is responsible

Civil No. 14-1393 (GAG)

for the accuracy of Doral's statements and thus liable for the misrepresentations.  (Id.)  They also point to the internal reporting structure of Doral and the high ranking positions that the Individual Defendants held as more evidence of scienter.  (Id. ¶ 297.)

In addition, according to FE2, monthly management reports were distributed to, among others, Wakeman, Doral's CFO (Wahlman, Ivanov, or Hoosten), Poulton and Ubarri.  (Id. ¶ 299.) Among other information, the monthly management reports included income statements, balance sheets, deposit activity, and loan activity reports.  (Id.)  FE2 also stated that, beginning in January 2013, in addition to regular quarterly reports required by the FDIC and the FRBNY, the FDIC required Doral to submit weekly and monthly reports, which were also submitted to the FRBNY. (Id.)  The weekly reports detailed Doral's liquidity, loans (including loans due to be funded and loans due to be paid off), receivables, deposits and any exposure to the government of Puerto Rico. (Id. 300.)  Then, beginning in January 2014, FE2 explained that the FDIC required daily reports detailing Doral's liquidity.  (Id. ¶ 301.)  These reports were reviewed by Defendant Hoosten prior to being sent to the FDIC and the FRBNY.  (Id.)  Doral's Principal Accounting Officer, Reinhard, also reviewed these reports prior to their filing.  (Id.)  FE2 believed that all of this additional reporting was required by the FDIC because of the tenuous financial condition of Doral, as well as the Puerto Rico government, which was a concern in light of Doral's substantial reliance on the Tax Receivable to satisfy its capital requirements.  (Id.)

5.  *Trading by Insiders and Salary Increases*

Lastly, Plaintiffs argue that the Individual Defendants were motivated to engage in this fraudulent course of conduct to allow certain defendants to sell their company common stock. Plaintiffs highlight that between August 30 and September 11, 2013, Defendants Ivanov, Poulton, and Ubarri collectively sold unusual quantities of Doral common stock as evidence of scienter.

Civil No. 14-1393 (GAG)

(Id. ¶¶ 302-303.)  In that time period, those defendants sold 16,305 shares of their personally-held Doral common stock for proceeds of $387,168.  (Id. ¶ 302.)  On August 28, 2013, Poulton sold 10,000 shares, amounting to 20.33% of his shares, for $239,900 in proceeds.  (Id.)  On August 30, 2013, Ivanov sold 2,705 shares, which amounted to 100% of his total holdings, for $63,568 in proceeds.  (Id.)  Then, on September 11, 2013, Ubarri sold 3,600 shares, amounting to 11.60% of his total holdings, for $83,700 in proceeds.  (Id.)  Plaintiffs claim that these sales are suspicious because they were made while Defendants were in possession of material, non-public information about the understatement of Doral's ALLL and the inflation of its capital ratios.  (Id. ¶ 303.)  They further claim that the sales are unusual because previously, no Doral insiders had made any sales of Doral common stock since November 1, 2006—nearly seven years earlier.  (Id.)

Plaintiffs also allege that the 2012 Closing Agreement, and corresponding improvement to Doral's capital ratios, provided a justification for increasing the Individual Defendants' salaries. (Id. ¶ 304.)  On April 16, 2012, shortly after Doral entered into the Closing Agreement, the Board of Directors approved salary increases for four of the Individual Defendants: increasing Wakeman's annual salary by $250,000, to $1.25 million; increasing Wahlman's annual salary by $50,000, to $500,000; increasing Ubarri's annual salary by $50,000, to $450,000; and increasing Poulton's annual salary by $100,000, to $500,000.  (Id.)

C.    The Particularity of the Fraud Pleadings

Defendants challenge Plaintiffs' pleading of this fraudulent scheme by arguing, inter alia, that: (1) Plaintiffs' allegations lump together the Defendants and do not sufficiently plead as to each individual defendant; (2) the allegations regarding the Defendants as a whole are insufficiently pleaded under the strict 9(b) standard; (3) some of the communications alleged occurred prior to the class period and thus must be disregard; (4) FE1 was not an employee during

48

**Civil No. 14-1393 (GAG)**

the class period and thus his or her allegations should be disregarded; (5) remaining FEs have not alleged to have had any contact with any of the Individual Defendants and, as such, their accounts are not entitled to any merit; and (6) that the Court of Appeals decision does not address Defendants' intent to defraud the Treasury Department.  (See Docket Nos. 56 at 24-40; 62 at 16-19, 21-28.)  In response, Plaintiffs argue: (1) the accounts of the FEs do indeed provide credible information; (2) the pre-class period facts provided by FE1 are probative of Doral's scheme; (3) the Court of Appeals decision renders Defendants' defense futile; and (4) that the facts pleaded sufficiently allege that Defendants knew of the material risk that the 2012 Closing Agreement would be voided.  (See Docket Nos. 58 at 36-41; 64 at 1-2, 9-12.)

> 1.  *Manipulation of the ALLL and PLLL*

Upon applying these standards to the facts detailed above, the court finds that Plaintiffs' allegations regarding Wakeman and Wahlman's participation in the fraudulent scheme by knowingly manipulating the ALLL and PLLL that was reported in the numerous SEC filings, conference calls, and press releases are sufficient to meet the heightened pleading standards of Rule 9(b) and the PSLRA for scienter.  With respect to Wakeman, Plaintiffs provide a specific description of a statement made by him during a January 11, 2012, which is alleged by FE1, Doral's Principal Accounting Officer and a Senior Vice President from September, 2011 through March 15, 2012.  (See Docket No. 53 ¶¶ 34, 83.)  In that meeting, Wakeman allegedly stated: "I want our leverage ratio over nine percent even if that means booking assets in later periods." (Id. ¶ 83.)  Plaintiffs claim that Wakeman's statement directing Doral's senior management to "book[] assets in later periods" to achieve a specific Tier 1 Leverage Ratio gives rise to a strong inference that Doral's Tier 1 Leverage Ratio reported in Doral's 2011 Form 10-K was knowingly manipulated.  (Id.)

**Civil No. 14-1393 (GAG)**

Furthermore, Plaintiffs allege that the Senior Vice President of Doral's loan processing group, who reported directly to Wakeman, instructed loan processors to not input updated property appraisals if they were below a certain level and not to input any significant declines in property values.  (Id.)  Notably, FE1 was in a senior management position and is alleged to have had ongoing contact with the Individual Defendants by directly reporting to Wahlman and regularly attended meetings with other Doral executives, including the Individual Defendants.  (Id. ¶ 34); see Abiomed, Inc., 778 F.3d at 245 (noting factors such as a confidential witness's position in senior level management and ongoing contact with other senior management are important in evaluating such sources).  By describing the statement in detail, the time it was made, and the context in which it was made, Plaintiffs have sufficiently pleaded a compelling inference that Wakeman likely knew that the Tier 1 Leverage Ratios reported in the 2011 Form 10-K was not accurate. Although Ubarri was allegedly present at that January 11 meeting, which allows for an inference that Ubarri knew of the purported fraudulent scheme, the lack of other allegations tying him to the scheme tends to weigh against a strong inference of his knowledge and participation in the scheme.

Moreover, when taking those allegations in conjunction with fact that on April 16, 2012, the Board of Directors of Doral approved a $250,000 salary increase for Wakeman, to bring his salary up to $1.25 million, see Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002) (noting motive and opportunity may be added to the mix of facts to show a strong inference of scienter), that as the CEO, President, and Director of the Bank, Wakeman controlled and was provided access to the documents alleged to be false or misleading, and also had access to non-public information, the court finds that there is a strong inference of scienter on his part.  Although courts have rejected "general inferences that the defendants, by virtue of their position within the company, 'must have known' about the company's problems when they undertook allegedly

**Civil No. 14-1393 (GAG)**

fraudulent actions," Lirette, 27 F. Supp. 2d at 283 (citing Maldonado v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)), these have been in cases wherein the plaintiff's scienter allegations rest *solely* on said inferences.  Furthermore, Wakeman participated in almost all of the statements that Plaintiffs claim to have been materially false and misleading.

To the extent that Defendants argue that all of FE1's allegations must be disregarded because he did not work for Doral during the class period, the court notes that courts have held that a "witness need not have been at the company for [the entirety], or indeed any, of an asserted class period to have probative information."  See Simon, 37 F. Supp. 3d at 515.  The relevant statement made by Wakeman was concerning the 2011 Form 10-K which reached the market on Monday, April 2, 2012—the first day of the class period.  (Docket Nos. 53 ¶ 133; 58 at 24.)  As such, insofar as Defendants argue that this particular statement must be disregarded because it was made prior to the beginning of the class period, the court finds it probative because it affected the public disclosures that reached the market during the class period.

Turning to Wahlman, Plaintiffs allege, through the reports of FE1, that during the class period, Doral's ALLL was based on outdated property appraisals and that loan processors were specifically instructed by the Senior Vice President of Doral's loan processing group, who reported directly to Wakeman, not to input updated property appraisals if they were below a certain level and not to input any significant declines in property values.  (Docket No. 53 ¶ 93.)  Notably, FE1 alleges that this practice was brought to Wahlman's attention in January 2012, shortly before the start of the class period, but Wahlman instructed that the data should not be touched.  (Id.)  The allegation that Wahlman instructed that the data not be touched despite being told that it was based upon outdated appraisals, allows for the inference that Wahlman knew that Doral's ALLL was being intentionally understated during the period of time before the release of the 2011 Form 10-K.

Civil No. 14-1393 (GAG)

But see In re Pharm., Inc. Sec. Litig., No. 04-12581-GAO, 2007 WL 951695, at *12 (D. Mass. Mar. 28, 2007) (holding that something more is required to show scienter than the alleging that a confidential witness informed management that the company's pricing structure was significantly flawed to support an allegation that management itself knew the structure to be flawed).

Furthermore, FE1 stated that Doral's Chief Risk Officer expressed concern regarding the calculation of the ALLL and that the employee in charge of running the ALLL model also expressed to FE1 that he was very uncomfortable with the model and the constant changes made to the ALLL by Defendant Wahlman. (Docket No. 53 ¶ 85.)  Plaintiffs further allege that Wahlman had daily involvement with Doral's ALLL model and was constantly pushing through changes to the model. (See id. ¶ 87.)  Although they fail to articulate when and how Wahlman was changing the ALLL model, when considering these allegations in conjunction with the rest, the inference of Wahlman's involvement in the fraudulent scheme becomes stronger.  Lastly, when taking into account Wahlman's salary increase of $50,000 to $500,000 during the class period, his high ranking positions of CFO, Chief Investment Officer, Chief Accounting Officer, an Executive Vice President, and a Director of the Bank throughout the class period, the court finds a strong inference of his involvement in the alleged fraudulent scheme.

To the extent that Defendants argue that more concrete information must be provided, such as written proof, the court reminds the parties of the procedural posture of this case. See In re Cabletron Sys., Inc., 311 F.3d at 33 (noting that "the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence").  That being said, the court notes that it did not consider conclusory allegations such as that FE1 stated that the problems with appraisals were well-known to Doral executives, including Wakeman and Wahlman. (Id. ¶ 93.)  In making such allegations, Plaintiffs are merely generally alleging culpability on part of the Individual

Civil No. 14-1393 (GAG)

Defendants—something that the PLSRA was enacted to prevent.  See part IV of this opinion; Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998) ("To satisfy Rule 9(b) [with respect to matters particularly within the opposing party's knowledge], the allegations must be accompanied by a statement of facts upon which the belief is founded.")

The remainder of the allegations with respect to the other Individual Defendants, however, fall short of the pleading requirements of Rule 9(b) and the PSLRA.  Said allegations group all of the Individual Defendants together generally without specifically referring to each one of them and are generally conclusory by failing to specify the what, where, and when of the alleged fraud.[5]  See 15 U.S.C. § 78u-4(b)(2); Stumpf, 2005 WL 2127674, at *11; In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d at 263.  For example, almost all of the allegations state that "Doral" or "Defendants" were frequently discussing changes to Doral's ALLL model in connection with its capital and they were moving assets around to keep the ALLL low.  (See, e.g., Docket No. 53 ¶¶ 87-89, 97-98.)

Moreover, when alleging why the collective Defendants were changing the model, FE1 and FE2 stated that they "believed and suggested" that Defendants were doing this to achieve the desired result of maintaining the ALLL at as low of a level as possible.  (Id. ¶¶ 84, 86.)  Such vague information and belief allegations by a confidential source does not provide a high level of detail nor does it indicate a sign of reliability on part of those witnesses.  See In re Cabletron Sys.,

---

[5] Although the First Circuit has not taken a position on attributing all statements to the defendants as collective actions without considering the liability of each individual defendant, known as the group pleading doctrine, there is considerable debate about the doctrine's continued existence after enactment of the PSLRA.  Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 93 (1st Cir. 2008).  However, even if the court was to apply the group pleading doctrine to this situation, "[t]o plead properly within the group pleading doctrine, a plaintiff must plead with particularity that each individual officer knew of the fraud."  In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 341 (D. Mass. 2002); In re Stone & Webster, Inc., Sec. Litig., 253 F. Supp. 2d 102, 112 (D. Mass. 2003).  As the court finds that Plaintiffs have failed to sufficiently plead that each Individual Defendant knew of the scheme to deliberately understate Doral's ALLL and PLLL, the allegations are insufficient regardless of the application of the doctrine.

Civil No. 14-1393 (GAG)

Inc., 311 F.3d at 28 (citing ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002) (noting that "for allegations made on information and belief, the plaintiff must . . . state with particularity all facts on which that belief is formed, *i.e.,* set forth a factual basis for such belief") and Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir. 1991) ("Where allegations of fraud are . . . based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief.").

Further bolstering the court's conclusion is the fact that neither FE2, FE3, nor FE4 are alleged to have any contact or communications with the Individual Defendants throughout the class period.  (See Docket No. 53 ¶¶ 84, 86-89, 94-101.)  Despite alleging that the Individual Defendants knew that Doral's underlying loan data was systematically incorrect and that they failed to fix the deficiencies, Plaintiffs do not allege that any of the FEs learned of this information from attending any meetings with the Individual Defendants, discussed these issues with any of them, or reviewed any documents regarding these issues.  See In re Gentiva Sec. Litig., 971 F. Supp. 2d 305, 324 (E.D.N.Y. 2013), on reconsideration in part (Dec. 10, 2013) (holding that scienter allegations were insufficient as a matter of law because plaintiffs alleged no direct contact between confidential witnesses and defendants) (citing In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011)); City of Roseville Employees' Ret. Sys. v. Sterling Fin. Corp., 963 F. Supp. 2d 1092, 1136 (E.D. Wash. 2013) (holding that "generic allegations that 'everyone knew' are insufficient, because they do not establish that the [confidential witnesses] 'were in a position to gain personal knowledge of what Defendants saw, knew, or thought'").  To the extent that Plaintiffs also allege that FE2 expressed his or her concerns regarding the widespread errors to Nancy Reinhard, the court notes that said executive is not a defendants in this case.  As such, this allegation is not probative information for whether the Individual Defendants intentionally

Civil No. 14-1393 (GAG)

understated Doral's ALLL during the class period or whether some of them knew that others were engaging in such a scheme.

Moreover, although the complaint includes some additional allegations of scienter, and the court is aware of its duty to take into account the entirety of the allegations, see Tellabs, 551 U.S. at 322-23, because the court finds that the allegations with respect to the Individual Defendants' participation in the alleged fraudulent scheme are particularly weak and circumstantial, the additional scienter allegations do not strengthen Plaintiffs' case.   Specifically, frequent and extensive reports between management of Doral and its regulators does not suggest that the Individual Defendants were engaging in a fraudulent scheme.   If anything, it would seem to suggest that the increased regulation of their actions would motivate them to not engage in fraud. See Seaman v. California Bus. Bank, No. 13-02031, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014) (noting the fact that defendant company "was subject to a consent order, and was being closely monitored by the FDIC, does not give Defendants a *greater* motive to lie or be reckless in its statements about the adequacy of its loan loss reserves.  If anything, it would tend to suggest the opposite.").  Indeed, as Plaintiffs explain, both the Consent Order and Written Agreement required that Doral provide its regulators with regular reports and that it develop a comprehensive ALLL methodology and periodically review it.   As such, generally pleading that Defendants were frequently making changes to the ALLL model is consistent with the requirements of those agreements.  (See Docket No. 53 ¶ 87-89.)

Lastly, to the extent that Plaintiffs point to unusual insider trading by Ivanov, Poulton, and Ubarri, the court finds these allegations to be particularly weak as well, even when taken in conjunction with the complaint as a whole.  Although allegations of insider trading may be used to support a theory of fraud, see New Jersey Carpenters, 537 F.3d at 55; Boston Scientific Corp., 523

Civil No. 14-1393 (GAG)

F.3d at 92, it is interesting that the defendants who sold their shares during the class period had so little alleged involvement in this case.  Indeed, Ivanov is alleged to have signed only a single Form 10-Q and neither Poulton nor Ubarri are alleged to have made a single statement to the investing public, other than Poulton preparing the investor presentation attached to Doral's March 21, 2014 Form 8-K.  (See Docket No. 53 ¶ 272.)  The First Circuit has held that insider trading done by one executive cannot allow for a strong inference of scienter on part of other executives.  See New Jersey Carpenters, 537 F.3d at 56 ("'even unusual sales by one insider do not give rise to a strong inference of scienter' when other insiders had not engaged in suspicious trading during the class period").  More so, with the exception of Ivanov, who allegedly sold all of his shares, Poulton and Ubarri only sold 20.33% and 11.60% of their shares in Doral respectively.  (See Docket No. 53 ¶ 302.)  Selling such a small amount does not suggest that Poulton and Ubarri were selling stocks due to their knowledge of the impending demise of Doral.

In short, Plaintiffs' allegations through the confidential witnesses and additional scienter allegations do not allow for a strong inference of scienter by the individual defendants Ivanov, Hooston, Ubarri, and Poulton to defraud investors with respect to the deliberate understatement of Doral's ALLL and PLLL.  Although "'the PSLRA does not require plaintiffs to plead evidence,'" Hill, 638 F.3d at 56, when examining the complaint as a whole, the court finds that the allegations appear to be almost entirely circumstantial, with the exception of Wakeman and Wahlman.

2.   *Concealing the Material Risk that the Department Would Seek to Void the 2012 Closing Agreement*

The court next turns to the question of whether Plaintiffs sufficiently allege that Defendants knew that there was a material risk that the Treasury Department would seek to void the 2012 Closing Agreement.  Although the court has taken judicial notice that there was indeed a material

**Civil No. 14-1393 (GAG)**

risk that the Department would seek to void the 2012 Closing Agreement, Plaintiffs fail to sufficiently plead that the Individual Defendants were aware of the risk and the Puerto Rico courts' decisions do not hold as such.  Plaintiffs point to the significance of the tax receivable to Doral's regulatory capital ratios, Defendants' regular communications with the Treasury Department, the financial instability of the Puerto Rican Government, that there were internal discussions at Doral each quarter about whether to continue to include the tax receivable in the Company's Tier 1 Capital, and that by early 2014, the FDIC was also closely scrutinizing Doral's inclusion of the tax receivable in its Tier 1 Capital.  (Docket No. 53 ¶¶ 131-32.)  These allegations do not plead with particularity nor do they allow for a strong inference that any of the Individual Defendants were indeed aware of the misrepresentation made to the Treasury Department.  For example, insofar as Plaintiffs argue that the Individual Defendants must have known about the misrepresentations to the Treasury Department because the tax receivable was so critical to Doral's core operations, the courts have only found this to be significant where there are other specific factual allegations providing an independent basis to infer that the defendants had notice of the wrongdoing.  See Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012) (rejecting application of "core operations" they absent independent specific allegations concerning knowledge of wrongdoing).  Compare Crowell v. Ionics, Inc., 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (applying core operations doctrine to attribute knowledge of fraud to defendants where there was an email pointing to the company's vice president as the author of the scheme) with Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 183 n.9 (D. Mass. 2012) (same District Judge who presided over Crowell finding the core operations theory inapplicable in an accounting fraud case because the facts were "less clear" than the "particularized facts" of Crowell).

Furthermore, merely alleging that "Defendants knew there was a risk that the Treasury

Civil No. 14-1393 (GAG)

Department would not pay Doral the Tax Receivable due to the financial instability of the Puerto

Rican Government" (Docket No. 53 ¶ 132) is exactly the type of conclusory allegation that the

PSLRA sought to disallow.  Ezra Charitable Trust v. Tyco Int'l Ltd., 466 F.3d 1, 12-13 (1st Cir.

2006) ("[s]imply pleading that the defendant knew of the falsity, without providing any factual

basis for that knowledge, does not suffice"); Maldonado, 137 F.3d at 12 ("the pleading of scienter

'may not rest on a bare inference that a defendant 'must have had' knowledge of the facts'").

More so, alleging that Defendants' scienter is evident from the fact that Doral's Vice President of

Tax, George Scopetta, met with representatives from the Treasury Department at least bi-monthly

during the class period does not provide the court with any information as to what was even

discussed during those meetings.  It does not provide any insight as the Individual Defendants'

knowledge of the misrepresentation or culpability in discussing the tax receivable during the class

period.  Lastly, to the extent that Plaintiffs allege that the fact that something turned out badly must

mean that the Individual Defendants knew earlier that it would turn out badly, the court rejects any

argument of fraud by hindsight.  See Boston Scientific Corp., 523 F.3d at 91.

> 3.   *Conclusion Regarding Scienter*

In sum, Plaintiffs have sufficiently pleaded scienter with respect to defendants Wakeman

and Wahlman's actions concerning the ALLL claim.  As such, each time Wakeman and Wahlman

commented on Doral's capital levels, specifically concerning its PLLL and ALLL, failed to

disclose the numerous problems that undermined its internal controls related to the accuracy of its

ALLL and PLLL from April 2, 2012 through March 3, 2013, stated that the SEC filings were

adhering to GAAP, and stated that Doral was in compliance with the Consent Order and Written

Agreement, they were issuing statements that a jury reasonably could find to be misleading.

With respect to the remaining defendants, however, Plaintiffs fail to plead their

Civil No. 14-1393 (GAG)

involvement in the purported fraudulent scheme with the particularity required under Rule 9(b) and the PSLRA.  While the allegations might amount to mere negligence on part of the remaining defendants, they are not enough to show that said defendants intentionally manipulated Doral's internal control systems and its ALLL models and that any of the Individual Defendants knew of the risk that the 2012 Closing Agreement would be voided—both claims being the foundation for Plaintiffs' cause of action.  See Abiomed, 778 F.3d at 246 (citing Greebel, 194 F.3d at 188) ("[A]llegations of corporate mismanagement are not actionable under Rule 10b-5.  Nor are allegations of mere negligence.").  Although prior to the enactment of the PSLRA, these sort of allegations would have most certainly passed the 12(b)(6) threshold, such is no longer the case. Further, unlike past securities fraud cases that have been adjudicated by this court, in the present case, Plaintiffs have failed to plead with particularity that what the remaining defendants were doing was indeed fraud, as opposed to mere corporate negligence.  See Hoff v. Popular, 727 F. Supp. 2d 77, 92-93 (D.P.R. 2010) (GAG); Fox v. First BanCorp, No. 05-2148 GAG, 2006 WL 4128534, at *9 (D.P.R. Nov. 6, 2006).

Lastly, and notably, the allegations contained in the complaint are likely sufficient to amount to a claim against Doral itself.  However, as discussed above, the present motion to dismiss is analyzed only as to the Individual Defendants at this stage due to the stay as to Doral.  It is also worth noting that although it is clear from the 2014 disclosures that the members of Doral made many mistakes throughout the class period, the First Circuit has made clear that "[n]ot all claims of wrongdoing by a company make out a viable claim that the company has committed securities fraud." Abiomed, 778 F.3d at 231.

Civil No. 14-1393 (GAG)

1   D. <u>Loss Causation</u>

2   The court must next turn to Defendants' challenge to the loss causation element with

3 respect to Wakeman and Wahlman.  A plaintiff bringing a claim under Rule 10b-5 must plead loss

4 causation, that is, that the "defendants' misrepresentations 'caused the loss for which the plaintiff

5 seeks to recover.'"  <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S. 336, 345-46, 125 S. Ct. 1627, 161 L.

6 Ed. 2d 577 (2005); <u>see also</u> 15 U.S.C. § 78u-4(b)(4).  "[U]nlike elements of a § 10(b) claim such

7 as fraud and scienter, however, neither Federal Rule of Civil Procedure 9(b) nor the [PSLRA]

8 require that securities fraud plaintiffs plead loss causation with specificity."  <u>Hoff</u>, 727 F. Supp. 2d

9 at 94 (internal quotation marks omitted) (citing <u>Dura</u>, 544 U.S. at 347, 125 S. Ct. 1627).

10 Therefore, it "should not prove burdensome for a plaintiff who has suffered an economic loss to

11 provide a defendant with some indication of the loss and the causal connection that the plaintiff

12 has in mind."  <u>Dura</u>, 544 U.S. at 347, 125 S. Ct. 1627; <u>see also</u> <u>Colon v. Diaz–Gonzalez</u>, 2009 WL

13 3571974, at *6 (D.P.R.2009) ("the loss causation pleading requirements should be interpreted so as

14 not to impose a significant burden on plaintiffs").  Moreover, "[d]isputes about loss causation turn

15 primarily on questions of fact."  <u>Hoff</u>, 727 F. Supp. 2d at 94 (citing <u>Wortley v. Camplin</u>, 333 F.3d

16 284, 295 (1st Cir. 2003)).

17   The complaint alleges that when Defendants' misrepresentations and fraudulent conduct

18 were disclosed to investors and the market, Doral's common stock plummeted as a direct result.

19 (Docket No. 53 ¶¶ 269-73, 306-15.)  Specifically, Plaintiffs aver that when Doral announced on

20 March 18, 2014 that it needed to delay the filing of its annual 10-K report for the year ending

21 December 31, 2013 due to "a material weakness in its internal control over financial reporting as

22 of December 31, 2013, related to the review of the underlying data and mathematical model

23 supporting its [ALLL] and the related [PLLL]," and admitted that its "internal control over

24

Civil No. 14-1393 (GAG)

financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013," the price of Doral common stock fell $1.13 per share, or more than 9%, from a closing price of $12.30 per share on March 17, 2014, to close at $11.17 per share on March 18, 2014.  (Id. ¶¶ 112, 269-70, 308.)  Thereafter, in response to the release of Doral's 2013 10-K that indicated it had understated its ALLL and needed to make a substantial out-of-period increase to its PLLL, suffered from widespread internal control deficiencies, and had not addressed the problems with its ALLL policy and methodology as required by the Consent Order and the Written Agreement, the price of Doral common stock tumbled 6.8%, from a closing price of $11.55 per share on Friday, March 21, 2014, to close at $10.76 per share on Monday, March 24, 2014.  (Id. ¶¶ 274; 309-11.)

The stock continued to decline over the next four trading days, as the market digested these adverse announcements, closing at $8.59 per share on March 28, 2014—a total decline of 25.6%.  (Id.)  Finally, Plaintiffs aver that when Doral disclosed on May 1, 2014 that the FDIC was no longer allowing the Bank to include the almost $230 million tax receivable in its Tier 1 capital, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014, on unusually heavy trading volume of more than 2.37 million shares traded—erasing more than $141 million in market capitalization from the stock's class period high.  (Id. ¶¶ 275-77, 315.)

The court finds that these allegations sufficiently provide Defendants with "some indication of the loss and the causal connection that the plaintiff has in mind."  Dura, 544 U.S. at 347, 125 S. Ct. 1627.

E.    Control Person Liability under Section 20(a)

Section 20(a) of the Securities Exchange Act imposes joint and several liability on any person who "directly or indirectly, controls any person liable under any provision of this chapter."

**Civil No. 14-1393 (GAG)**

15 U.S.C. § 78t(a).  Liability under Section 20(a) is secondary, and cannot exist without first establishing the primary liability of the company or its insiders.  See <u>Abiomed</u>, 778 F.3d at 246; <u>ACA Fin.</u>, 512 F.3d at 67-68.   Plaintiffs make no allegations that allow the court to infer that either Ivanov, Hooston, Ubarri, or Poulton directly or indirectly controlled Wakeman or Wahlman.  As such, Plaintiffs' control person liability claim fails as a matter of law.  Furthermore, Plaintiffs have failed to establish scienter with respect to Ivanov, Hooston, Ubarri, and Poulton, and thus have failed to plead primary liability under its 10b-5 claim, which leads to the inability to establish secondary liability under section 20(a).  See <u>Abiomed</u>, 778 F.3d at 246.

## VI.   Conclusion

In sum, in light of the aforementioned reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss at Docket No. 56 as to the Individual Defendants.  Accordingly, the case against Wakeman and Wahlman continues, but is dismissed as to the remaining defendants.

Although Plaintiff's case proceeds exclusively against defendants Wakeman and Wahlman, they should nonetheless consider that, at this juncture, Doral is bankrupt.  Contrary to earlier similar class action cases before the undersigned such as those involving Banco Popular and First Bank, there is presumably no deep pocket for the putative class to recover, should a judgment befall in its favor.  Thus, the court highly suggests that Plaintiffs at this time strongly consider proceeding individually versus requesting that the class be certified.  More so, the court strongly suggests that the parties seriously consider settlement alternatives at this time, once the case is referred to the Magistrate Judge Bruce J. McGiverin for the initial scheduling conference.

Civil No. 14-1393 (GAG)

1    **SO ORDERED.**

2    In San Juan, Puerto Rico this 22nd day of July, 2015.

3                                              *s/ Gustavo A. Gelpí*
                                              GUSTAVO A. GELPI
4                                          United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24